1   Julie Cavanaugh-Bill, Nevada Bar # 11533
    CAVANAUGH-BILL LAW OFFICES. LLC
2   401 Railroad St., Ste. 307
    Elko, Nevada 89801
3   (775) 753-4357
4   julie@cblawoffices.org

5   Roger Flynn, Colorado Bar # 21078, *Pro Hac Vice*
    Jeffrey C. Parsons, Colorado Bar # 30210, *Pro Hac Vice*
6   WESTERN MINING ACTION PROJECT
7   P.O. Box 349, 440 Main St., #2
    Lyons, CO 80540
8   (303) 823-5738
    wmap@igc.org
9

10  Attorneys for Plaintiffs

11                     UNITED STATES DISTRICT COURT
12                         DISTRICT OF NEVADA
13

14  _____ )      Case No:
15  GREAT BASIN RESOURCE WATCH; and     )
    WESTERN SHOSHONE DEFENSE PROJECT,   )
16                                      )      FIRST AMENDED
                   Plaintiffs,          )      COMPLAINT FOR VACATUR,
17                                      )      EQUITABLE, DECLARATORY
                                        )      AND INJUNCTIVE RELIEF
18  vs.                                 )
19                                      )
    UNITED STATES DEPARTMENT OF THE     )
20  INTERIOR; U.S. BUREAU OF LAND       )
    MANAGEMENT; CASEY HAMMOND,          )
21  Acting Assistant Secretary; and JON D. SHERVE, )
    Field Manager of the BLM's Mount Lewis Field )
22  Office,                             )
23                                      )
                   Defendants.          )
24  _____ )

25
26
27
28

INTRODUCTION

1.      Plaintiffs, Great Basin Resource Watch (GBRW), Western Shoshone Defense Project (WSDP), and the Progressive Leadership Alliance of Nevada (PLAN) file this suit for vacatur, and equitable, declaratory and injunctive relief under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, Federal Land Policy Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 et seq., the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et. seq., the Stock Raising Homestead Act of 1916, 39 Stat. 865, 43 U.S.C. § 300 (historical)(SRHA), the President's Executive Order of April 17, 1926 establishing Public Water Reserve # 107 (PWR 107), other federal laws, and their implementing regulations and policies, challenging the decisions of the United States Department of the Interior (DOI) and its Bureau of Land Management (BLM) to approve the Mount Hope Project (Project or Mine), a large open pit mining project on public lands proposed by Eureka Moly, LLC (EML).[1]

2.      Plaintiffs challenge the Record of Decision (ROD) approving EML's Plan of Operations (PoO) for the Mine and related Plans of Development (PODs) and Rights-of-Way for electrical transmission lines (ROWs), and the corresponding Final Supplemental Environmental Impact Statement (FSEIS) BLM prepared for the Mine/ROWs.  The ROD was signed by Casey Hammond, Acting Assistant Secretary of the Interior on September 27, 2019, which approved the Project and its Plan of Operations, including the associated PODs/ROWs.  The ROD was based on the

---

[1] According to the company's website, General Moly, Inc. owns an 80% interest in the Mt. Hope Project "through the Eureka Moly LLC ("EMLLC") joint venture. General Moly's  "largest shareholder [is] AMER International Group ("AMER") of China." http://www.generalmoly.com/company/ (viewed October 30, 2019).  "POS-Minerals Corporation ('POS-M'), a wholly owned subsidiary of POSCO, the Korean steel company, owns the remaining 20% interest." http://www.generalmoly.com/news-release/general-moly-receives-federal-record-of-decision-for-the-mt-hope-molybdenum-project-in-nevada-provides-update-on-liquidity/ (viewed October 30, 2019).

FSEIS, which was issued in August of 2019 by BLM's Mt. Lewis Field Office and Jon D. Sherve, Field Manager for that Office.

3.  DOI/BLM's actions reviewing and approving the Project were previously found to be arbitrary and capricious and in violation of numerous federal laws, including NEPA and FLPMA, by the Ninth Circuit Court of Appeals in GBRW/WSDP's challenge to the previous Final EIS and ROD, issued in 2012 (2012 FEIS and 2012 ROD).  *See* Great Basin Resource Watch v. BLM, 844 F.3d 1095 (9th Cir. 2016).  As a result of the previous litigation, the 2012 ROD was vacated and remanded to BLM.

4.  Upon remand, DOI/BLM conducted further review of the Project.  According to DOI/BLM, the new ROD and FSEIS comply with the Ninth Circuit's decision and applicable federal law.  As shown herein, that is not the case.  DOI/BLM's ROD and FSEIS not only fail to comply with federal law and the Court's decision, but ignore critical new information that further exemplifies DOI/BLM's continued failure to meet the strict requirements of federal public land, mining, and environmental law.

5.  For these and the related reasons addressed herein, Plaintiffs ask this court to declare that the ROD, FSEIS, and Project/ROW approvals and decisions signed and prepared by DOI and BLM for the Project (including reliance on the still-inadequate 2012 FEIS upon which the new analysis and approvals rely on) are in violation of federal law.  Plaintiffs ask this court to set aside/vacate and remand the decisions to the DOI/BLM, and enjoin any construction, operation, or development of the Project pending compliance with federal law.

**Summary of BLM/DOI Permitting and Previous Litigation**

6.  "In June of 2006, Eureka Moly, LLC (EML) submitted a Plan of Operations (NVN- 082096) for the Mount Hope Project (Project) to the BLM, Mount Lewis Field Office of the Battle Mountain District, as required under 43 Code of Federal Regulations (CFR) § 3809 and § 3715.  In January of 2008, EML submitted a

Plan of Development (POD) for a long term right-of-way (NVN- 084632), and later a second POD for a short term right-of-way (NVN-091272), for a 230-kilovolt transmission line from the Machacek Substation to the Project substation located near the proposed mill.  A final Plan of Operations was submitted to the BLM in June of 2012 and approved on November 16, 2012." ROD at 2.

7.     NEPA requires federal agencies to prepare an Environmental Impact Statement (EIS) for any proposed major action that may significantly affect the quality of the environment.  42 U.S.C. § 4332(2)(C).  Accordingly, "The BLM prepared a Draft Environmental Impact Statement (DEIS) for the Project in December 2011 (BLM 2011) and FEIS in October 2012 (BLM 2012a). The BLM issued the *Mount Hope Project Record of Decision, Plan of Operations Approval, and Approval of Issuance of Right-of-Way Grants* (ROD) on November 16, 2012 (BLM 2012b)."  FSEIS at 1.

8.     The Project received strong objections from the U.S. Environmental Protection Agency (EPA), Eureka County, and the local ranching and farming communities, as well as Plaintiffs.  *See*, *e.g.*, 2012 FEIS Appendix H (summaries of public comment letters on Draft EIS).

9.     The Eureka County Commissioners highlighted the Project's severe impacts on ground and surface waters and BLM's failure to fully review and protect these resources:

> The affected natural resource that pervades the entire project and its surrounding environment is water. The DEIS's failure to treat this resource with requisite attention, detail, and quantification affects the sustainability of this resource on its own; but perhaps more importantly, **the failure to protect water produces a failure to protect resources critical to Eureka County agriculture and recreation and the health and wellbeing of the County residents.** The County highlights as an example the superficial treatment of proposed dewatering of Roberts Creek (including the corollary of increasing groundwater extraction to pipe that substitute supply into the creek as a mitigation measure).  The County questions the DEIS's assertion that reduction in creek flow will not become significant until the stream is completely dewatered; and the corollary suggestion that expanding

4

groundwater extraction, beyond that already specified for direct application to mining operations, and lacing the landscape with pipes, would provide worthy or effective mitigation.

February 28, 2012 letter from Eureka County to BLM, at 2 (Included in Appendix H to 2012 FEIS as comment # 803) (emphasis added).

10.    Due to the legal and factual deficiencies of the Draft EIS, the EPA determined that the Draft EIS contained "inadequate information" and requested that BLM prepare a revised or Supplemental Draft EIS instead of proceeding to issue the Final EIS. *See* March 28, 2012 EPA letter to BLM. BLM refused this request and issued the 2012 FEIS over EPA's objections.

11.    After the publication of the 2012 FEIS, EPA found it also to be legally deficient, and requested that BLM prepare a Supplemental Final EIS before approving the Project (i.e., issuing the ROD). *See* EPA letter to BLM, November 13, 2012. BLM again refused this request and shortly thereafter approved the Project via the issuance of the 2012 ROD on November 16, 2012.

12.    In addition to authorizing all operations in EML's mining plan, the 2012 ROD also determined the costs of EML's reclamation obligations, requiring a "financial guarantee amount [of] $73,360,363 for the 7,992 acres of surface disturbance on public and private lands associated with the first three years of operations for the Project (NVN-082096), as described in the Plan." 2012 ROD at 30.

13.    The 2012 ROD also required EML to establish a "Long Term Funding Mechanism (LTFM) … required for post-reclamation obligations (including long-term monitoring and mitigation) associated with the closure process of the Mount Hope Project." 2012 ROD at 31. "EML will fund the initial amount of the trust fund in the amount of $271,912. The initial funding amount was calculated based on the projected costs of implementing the above-described post-reclamation requirement for approximately

500 years.  Total cost of the mitigation and monitoring over the 500 year period is anticipated to be $83,202,396." Id.

14.     On December 17, 2012, GBRW/WSDP petitioned the Director of the Nevada BLM to reconsider the ROD and FEIS.  On January 4, 2013, the BLM State Director rejected GBRW/WSDP's petition.  On February 15, 2013, GBRW/WSDP filed its Complaint in this District Court challenging the agency's decisions.  On February 20, 2013, GBRW/WSDP filed their Motion for Preliminary Injunction ("PI") in order to protect public resources on Mt. Hope pending a ruling on the merits.  On August 20, 2013, the parties entered into a joint stipulation to stay consideration of the PI due to the fact that, as a result of the current and ongoing economic conditions involving the Project, all major ground-disturbing construction activities had ceased.  On August 22, 2013, the district court then denied GBRW/WSDP's PI Motion, without prejudice, and required EML to provide at least 60 days' notice to GBRW/WSDP before recommencing the ground disturbance work, with GBRW/WSDP reserving the right to re-file its PI Motion if needed.  The parties then agreed to a briefing schedule that would expeditiously resolve the case based on GBRW/WSDP's Motion for Summary Judgment.  Because EML never recommenced ground disturbance at the site, GBRW/WSDP did not re-file their PI Motion.

15.     Upon briefing, but without conducting any oral argument, the district court denied GBRW/WSDP's Motion for Summary Judgment on July 23, 2014.  GBRW/WSDP then appealed that denial to the Ninth Circuit.

16.     After briefing and oral argument, on December 28, 2016, the Ninth Circuit issued its decision, where it "AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED with instructions to vacate the record of decision and remand to the BLM." Great Basin Resource Watch, 844 F.3d 1095, 1111-12 (9th Cir. 2016).

17.     The ROD summarized the Ninth Circuit's decision:

[T]he court held that "the BLM's analysis of air impacts in the FEIS was inadequate because the agency did not provide any support for its use of baseline values of 'zero' for several air pollutants" and that "the cumulative impacts portion of the FEIS does not comply with NEPA [National Environmental Policy Act of 1969]" because it failed to quantify or fully discuss effects of certain other actions that potentially affect the air resource. The plaintiffs also raised on appeal the issue of whether the BLM had adequately considered impacts on land withdrawals and reserved water rights associated with PWR 107. The Ninth Circuit declined to address this claim before BLM had an opportunity to clarify the status of springs in the vicinity of the Project with respect to Public Water Reserves noting that the FEIS was "internally contradictory" and asked BLM to clarify its position. Accordingly, the Ninth Circuit affirmed in part, reversed in part, vacated in part, and remanded with instructions to vacate the record of decision and remand to the BLM.

On remand, the District Court entered an order approving the parties' stipulation that the ROD be vacated and the matter remanded to the BLM, based on the Ninth Circuit decision.

The BLM published the Draft SEIS (DSEIS) in February, 2019, and published the Final SEIS (FSEIS) in July, 2019 as a response to the Ninth Circuit's decision of December 28, 2016.

ROD at 4.

18.     The Ninth Circuit decision also held that "the analysis of ground water pumping in the FEIS does *not* take into account the roughly 200 gallons per minute needed to replace depleted spring and stream water." 844 F.3d at 1110 (emphasis in original). The additional water extraction was proposed by BLM as a purported mitigation measure for the lost stream and spring flows caused by the dewatering of the regional aquifer resulting from the Project's decades-long pumping operations.

19.     The Court rejected EML's argument that "the FEIS thoroughly analyzed the effect of using water from its production wells" to replace the waters eliminated by the dewatering, finding EML's "argument … factually incorrect." Id.

20.     The Court ultimately declined to rule on this NEPA claim "because the BLM's NEPA analysis is deficient in other respects, the ultimate disposition of this appeal does not depend on the resolution of this portion of Plaintiffs' NEPA claim." Id. at 1111.

7

21.     In addition to their comments submitted during the previous permitting process, GBRW/WSDP/PLAN submitted comments to BLM/DOI on the DSEIS (dated April 22, 2019), as well as on the FSEIS (dated September 18, 2019).  The EPA submitted comments during the previous BLM/DOI permitting review, as well as additional comments on the DSEIS and FSEIS (dated September 23, 2019).

22.     During the litigation, the Project never restarted as EML suspended operations. "EMLLC broke ground for the Project in early 2013 but stopped construction in mid-2013 due to unforeseen loss of Project funding. BLM was notified on October 29, 2013, that the Project was suspended." March 21, 2019 letter from Defendant BLM Mt. Lewis Field Office Manager Jon Sherve to EML (granting EML's request to terminate the pre-existing Long Term Funding Mechanism (trust fund) held by BLM to cover long-term reclamation).

23.     Also during the previous litigation, EML was found to be in noncompliance with the 2012 approval and was required to apply for an Amendment to its Plan of Operations:

> During the pendency of litigation while the ROD remained effective, EML began Project activities and created approximately 1,652 acres of surface disturbance related to mine development and construction. This disturbance typically consisted of topsoil clearing and grubbing in some areas, and only brush and vegetation clearing in others.

> In November 2013, the BLM issued a Noncompliance Order to EML for surface disturbance that occurred outside of the approved surface disturbance footprint, but still within the approved 2012 Plan boundary. The unauthorized disturbance totaled 153 acres and was generally associated with earthworks where powerlines, water lines, roads, collection channels, and ancillary facilities would be constructed.

> In response to the noncompliance order, and to address updated engineering designs for the Project, EML submitted an amendment to its approved Plan of Operations - The Mount Hope Project Plan of Operations Amendment and Application for Reclamation Permit Modification (Plan Amendment) (EML 2014). Complete details of the Plan Amendment are provided in Chapter 2 of the Mount Hope Project Amendment Environmental Assessment (EA) (BLM 2015a). In general, the amendment provided for sufficient additional surface disturbance acreage to account for the noncompliance issue and to facilitate minor

8

realignments/modifications to certain Project-related facilities. The acreage subject to surface disturbance within the Project boundary was increased by 365 acres to 8,618, and the Project boundary was increased by 180 acres to accommodate a repeater tower and associated access road (Figure 1.3.1).

The BLM issued a Decision Record and Finding of No Significant Impact on April 23, 2015, for the Mount Hope Project Amendment EA (BLM 2015b).

FSEIS at 4.

24.     In October and December of 2015, EML submitted another Amendment to its Plan of Operations, which requested that BLM's previous reclamation cost determinations in the 2012 ROD be reduced, such that EML would only be required to submit a financial guarantee for the reclamation obligations associated with ground disturbance that occurred in 2013 before operations were suspended. *See* EML's Mount Hope Project Plan of Operations Amendment and Application for Reclamation Permit Modification (December 2015). BLM (Field Manager Jon Sherve) granted that request in its Decision, Determination of Require Financial Guarantee, issued on December 21, 2015.

25.     Except for the Project operations/activities on the additional 365 acres of disturbance resulting from the 2013 Noncompliance Order and Amended Plan of Operations in 2014, the Project operations/activities (and their associated environmental impacts) approved in the ROD and reviewed in the FSEIS in 2019 are the same operations/activities (and their associated impacts) approved in the 2012 ROD and reviewed in the 2012 FEIS.

26.     "This FSEIS tiers from and updates the FEIS (BLM 2012a); as such, the FSEIS chapter numbers follow the organization of the FEIS. This FSEIS also tiers from the 2015 Plan Amendment EA (BLM 2015a) to the extent necessary to reflect minor boundary and design changes in the Project Plan of Operations. This FSEIS only includes information that has been added or revised to address the specific air quality and PWR 107 analyses identified above in Chapter 1.0." FSEIS at 4-5.

27.     After the issuance of the FSEIS in August 2019, DOI Assistant Secretary Hammond, on September 27, 2019, signed the ROD, approving operations under the mining Plan of Operations and PODs for the ROWs.

28.     Unlike the 2012 ROD, however, the new ROD did not make the reclamation cost determinations for the approved mine operations or the ROWs, or make any determination of the amount of the Long Term Funding Mechanism (LTFM).

29.     "This decision constitutes the final decision of the Department of the Interior and, in accordance with the regulations at 43 CFR 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 CFR Subpart 4.400.  Any challenge to this decision must also be brought in the Federal District Court." ROD at 27 (approving Plan of Operations); ROD at 29 (same, approving ROWs).

## JURISDICTION AND VENUE

30.     This is a suit pursuant to the APA, FLPMA, NEPA, the Executive Order establishing Public Water Reserve 107, the Stock Raising Homestead Act (SRHA), and other federal statutes, regulations and requirements.  Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question), § 2201 (declaratory relief), and § 2202 (injunctive relief).

31.     Venue is properly before the District of Nevada pursuant to 28 U.S.C. §§ 1391 (b) and (e).  The BLM Mt. Lewis Field Office, and named defendant Jon Sherve, who issued the 2012 FEIS, 2012 ROD and 2019 FSEIS, are located in Nevada.  The Mt. Hope Project is located in Eureka County, Nevada.  Plaintiffs GBRW, WSDP, and PLAN are located and reside in Nevada.

## PARTIES

32.     Plaintiff Great Basin Resource Watch (GBRW) is a nonprofit organization based in Reno, Nevada that is concerned with protecting the Great Basin's land, air, water, wildlife and communities from the adverse impacts of hardrock mining.  GBRW

10

members include ranchers, sportsmen, conservationists, and Native Americans dedicated to protecting the communities, land, air, water and Native American resources of the Great Basin.  Members of GBRW have used, enjoyed, and valued the area of the Project, including the Project site, for many years.  Members of GBRW utilize springs and waterholes on BLM land in Nevada for stockwatering and other water-related purposes.  Members of GBRW hike, view and photograph wild plant and animal life, and generally enjoy using the area of the Project for recreational, historical, conservation, and aesthetic purposes.  Members of GBRW intend on continuing to use and value the lands at, and affected by, the Project during 2019 and in future years.  These uses will be immediately, irreparably, and significantly harmed by the Project and related operations.

33.   Members of GBRW include ranchers and farmers living and working on, and owning, the closest private lands to the Project.  These members graze and water stock in the Mt. Hope area, and own water rights in the area and intend on continuing these uses as they have done since their families first homesteaded the area in the 1860s.  These uses will be immediately, irreparably, and significantly harmed by the Project, including the loss of public water reserves and the lands protected by PWR 107.

34.   GBRW and WSDP submitted comments to the BLM throughout the Defendants' review and permitting of the Project.  GBRW, WSDP, and PLAN together submitted two sets of joint comments in 2019 on the Draft and Final SEIS.

35.   Plaintiff Western Shoshone Defense Project (WSDP) is a nonprofit organization whose mission is to protect and preserve Western Shoshone rights and homelands for present and future generations based upon cultural and spiritual traditions.  WSDP and its members have concrete and significant interests in the lands affected by the

11

Project, and use these lands for traditional, cultural, and religious uses.  These interests will be negatively affected, and many will be eliminated, by the Project.

36.    Members of WSDP have used, enjoyed, and valued the area of the Project, including the Project site.  Members of WSDP utilize springs and waterholes on BLM land in Nevada for stockwatering and other water-related purposes.  Members of WSDP use the area of the Project for cultural, religious, historical, recreational, conservation, and aesthetic purposes.  Members of WSDP intend on continuing to use and value the lands at, and affected by, the Project during 2019 and in future years.  These uses will be immediately, irreparably, and significantly harmed by the Project and related operations.

37.    Plaintiff Progressive Leadership Alliance of Nevada (PLAN) is a nonprofit organization with offices in Las Vegas and Reno, Nevada, that works to hold mineral extraction companies accountable for their impacts to communities and the environment, and to protect Nevada's land, air, water, and cultural resources from adverse impacts caused by mineral extraction operations.  In 2019, PLAN submitted joint comments along with GBRW and WSDP to the BLM on the DSEIS and FSEIS.  PLAN was not a party in the previous federal court litigation regarding the Mt. Hope Mine.  PLAN was not involved with, nor participated in, any decisions or actions taken by GBRW or WSDP regarding the previous litigation over the Mt. Hope Mine.  Members of PLAN have used, enjoyed, and valued the area of the Project, including the Project site.  Members of PLAN hike, view and photograph wild plant and animal life, and generally enjoy using the area of the Project for recreational, historical, conservation, and aesthetic purposes.  Members of PLAN intend on continuing to use and value the lands at, and affected by, the Project in 2020 and in future years.  These uses will be immediately, irreparably, and significantly harmed by the Project and related operations.

38.     In addition, GBRW, WSDP, and PLAN, and their members, have been, and are being, irreparably harmed by BLM's failure to conduct a proper NEPA analysis and to fully involve the public, and GBRW/WSDP/PLAN and their members, in the required NEPA process.

39.     Defendant Bureau of Land Management (BLM) is an agency of the defendant United States Department of the Interior.  The Mt. Lewis Field Office of the BLM issued the 2012 FEIS, the 2012 ROD, and the 2019 FSEIS for the Project.  The BLM has oversight responsibility for the federal lands affected by the Project.  Defendant Jon Sherve, the Field Manager of the BLM Mt. Lewis Field Office, was the Authorized Officer for the FSEIS.  Defendant Casey Hammond is the Acting Assistant Secretary for Land and Minerals Management of the Interior Department, who signed the 2019 ROD on September 27, 2019.  They are sued in their official capacities.

**The Mount Hope Mine Project and Its Severe and Permanent Destruction and Elimination of Public Lands and Waters**

40.     The Mt. Hope Mine Project will be one of the largest open pit mines in the nation, with operations lasting for roughly 80 years, causing permanent alteration of the landscape, and a complete reworking of the surface and ground water hydrology of three separate watersheds, with adverse impacts to over 200 square miles of public and private land, lasting for hundreds of years.  The Project will have immediate, irreparable, and permanent impacts to the local ranching and farming communities and families which have lived there since the 1860s and to the critical environmental, recreational, economic, historical, cultural and wildlife resources that will be either eliminated or significantly affected by BLM's approval of the Project.

41.     "The Project will consist of a proposed molybdenum mine including a power transmission line, a water well field, and all associated facilities to be located on

13

public land administered by the BLM Mount Lewis Field Office and on private land controlled by EML. The Project will utilize an open pit mining method and will process the mined ore using a flotation and roasting process.  The project will be located in Eureka County, Nevada approximately 23 miles northwest of the town of Eureka, Nevada." ROD at 2.

42.  "The Project Area, which covers 21,523 acres, includes the Mine Facility Area, Long-term ROW, and the well field development area. EML's holdings include 14 patented claims (259 acres of private land) and approximately 1,550 lode and mill site mining claims.  The Mount Hope ore body contains approximately 966 million tons of molybdenite (molybdenum disulfide) ore that will produce approximately 1.I billion pounds of recoverable molybdenum during the ore processing time frame." ROD at 3.

43.  "Approximately 1.7 billion tons of waste rock will be produced by the end of the 32-year mine life and approximately 1.0 billion tons of tailings will be produced by the end of the 44 years of ore processing." ROD at 3.  The two waste rock dumps would cover 2,246 acres, and the two tailings waste facilities would cover 3,259 acres. 2012 FEIS at 2-3 (Table 2.1-1).

44.  "The 80-year project will have an 18- to 24-month construction phase, 44 years of mining and ore processing, 30 years of reclamation, and five years of post-closure monitoring. Concurrent reclamation will not commence until after the first 15 years of the Project." ROD at 3.

45.  "The surface disturbance associated with the proposed activities totals 8,355 acres on both public and private lands." ROD at 3.  That acreage figure is the same as approved in the 2012 ROD.

46.  "Mining would be conducted 24 hours per day and seven days per week.  The mining rate, ore and waste rock combined, would average 232,000 tons per day over

the life of the mine.  The highest daily mining rates would be encountered during the first 25 years of production and would average approximately 265,000 tpd."  2012 FEIS at 2-17.

47.    "Proposed project components will include:

• An open pit with a life of approximately 32 years and associated pit dewatering;
• Waste rock disposal facilities where waste rock will be segregated according to its potential to generate acid rock drainage;
• Milling facilities including a crusher, conveyors, semi-autogenous grinding and ball mills, flotation circuits, concentrate dewatering, ferric chloride concentrate leach circuit, and filtration and drying circuits that will operate for approximately 44 years;
• A molybdenite concentrate roaster and packaging plant to package the technical grade molybdenum oxide (TMO) in bags, cans or drums;
• A ferromolybdenum (FeMo) plant for production of FeMo alloy using a metallothermic process and separate packaging plant for drums and bags;
• Two tailings storage facilities (South tailings storage facility [TSF] and North TSF) and associated tails delivery and water reclaim systems;
• An ongoing exploration program utilizing drilling equipment, roads, pads, and sumps;
• Low-Grade Ore Stockpile that will feed the mill after mining ceases;
• Water supply development with associated wells, water delivery pipelines, access roads, and power in the Kobeh Valley Well Field Area;
• An approximately 24-mile, 230-kV electric power supply line from the existing Machacek substation, with a substation and distribution system located in the Project Area;
• A realigned section of the existing Falcon-Gondor powerline, which will require an amendment to the existing ROW at the time it is needed (near Year 36);
• Ancillary facilities including haul, secondary, and exploration roads, a ready line (location of haulage equipment that is ready for use on a daily basis), warehouse and maintenance facilities, storm water diversions, sediment control basins, pipeline corridors, reagent and diesel storage, storage and laydown yards, ammonium nitrate silos, explosives magazines, fresh/fire suppression water storage and a process water storage pond, monitoring wells, an administration building, a security/first aid building, a helipad, a laboratory, growth media/cover stockpiles, borrow areas, mine power loop, communications equipment, hazardous waste management facilities, a Class III waivered landfill, and an area to store and treat petroleum contaminated soils;
• Turn lane(s) on SR 278;
• The option for the toll roasting of Mo from concentrate offsite; and
• The closure of the tailings storage facility and the potentially acid generating (PAG) waste rock disposal facility with the use of evapotranspiration cells to manage the long term discharge from these facilities, as well as the physical

15

reclamation of all Project components."

2012 ROD at 5-6.

48.     The excavated mine pit will be one of the deepest mine pits in the country.  "The ultimate pit depth would be approximately 2,600 feet below ground surface." 2012 FEIS at 2-4.  *See also* 2012 FEIS Figure 2.1.6 (cross-section diagram).

49.     "Mining the open pit would result in an excavation of approximately 2,300 feet below the existing water table, which would be approximately 2,640 beneath the natural surface."  2012 FEIS at 2-86.  "The pit lake that is anticipated to form in the open pit is expected to fill slowly (Figure 3.3.12) and would be 900 feet deep at 200 years after the end of mining."  2012 FEIS at 3-220.  It would eventually be over 1,100 feet deep.  2012 FEIS Figure 3.3.12.

50.     These Project facilities and impacts will significantly degrade, if not eliminate altogether, important public land resources at and near the Project site including surface and ground waters, air quality, wildlife, recreation, and cultural/historical resources.

51.     The Project will also eliminate grazing at the site.  "The constructed fence would exclude livestock grazing during mine operations and reclamation for approximately 70 years."  FEIS at 3-421.

52.     The Project, including the new powerlines/ROWs, would significantly impact the Pony Express National Historic Trail.  The Trail was officially designated by Congress pursuant to the National Trails System Act, 16 U.S.C. §§ 1241, et seq. Portions of the Trail within the Project site have been determined to be eligible for listing on the National Register of Historic Sites.  2012 FEIS at 3-587 to -588.  The Pony Express Trail currently crosses public lands near the base of Mt. Hope.  2012 FEIS Figure 2.1.5.  The Project would locate the tailings dump and southern waste rock dump (Non-PAG WRDF) within a few hundred feet of the Trail and bisect the

Trail with the powerlines – destroying the historical value of the Trail.  BLM admits that the "mitigation" proposed for the Trail, largely photo-documenting the current Trail before the Project begins, "is not likely" to reduce the impact below the finding of "significant" impacts.  2012 FEIS at 3-592.

53.   In addition to the 8,000+ acres of surface disturbance and impacts, the Project will involve the pumping/dewatering of the regional aquifer during mining in order to keep the mine pit dry and provide water for mineral processing.

> Dewatering would be required in the open pit during the mining phase of the Project. The open pit dewatering would be achieved with in-pit sumps and, if necessary, horizontal drains and perimeter wells would also be used. The average pit inflow rate is estimated to range between 60 to 460 gpm [gallons per minute](100 to 750 afy) [acre-feet per year], commencing in Year 1 of the Project and continuing through Year 32, as shown in Table 3.2-7.  In addition, ground water pumping in the KVCWF area for process-water supply would be achieved with high capacity production wells completed in the basin-fill and carbonate bedrock aquifers.  The average total combined pumping rate of the well field is estimated to range between 6,540 to 7,000 gpm (10,550 to 11,300 afy), commencing in Year 1 of the Project (2012) and continuing through Year 44 (2055), as shown in Table 3.2-7.

2012 FEIS at 3-74.  One acre-foot of water equals approximately 325,851 gallons.

54.   "Peak groundwater extraction rates of up to 11,300 acre-feet annually (afa) are proposed, with the majority of groundwater coming from the Kobeh Valley wellfield and the remainder coming from pit dewatering operations.  Water flowing to the pit is anticipated to come from Kobeh Valley and Diamond Valley, with the majority from Diamond Valley.  Based on predicted dewatering rates, the Diamond Valley withdrawal rate will be approximately 460 gpm (740 afa) near the end of mining. **The groundwater extracted for mining use will be consumptively used in processing activities of the Project (i.e., no water will be returned to the aquifer).**"  EML's Mount Hope Mine Project Water Resources Monitoring Plan, at 2 (submitted with EML's Plan of Operations Amendment and Application for Reclamation Permit Modification (December 2015)(emphasis added).

55.  Thus, the "average total combined pumping rate of the well field," up to 11,300 afy (acre-feet per year), including the 750 afy of pit pumping, equals over 3.68 billion gallons of water pumped per year.  With the predicted pumping to last roughly 43 years, this means that, in total, up to 158.3 billion gallons of water will be removed from the Mt. Hope area by the Project's dewatering.

56.  BLM acknowledges that the dewatering will result in "Irreversible Impacts" and "Irretrievable Impacts" to "Water Resources-Water Quantity": "Water removed from the aquifer and used in the operations would not be available for other uses.  In addition, springs and surface waters may have decreased flows and limited uses." Table 4.9-1, 2012 FEIS at 4-102.

57.  "The open pit dewatering activities and KVCWF [Kobeh Valley Central Well Field, located to the southwest of the open pit and waste/tailings dumps] pumping would lower (draw down) the water table in the vicinity of those facilities. The predicted maximum drawdown in the bedrock of the open pit area is approximately 2,250 feet, whereas in central Kobeh Valley, the predicted maximum drawdown is approximately 120 feet near the center of the well field after 44 years of pumping." 2012 FEIS at 3-74 to -75.  *See also* 2012 FEIS Figure 3.2.18, 2012 FEIS at 3-81 (showing predicted drawdown levels).

58.  Due to this dewatering "significant water table drawdown in the aquifer would occur in an area measuring approximately 232 square miles around the Project Area." 2012 FEIS at 3-424.

59.  The FSEIS reiterated the Project's massive dewatering/pumping impacts: "The predicted maximum drawdown in the bedrock of the open pit area is approximately 2,250 feet, whereas in central Kobeh Valley, the predicted maximum drawdown is approximately 120 feet near the center of the well field after 44 years of pumping.

18

See Section 3.2.3.3.1, pages 3-74 through 3-106 of the FEIS for the full analysis of surface water resources." FSEIS at 15.

60.    "After dewatering ceases, the ground water would begin to recover in the open pit area.  Similarly, ground water in the basin-fill and bedrock aquifers of Kobeh Valley would begin to recover when production water pumping in the KVCWF ceases (Year 42).  The limits of ground water drawdown surrounding the open pit and KVCWF would continue to expand in the perimeter areas after open pit dewatering and production well pumping cease, as the open pit and dewatered portions of the aquifers fill with ground water that is derived from storage as well as natural recharge.  Due to aquifer geometry and heterogeneity, the rate and ultimate extent of continued lateral expansion of drawdown would not be the same in all directions. Figure 3.2.1 shows the simulated ten-foot water table drawdown contours at ten, 50, 100, 150, 200, 250, 300, 350, and 400 years of post-Project recovery, which were used to establish the composite maximum-extent-of-drawdown.  The boundary of the maximum-extent-of-drawdown encompasses all of the areas that are predicted to experience more than ten feet of drawdown at any time in the future due to the Proposed Action."  FSEIS at 15.

61.    As a result of this dewatering, BLM predicts that "22 springs, two perennial stream segments (Roberts Creek and Henderson Creek) and portions of four intermittent and ephemeral stream drainages" are within the area where at least a ten-foot drop in the water level will occur (the 10-foot drawdown cone).  2012 FEIS at 3-80.

62.    "The ground water drawdown under the Proposed Action is predicted to be more than ten feet for two perennial stream segments (Roberts Creek and Henderson Creek) and at 22 perennial or potentially perennial spring sites (Table 3.2-8) for varying periods up to at least 400 years after the end of the mining and milling operations."  2012 FEIS at ES-19 (Table ES-1).

63.    In addition, "Impacts to surface water resources could occur in areas with less than ten feet of predicted drawdown." 2012 FEIS at 3-79. *See* 2012 FEIS Table 3.2.8 "Springs that May be Affected by Project Activities," 2012 FEIS at 3-79.

64.    It is "assumed that all of the springs located in the area projected to experience ten feet or more of drawdown are interconnected with the regional groundwater system and potentially could be impacted due to water-table lowering attributable to the Proposed Action." 2012 FEIS Appendix H at 446; 2012 FEIS at 3-87 (same).

65.    The Project will result in significant and irreparable adverse impacts to the springs, seeps, waterholes and streams affected by the Project's dewatering, especially those ground and surface waters within the 10-foot drawdown cone:

> Mine dewatering**,** ground water pumping**,** and subsequent recovery of the water table is expected to draw down the ground water table in an area surrounding the open pit. As discussed in Section 3.2, modeling results show that significant water table drawdown in the aquifer would occur in an area measuring approximately 232 square miles around the Project Area, including the northeast quadrant of Kobeh Valley and the southernmost fringe of Roberts Mountains. Stock water resources within the ten-foot drawdown contour from Proposed Action pumping include water rights within the Romano, Lucky C, Roberts Mountain, 3 Bars, and Santa Fe/Ferguson Allotments. Eighteen existing stock water rights occurring within the ten-foot drawdown area may experience negative impacts including a reduction in available water or complete water loss as a result of ground water drawdown associated with the Proposed Action (Figure 3.12.1). Table 3.2-7 in the Water Resources - Water Quantity Section identifies the water rights associated with stock water that would be located within the ten-foot drawdown contour from the Proposed Action activities. Twenty-two springs and two segments of perennial streams are also located within the area predicted to be impacted by the ground water drawdown. Livestock that utilize those sources of water could be affected. Springs predicted to be impacted are shown on Figure 3.2.9.

2012 FEIS at 3-424 to -425 (emphasis added).

**Failure to Protect Reserved and Withdrawn Public Lands and Waters**

66.     This dewatering of the aquifer and substantial lowering of the water table, causing the

significant loss and/or elimination of springs and streams, violates DOI/BLM's duties

to protect these resources under FLPMA and Presidential Order.

67.     Water flows in springs and waterholes on public land in the West are reserved for

public use by Public Water Reserve # 107 ("PWR 107"), which was created by

Executive Order by President Calvin Coolidge in 1926.  The reservation of federal

water rights also included a withdrawal from entry of public lands ¼ mile around

each spring/waterhole. PWR 107 provides:

> [I]t is hereby ordered that every smallest legal subdivision of public land surveys
> which is vacant, unappropriated, unreserved public land and contains a spring or
> water hole, and all land within one quarter of a mile of every spring or water hole
> located on unsurveyed public land, be, and the same is hereby, withdrawn from
> settlement, location, sale, or entry, and reserved for public use in accordance with
> the provisions of Section 10 of the Act of December 29, 1916.

Executive Order of Apr. 17, 1926, previously codified at 43 C.F.R. § 292.1 (1938).  *See

also* GENERAL LAND OFFICE, DEPARTMENT OF INTERIOR, CIRCULAR 1066, 51 I.D. 457-

58 (1926) ("[t]he above order [PWR #107] was designed to preserve for general public

use and benefit unreserved public lands containing water holes or other bodies of water

needed or used by the public for watering purposes."). 1926 I.D. LEXIS 45.

68.     "The purpose of PWR 107 was to prevent the monopolization by private individuals

of springs and waterholes on public lands needed for stockwatering." Great Basin

Mine Watch v. Hankins, 456 F.3d 955, 966 (9th Cir. 2006)(citations omitted).

69.     The 1926 Executive Order and withdrawal were promulgated under the authority of

Section 10 of the Stock-Raising Homestead Act of Dec. 29, 1916, 39 Stat. 862, 865,

43 U.S.C. § 300 (SRHA), which provided that withdrawn "lands containing water

holes or other bodies of water needed or used by the public for watering purposes …

shall, while so reserved, be kept and held open to the public use for such purposes…."

Although the Stock-Raising Homestead Act and the underlying authority of the

President to withdraw such lands pursuant to the Pickett Act of 1910, 36 Stat. 847, was repealed by FLPMA in 1976, withdrawals (such as the 1926 Executive Order) made pursuant to those authorities remain in force today. 43 U.S.C. § 1701 note (FLPMA).

70.     As detailed herein, the Project's ground water pumping/dewatering is predicted to cause many springs/waterholes (Springs) established under PWR 107 in 1926 to be eliminated or have substantially reduced flows.  DOI/BLM failed to ensure that these springs are not impaired by the Project, particularly the pumping/dewatering and placement of Project facilities at the Spring locations.

71.     Under the PWR 107 Executive Order and related laws, DOI/BLM cannot authorize activities that will impair the public use of any reserved waters and/or lands. DOI/BLM's approval of pumping/dewatering, and other activities associated with the Project, which could dry up or materially reduce springs and waterholes protected by PWR 107, is not in compliance with these requirements.

72.     DOI/BLM cannot cause the loss of federal property such as PWR 107 reserved water rights and lands without congressional or Presidential authorization, which has not occurred here.

73.     PWR 107, related laws, and FLPMA prevent the federal government from allowing a mining operation to diminish any of the reserved waters.  These waters are held pursuant to a federal reserved water right and are to be used (and protected by BLM) for the purposes of the reservation— public watering uses.  Federal reserved water rights derive from federal reservations.  Removing the water from these springs and/or waterholes as a result of groundwater withdrawals from the Project is prohibited.

74.     In addition to other public benefits, Springs that will be affected by the Project's dewatering and other operations are utilized by livestock grazing on public land.

Public lands at/near the Project site, including public lands and waters covered by PWR 107 and predicted to be significantly affected by groundwater pumping and Project facilities such as the waste/tailings/rock/soil dumps, are covered by grazing allotments and permits issued by the BLM.  2012 FEIS at 3-149 (Figure 3.12.1).  The elimination or reduction of water flow at springs and/or waterholes would adversely affect the ability of livestock to utilize those water sources in the future.  Reduction or loss of water flow in Springs used by livestock would result in the displacement of livestock from the site, and/or concentrating livestock at water sources not affected by dewatering.

75.     Destruction or loss of the reserved waters and withdrawn lands under PWR 107, including the location of Project facilities within the withdrawn lands, and/or the preclusion of public access via fencing, is prohibited under PWR 107, FLPMA, and the SRHA.

76.     Failure to review and fully protect the reserved water rights, waters, springs and water holes, related withdrawn lands, and public uses of these lands and waters, violates PWR 107, the SHRA, and BLM's duty under FLPMA to "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. § 1732(b).

77.     DOI/BLM's failure to review and fully protect these resources also violates FLPMA's mandate that: "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values."  43 U.S.C. § 1701(a)(8).

78.     In addition, BLM did not ensure that the Project will not disturb public lands withdrawn by the 1926 Executive Order in contravention of the purposes for which the land was withdrawn.

79.     A number of Springs and lands withdrawn by PWR 107 are located within the "footprint" of the Project, including those waters and lands to be buried by the waste rock and rock/soil dumps. "Certain springs and their associated wetlands would be removed or buried as a result of the development of the open pit and WRDFS [Waste Rock Disposal Facilities]." 2012 FEIS at 4-103 (Table 4.9-1)(finding that there will be "Irretrievable Impacts" to "Wetland/Riparian Zones").

80.     Included within BLM's list of affected springs within the drawdown area are springs that contain these federal reserved water rights and withdrawn lands.

> In 1926, a carte blanche Public Water Reserve (PWR) was created through an EO by President Coolidge entitled "Public Water Reserves No. 107" (PWR 107). PWR 107 ended the site-specific system of reserving springs and water holes. The purpose of PWR 107 was to reserve natural springs and water holes yielding amounts in excess of homesteading requirements. This order states that "legal subdivision(s) of public land surveys which is vacant, unappropriated, unreserved public land and contains a spring or water hole, and all land within one quarter of a mile of every spring or water be reserved for public use."

2012 FEIS at 3-58.

81.     "Public Water Reserves (PWR 107) are acknowledged in the State of Nevada by issuance of a Reserved water right permit by the State Engineer. The BLM has filed applications for Reserved water rights for stockwater and wildlife use in Kobeh Valley and the adjacent basins, with subsequent Reserved permits being granted by the State Engineer. These are acknowledged and disclosed in the EIS within the modeled area of Project drawdown, including the rates and annual duties granted." 2012 FEIS Appdx. H at 431. *See also* 2012 FEIS Table 3.2-6 ("Non-EML Water Rights That May be Affected by Project Activities."), 2012 FEIS at 3-61 to -62.

82.     In the previous lawsuit, GBRW/WSDP argued that BLM violated FLPMA and other laws due to BLM's failure to protect the water rights reserved by PWR 107 for at least four springs that would be dewatered, and illegal approval of the permanent

24

waste dumps and other ancillary operations within the public lands withdrawn by PWR 107.  Great Basin Resource Watch, 844 F.3d at 1111 (discussing PWR claims).

83.   The Ninth Circuit stated that "the proper analysis of the PWR 107 claim turns in large part on whether the four springs in the area of the project are 'covered' by PWR 107 – that is, whether the four springs are located on lands that were withdrawn by PWR 107 – but BLM's position on that question is unclear." Great Basin Resource Watch, 844 F.3d at 1111.

84.   More specifically, the Ninth Circuit stated that:

> The FEIS is internally contradictory, suggesting in some places that the four springs *are* covered by PWR 107 and in other places that they are *not*. We note that the BLM had previously submitted "Notification of Public Water Reserve" forms for the four springs to the State of Nevada.  Each of those forms lists an amount of water that the United States wishes to claim as a federal reserved water right and cites PWR 107 as authority for the reservation.  The notifications have never been rescinded.  If, on remand, the BLM decides that the springs are not important, it should at the very least explain why it has apparently changed its position.

844 F.3d at 1111, n. 12 (emphasis in original).  As a result, "we remand the case to the agency for clarification." Id. at 1111.  Relatedly, because the Court remanded the FEIS back to the agency "to fix the errors in its analysis of the Project under NEPA," Id. at 1111, "[f]or this reason, we also decline to address Great Basin's FLPMA claim" associated with the PWR 107 issues. Id. at 1111, n. 10.

85.   Upon remand, the FSEIS then clarified that at least four springs are covered by PWR 107:

> [S]even springs were re-evaluated for PWR eligibility pursuant to these criteria. In addition to the data and reports considered with the 2012 FEIS, BLM also conducted additional site visits to use in this re-evaluation.  The springs were partly selected based upon the Ninth Circuit's 2016 decision, where it recommended BLM clarify its position related to whether springs 597, 612, 619, and 742 were PWR 107 sites.  The Court's concern regarding the status of these springs stems from PWR notifications BLM filed in 1994 with the Nevada State Engineer for these springs.  BLM has since confirmed that it also filed a notification on spring 604 in 1994.

25

1

2   In light of the Ninth Circuit Court's decision, the BLM began a more thorough examination of certain springs, which included the four springs recommended by the Ninth Circuit, and three additional springs with potential PWR status given their close proximity to the Project, their likelihood of direct impact from Project-related facilities, and/or their previous filing status as PWRs in 1994. The three additional springs include springs 604, 639, and 646.

3

4

5

6   FSEIS at 12.

7   86.   "The BLM revisited all of its existing PWR claims in April and May of 2016 to

8   determine if they were still valid." FSEIS at 13.  After summarizing its review, BLM

9   determined that: **"Springs 597, 604, 619, and 742 do have prior PWR notifications**

10   **filed with the State Engineer and remain PWR sites."** FSEIS at 14 (emphasis

11   added).

12   87.   "The BLM previously found that there were no PWR 107 sites within the ten-foot

13   drawdown contour. Through this re-evaluation of the six springs within this contour

14   subject to prior PWR notifications as described in Section 3.2.2.7 above, four of the

15   springs (Garden Spring [Spring 597], Unnamed Spring [Spring 604], Mount Hope

16   Spring [Spring 619], and Lone Mountain Spring [Spring 742]) meet PWR eligibility

17   criteria." FSEIS at 15.

18   88.   These PWR 107 springs were part of Plaintiffs' claim in the previous litigation. "The

19   springs at issue are … Mt. Hope Spring, also referred to as SP-4 or Spring 619;

20   Garden Spring, also referred to as SP-2 or Spring 597; and Lone Mountain Spring,

21   also referred to as Spring 742."  844 F.3d at 1111, n. 11.  GBRW/WSDP also asserted

22   that the "Unnamed Spring [Spring 604]" also qualified as a PWR 107 Spring – a

23   position with which DOI/BLM now concurs as noted above.  GBRW/WSDP also

24   maintain that an additional spring that was at issue in the previous litigation, known

25   as "McBride's Spring, also referred to as SP-1 or Spring 612," Id., should also qualify

26   under PWR 107.

27

28

89.     Spring 619 is known as the "Mt. Hope Spring," and was submitted by BLM as a PWR 107 Reserved Right to the State Engineer in 1994 (R06940), covering water for 400 cattle and 75 horses.  BLM asserts a reserved right of .0147 cubic feet per second which equates to 6.6 gallons per minute, year round. *See* Nevada Division of Water Resources website:

http://images.water.nv.gov/images/proofs/reserved/R06000/R06940.pdf (last reviewed October 24, 2019).  "448.83 gal. per min. equals 1 cubic foot per second." Id.  Spring 619 is also shown as Spring # SP-4 in the 2012 FEIS.  *Compare* 2012 FEIS Figure 2.1.5 (map of Project facilities) with Figures 3.2.18 and 3.2.20 (maps of spring locations).

90.     The Mt. Hope Spring, 619/SP-4, is located immediately adjacent to, or within, the proposed north Waste Rock Disposal Facility (WRDF), which will receive the Potentially Acid Generating Waste Rock (PAG-WRDF), and is less than 1,000 feet from the Non-PAG WRDF.  2012 FEIS Figure 2.1.5.

91.     "The Project would generate approximately 1.7 billion tons of waste rock that would occupy a total footprint of approximately 2,246 acres. Waste rock would be placed in two distinct WRDFs over the life of the mine, which would almost encircle the open pit (Figure 2.1.9). The PAG WRDF would ultimately contain approximately 0.5 billion tons of waste and the non-potentially acid generating (Non-PAG) WRDF approximately 1.3 billion tons."  2012 FEIS at 2-23.

92.     Spring 597 is known as the "Garden Spring," and was submitted by BLM as a PWR 107 Reserved Right to the State Engineer in 1994 (R06942), covering water for 400 cattle and 75 horses.  BLM asserts a reserved right of .0147 cubic feet per second which equates to 6.6 gallons per minute, year round. *See* Nevada Division of Water Resources website:

http://images.water.nv.gov/images/proofs/reserved/R06000/R06942.pdf (last

reviewed October 24, 2019).  Spring 597 is also shown as Spring # SP-2 (or SP-2A) in the 2012 FEIS.  *Compare* 2012 FEIS Figure 2.1.5 (map of Project facilities) with Figures 3.2.18 and 3.2.20 (maps of spring locations).

93.  The Garden Spring, 597/SP-2/2A, is located within or immediately adjacent to the proposed "Growth Media Stockpile" near the northern boundary of the Project Area, where soil, dirt, and other growth media will be dumped prior to its use in post-mining reclamation.  2012 FEIS Figure 2.1.5.

94.  Spring 742 is known as the "Lone Mtn. Spring," and was submitted by BLM as a PWR 107 Reserved Right to the State Engineer in 1994 (R06951), covering water for 100 cattle and 75 horses.  BLM asserts a reserved right of .0054 cubic feet per second which equates to 2.4 gallons per minute, year round. *See* Nevada Division of Water Resources website:

http://images.water.nv.gov/images/proofs/reserved/R06000/R06951.pdf (reviewed October 24, 2019).

95.  Spring 604, known as the "Unnamed Spring", was submitted by BLM as a PWR 107 Reserved Right to the State Engineer in 1994 (amended in 2016)(R06943), covering water for 400 cattle and 75 horses.  BLM asserts a reserved right of .0147 cubic feet per second which equates to 6.6 gallons per minute, year round. *See* Nevada Division of Water Resources website:

http://images.water.nv.gov/images/proofs/reserved/R06000/R06943.pdf (reviewed October 24, 2019).

96.  Spring 604, depicted as SP-3 in the 2012 FEIS, is located immediately adjacent to, or within, the proposed PAG WRDF.  2012 FEIS Figure 2.1.5.

97.  The ROD approves the construction or location of mine facilities (shown on 2012 FEIS Figure 2.1.5) within one quarter mile of Springs 597, 604, and 619, or at a minimum within the 40 acres surrounding each spring withdrawn by PWR 107,

28

whichever is applicable.  The construction or location of mine facilities are approved to be located/constructed either right on top of, and/or immediately adjacent to, these Springs.  In addition to the loss/reduction of flows at these Springs, "springs (619, 639, 646) would also be directly affected by construction of Project components."  2012 FEIS at 3-79.

98.   The Mt. Hope, Garden, Lone Mtn., and Unnamed Spring 604 existed on April 17, 1926.  Thus, the priority date of the PWR 107 federal reserved water rights, as well as the withdrawal from entry for other uses, is the date of that Executive Order, April 17, 1926.  For example, BLM's asserted PWR 107 reserved right for Spring 619 (Mt. Hope Spring) (R06940) listed the priority date as "April 17, 1926" and the "Authority" for the right as "Executive Order of April 17, 1926 (PWR 107)."  *See* Nevada Division of Water Resources website:

http://images.water.nv.gov/images/proofs/reserved/R06000/R06940.pdf

(last reviewed October 24, 2019).  *See also* Nevada websites cited above for the Garden, Lone Mtn., and 604 Springs (same priority date and authority).

99.   These springs, and the lands surrounding them withdrawn from entry in 1926 under PWR 107, will either be eliminated by Project facilities, or so seriously compromised, that the lands and waters will no longer be available for the purposes for which the lands and waters were reserved/withdrawn.

100.   DOI/BLM did not consider an alternative of locating/constructing Project facilities away from the lands withdrawn around the PWR 107 springs, nor did it consider an alternative of not allowing the flows in these Springs to be diminished, in order to comply with PWR 107.  The consideration of alternatives is "the heart of the environmental impact statement."  40 CFR § 1502.14.  Based on DOI/BLM's erroneous legal position on PWR 107, DOI/BLM did not seriously consider the alternative of keeping Project facilities away from the PWR 107 Springs and the

corresponding surrounding withdrawn lands.  This violates DOI/BLM's duty to take a "hard look" at all reasonable alternatives to, and the environmental impacts from, Project operations. <u>Great Basin Resource Watch</u>. 844 F.3d at 1101.

101.   DOI/BLM did not keep these lands "held open to the public use" as required by the SRHA, PWR 107, and FLPMA.

102.   The groundwater pumping and dewatering approved by DOI/BLM in the ROD will either eliminate or seriously impair the federal reserved water rights and withdrawn lands, and the uses of these waters and lands, protected by the SRHA, PWR 107, and FLPMA.

103.   This substantive failure to protect these public resources is compounded by the agency's failure under NEPA to adequately analyze mitigation measures to protect ground and surface water, and to adequately analyze the direct and cumulative impacts to these resources.  *See* below ¶¶ 175-197, 201-216.

104.   There is one exception to DOI/BLM's duty to protect the PWR 107 Springs and withdrawn lands.  Under the Pickett Act (the statutory source for the SHRA and PWR 107 withdrawals), lands withdrawn around PWR 107 Springs containing valuable deposits of "metalliferous minerals" were opened for claiming under the 1872 Mining Law.  Pickett Act of June 25, 1910, c. 421, 36 Stat. 847 (Addendum), as amended by the Act of August 24, 1912, c. 369, 37 Stat. 497 (Addendum).  The 1910 Act opened withdrawn lands to claiming for most valuable minerals: "[A]ll lands withdrawn under the provisions of this Act shall at all times be open to exploration, discovery, occupation, and purchase, under the mining laws of the United States, so far as the same apply to minerals other than coal, oil, gas, and phosphates." 36 Stat. 847, Sec. 2.

105.   In 1912 Congress amended the Pickett Act to limit the opening of withdrawn lands to only lands containing "metalliferous minerals." "[A]ll lands withdrawn under the provisions of this Act shall at all times be open to exploration, discovery, occupation,

and purchase under the mining laws of the United States, so far as the same apply to metalliferous minerals." 37 Stat. 497, Sec. 2.

106.    There is no evidence in the FEIS or elsewhere in the public record that shows that the claims covering the PWR springs, and the withdrawn lands around the PWR springs, contain valuable deposits of metalliferous minerals "under the mining laws of the United States."  Pursuant to the 1872 Mining Law, only claims for metalliferous minerals that contain "valuable mineral deposits" are valid against the United States. 30 U.S.C. § 22.

107.    As the Interior Department has long held:

> Regarding the use of "metalliferous minerals" in the Picket[t] Act, the [Consolidated Ores] decision concluded that the term "was used to describe those minerals or ores of economic value from which the useful metals could be directly and advantageously extracted." Consolidated Ores at 472.

David E. Hoover and Lester F. Whalley, 99 IBLA 291, 294 (1987), 1987 WL 110721 at **4, quoting Consolidated Ores Mines Co., 46 Pub. Lands Dec. 468 (1918), 1918 WL 1078.

108.    Despite this, DOI/BLM assert that the Pickett Act exemption for metalliferous minerals applies equally to the lands approved for the waste rock dumps and other facilities within the ¼ mile around the PWR 107 Springs, even though no mining would occur on these lands and there is no evidence that valuable deposits of metalliferous minerals occur on these lands.

> For three of the additional springs (597, 604, and 619) that do continue to meet PWR 107 criteria, and are within the Project boundary, the lands associated with these springs are subject to the exception under the Pickett Act which lifts the withdrawal associated with PWR 107 for mining of metalliferous minerals such as molybdenite.  Such lands are not withdrawn from location of claims for molybdenite or from the occupation of such lands for molybdenite mining in compliance with the mining law.  To the extent federal reserved water rights could potentially be impacted, those impacts would result from activity exempted from the scope of the withdrawal under the Pickett Act and were analyzed and addressed through monitoring and mitigation measures.  Spring 742 also remains a PWR 107 site but is located outside the Project boundary.  The impacts

associated with spring 742 do not change from the impact discussion in the 2012 FEIS as they have been considered and addressed through monitoring and mitigation.

FSEIS at 15-16.

109.    Yet without evidence that the claims at/around the PWR 107 Springs contain the requisite discovery of valuable metalliferous minerals (i.e., "those minerals or ores of economic value from which the useful metals could be directly and advantageously extracted"), the claimant "cannot sustain valid locations on land withdrawn from the location of mining claims except for metalliferous minerals." David Hoover at **5.

110.    DOI/BLM erroneously believed that the fact that there may be a valuable deposit of a metalliferous mineral (molybdenum/molybdenite) within the mining claims covering the core pit area automatically extends rights under the Mining Law, and the associated Pickett Act exemption from PWR 107, to the lands and claims covering the waste rock dumps and other ancillary facilities far away from the pit.  FSEIS at 15-16.

111.    This ignores the longstanding rule that rights to mine and possess lands containing valuable minerals "under the mining laws of the United States" do not extend to lands that do not contain such valuable minerals:  "A claimant may not use the deposit present in one location to lend validity to an adjacent location. *See Waskey v. Hammer*, 223 U.S. 85, 91 (1912) ('A discovery without the limits of the claim, no matter what its proximity, does not suffice.'); *Lombardo Turquoise Milling & Mining Co. v. Hemanes*, 430 F.Supp. 429, 443 (D. Nev. 1977)." Center for Biological Diversity v. U.S. Fish and Wildlife Service, ---F.Supp.3d---, 2019 WL3503330, *11 (D. Ariz. 2019).

112.    As the Ninth Circuit has held: "The statute [1872 Mining Law] grants two rights, (1) the right to explore and purchase all valuable mineral deposits in lands belonging to the United States; and (2) the right to occupation and purchase of the lands in which

valuable mineral deposits are found. … [I]t is clear under both the mining law and the regulations that a discovery of valuable mineral is the sine qua non of an entry to initiate vested rights against the United States." Davis v. Nelson, 329 F.2d 840, 844-45 (9th Cir. 1964).  Thus, without the discovery of a valuable mineral deposit, the claimant does not have a statutory right to occupation of those lands.

113.   DOI/BLM cannot approve a mining operation on withdrawn lands, such as within the Project site around the PWR 107 Springs, unless valid claims for metalliferous minerals exist on the withdrawn lands.  Any mining claims filed or located on lands withdrawn by PWR 107 are null and void unless they meet the requirements under the Mining Law for the discovery of a valuable mineral deposit.  "Mining claims located on lands not open to appropriation are null and void ab initio." Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745, 756 (D.C. Cir. 2007), citing Shiny Rock Mining Corp. v. United States, 825 F.2d 216, 219 (9th Cir. 1987) (same).

114.   The subject claims covering the PWR springs, and lands within ¼ mile of each PWR noted above (or within the 40 withdrawn acres whichever is applicable) were not claimed prior to the 1926 Executive Order, as all of EML's claims were filed after 1926.

115.   Thus, DOI/BLM's approval of the placement of any Project facility within these withdrawn lands is illegal under PWR 107, the SRHA, and FLPMA, unless the lands claimed under the 1872 Mining Law contain the requisite discovery of a valuable mineral deposit of a metalliferous mineral on each claim.

116.   The lands within ¼ mile (or within the withdrawn 40 acres) of springs # 597, 604, 619, and 742 do not contain valuable mineral deposits of metalliferous minerals within the limits of the mining claims covering these lands.

117.    For example, BLM admits that the location of the waste rock dumps were chosen due in part to the lack of "suitable mining reserves underneath the waste rock disposal facilities."  2012 FEIS at ES-7.

118.    According to EML's current Feasibility Report (prepared for financial and securities regulators): "The mineral zones or "shells" consist of quartz porphyry rocks that have been veined by quartz stockwork containing molybdenite. EMLLC is focused on the economic molybdenum mineralization in the deposit; however, there is other mineralization in the district such as tungsten, silver, gold, cadmium, indium, lead, zinc, and copper **which are not currently found in economically minable quantities."**  Mt. Hope Project, Form 43-101F1 Technical Report Feasibility Study, at 7, http://www.generalmoly.com/wp-content/uploads/2018/04/01-2014-Mount-Hope-43-101-Feasibility-Study.pdf (viewed October 24, 2019)(emphasis added).  *See* additional discussion regarding the lack of valuable mineral deposits in the lands to be covered by the waste rock dumps and other facilities in ¶¶ 141-158 below.

119.    Also, based on the fact that the only mining claims to be excavated by the Project are located within the confines of the mine pit, it is unreasonable and arbitrary and capricious for DOI/BLM to assume that the claims at and surrounding the PWR springs (i.e. within ¼ mile or within 40 acres around the springs), lands which will be buried by hundreds of millions of tons of waste rock, contain the requisite discovery of valuable mineral deposits.  For example: the Mt. Hope Spring (SP-4) is located roughly ½ mile north of the edge of the pit; the Garden Spring (SP-2) is located over 1 mile north of the edge of the pit.  *See* 2012 FEIS Figure 2.1.5 (showing locations of Springs and Project facilities).

120.    Even arguably assuming that all of the mining claims covering the mine pit contain the requisite valuable minerals, the record does not show that the claims covering the withdrawn springs and lands, some over a mile away from the mine pit, contain

34

valuable deposits of metalliferous minerals.  Despite this, DOI/BLM's review of the Mt. Hope Project was based on its legal view that EML has a "statutory right … [to] develop federal mineral resources" and use/possess all the lands at/around the PWR 107 Springs. 2012 FEIS at 1-9.

121.   Unless the withdrawn lands surrounding the PWR 107 Springs contain a valuable deposit of metalliferous minerals on each claim, they are not open under the provision of the Pickett Act and remain withdrawn from entry under PWR 107 and the SRHA and DOI/BLM cannot approve the location of any Project facilities or operations on those lands.

122.   Neither the 2012 FEIS or FSEIS contain any analysis of whether the lands withdrawn and protected by PWR 107 contain valuable deposits of metalliferous minerals, in violation of NEPA, FLPMA, PWR 107, the SRHA, and the APA.  As noted herein, the evidence in the record shows the opposite – that any purported valuable minerals are limited, at best, to the mine pit and are not found at/around the PWR 107 Springs.

123.   DOI/BLM have not considered, or determined, whether the claims covering the PWR Springs (and withdrawn lands around the springs, whether ¼ mile or 40 acres) contain valuable deposits of metalliferous minerals.  Yet DOI/BLM approved the location of Project facilities on these withdrawn lands.

124.   DOI/BLM assert that the agency only needs to determine whether the mining claims on the lands surrounding the PWR 107 Springs are valid (i.e., contain the requisite discovery of valuable minerals) when the lands are withdrawn from entry.  "BLM's regulations and Departmental policy do not require mining claim validity determinations before approval of mining operations on lands open to location under the Mining Law. … BLM's regulations at 43 C.F.R. 3809.100 only require a validity examination prior to mine approval if the lands are withdrawn." ROD at 8.

35

125.     As discussed herein, that regulatory position cannot square with the statutory requirement that EML's purported "statutory rights" to use and possess its mining claims under the Mining Law only accrue upon the discovery of a valuable mineral deposit. 30 U.S.C. §§22, 23.  "A mining claimant has the right to possession of a claim only if he has made a mineral discovery on the claim." Lara v. Secretary of the Interior, 820 F.2d 1535, 1537 (9th Cir. 1987). *See also* Davis v. Nelson, 329 F.2d at 845 (9th Cir. 1964)("right to occupation and purchase of the lands" is limited to only those lands "in which valuable mineral deposits are found.").

126.     Thus, in reviewing EML's mining plan, DOI/BLM must first establish the factual basis for EML's purported "statutory right" to use/possess the lands around the PWR 107 Springs and to qualify for an exemption from PWR 107 under the Pickett Act – something that DOI/BLM admit they did not do.

127.     In any event, DOI/BLM ignore the language of PWR 107 which withdrew the lands around the PWR 107 Springs from mineral entry.  As the Ninth Circuit stated in this case, DOI/BLM's duty to protect these lands and waters under PWR 107 "turns in large part … on whether those four springs are located on **lands withdrawn by PWR 107**." Great Basin Resource Watch, 844 F.3d at 1111 (emphasis added).  Here, because DOI/BLM now admit that these four springs "are 'covered' by PWR 107," Id., these lands were withdrawn in 1926.  Thus, even under DOI/BLM's truncated view of when it must determine claim validity, the fact that these lands around the Springs were withdrawn in 1926 requires such an inquiry and determination.

128.     Without evidence and a determination that the mining claims covering these lands and waters contain the discovery of a valuable deposit of metalliferous minerals, the mere fact that EML or its affiliates have filed mining claims on these lands does not mean that these lands and waters are exempt from the PWR 107 withdrawals and protections.

129.     Also, even if demonstrated valid claims for metalliferous minerals cover all of the public lands at and within ¼ mile of the PWR springs (or within the 40 withdrawn acres whichever is applicable), DOI/BLM must ensure that these lands are kept and held open to the public use for watering purposes under the 1926 Executive Order and the Stock Raising Homestead Act.  "Any such mining location … is subject, however, to the provision of the Stock-Raising Homestead Act of 1916 that it be 'held open to the public use' for water purposes." 2 AMERICAN LAW OF MINING § 14.06[11][a].

130.     When approving the Project, DOI/BLM did not ensure that the lands would be kept and held open to the public for watering purposes.  The lands at and around the PWR 107 Springs that will be buried or significantly compromised have not been held open as required.  This is true for those lands/waters directly buried and adjacent to the mine facilities, but also any such lands/waters where access will be precluded by the Project's fence.

**Failure to Properly Protect Public Resources Under FLPMA Due to DOI/BLM's Erroneous Assumption that EML Had Statutory Rights to Use and Possess Public Land for the Permanent Waste Rock and Tailings Facilities**

131.     Despite all of the Project's significant, irreversible and permanent impacts to public lands and waters, DOI/BLM based their decisions on the assumption that EML had statutory rights to conduct all of their proposed operations, based on EML's mere staking of claims under the 1872 Mining Law, 30 U.S.C. §§21-43.  This includes the permanent waste rock and tailings dumps, which cover 2,246 acres (waste rock) and 3,259 acres (tailings). 2012 FEIS at 2-3 (Table 2.1-1).

132.     DOI/BLM's review and approval of the Mt. Hope Project was based on its legal view that EML has a "statutory right … [to] develop federal mineral resources" at the site. 2012 FEIS at 1-9.  According to BLM, the 1872 Mining Law gives EML "the underlying right to access and develop minerals."  2012 FEIS at 2-241.

133.   Based on this purported statutory right, DOI/BLM rejected the Environmentally Preferred Alternative, the No-Action Alternative.  2012 ROD at 9.  According to the BLM, EML has a statutory right to conduct its waste rock and tailings dumping, processing, and other operations based solely on the fact that the company has blanketed the Project's lands with mining claims.

134.   The Project area include 259 acres of EML's private land.  ROD at 3.  EML's private lands are found in the eastern side of the mine pit (roughly 25% of the pit area), and adjacent to the pit on the east side (where some of the processing facilities will be located).  2012 FEIS Figure ES.4 (showing public and private lands and major project facilities).

135.   The remaining Project lands are BLM public lands. Id.  According to the ROD, these public lands are covered by "approximately 1,550 lode and mill site mining claims" claimed by EML under the 1872 Mining Law. ROD at 3.

136.   EML's current Feasibility Report, at 6, states that: "the Mount Hope Project consists of 13 patented lode claims, one patented mill site claim, and 1,521 unpatented lode claims." http://www.generalmoly.com/wp-content/uploads/2018/04/01-2014-Mount-Hope-43-101-Feasibility-Study.pdf (viewed October 24, 2019).

137.   Based on the list and corresponding map of the company's owned and leased unpatented claims at the site contained in their current Feasibility Report, all of the claims at the site are lode mining claims (roughly 20 acres in size each). Id. at 19-21.  Although the ROD states that there are some mill site claims at the site, it fails to show where they are, and which facilities will be located upon them.  ROD at 3.  Based on GBRW's review of the Eureka County property records (where federal mining/millsite claims must be recorded), the roughly 10 millsite claims owned/leased by EML are located east of Highway 278, away from Project facilities.

138.   According to the DOI/BLM, the mere filing of these claims (regardless of the type of claim) precludes the agencies from choosing the no-action alternative, and significantly restricts its approval and review authority over the Project.  DOI/BLM's position is wrong.  As discussed above, such "statutory rights" can only accrue to the company if these claims satisfy the requirements of the 1872 Mining Law for possessory rights.  "A mining claimant has the right to possession of a claim only if he has made a mineral discovery on the claim." Lara v. Secretary of the Interior, 820 F.2d 1535, 1537 (9th Cir. 1987). *See also* Davis v. Nelson, 329 F.2d at 845 (9th Cir. 1964)("right to occupation and purchase of the lands" is limited to only those lands "in which valuable mineral deposits are found.").

139.   The ROD authorizes EML to permanently occupy the public lands with the placement of the waste rock and tailings on the company's mining claims.  The Mining Law limits the permanent use and development of mining claims on public lands to only those lands that contain a "valuable mineral deposit."  "All valuable mineral deposits in lands belonging to the United States … shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase." 30 U.S.C. § 22.

140.   Only upon the discovery of a "valuable mineral deposit," within the boundaries of each mining claim does the claimant have rights to permanently use and occupy those public lands.  "Thus, although a claimant may explore for mineral deposits before perfecting a mining claim, without a discovery, the claimant has no right to the property against the United States or an intervenor.  30 U.S.C. § 23 (mining claim perfected when there is a 'discovery of the vein or lode'); *see also Cole v. Ralph,* 252 U.S. 286, 295–96 (1920)." Freeman v. Dept. of Interior, 37 F.Supp.3d 313, 319 (D.D.C. 2014).  "If there is no valuable mineral deposit beneath the purported unpatented mining claims, the unpatented mining claims are completely *invalid* under

the 1872 Mining Law, and no property rights attach to those invalid unpatented mining claims." <u>Center for Biological Diversity v. U.S. Fish and Wildlife Service</u>, --- F.Supp.3d ---, 2019 WL3503330, *5 (D. Ariz. 2019)(emphasis in original).

141.   To satisfy the discovery requirement necessary for a valid mining claim, "the discovered deposits must be of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine." <u>U.S. v. Coleman</u>, 390 U.S. 599, 602 (1968). This economic test for claim validity necessarily includes the consideration of all costs necessary to develop, process, transport, and market the mineral, including costs to protect public land and the environment. "[I]t must be shown that the mineral can be extracted, removed and marketed at a profit." <u>Id</u>.

142.   There is no evidence in the record that the mining claims covering the public lands approved for the tailings and waste rock dumps are valid under the Mining Law.

143.   DOI/BLM have not inquired into, or determined, whether the mining claims at the Project site are valid. DOI/BLM stated their position that they are not required to determine whether the claims are valid before assuming EML had a statutory right to use and possess these lands covered by the claims. ROD at 8.

144.   For the limited number of mill site claims near the Project site, the test for EML to hold valid possessory rights for the lands covered by these claims is different than for mining claims. *See* 30 U.S.C. § 42. But like the mining claims at the site, DOI/BLM have not inquired into, or determined, whether the mill site claims at the Project site are valid. DOI/BLM stated their position that they are not required to determine whether the claims are valid before assuming EML had a statutory right to use and possess these lands covered by the claims. ROD at 8.

145.   In addition to the lack of any evidence that the claims to be used for waste rock dumps, tailings waste facilities, and other non-extraction operations away from the

mine pit are valid under the Mining Law, the evidence in the record shows that all of the lands covered by these claims do not contain the requisite valuable deposit of a locatable mineral (i.e., those minerals subject to claiming under the 1872 Mining Law).

146.    For example, BLM states that there may be zinc mineralization in a limited area north of the mine pit.  2012 FEIS at 3-257.  Yet in discussing the impact of placing some of the waste rock on these lands (which would preclude open pit mining in the future), BLM acknowledges that "there is not sufficient reasonably available geologic and resource information to more definitely address this potential impact."  2012 FEIS at 3-260.

147.    "Implementation of the Proposed Action would result in the extraction of waste rock that would be placed adjacent to the open pit and limit the future development of the identified Zn mineralization located to the north of the open pit.  Significance of the Impact: This is not considered a potentially significant impact to geology and minerals, because a known Zn mineralization has not been sufficiently defined…."  2012 FEIS at 3-260.

148.    Outside of this one undefined and limited area of potential, but undetermined, zinc mineralization, no other even remotely potential areas of economic mineralization were found at the site.  2012 FEIS at 3-257 (noting that for other minerals, "EML would evaluate those additional mineral resources in the future.").

149.    According to EML's current Feasibility Report, at 7, outside of the mine pit, there are no minerals that could satisfy the Mining Law's valuable mineral deposit requirements: "The mineral zones or 'shells' consist of quartz porphyry rocks that have been veined by quartz stockwork containing molybdenite. EMLLC is focused on the economic molybdenum mineralization in the deposit; however, there is other mineralization in the district such as tungsten, silver, gold, cadmium, indium, lead,

41

zinc, and copper **which are not currently found in economically minable quantities."** http://www.generalmoly.com/wp-content/uploads/2018/04/01-2014-Mount-Hope-43-101-Feasibility-Study.pdf (viewed October 24, 2019)(emphasis added).

150.    Indeed, EML has worked to confirm that no valuable mineral deposits exist elsewhere at the site: "EML is presently conducting activities under Notices within the Project Area.  These activities include condemnation drilling (i.e., drilling to confirm that no valuable minerals occur in the area drilled)." 2012 FEIS at 1-7.

151.    The Mt. Hope ore body in the pit consists of: "1) quartz molybdenite veinlets (comprising 75 percent of ore) … 2) coarse quartz molybdenite veins (ten percent of ore) … 3) blue quartz veins (ten percent of ore) … and 4) molybdenite 'paint' (five percent of ore)."  2012 FEIS at 3-254.

152.    According to the geologic maps/cross-sections in the FEIS, these mineral types are limited to the pit area.  2012 FEIS Figure 3.4.2 (Geologic Map of the Mount Hope Area); Figure 3.4.3 (Geologic Cross Section).

153.    These figures show that the Project lands approved for the waste rock and tailings do not contain the purported economic mineralization of the four types of molybdenite/quartz described in the 2012 FEIS (at 3-254).  For example, the Geologic Map (Figure 3.4.2) shows that the lands about 1,000 feet to the southwest of the summit of Mt. Hope (and to the southwest of the pit) contains ordinary "Alluvium."  The largest of the waste rock dumps (Non-PAG WRDF) would be located on these lands containing mere Alluvium.  2012 FEIS Figure 2.1.5.  Other lands outside the pit boundary also do not contain the purportedly economically valuable molybdenite/quartz.  *See* 2012 FEIS Figures 3.4.2 and 3.4.3.

154.    The 2012 FEIS shows that the lands approved for the permanent waste rock dumps and tailings facilities are on lands (and lode mining claims) that do not contain the

requisite valuable mineral deposit.  *Compare* 2012 FEIS Figure 2.1.5 (Late Project Life Plan View Open Pit and Facilities) *with* Figures 3.4.2 and .3 (geologic maps/figures).

155.   BLM admits that there is a lack of "suitable mining reserves underneath the waste rock disposal facilities."  2012 FEIS at ES-7.

156.   Based on these figures, these lands contain common varieties of rock that are not considered locatable minerals under federal mining law – such as Alluvium.  Thus, the evidence in the record shows that the lands to be covered by the waste rock, tailings, and other ancillary facilities do not contain the requisite valuable deposits of locatable minerals, which as discussed above is a prerequisite for EML to establish use/occupancy rights against the United States.  *See* 30 U.S.C. § 22.

157.   Under the Surface Resources and Multiple Use Act of 1955, "common varieties" of minerals are not locatable (i.e., cannot be legitimately claimed) under the Mining Law.  30 U.S.C. § 611.

158.   DOI/BLM have not determined whether the lands to be used for the waste rock dumps, the tailings facilities, and other non-extractive operations contain locatable minerals or common variety minerals.

159.   Thus, based on the record, the lands to be covered by the large ancillary waste and processing facilities do not contain the  requisite valuable and locatable mineral deposits.  At minimum, the record does not support DOI/BLM's position that EML has satisfied the Mining Law's requirements for statutory "rights" to use and possess public lands for permanent disposal of mine waste and tailings.

160.   The waste rock disposal facilities and the tailings facilities will remain on the site and will not be removed from their approved locations.  The Plan of Operations approved by the ROD, including for reclamation and closure of the Project, does not include

any plan for the removal of these facilities from the approved locations on public land.

161.   Based on this erroneous interpretation and reliance on EML's purported "rights" under the Mining Law, DOI/BLM failed to properly apply its special use permitting regulations, 43 C.F.R. Part 2920 (Leases, Permits, Easements).

162.   Instead, the agency reviewed and approved all aspects of the Project under its regulations at 43 C.F.R. Part 3809.  These Part 3809 regulations only apply to "operations authorized by the mining laws." 43 C.F.R. § 3809.1(a).

163.   Here, because the waste rock dumps, tailings facilities and other Project activities are not governed under any rights associated with the 1872 Mining Law as noted above, the agency's decision to regulate all of these activities under Part 3809 instead of Part 2920 violates FLPMA and is contrary to law.

164.   FLPMA requires DOI/BLM to "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. § 1732(b).  In addition, FLPMA mandates that: "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values."  43 U.S.C. § 1701(a)(8).

165.   FLPMA does, however, contain some limits on DOI/BLM authority over operations authorized by the 1872 Mining Law:

> Except as provided in section 314, section 603, and subsection (f) of section 601 of this Act and in the last sentence of this paragraph, no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 or **impair the rights of any locators or claims under that Act**, including, but not limited to, rights of ingress and egress. In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.

43 U.S.C. § 1732(b)(emphasis added).

44

166.     Under FLPMA, DOI/BLM has full discretion and authority over operations proposed on public lands, including hardrock mining operations such as the Mt. Hope Project, to "protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values."  43 U.S.C. § 1701(a)(8). However, such discretion/authority is limited to only "preventing unnecessary or undue degradation" of public resources if the application of that discretion/authority "impair[s] the rights of any locators or claims under that Act [the 1872 Mining Law]." 43 U.S.C. § 1732(b).

167.     Here, as detailed above, EML has not shown, nor has DOI/BLM attempted to show, that EML has met the legal prerequisites of the Mining Law to have "rights" to the use and possession of its mining claims (e.g., no evidence that the claims covering all of the waste/tailings facilities contain the requisite valuable deposit of a locatable mineral.  As such, there are no "rights" that can be "impaired" by DOI/BLM's full discretionary authority over those aspects of the Project that do not have the necessary factual basis to support such rights.

168.     DOI/BLM's discretionary authority is implemented in part via DOI/BLM's special use FLPMA regulations, which apply whenever activities are not "authorized" by other laws. "Any use not specifically authorized under other laws or regulations and not specifically forbidden by law may be authorized under this part." 43 CFR § 2920.1-1.  Thus, because EML's waste rock and tailings dumps are not "authorized by the mining laws," absent verified evidence that these uses satisfy the Mining Law's prerequisite requirements for the establishment of such rights, they are governed by Part 2920, not Part 3809.

169.     Overall, EML's "rights" only exist if they are supported by evidence in the record that each claim meets the factual and legal prerequisites for such rights under the 1872 Mining Law.  Here, there is no evidence in the record that each of the claims

45

proposed for long-term/permanent occupation (e.g., waste/tailings, soil/rock dumps) are valid.  Indeed, DOI/BLM has not inquired into whether these claims satisfy the Mining Law's prerequisites, and stated that they have no intention to conduct such an inquiry.  ROD at 8.

170.     DOI/BLM's Part 2920 FLPMA regulations require that:

> (b) Each land use authorization shall contain terms and conditions which shall:
> (1) Carry out the purposes of applicable law and regulations issued thereunder;
> (2) Minimize damage to scenic, cultural and aesthetic values, fish and wildlife habitat and otherwise protect the environment;
> (3) Require compliance with air and water quality standards established pursuant to applicable Federal or State law; and
> (4) Require compliance with State standards for public health and safety, environmental protection, siting, construction, operation and maintenance of, or for, such use if those standards are more stringent than applicable Federal standards.
> (c) Land use authorizations shall also contain such other terms and conditions as the authorized officer considers necessary to:
> (1) Protect Federal property and economic interests;
> (2) Manage efficiently the public lands which are subject to the use or adjacent to or occupied by such use;
> (3) Protect lives and property;
> (4) Protect the interests of individuals living in the general area of the use who rely on the fish, wildlife and other biotic resources of the area for subsistence purposes;
> (5) Require the use to be located in an area which shall cause least damage to the environment, taking into consideration feasibility and other relevant factors; and
> (6) Otherwise protect the public interest.

43 C.F.R. § 2920.7(b).

171.     These FLPMA requirements – to "protect the public interest," to "Protect federal property," and to "minimize damage to scenic, cultural and aesthetic values, fish and wildlife habitat and otherwise protect the environment," are not found in the basic command to "prevent unnecessary or undue degradation" that applies to "operations authorized by the mining laws." 43 C.F.R. § 3809.1(a).

172.     DOI/BLM erroneously failed to apply, or even consider applying, the Part 2920 regulations to any aspect of the Mt. Hope Project.

46

173.    Accordingly, in addition to making an arbitrary and capricious decision without evidentiary support, DOI/BLM violated FLPMA's mandate to manage these lands in the public interest and other requirements under 43 CFR Part 2920 – something DOI/BLM refused to do or consider in this case.

174.    In addition, under NEPA, the agency is required to fully consider all "reasonable alternatives."  The consideration of alternatives is considered "the heart of the environmental impact statement."  40 CFR § 1502.14.

175.    Based on DOI/BLM's erroneous legal assumption that EML had a "statutory right" to use and possess the public lands for the waste dumps, tailings, and other ancillary facilities, DOI/BLM did not seriously consider the alternative of regulating (and/or potentially denying) these facilities under the Part 2920 regulations nor did DOI/BLM properly consider the "Environmentally Preferred Alternative," the No-Action Alternative.  2012 ROD at 9.  This violates DOI/BLM's duty to take a "hard look" at all reasonable alternatives to, and the environmental impacts from, Project operations. Great Basin Resource Watch. 844 F.3d at 1101.


**Violation of NEPA – Failure to Adequately Analyze Mitigation for Project Impacts**

176.    NEPA requires DOI/BLM to fully analyze mitigation measures, their effectiveness, and any impacts that might result from their implementation.  NEPA regulations require that an EIS: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 CFR § 1502.14(f); and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." 40 CFR § 1502.16(h).  As noted herein, that did not occur in this case.

177.    NEPA requires that DOI/BLM review mitigation measures as part of the NEPA process -- not in some future decision shielded from public review. 40 CFR § 1502.16(h).

Putting off an analysis of possible mitigation measures until after a project has been approved, and after adverse environmental impacts have started to occur,

47

1
2
3

> runs counter to NEPA's goal of ensuring informed agency decisionmaking. *See*
> *Robertson*, 490 U.S. at 353, 109 S.Ct. 1835 ("Without [a reasonably complete]
> discussion [of mitigation], neither the agency nor other interested groups and
> individuals can properly evaluate the severity of the adverse effects.").

4

> Great Basin Resource Watch, 844 F.3d at 1107.

5
6
7
8
9

178.    The "mitigation" plan to purportedly reduce the adverse impacts to the surface and ground waters that will be dewatered is largely a plan to monitor the predicted drop in the water table and only then develop a plan to purportedly replace the lost flows to some of the impacted springs.  2012 FEIS at 3-88 to -106.  *See also* ROD at 19-20 (discussing mitigation measures for lost spring flows).

10
11
12
13
14
15

179.    For example, mitigation measure 3.2.3.3-2c, to purportedly replace spring flows eliminated by the dewatering, will not even be considered, let alone implemented, until noticeable drops in the water table (and associated loss of spring flows) have already occurred – and only **after** mining and processing operations have ended during mine closure:

16
17
18
19
20
21
22
23
24

> The numerical ground water flow modeling indicates that some impacts to springs may occur after the end of mining and milling operations, when some of the operational measures described above may not be available. For the post-Project delayed impacts of drawdown, the ground water flow model will be updated during the closure process consistent with regulations and policies using the accumulated field data for pumping rates, consumptive use, and observed drawdown within the Hydrologic Study Area to re-evaluate projected drawdown that will occur after the end of mining and milling operations.  If BLM determines that the Project impacts perennial stream segments or springs in this post-operational phase, mitigation consisting of one of both of the following measures will be required:
> 1.    Installation of a well and pump at affected stream or spring locations to restore the historic yield of the affected surface water resource.
> 2.    Posting of an additional financial guarantee to provide for potentially affected water supplies in the future.

25
26
27

ROD at 20. *See also* 2012 FEIS Table 3.2.9 (listing mitigation measures), 2012 FEIS at 3-93 to -106; 2012 FEIS Figure 3.2.21 (map of pipes and springs), 2012 FEIS at 3-90.

28

180.   Thus, according to the ROD, this mitigation measure will not even be considered, at a minimum, until after the "44 years of mining and ore processing" are completed. ROD at 3.

181.   The other two mitigation measures for lost stream/spring flows, ROD at 19-20, will also only be considered "If monitoring (Mitigation Measure 3.2.3.3-2a, Water Quantity) indicates that flow reductions of perennial surface waters are occurring and that these reductions are likely the result of mine-induced drawdown, the following measures will be implemented: 1. The BLM will evaluate the available information and determine whether mitigation is required." ROD at 20.

182.   Even this mitigation is inadequately analyzed.  As noted in the ROD and 2012 FEIS: "Implementation of the mitigation outlined in Table 3.2-9 would result in up to approximately 37.2 acres of additional surface disturbance associated with road and pipeline construction and maintenance, as well as the need for approximately 302 acre-feet of water that will at least initially come from EML's existing water rights if additional water rights have not yet been secured."  ROD at 19, 2012 FEIS at 3-89.

183.   Despite the acknowledgement that an additional "302 acre-feet of water" would be needed for this mitigation, there is no analysis of where this water will come from, or the impacts from its withdrawal and discharge into these waters.  Although BLM says that this water "would at least initially come from EML's existing water rights," Id., there is no analysis of the impacts stemming from the EML's extraction of this additional water.

184.   The U.S. EPA, in its comments on the 2012 FEIS, was strongly critical of this omission:

> Section 3.2.3 of the Final EIS indicates the approximate environmental impact associated with the implementation of the proposed surface water quantity mitigation measures. The impacts identified only consider surface disturbance for infrastructure construction. The Final EIS states that the water supply for the up to 302 acre feet per year (afy) of mitigation water

> would come from EML's current groundwater allocation of 11,300 afy until an alternative source for this water is identified. It is likely that any alternative source would also be groundwater. The Final EIS does not discuss the additional impact that this mitigation would have upon groundwater levels should the entire 302 afy be supplied by groundwater extraction in excess of EML's current allocation.

November 13, 2012 EPA comment letter to BLM, at 2.  The 302 afy of additional water equals more than 98.4 million gallons of water needed per year.

185.    To cure this NEPA deficiency, EPA recommended that:

> The Supplemental FEIS or ROD should include the results of revised groundwater modeling showing the additional groundwater drawdown impacts that would result from the up to 302 afy of additional groundwater extraction required to replace lost surface water flows. Alternatively, it should include a restriction that all mitigation water be diverted from EML's existing 11,300 afy water rights.

EPA Nov. 13, 2012 letter at 2.  BLM never prepared the Supplemental FEIS requested by EPA, nor provided the needed analysis.

186.    Eureka County also strongly criticized the lack of analysis for this purported mitigation:

> The County questions the DEIS's assertion that reduction in creek flow will not become significant until the stream is completely dewatered; and the corollary suggestion that expanding groundwater extraction, beyond that already specified for direct application to mining operations, and lacing the landscape with pipes, would provide worthy or effective mitigation.

February 28, 2012 letter from Eureka County to BLM, at 2 (Included in Appendix H to 2012 FEIS as comment # 803).

187.    In its comments on the Draft SEIS in 2019, EPA again highlighted the inadequacies of BLM's analysis of the replacement/mitigation waters:

> As identified in EPA's comment letter on the 2012 DEIS and 2012 FEIS, it is unclear whether there is enough water necessary for the proposed surface and spring water mitigation to replace surface supplies, and whether using Eureka Moly's existing groundwater allotment for replacement purposes is feasible, effectual, or viable over the long term. **The DSEIS does not appear to address**

**the estimated shortfall needed to replace depleted spring and stream water, or the source of this replacement supply.**

Section 3.2.3 of the FEIS evaluated the approximate environmental impacts associated with the implementation of proposed water quantity mitigation measures. The impacts identified only consider surface disturbance for infrastructure construction. The 2012 FEIS stated that the water supply for the up to 302-acre feet per year (afy) (or 100 million gallons) of mitigation water would come from EML's current groundwater allocation of 11,300 afy until an alternative source for this water is identified. It is likely that any alternative source would also be groundwater. **Neither the FEIS or this DSEIS discuss the additional impact that this mitigation would have upon groundwater levels should the entire 302 afy be supplied by groundwater extraction in excess of EML's current allocation.**

FSEIS Appendix D, Comment (no page number provided in FSEIS)(emphasis added).

188.   As a result of these deficiencies, EPA recommended that BLM substantially revise its NEPA mitigation analysis:

>   ***Recommendations:*** EPA recommends that the SFEIS include the results of revised groundwater modeling showing the additional groundwater drawdown impacts that would result from the up to 302 afy of additional groundwater extraction required to replace the lost surface water flows. Unless alternative mitigation water would come from a different groundwater basin, EPA recommends that the SFEIS include a restriction that all mitigation water be diverted from EML's existing 11,300 afy water rights.

>   Discuss in the SFEIS whether the time lag between when the monitored flows produce impacts, to when measures will be taken to replace the water, is effective and viable.

Id. (FSEIS Appendix D).  Outside of repeating its previous list of mitigation measures in the 2012 FEIS, BLM refused to undertake any additional analysis or mitigation measures. Id. (BLM's response to EPA).

189.   In its comments on the FSEIS, EPA again reiterated its serious concerns with BLM's failure to provide the needed analysis of this replacement water:

>   The EPA previously recommended that mitigation replacement flows come from the proponent's existing water rights, or that an alternate replacement source be identified in advance, and the impacts analyzed. This is critical because both the FEIS and FSEIS confirm project activities may permanently

eliminate or severely reduce water levels of 22 springs and 2 perennial streams. (FSEIS, pgs. 16-18; 2012 FEIS Tables 3.2-8 & 3.2-9, pgs. 3-81, 3-89). EPA notes that mitigation measures call for applying, initially, 302-acre feet/year from Eureka Moly's existing water rights to replace the water source, compensate for surface water loss and impacts to grazing and wildlife resources, and restore historic yields (2012 FEIS pgs. 3-88 through 89). **However, the FSEIS does not clearly identify the source of alternative mitigation water once the initial replacement water from existing water rights is expended or otherwise unavailable.**

September 23, 2019 EPA Regional Headquarters letter to Defendant Jon Sherve, BLM Field Manager, at 2 (emphasis added).

190.   As a result of these NEPA deficiencies, "EPA recommends that the ROD identify the alternative supplemental water source that will replace the quantity, functions and values of all lost surface water resources, as well as the impacts to transport alternative water." Id.  Again, DOI/BLM took no action, issuing the ROD just a few days later.

191.   Despite the purported "mitigation" of some of the water losses to some of the affected waters, other springs will be permanently lost (including PWR 107 springs), as noted above, due to the location of the Project's waste dumps and other facilities.  For example, Springs 619, 639, and 646 (and likely 612), will no longer exist and the only "mitigation" for their complete loss is a plan to "install a guzzler east of the Project fence and west of SR [State Route] 278 designed for large game," or "install a guzzler designed for large game."  2012 FEIS Table 3.2.9.  As noted above, based on the FEIS, it also appears that other springs will be unusable due to the location of Project facilities (e.g., Springs 597 and 604).

192.   For the Springs to be covered and/or destroyed by Project facilities, no mention is made of keeping these lands open for stockwatering or public use, as required by the SRHA, PWR 107, and FLPMA.  The "mitigation" plan to "install a guzzler for large game" fails to protect the current livestock use, which is acknowledged to be a current use of these springs. See Table 3.2.9, 2012 FEIS.

193.    There is no support provided as to whether the mitigation for surface waters will be effective.  Although the FEIS states that all of these mitigation measures will be "effective," or "highly effective," no supporting scientific analysis is provided.  2012 FEIS Table 3.2-9.

194.    For example, the "mitigation" for the loss of the PWR springs to be destroyed by the Project facilities is the installation of a wildlife guzzler to be located near the Project. No analysis is given to support the assertion that this will be "highly effective" in attracting and sustaining wildlife, particularly when the new guzzlers will be located in many instances within the Project Boundary and adjacent to Project facilities such as dirt/rock dumps.  *Compare* 2012 FEIS Figure 3.2.21 (location of guzzlers), with Figure 2.1.5 (Project facilities).  In addition, the wildlife guzzler is not intended to mitigate for the elimination of livestock watering.  2012 FEIS Table 3.2-9 (guzzler "designed for large game," not livestock).

195.    DOI/BLM assert that the purported mitigation measure to replace lost stream and spring flows (Mitigation Measures 3.3.3.3-2) will be effective in protecting the water quality and environmental resources in these waters.  For example, for Roberts Creek:

> There is a potential impact to the flow of Roberts Creek resulting from mine-related ground water drawdown under the Proposed Action. A decrease in the flow of Roberts Creek could result in an inability to meet the beneficial uses outlined for a Class A surface water body.
> **Impact 3.3.3.3-2:** The ground water drawdown is predicted to be greater than ten feet for the perennial stream segments of Roberts Creek for varying periods of time up to at least 400 years after the end of mining and milling operations.
> **Significance of the Impact:** The impact is considered potentially significant.
> **Mitigation Measure 3.3.3.3-2:** The measures outlined under Mitigation Measure 3.2.3.3-2 would address the potential reduced flows outlined in the impact.
> **Effectiveness of Mitigation and Residual Effects:** *Implementation of the Mitigation Measure 3.3.3.3-2 would be effective at preventing degradation of water quality in Roberts Creek.* The mitigation measure would restore flows to the creek, which would remove the underlying cause of this potential impact.

2012 FEIS at 3-218 (italics added).  "Roberts Creek and its tributaries are Class A water bodies from the headwaters to the reservoir."  2012 FEIS at 3-183.  Under Nevada law, "The beneficial uses of Class A waters are municipal or domestic supply, or both, … aquatic life, propagation of wildlife, irrigation, watering of livestock [and] recreation." Id.

196.   Despite relying on the discharge of water into the streams/springs as the means to "prevent degradation of water quality," there is no discussion or analysis as to the quality of the water that will be discharged into Roberts Creek, or any of the other waters that will purportedly receive the mitigation replacement water.  *See generally,* 2012 FEIS at 3-91, Figure 3.2.21 (showing the various pipelines that would transport water for discharge into Roberts Creek, the PWR 107 Springs, and other affected waters).

197.   DOI/BLM cannot claim that "Implementation of the Mitigation Measure 3.3.3.3-2 would be effective at preventing degradation of water quality in Roberts Creek," 2012 FEIS at 3-218, or any of the other streams/springs that will be dewatered, when they never analyzed what the quality of the replacement water will be.  Factual determinations made without credible scientific support are arbitrary and capricious.  Relying on mitigation measures that involve pumping, transporting, and discharging water into streams and springs, without analyzing the quality of that water, and its effects upon the environment – clearly a relevant factor that should have been considered – is also the hallmark of an arbitrary and capricious decision.

198.   In addition to surface waters, DOI/BLM also failed to fully analyze and protect ground waters that will be eliminated or severely impacted by the Project.  For example, for ground water, BLM stated that: "BLM would not address or mitigate impacts to water rights."  2012 FEIS at 3-107.  Instead, DOI/BLM defers this analysis to the NDEP (Nevada Division of Environmental Protection).  Yet, under NEPA,

DOI/BLM cannot defer NEPA-mandated analysis to state agencies that have no NEPA responsibilities (or to documents/analysis not subject to NEPA's procedural safeguards).

199.  In addition, because of the erroneous assumptions and conclusions regarding air pollution, DOI/BLM did not prepare or consider any mitigation measures for the Project's air pollution. "No mitigation is proposed for this impact." 2012 FEIS at 3-293 (for $PM_{10}$, $PM_{2.5}$ and Pb emissions); 2012 FEIS at 3-294 (for combustion emissions of CO, $NO_2$, $SO_2$, $PM_{10}$, $PM_{2.5}$ and VOCs (Volatile Organic Compounds).

200.  Similar to impacts to water resources, BLM admits that additional mitigation to protect air quality "could be implemented," but erroneously asserts that it is up to NDEP, not BLM, to analyze and require such mitigation. 2012 FEIS at 3-701 (listing various mitigation to lessen air pollution from mine equipment). As noted above, such a failure violates NEPA's mitigation requirements.

201.  DOI/BLM clearly have the authority to mitigate all adverse impacts, regardless of a state's concurrent jurisdiction over the operations:

> Although other Federal and State agencies regulate various aspects of mining under other statutes, BLM has its own responsibilities under FLPMA and the mining laws to protect the resources and values of the public lands from unnecessary or undue degradation.
> …
> [S]ections 302(b) and 303(a) of FLPMA, 43 U.S.C. 1732(b) and 1733(a), and the mining laws, 30 U.S.C. 22, provide the BLM with the authority to require mitigation. Mitigation measures fall squarely within the actions the Secretary can direct to prevent unnecessary or undue degradation of the public lands. An impact that can be mitigated, but is not, is clearly unnecessary.

65 Fed.Reg. 69998, 70053 (November 21, 2000)(Preamble to DOI/BLM's 43 C.F.R. Part 3809 regulations).

**Violation of NEPA – Failure to Adequately Analyze Impacts to Water Resources**

202.  In addition to failing to adequately analyze mitigation for the surface and ground waters lost from the pumping/dewatering, and the effectiveness of those mitigation

measures, DOI/BLM failed to adequately analyze the actual impacts to water resources, both from direct Project activities and mitigation as well as from other cumulative activities in the area.

203.   Regarding direct impacts, DOI/BLM failed to respond to the Ninth Circuit's finding that "the analysis of ground water pumping in the FEIS does *not* take into account the roughly 200 gallons per minute needed to replace depleted spring and stream water." Great Basin Resource Watch, 844 F.3d at 1110 (emphasis in original).  The Court rejected EML's argument that "the FEIS thoroughly analyzed the effect of using water from its production wells" to replace the waters eliminated by the dewatering," finding EML's "argument … factually incorrect." Id.

204.   The ROD and FSEIS did not undertake any additional analysis of the environmental effect of extracting and using this additional water, despite the Ninth Circuit's finding that the 2012 FEIS was legally deficient on this account.

205.   The Ninth Circuit did note that, in comparison to the massive loss of water caused by the pumping/dewatering itself, the amount of mitigation water involved with BLM's error in failing to consider the effects of using that water "appears to be quite small." 844 F.3d at 1110.  However, after reviewing BLM's response to the remand, EPA stressed that this is a critical issue that BLM should have reviewed.  "The EPA previously recommended that mitigation replacement flows come from the proponent's existing water rights, or that an alternate replacement source be identified in advance, and the impacts analyzed. This is critical because both the FEIS and FSEIS confirm project activities may permanently eliminate or severely reduce water levels of 22 springs and 2 perennial streams."  September 23, 2019 EPA Regional Headquarters letter to Defendant Jon Sherve, BLM Field Manager, at 2.

206.    In addition to failing to analyze the impacts from, or the source of, removing the additional 302 afy of groundwater as purported mitigation for the lost stream and spring flows, neither the 2012 FEIS or the FSEIS contain any discussion of the impacts from discharging this water into the affected streams and springs.

207.    DOI/BLM never analyzed the quality of this replacement water, nor its effects upon the streams and springs.

208.    DOI/BLM cannot rely on additional waters to be discharged into affected streams and springs as mitigation for those lost flows when it has not analyzed the impacts to those streams and springs (and to the wildlife, recreation, livestock, and other public uses of those waters), including whether the discharged mitigation waters would fully protect these uses and comply with all water quality standards for those waters.

209.    Regarding cumulative impacts from other activities in the area that may adversely affect water resources, as the Ninth Circuit held in this case, "'[i]n a cumulative impact analysis, an agency must take a 'hard look' at *all* actions' that may combine with the action under consideration to affect the environment. *Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010)." Great Basin Resource Watch, 844 F.3d at 1104 (emphasis in original).

210.    BLM/DOI refused to respond to EPA's (and GBRW/WSDP/PLAN's) serious concerns regarding the failure to analyze the cumulative impacts to groundwater – and the associated effects to connected surface streams and springs.  For example, BLM recently initiated a new round of oil and gas leases in the same area as the Mt. Hope Project, including proposed leases where significant stream and spring flows losses are predicted.

211.    BLM issued the Environmental Assessment (EA) for the Lease Sale in April of 2019. https://eplanning.blm.gov/epl-front-

office/projects/nepa/117695/170192/206810/FINAL_EA_for_March_2019_Parcels_f

or_July_2019_O+G_Lease_Sale.pdf (viewed October 28, 2019).

212.    Despite the fact that the same BLM office proposed oil and gas leasing near Mt.

Hope, neither the FSEIS nor the ROD considered at all the cumulative impacts on

water resources that may occur as a result of the significant water removals caused by

expected drilling on the leases.  As EPA determined:

> *Cumulative Impacts*
> Potential impacts to water resources from oil and gas development are
> acknowledged as "potentially severe" in terms of further drawdown of
> water levels. EPA notes that the March 2019 Lease Sale EA identified
> that oil and gas exploration, drilling, and production could include
> well stimulation and hydraulic fracturing which uses "appreciable"
> amounts of water, up to 800,000-10 million gallons (Lease Sale EA, p.
> 17, 28-29).

September 23, 2019 EPA Regional Headquarters letter to BLM, at 2.

213.    "EPA notes that a recent BLM March 2019 Competitive Oil and Gas Lease Sale

Environmental Assessment (Lease Sale EA) estimated approximately 25 wells

could be developed within the next ten years in the district, and a map of proposed

oil and gas lease parcel locations within the Lease Sale EA shows at least 15 of the

parcels offered for sale are within 10 miles of the Mt. Hope Mine." September 23,

2019 EPA letter at 1.

214.    The map of proposed leases (Lease Sale EA at 12, Figure 2), when compared

with the 2012 FEIS, shows approximately 50 new proposed leases north of

Highway 50 within the "Cumulative Action Scenario – Projected Water Table

Drawdown" for the Mt. Hope Project.  2012 FEIS at 4-51, Figure 4.4.1

("Cumulative Action Scenario – Projected Water Table Drawdown").

215.    EPA highlighted the fact that "oil and gas exploration, drilling, and production

could include well stimulation and hydraulic fracturing which uses 'appreciable'

amounts of water, up to 800,000-10 million gallons (Lease Sale EA, p. 17, 28-29)."  September 23, 2019 letter at 2.

216.     As a result of this significant omission, "EPA recommends the ROD disclose and discuss the significance of these cumulative aquatic resource effects and what restrictions, buffers, engineering controls or other mitigations would be most appropriate to protect scarce water resources." Id.

217.     Despite this, the FSEIS and ROD never discussed or analyzed these new cumulative impacts, or even mentioned the proposed leasing and anticipated drilling impacts at all, in violation of NEPA's mandate that the agency "must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 CFR § 1500.1(b).

**Violation of NEPA -- Failure to Adequately Analyze Baseline/Background Air Quality**

218.     A central finding of the Ninth Circuit's decision was that the 2012 FEIS and 2012 ROD violated NEPA by failing to properly analyze background/baseline air quality conditions, and failing to adequately consider the cumulative air emissions of other air pollution sources within the cumulative impacts study area around the Project site. Great Basin Resource Watch, 844 F.3d at 1101-06.  As a result, the Court vacated and remanded the ROD and required BLM to comply with NEPA in any subsequent review.  The new FSEIS and ROD purport to satisfy the Ninth Circuit's direction and NEPA.

219.     Regarding background/baseline levels, DOI/BLM is required to "describe the environment of the areas to be affected or created by the alternatives under consideration."  40 CFR § 1502.15.  The establishment of the baseline conditions of the affected environment is a fundamental requirement of the NEPA process. "Without establishing the baseline conditions which exist ... before a project begins,

59

there is simply no way to determine what effect the project will have on the environment, and consequently, no way to comply with NEPA." Great Basin Resource Watch, 844 F.3d at 1101, *quoting* Half Moon Bay Fisherman's Mktg. Ass'n. v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988). "[W]ithout [baseline] data, an agency cannot carefully consider information about significant environment impacts. Thus, the agency fails to consider an important aspect of the problem, resulting in an arbitrary and capricious decision." N. Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1085 (9th Cir. 2011).

220. The FSEIS summarizes DOI/BLM's attempt to comply with the Ninth Circuit's direction: "The discussion of background concentrations has been revised (Air Sciences, Inc. 2017, revised 2018) to respond to the remand from the Ninth Circuit Court of Appeals, which directed BLM to further explain its reliance on the zero baseline background concentration values for carbon monoxide (CO), nitrogen dioxide (NO2), one- and three-hour time-averaged sulfur dioxide (SO2), and lead (Pb)." FSEIS at 24.

221. But like the 2012 FEIS, the new FSEIS refused to obtain any data regarding the existing background, or baseline, levels of air pollutant levels at or near the Project site. "No monitoring has been performed within the Project Area for ambient concentrations of CO, NO2, ozone, or SO2, nor does the Nevada Division of Environmental Protection (NDEP) Bureau of Air Pollution Control (BAPC) specify background concentrations for these pollutants. However, background values are necessary for the purpose of comparing modeled results to the National Ambient Air Quality Standards (NAAQS) and Nevada State Ambient Air Quality Standards." FSEIS at 24. *See* 2012 FEIS at 3-288.

222. Also like the 2012 FEIS, the FSEIS sets the baseline/background levels for Clean Air Act Criteria Pollutants noted in the Ninth Circuit's decision (carbon monoxide (CO),

60

nitrogen dioxide (NO2), one- and three-hour time-averaged sulfur dioxide (SO2), and lead (Pb)), at "zero."  FSEIS at 24, Table 3.6-1.

223.   BLM again relies on a 2007 discussion with a state employee of the Nevada Department of Environmental Protection (NDEP)'s Bureau of Air Pollution Control (BAPC) to set the baseline/background levels of these pollutants at zero – the exact same employee discussion relied upon in the 2012 FEIS and found to be legally inadequate by the Ninth Circuit. *Compare* FSEIS Table 3.6-1 ("Reference" for background levels described as "Greg Remer, BAPC, March 19, 2007") *with* 2012 FEIS at 3-288 (Table 3.6-7)("Reference" for background levels described as "Greg Remer, BAPC, March 19, 2007").

224.   The FSEIS did provide "representative" baseline/background levels for CO, $NO_2$ and $SO_2$ for rural areas similar to the Project site that are well above zero.  FSEIS at 34, Table 3.6-4 (showing "background concentrations for rural areas like the Project" for CO, $NO_2$ and $SO_2$).

225.   Despite acknowledging these above-zero representative background/baseline levels, the FSEIS's new air quality analysis still set the baseline/background levels for CO, $NO_2$ and $SO_2$ as "zero."  FSEIS Table 4.1-1.

226.   DOI/BLM's refusal to consider the representative background/baseline levels for CO, $NO_2$ and $SO_2$ as above "zero" also contradicts BLM's own recent review and approval of the Prospect Mountain Mine southwest of Eureka within the same air quality Cumulative Effect Study Area as Mt. Hope (and the one project considered in BLM's cumulative impacts air analysis discussed below).  BLM's Mt. Lewis Field Office approved that mine in July 2019  It relied on an air quality report that specifically included the above-zero background/baseline levels noted in FSEIS Table 3.6-4 – the same above-zero background/baseline levels that were not factored into the FSEIS's air quality determinations for Mt. Hope.

227.    In that May 2019 air quality report for the Prospect Mountain Mine, Table 3-2 at p. 15, BLM included above-zero background/levels for CO, $NO_2$ and $SO_2$ (as well as PM) https://eplanning.blm.gov/epl-front-office/projects/nepa/108000/174104/211543/20190531_ProspectMtn_AirRep_Final_508.pdf (viewed October 28, 2019).

228.    The background/baseline levels for the pollutants in that Table are the same as found in FSEIS Table 3.6-4.  Yet while BLM included these levels in its air quality review for the Prospect Mountain Mine, BLM's "Cumulative Modeling Analysis" for the Mt. Hope Project still listed the "Background Concentration" for  CO, $NO_2$ and $SO_2$ as "zero." FSEIS at 37, Table 4.1-1.

229.    It was arbitrary and capricious for DOI/BLM to conclude that the background/baseline level for these pollutants is "zero" at Mt. Hope, when BLM's own review of a project within the same air quality area shows these levels to be well above zero.

230.    The continued use of zero for background concentrations is not supported by the required detailed analysis or the evidence in the record.  As another example, in making this assumption, the FSEIS states "[t]he Project Area is located in a rural area with no development or major roads (which are potential sources of CO, NO2 and SO2 emissions) within the immediate vicinity."  FSEIS at 26.

231.    This is inaccurate, as the same paragraph admits that "[t]he nearest major road to the Project Area is Nevada SR 278 located … approximately one-quarter mile to the east from the northeastern edge of the Project area."  FSEIS at 26.  Furthermore, even this statement is misleading, as the map of the Project facilities shows that SR 278 is actually within, not a quarter mile away from, the Project Boundary.  2012 FEIS Figure 2.1.5.

232.     As shown in the 2012 FEIS, the Cumulative Effects Study Area for Air Quality (CESA) includes lands crossed by SR 278 as well as U.S. Highway 50 and other roads. 2012 FEIS Figure 4.3.5.  DOI/BLM cannot avoid calculating the emissions from activities occurring within the Air Quality CESA.

233.     As BLM acknowledges, "[B]ackground values are necessary for the purpose of comparing modeled results to the National Ambient Air Quality Standards (NAAQS) and Nevada State Ambient Air Quality Standards." FSEIS at 24.  *See* 2012 FEIS at 3-288.

234.     The FSEIS combined these "zero" levels to calculate the predicted air pollution emissions from the Project, concluding that none of the predicted levels of these criteria pollutants (combined with the background levels) would be above the applicable standards.  FSEIS Table 4.1-1.

235.     Yet without adequate background/baseline data, this conclusion is unsupportable.

236.     The U.S. EPA specifically advised BLM that the failure to conduct baseline analysis and obtain baseline data violates NEPA:

> The Final EIS, however, substitutes a value of zero for CO, $NO_2$, and $SO_2$ (1-hour and 3-hour) background concentrations.  We understand that the citations provided for this change are personal communications with two individuals at the Nevada Bureau of Air Pollution Control on March 19, 2007 and March 19, 2008. EPA is concerned that a background concentration of zero for these pollutants may be too low to be accurately representative.

November 13, 2012 EPA comments on 2012 FEIS to BLM at 2.

237.     Although DOI/BLM assert that the FSEIS properly responded to the Ninth Circuit's remand order on the "zero" baseline/background issue, EPA again determined that the FSEIS stills suffers from an inadequate analysis of these levels.  "The EPA recommended against the use of 'zero' as a background concentration value for modelling criteria air pollutants, as no air is completely free from background pollutants; however, the FSEIS continues to include a background concentration

of zero. For future analyses, the EPA recommends that the BLM use available representative data to estimate background concentrations, as has been done for other environmental reviews for mining sites in Nevada." September 23, 2019 EPA letter to BLM, at 2.

238.   This reliance on "zero" for background conditions of $NO_2$, as with the other pollutants, contradicts the record and other admissions in the 2012 FEIS and FSEIS.

239.   For example, DOI/BLM's "zero" baseline/background assumption ignores its own admission that there are other sources of $NO_2$ emissions in the area. In its discussion of the no-action alternative (i.e., no Project approval), BLM admits that: "Combustion of diesel in the trucks and drilling rigs can produce elevated levels of CO, $NO_2$, $SO_2$, $PM_{10}$, $PM_{2.5}$, and $O_3$. The amount of these emissions under the No Action Alternative would be substantially less than under the Proposed Action." 2012 FEIS at 3-305. Although no analysis is provided to show how "substantially less" the current/background emissions are (itself a violation of NEPA's mandate to analyze these issues), it is clear that they are more than "zero."

240.   Additionally, for "Past and Present Actions" in the area, Table 4.2-2 in the 2012 FEIS lists over a dozen "Activities that May Cumulatively Affect Air Resources." Yet the 2012 FEIS and 2019 FSEIS are devoid of any calculation or even estimate of the emissions from these sources.

241.   DOI/BLM's unsupported conclusion that background levels of $NO_2$ (and other pollutants) is zero is further undermined by the Project's location adjacent to Highway 278. As noted above, "combustion of diesel in the trucks" is a source of $NO_2$. 2012 FEIS at 3-305. DOI/BLM's conclusion that there are no emissions from trucks on Rte. 278 (i.e., zero background levels) is groundless.

64

**Violation of NEPA -- Failure to Adequately Analyze Direct, Indirect and Cumulative Air Pollution**

242.    In addition to requiring an accurate analysis of background/baseline pollutant levels, NEPA requires DOI/BLM to fully consider all direct, indirect, and cumulative environmental impacts of the proposed action.  40 CFR §1502.16; 40 CFR §1508.8; 40 CFR §1508.25(c).  Direct effects are caused by the action and occur at the same time and place as the proposed project.  40 CFR § 1508.8(a).  Indirect effects are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  40 CFR § 1508.8(b).  Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." Id.

243.    "'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 CFR § 1508.7.

244.    As the Ninth Circuit held in this case, "Accordingly, '[i]n a cumulative impact analysis, an agency must take a 'hard look' at *all* actions' that may combine with the action under consideration to affect the environment. *Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010)." Great Basin Resource Watch, 844 F.3d at 1104 (emphasis in original).  DOI/BLM failed to do that at Mt. Hope.

245.    The 2012 FEIS acknowledges that other sources of air pollution in the "Cumulative Effects Study Area (CESA)" will emit Clean Air Act Criteria Pollutants.  For example, BLM admits that mining, oil and gas, agriculture and commercial

65

operations in the area all "generate fugitive dust and combustion emissions."  2012

FEIS at 4-54.  *See also, e.g.*, Figure 4.3.5, FEIS at 4-45 (showing mineral and oil and

gas projects, including the 100+ oil and gas leases, within the air quality CESA).

246.     Despite these errors and omissions, DOI/BLM nevertheless concluded that the Project

would not result in any potential violation of federal or state air quality standards and

related laws.  "Air impacts from the Proposed Action, in combination with air

impacts from past and present actions, and RFFAs [Reasonably Foreseeable Future

Actions], would result in total impacts below the NAAQS.  This conclusion is

consistent with the cumulative air impacts analysis in the FEIS."  FSEIS at 37.

247.     For this conclusion, DOI/BLM rely on the new report prepared by EML's contractor,

Air Sciences, Inc..  BLM failed to include the 2017 Air Sciences 2017 Supplementary

Analysis in the documents available to the public during the public comment period,

so GBRW/WSDP/PLAN were unable to review or verify the data/conclusions offered

by Air Sciences, in violation of GBRW/WSDP/PLAN's, and the public's, rights to

review and comment upon DOI/BLM proposals.

248.     In any event, EML's air quality report failed to account for the true cumulative air

impacts.  For example, the only current and reasonably foreseeable sources of air

pollution added to the Mt. Hope Project's emissions were three distant mining

operations: "Cumulative Impact" calculated from "Combined impact from Mount

Hope, Gold Bar, Ruby Hill, and Prospect Mountain Mine." FSEIS at 37, Table 4.1-1

("Mount Hope Project Cumulative Modeling Analysis").

249.     NEPA's obligation to consider cumulative impacts extends to all "past," "present,"

and "reasonably foreseeable future actions."  40 CFR §1508.7.  This analysis must

include project-specific cumulative data, a detailed quantified assessment of other

projects' combined environmental impacts, and objective quantification of the

impacts from other past, existing and reasonably foreseeable future activities within

the Cumulative Effect Study Area (CESA).  <u>Great Basin Resource Watch</u>, 844 F.3d at 1104-06.

250.    Although the 2012 FEIS admits that there will be cumulative effects/impacts from various other oil and gas, agricultural, commercial, and other activities, there is no detailed analysis about the actual impacts from any of these activities.  2012 FEIS Section 4, at 4-1 to -104.  Instead, the 2012 FEIS largely lists these activities, notes that they will result in cumulative impacts along with the Project to various resources (e.g., air, water, wildlife, cultural/historical), provides a summary of the acreages of these activities, and a cursory mention of impacts.  *See*, *e.g.*, Table 4.2-2, 2012 FEIS at 4-10 to -12, listing types of activities that will cause cumulative impacts.

251.    For "Past and Present Actions" in the area, Table 4.2-2 lists over a dozen "Activities that May Cumulatively Affect Air Resources."  Yet the 2012 FEIS and 2019 FSEIS are devoid of any calculation or even estimate of the emissions from these sources.

252.    Similarly, Table 4.2-2 lists over a dozen "Reasonably Foreseeable" "Activities that May Cumulatively Affect Air Resources" in the area.  Yet neither the 2012 FEIS or the FSEIS contain any estimate or analysis of the potential emissions from these activities.

253.    The FSEIS fails to calculate or even estimate cumulative air emissions within the AQ CESA, particularly the air emissions from all "reasonably foreseeable future actions" (RFFAs) such as oil and gas operations, notice-level mineral operations, gravel mines, truck/vehicle traffic, and other activities within the AQ CESA listed in Table 4.2-2.

254.    For these reasonably foreseeable activities, the FSEIS does not include any analysis of air emissions from any of the RFFAs, except from one other mine.  "A modeling analysis was conducted to determine the cumulative impacts of the combined emissions from the Proposed Action (i.e., Project-related emissions including heavy-

duty mobile equipment [e.g., haul trucks, dozers, graders, water trucks, etc.]), the present actions of the Gold Bar Project and the Ruby Hill Mine Project, and the RFFA of the Prospect Mountain Mine Project."  FSEIS at 36.

255.    The Prospect Mountain Mine Project "is located about 3.5 miles southwest of the town of Eureka in Eureka County, Nevada." BLM Decision Record, Plan of Operations Approval, Determination of Required Financial Guarantee Amount," Prospect Mountain Project, at 1 https://eplanning.blm.gov/epl-front-office/projects/nepa/108000/176864/215537/20190712_Gullsil_ProspectMtn_DecisionRecord.pdf (reviewed October 28, 2019)(approval signed by Defendant Jon Shevre, BLM Mt. Lewis Field Office Manager on July 12, 2019).

256.    Thus, the only "reasonably foreseeable future action" (RFFA) that DOI/BLM considered in the FSEIS's air quality discussion was a project on the other side of Federal Highway 50, well over 20 miles from Mt. Hope.  Yet **none** of the other RFFAs within the AQ CESA, most of them north of Highway 50 and many closer to Mt. Hope than the Prospect Mountain Mine, were ever considered by DOI/BLM. *See* Figure 4.3.5, 2012 FEIS at 4-45 (showing mineral and oil and gas projects, including the 100+ oil and gas leases, within the air quality CESA); 2012 FEIS Table 4.2-2, listing over a dozen "Past and Present" and over a dozen "Reasonably Foreseeable" "Activities that May Cumulatively Affect Air Resources" in the area.

257.    BLM is under the mistaken belief that the only inadequacy found by the Ninth Circuit on cumulative air emissions was the failure to include the air emissions from the two other current, and one future, mining projects noted in the 2012 FEIS.  The Court found that the FEIS's "discussion of cumulative air impacts is insufficient." 844 F.3d at 1105.  The Court then quoted from FEIS section 4.4.4 to support its NEPA inadequacy ruling. Id.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

258.     Yet the FSEIS merely relies upon that same section 4.4.4 to calculate the cumulative

air emissions.  "Reasonably foreseeable future actions (RFFAs) are described in

Section 4.4.4 of the Final EIS." FSEIS at 36.

259.     The Court specifically determined that BLM was required to conduct a complete

analysis of the air emissions from all current projects as well as all RFFAs in the AQ

CESA – not just from the other mines:

> [T]he BLM in this case did not provide sufficiently detailed information in its
> cumulative air impacts analysis.  The BLM made no attempt to quantify the
> cumulative air impacts of the Project together with the Ruby Hill Mine and
> vehicle emissions.  **Nor did the BLM attempt to quantify or discuss in any
> detail the effects of other activities, such as oil and gas development, that are
> identified elsewhere in the FEIS as potentially affecting air resources.**
> …
> The cumulative air impacts portion of the FEIS fails to "enumerate the
> environmental effects of [other] projects" or "consider the interaction of multiple
> activities." *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1133 (9th Cir.
> 2007). Accordingly, we hold that the cumulative impacts portion of the FEIS does
> not comply with NEPA.

844 F.3d at 1105-06 (emphasis added).

260.     The FSEIS, and apparently also the 2017 EML air report, did not analyze all of the

cumulative air emissions from "other activities, such as oil and gas development, that

are identified elsewhere in the FEIS as potentially affecting air resources." Id.  This is

despite the FEIS's conclusions that such development is "reasonably foreseeable."

2012 FEIS Table 4.2-2, listing over a dozen "Past and Present" and over a dozen

"Reasonably Foreseeable" "Activities that May Cumulatively Affect Air Resources"

in the area.

261.     Regarding oil and gas operations, the 2012 FEIS acknowledges that: "the overall

potential for oil and gas exploration and development within the CESAs would be

moderate to high because it is on a trend between the Pine Valley and Railroad Valley

production wells.  In addition, oil and gas interest has been increasing in the area. In

the assessment area for EA NV063-EA06-092, an average of one exploration well

was drilled per year between the years of 1980 and 2004 versus a total of 13 exploration wells drilled in the 33 years prior." 2012 FEIS at 4-47.

262.    The 2012 FEIS determined that, based on a nearby/overlapping oil and gas leasing EA issued in 2006 (NV063-EA06-092), there would be substantial oil and gas activities within just the first ten years.  2012 FEIS 4-47/48.  That EA only covered the "eastern portion of the Shoshone-Eureka Planning Area with lands in the southern CESA portions of Eureka and Nye Counties," 2012 FEIS 4- 47, but did not analyze oil and gas leasing in Elko County, which covers a large portion of the Mt. Hope AQ CESA.  *See* FEIS Figure 4.3.5.  The 2012 FEIS estimated that, during the initial ten-year period (no estimates were given for later years of the Mt. Hope Project, which should have been done), and just on the leases covered in the 2006 EA: "Surface disturbance from oil and gas exploration could total a maximum of 572.5 acres."  2012 FEIS 4-47.  "Surface disturbance from oil and gas production over the ten-year planning period could total a maximum of 54.5 acres."  2012 FEIS 4-47/48.

263.    Despite predicting that there will be both oil and gas exploration and development on BLM-issued leases in the area, and estimating the amount of ground disturbance from these activities, BLM failed to analyze the cumulative air emissions from exploration/development on these leases – as required by the Ninth Circuit's order and NEPA.

264.    Based on 2012 FEIS Figure 4.3.5, there are well over 100 "Authorized Oil and Gas Leases" within the Mt. Hope AQ CESA.  Yet neither the 2012 FEIS (found legally inadequate under NEPA by the Ninth Circuit) or the new FSEIS (which relies on Section 4.4.4 of the 2012 FEIS) contain any analysis of potential cumulative air pollutant emissions from exploration and/or development on these leases, or from any other potential sources outside of the three distant mines.

70

265.   Instead, BLM merely concluded that "[i]n response to the remand from the Ninth Circuit Court of Appeals, the BLM confirmed that there are no oil and gas developments in the CESA, and vehicular emissions are generally considered included in background concentrations and are not specifically included in air models for NEPA analysis." FSEIS at 36.

266.   This ignores the Ninth Circuit's order that DOI/BLM analyze the **future** potential air emissions from oil and gas activity within the AQ CESA – not just the present situation.  Under NEPA, cumulative impacts necessarily include air emissions from "past, present, and reasonably foreseeable **future** actions." 40 CFR § 1508.7 (emphasis added).

267.   Recent BLM NEPA analysis for oil and gas leases in the West include quantified estimates and analysis of potential air pollutant emissions from future exploration/development of these leases – estimates and analysis lacking from any of the air quality discussion in the FSEIS and 2012 FEIS.

268.   As part of their comments on the Draft SEIS in April 2019, GBRW/WSDP/PLAN submitted a number of BLM Environmental Assessments (EAs) for oil and gas leasing in Montana, South Dakota, North Dakota, and New Mexico.  In each of these EAs, BLM analyzed/estimated the potential air emissions from exploration/development of the leases covered by the EAs.

269.   BLM included these calculations in the leasing EAs despite the fact that oil and gas leases themselves do not approve any drilling, or pollutant emissions, as the leases just provide lease holders with the right to apply for approval to drill on those leases. Nevertheless, BLM considered these emissions to be reasonably foreseeable outcomes of the proposed leasing under NEPA.

270.   Yet the Mt. Hope FSEIS (and 2012 FEIS) failed to even attempt to estimate potential emissions from the oil and gas leases in the Mt. Hope Air Quality CESA.  As BLM

did in these leasing EAs, BLM is very capable of analyzing/estimating the indirect and cumulative impacts to air quality (as well as water quantity/dewatering, water quality, and other resources resulting from activities on the leases), as well as actually measuring background levels of air pollutants in the leasing area.

271.    The fact that DOI/BLM's approval of the Mt. Hope Project does not authorize oil and gas leasing does not mean that BLM can ignore the indirect and cumulative impacts that may result from activities on these current BLM leases, which BLM is fully capable of doing (as shown by the various BLM EAs across the West).

272.    The FSEIS takes the position that there are no reasonably foreseeable potential emissions from activities that may occur on the over 100 oil and gas leases in the CESA (or from any other of the over a dozen "Reasonably Foreseeable" "Activities that May Cumulatively Affect Air Resources" in the area shown in 2012 FEIS Table 4.2-2.). FSEIS, Appendix D, response to comment C-9.

273.    As grounds, BLM contradicts its previous position in the 2012 FEIS that the probability of oil and gas development in the area was "moderate to high." 2012 FEIS at 4-47. Now, with no evidentiary support, the FSEIS says that "there is a low probability, and thus the BLM did not include such [emissions from oil and gas exploration/development] in the revised air quality modeling for the Final SEIS." FSEIS Appendix D, response to comment C-9.

274.    Yet, even if there was evidence to support this switch of probabilities (which has not been provided), "low probability" of emissions from oil and gas exploration/development on the 100+ leases within the CESA does not equal "zero" emissions.

275.    For example, in a recent BLM EA for an oil/gas lease sale in rural Utah, BLM stated that there would be a "low potential for oil and gas" development. Environmental

72

Assessment DOI-BLM-UT-0000-2019-0002-Other_NEPASLFO, June 2019

Competitive Oil and Gas Lease Sale, Salt Lake Field Office Area Parcels, at 7

(attached to GBRW/WSDP/PLAN comments). https://eplanning.blm.gov/epl-front-

office/projects/nepa/119572/171474/208481/EA_SLFO_DOI-BLM-UT-0000-2019-

0002-EA(BoxElder)4-23-2019.pdf (viewed October 28, 2019).

276.   Yet in that EA, BLM estimated that, at a minimum, at least one well would be drilled

per lease area and thus included a quantified estimate of air pollutant emissions. For

example, regarding greenhouse gas (GHG) emissions, BLM stated:

> Potential GHG emissions from speculative future oil or gas well production on the
> parcels was calculated assuming one well per parcel and an emissions estimate
> value. Total GWP, which includes direct and indirect emissions of carbon
> dioxide, methane, and nitrous oxide from an oil or gas well (including well
> development and production) are 1,676 tons per year (tpy) $CO_2e$ for a single
> operational well and 2,606 tons per year $CO_2e$ for a single drill rig. For one
> potential well, this would equate to 1,676 tpy $CO_2e$ for well operations and 2,606
> tpy $CO_2e$ for drilling and construction.
> …
> Using the RFDS [Reasonably Foreseeable Development Scenarios] of one
> producing well, and an EPA emissions factor of 0.0551 metric tons (MT) of $CO_2$
> per million cubic feet of gas and 0.43 MT of $CO_2e$ per barrel (EPA 2018),
> indirect annual downstream GHG emissions can be estimated at 3,483 MT
> $CO_2e$/yr for a gas well and 3,156 MT $CO_2e$/yr for an oil well. Actual GHG
> emissions may range from zero (assuming parcels are not sold or developed) to an
> indeterminate upper range based on realized production rates, control technology,
> and physical characteristics of any gas produced. A range of production estimates
> and downstream emissions for the field office is presented in Appendix H.

Utah 2019 EA at 28-29.

277.   For other pollutants, such as NOx, BLM estimated that each well would produce

13.37 tons for just the initial drilling and completion of one well. Utah 2019 EA at

Table 4, at pp. 26-27.

278.   BLM/DOI also ignore the fact that BLM's Battle Mountain District Office – the same

office that prepared the ROD for Assistant Secretary Hammond and which oversees

the Mt. Lewis Field Office which issued the 2012 FEIS and new FSEIS – completed

in April 2019 its own EA and proposal for additional oil and gas leasing in the vicinity of Mt. Hope, including over 40 leases within the Air Quality CESA. *Compare* 2012 FEIS Figure 4.3.5 (showing existing oil and gas leasing within the CESA) with April 2019 Leasing EA at 12, showing proposed lease parcels in the area. https://eplanning.blm.gov/epl-front-office/projects/nepa/117695/170192/206810/FINAL_EA_for_March_2019_Parcels_for_July_2019_O+G_Lease_Sale.pdf (viewed October 28, 2019) (BLM 2019 Lease EA).

279.   In that EA, BLM analyzed and determined an estimated level of air pollution that could be reasonably expected from exploration/development on the leases (like the other BLM EAs submitted by GBRW/WSDP/PLAN to BLM). Yet none of that analysis was considered in the FSEIS that was released later in 2019.

280.   EPA criticized BLM for, at Mt. Hope, failing to consider what BLM itself admits in the 2019 Lease EA are the reasonably foreseeable potential air pollution emissions that can be expected to result from activities on the leases:

> The EPA continues to recommend that the BLM consider nearby sources and reasonably foreseeable future actions as a part of assessing cumulative air quality impacts associated with the proposed molybdemum [*sic*] mine. EPA notes that a recent BLM March 2019 Competitive Oil and Gas Lease Sale Environmental Assessment (Lease EA) estimated approximately 25 wells could be developed within the next ten years in the district, and a map of proposed oil and gas lease parcel locations within the Lease Sale EA shows **at least 15 of the parcels offered for sale are within 10 miles of the Mt. Hope Mine.** Even though the Final SEIS states that potential oil and gas development emissions need not be considered because of the "reduced likelihood" that applications for permits to drill will be filed (FSEIS p. 36 and Response to Comment C-9), **the Lease Sale EA provides current information that anticipates an increase in overall criteria pollutants, hazardous air pollutants, and greenhouse gas emissions.**

September 23, 2019 EPA letter to BLM, at 1 (emphasis added).

281.    Five of the proposed leases are on the same side of Highway 278, just a few miles south of the Mt. Hope Mine.  BLM 2019 Lease EA Figure 2.  Another cluster of proposed leases is just across the Highway from the Mine, in Diamond Valley.  Id.

282.    Because of the potential for cumulative air pollution emissions from activities on these proposed leases that "anticipates an increase in overall criteria pollutants, hazardous air pollution, and greenhouse gas emissions," "EPA recommends that BLM update the Mount Hope cumulative impact analysis, and provide updated conclusions in the ROD, to reflect total anticipated cumulative increases in each criteria air pollutant and hazardous air pollutant when considering the proposed mine operating along with 25 anticipated oil or natural gas wells."  Id.  DOI/BLM refused EPA's direction and issued the ROD four days later.

283.    In that April 2019 Lease EA, BLM prepared a detailed "Air emissions inventory for a representative oil and gas well" to estimate air pollution emissions from a typical well.  BLM 2019 Lease EA at 22 (Table 3).  To estimate potential air emissions from the leasing, BLM prepared a "Reasonably Foreseeable Development (RFD) Scenario."

284.    "The RFD scenario (Appendix G) predicts a maximum of 25 wells in the Battle Mountain District.  The number in any given area is unknown but potential emissions would be multiplied appropriately." BLM 2019 Lease EA at 22.

285.    For example, the Lease EA estimated that one "representative oil and gas well in the western U.S." could reasonably be expected to emit 15.6 tons per year of NOx. 6.9 tons per year of PM10, and 10.4 tons per year of Hazardous Air Pollutants (HAPs), among at least a dozen other pollutants.  Id. Table 3.  As EPA noted, the EA "estimated approximately 25 wells could be developed within the next ten years" in the area.  September 23, 2019 EPA letter at 1, citing the BLM Lease EA.

286.    Despite the fact that the same BLM Office prepared these emission estimates for a typical oil and gas lease, and recognizes that these emissions are reasonably foreseeable to occur, BLM failed to mention, let alone estimate or analyze, these emissions in the FSEIS for the Mt. Hope Project.

287.    Nowhere does the FSEIS or 2012 FEIS provide the quantified assessment of the impacts from these activities as required by NEPA and the Ninth Circuit's decision.

288.    The lack of any quantified analysis or data of the cumulative air emissions from the activities within the air quality CESA is especially problematic when coupled with the above-noted lack of any background/baseline data or adequate analysis of air quality at/near the Project site.

289.    Thus, BLM's position that there will be "zero" emissions from the over 100+ previous oil and gas leases within the Air Quality CESA over the life of the Mt. Hope Project, let alone the additional new 40+ leases in the AQ CESA, contradicts the agency's own position and lacks scientific credibility.

290.    As a result of the reasonably foreseeable air emissions from these and the other Present and RFFA actions in the affected area, DOI/BLM's position that the only current and "reasonably foreseeable future" sources of air pollutant emissions in the AQ CESA are the three other mining operations (FSEIS at 37), is unsupportable, violates NEPA's review requirements, as well as FLPMA's mandate that BLM ensure compliance with all air quality standards and requirements.

**Violation of FLPMA and NEPA – Failure to Ensure Compliance with Air Quality Standards**

291.    FLPMA requires that: "In managing the public lands the Secretary [of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).  BLM cannot approve a mining plan of operations that would cause "unnecessary or undue degradation." 43 CFR § 3809.411(d)(3)(iii).  BLM failed to comply with these requirements.

76

292.     FLPMA and DOI/BLM mining regulations require that all activities on public land comply with all environmental protection standards, including air and water quality standards.  *See, e.g.,* 43 CFR § 3809.5 (definition of "Unnecessary of Undue Degradation" prohibited under FLPMA includes "fail[ure] to comply with one or more of the following: … Federal and state laws related to environmental protection."); § 3809.420(b)(4) (listing Performance Standards that must be met, including the requirement that "All operators shall comply with applicable Federal and state air quality standards, including the Clean Air Act (42 U.S.C. 1857 *et seq.*)."

293.     The same is true for operations that are not specifically authorized by the 1872 Mining Law (such as the waste and tailings facilities discussed above) which are properly governed by DOI/BLM's FLPMA special use regulations :  "(b) Each land use authorization shall contain terms and conditions which shall: … (3) Require compliance with air and water quality standards established pursuant to applicable Federal or State law."  43 C.F.R. §2920.7(b)(3).

294.     Here, because DOI/BLM failed to analyze and account for the potential cumulative emissions from the Project and all the other current and reasonably foreseeable future activities in the Air Quality CESA (including at a minimum, oil and gas exploration/development), as well as failing to accurately ascertain background/baseline pollution levels, the finding in the FSEIS and ROD that all of these emissions will nevertheless comply with all applicable air quality standards, is arbitrary and capricious, fails to consider all relevant factors, and in violation of FLPMA and its implementing regulations.

295.     In addition, DOI/BLM's determination that the project would comply with all air quality standards was based on a legally-incorrect compliance location.  BLM calculated the Project's potential air emissions at the extreme edge of the Project boundary fenceline, without considering the air pollution levels or impacts within the

Project site, or how emissions would affect the public that travels through the site. 2012 FEIS at 3-295, Figure 3.6.4.  For example, Figure 3.6.2 (2012 FEIS at 3-283) shows that all of the air quality modeling "Receptor Locations" (the locations used to ascertain compliance with air quality standards) were set no closer to the actual emission sources than the project fenceline.

296.    EPA Clean Air Act regulations require that compliance with air quality standards should be measured at the nearest point of public access, not at the extreme edge of the Project fenceline. *See* 40 C.F.R. § 50.1(e) (EPA regulations defining "ambient air" as "that portion of the atmosphere, external to buildings, to which the general public has access.").

297.    The 2012 FES lists well over 100 sources of air pollution within the Project fenceline/boundary that will emit "Hazardous Air Pollutants" (HAPs), "Volatile Organic Compounds" (VOCs), along with Criteria Pollutants such as NOx, Lead (Pb), $PM_{10}$, $PM_{2.5}$, $SO_2$, and others.  2012 FEIS at 3-289, Table 3.6-8.

298.    DOI/BLM admit that the public will have access within the Project fenceline/boundary, and much closer to Project activities that will generate harmful air pollution, than the chosen outer-edge compliance "Receptor" determination points.  This is particularly true for public use of the Pony Express Trail, which currently crosses public lands near the base of Mt. Hope.  2012 FEIS Figure 2.1.5. The Project would locate the tailings dump and southern waste rock dump (Non-PAG WRDF) within roughly a few hundred feet of the Trail and bisect the Trail with the powerlines. Id.

299.    Although DOI/BLM's conclusion that the Project will not violate air quality standards was based on an analysis of the outside-perimeter fenceline, areas inside the fenceline will be open to the public at various times during each year.

EML will implement the mitigation plan included in Appendix D, Attachment 1 of the FEIS to **provide access through the Project Area during the**

**annual Pony Express re-ride, which generally occurs in June.  This mitigation will allow for independent (non-members of the National Pony Express Association) re-riders to follow the trail through the Project Area at other times of the year,** subject to 30-day advance notice and certain safety restrictions, and subject to coordination with EML's operations, and to provide for an alternative route for trail riders during other times of the year, weather permitting.

ROD at 17 (discussing Mitigation Measure 3.20.3.3-2)(emphasis added).  *See also* 2012 FEIS at 3-593 (same).  Thus, DOI/BLM failed to ensure that all applicable air quality standards will be met at the public access locations within the fenceline.

300.    This violates not only the substantive FLPMA requirement that DOI/BLM ensure compliance with all air quality standards, but also the NEPA requirement that all aspects of the Project's environmental impact be properly analyzed.  In this instance, DOI/BLM never calculated or even estimated the air pollution levels that public users of the Pony Express Trail will be exposed to within the fenceline.

301.    NEPA requires that: "Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act [NEPA] and other environmental laws and policies."  40 C.F.R. § 1502.2(d).

302.    Violations of NEPA noted in this Complaint constitute "unnecessary or undue degradation" (UUD) that FLPMA prohibits.  *See* 43 C.F.R. § 3809.5 (definition of UUD includes "failure to comply with one or more of the following: … Federal and state laws related to environmental protection.").  As DOI has held:  "Like NEPA, the [UUD] definition requires BLM to consider the nature and extent of surface disturbances resulting from a proposed operation and environmental impacts on resources and lands outside the area of operations. …  To the extent BLM failed to meet its obligations under NEPA, it also failed to protect public lands from unnecessary or undue degradation." Island Mountain Protectors, 144 IBLA 168, 202, 1998 WL 344223, * 28 (citations omitted).

303.     Overall, DOI/BLM's assertion that the Project will fully comply with air quality standards and requirements, and at the appropriate compliance locations, without all of the above-noted necessary information is arbitrary and capricious, made without consideration of all relevant factors, and contrary to law.

**FLPMA Violation -- Failure to Determine the Project's Reclamation Costs and Financial Assurances**

304.     In the ROD, DOI/BLM approved EML's Plan of Operation for the Mine as well as the Plans of Development for the ROWs without determining the reclamation and related costs as required by DOI/BLM's FLPMA mining and ROW regulations.

305.     DOI/BLM mining regulations require that all activities in the Plan of Operations be covered by a "financial guarantee" that "must cover the estimated cost as if BLM were to contract with the third party to reclaim your operations according to the reclamation plan, including construction and maintenance costs for any treatment facilities necessary to meet Federal and State environmental standards." 43 C.F.R. § 3809.552(a).

306.     "BLM will periodically review the estimated cost of reclamation and the adequacy of any funding mechanism established under paragraph (c) of this section and require increased coverage, if necessary." 43 C.F.R. § 3809.552(b).

307.     "When BLM identifies a need for it, you must establish a trust fund or other funding mechanism available to BLM to ensure the continuation of long-term treatment to achieve water quality standards and for other long term, post-mining maintenance requirements. The funding must be adequate to provide for construction, long-term operation, maintenance, or replacement of any treatment facilities and infrastructure, for as long as the treatment and facilities are needed after mine closure. BLM may identify the need for a trust fund or other funding mechanism during plan review or later." 43 C.F.R. § 3809.552(c).

308.    The "reclamation cost determination" made by DOI/BLM is the amount of monies that must be covered by the financial guarantee.  43 C.F.R. § 3809.554.  Financial guarantee instruments can take the form of "surety bonds," cash, "irrevocable letters of credit from a bank or financial institution," "certificates of deposit or savings accounts," "negotiable United States Government, State and Municipal securities or bonds," "Investment-grade rated securities," or insurance with a "rating of 'superior' or an equivalent from a nationally recognized insurance rating service." 43 C.F.R. § 3809.555(a)-(f).

309.    The required Reclamation Cost Estimate (RCE) submitted by the operator forms the basis for the reclamation cost determination made by BLM.  "The BLM FO [Field Office] or other delegated AO [Authorized Officer] issues a written determination of the named operator's reclamation cost estimate (RCE) and required bond amount for existing and/or proposed disturbance on the specified operations." BLM Surface Management Bond Processing Handbook, H-3809-2, at II-1.

310.    BLM's "Surface Management Handbook, H-3809-1" which governs the review and approval of mining operations, requires that the reclamation cost determination be made and established at the time the ROD approving the mining plan is issued.

> A decision approving a Plan of Operations and stating the conditions of approval must be sent to the operator by certified mail, return receipt requested.  **The decision must state the estimated reclamation cost determination and the financial guarantee amount.**  The decision must also remind the operator that surface disturbing activity cannot begin until the financial guarantee has been accepted and obligated by the BLM.

BLM Handbook H-3809-1, at 4-45 (emphasis added).

311.    Prior to issuance of the 2012 ROD, EML submitted the RCE to BLM to cover operations in the proposed Plan of Operations.

312.    Pursuant to these regulatory requirements, BLM accepted EML's RCE and the 2012 ROD approved EML's Plan of Operations, and included the required reclamation cost

determination.  The 2012 ROD "determined that the required financial guarantee amount is hereby set at $73,360,363 for the 7,992 acres of surface disturbance on public and private lands associated with the first three years of operations for the Project (NVN-082096), as described in the Plan.  The proponent must provide a financial guarantee in this amount using one or more of the acceptable financial guarantee instruments listed under 43 CFR § 3809.55."  2012 ROD at 30.

313.   In addition, the 2012 ROD established a Long-Term Funding Mechanism for the Project:

> Pursuant to the Guidelines for Establishing a Long Term Funding Mechanism (LTFM) and in accordance with 43 CFR § 3809.552(c), the BLM has determined that a LTFM will be required for post-reclamation obligations (including long-term monitoring and mitigation) associated with the closure process of the Mount Hope Project. …

> The LTFM will include the establishment of a trust fund that is implemented through *The Mt. Hope Project Long-Term Irrevocable Trust* and the *Mt. Hope Project Long-Term Trust Agreement* (collectively "Agreements").  EML will fund the initial amount of the trust fund in the amount of $271,912.  The initial funding amount was calculated based on the projected costs of implementing the above-described post-reclamation requirement for approximately 500 years.  Total cost of the mitigation and monitoring over the 500 year period is anticipated to be $83,202,396.  The creation and funding of the LTFM does not preclude BLM from requiring further reclamation, monitoring or mitigation pursuant to 43 CFR § 3809 should conditions warrant.

> Funding requirements are currently being finalized and, upon acceptance by the BLM, all funding mechanisms must be put in place in accordance with the Agreements.  Documentation of such funding shall be provided to the Bureau of Land Management, Nevada State Office, Branch of Minerals Adjudication, 1340 Financial Blvd., Reno, NV 89502-7147.

2012 ROD at 31.

314.   Upon issuance of the 2012 ROD, EML submitted the financial guarantee for the reclamation costs of $73,360,363.  EML also submitted the initial amount of the LTFM.  Construction then commenced at the Project site in early 2013.

315.     The new ROD, however, contains no RCE for the operations approved in the ROD, nor any of the required reclamation cost determinations for the approved operations (including no LTFM), let alone for the next three years of approved operations.

316.     Instead, BLM has allowed EML to just submit a RCE for what BLM and EML label "Phase 0," which covers only the ground disturbance and reclamation obligations for the initial work EML did in early 2013 before it suspended operations due to financial concerns.

317.     BLM approved the RCE for the completed Phase 0 work in 2015:

> The revision to the Mt. Hope Project Plan of Operations in the APO consists of establishing a "Phase 0" for bonding purpose and minor revisions to the Water Resources Monitoring (WRMo) Plan.  Phase 0 consists of a phased bonding revision that will reduce EML's bound amount for the Project from the amount approved for Phase 1 to the amount calculated in the revised reclamation cost estimate (RCE) submitted for Phase 0 in the APO. The RCE for Phase 1 was based on the anticipated disturbance at the end of year three (4,269 acres). The Phase 0 RCE is based on the actual disturbance currently present on the Project (1,689 acres).

DECISION, Amendment to the Plan of Operations Approval Determination of Required Financial Guarantee, U.S. BLM, November 18, 2015, at 2.  In that Decision, BLM approved the RCE for Phase 0 at $2,696,685. Id. at 3.

318.     This Decision thus reduced EML's required RCE for the approved Project from $73,360,363 to just $2,696,685.

319.     In February, 2019, BLM issued a similar decision revising the RCE and reclamation cost determination for Phase 0, which was "issued to update the reclamation cost estimate for the operator's Project."  DECISION, Determination of Required Financial Guarantee Amount, U.S. BLM, February 11, 2019, at 1.  That decision set the revised RCE for Phase 0 in "the amount of $3,093,686 [which] is sufficient to meet all anticipated reclamation requirements for this three-year bond period." Id.

320.     EML has yet to submit the updated RCE for any ground disturbance except the Phase 0 work already done.

321.    DOI/BLM has not made the required reclamation cost determination for the operations approved in the new ROD.  This is despite the fact that Phase 1 of the newly-approved operations will disturb at least 4,269 acres which are in addition to the already-disturbed 1,689 acres from Phase 0.  BLM November 18, 2015 Decision, at 2.

322.    The new ROD approved EML's Plan of Operations for the entire life of the Project, including at least another 4,269 acres in the next three years (Phase 1), yet the ROD contains no RCE to cover EML's reclamation obligations on any of these acres.

323.    In addition, the new ROD makes no mention of the LTFM, which was established in the 2012 ROD.  In March of 2019, EML requested that BLM dissolve the LTFM and return the monies that EML has provided to BLM after the 2012 ROD was issued.  BLM approved that request in a letter to EML.

> The Bureau of Land Management (BLM) received a "Request to Dissolve Long Term Funding Mechanism for the Mt Hope Project" from Eureka Moly LLC (EMLLC) on March 13, 2019.  EMLLC requests that the long-term funding mechanism (LTFM) for the Mt. Hope Project (Project) be dissolved and the monies returned to EMLLC.  The LTFM was established in November 2012 to provide financial assurance for mining solution management activities for 500 years following mine reclamation and closure.
>
> EMLLC broke ground for the Project in early 2013 but stopped construction in mid-2013 due to unforeseen loss of Project funding.  BLM was notified on October 29, 2013, that the Project was suspended.  EMLLC has committed to re-establishing the LTFM in coordination with BLM, when the Project comes out of suspension.
>
> BLM acknowledges that EMLLC is currently working to finalize two essential permitting actions which you are scheduled to complete in mid-2019, and EMLLC will then pursue Project financing.  BLM concurs that when the Project comes out of suspension, EMLLC would re-establish the LTFM, along with other financial guarantee requirements, in coordination with this office and Nevada Division of Environmental Protection.

March 21, 2019 letter from Jon Sherve, BLM Field Office Manager, to EML.

324.     The day before, BLM Manager Sherve sent a letter to the financial institution acting as Trustee for the LTFM, informing the bank that, in response to EML's request, BLM "terminate[d] the Trust Fund." March 20, 2019 letter from Jon Sherve to U.S. Bank (Denver, CO).  In that letter BLM stated as grounds for the termination that it "was notified [by EML] on October 29, 2013, that the Project was suspended."  As a result of BLM's termination of the Trust Fund, Field Manager Sherve informed U.S. Bank that "I hereby request  distribution of any remaining funds in the Trust Estate be released to EMLLC." Id.

325.     In addition to releasing all the monies for the LTFM and terminating the LTFM, DOI/BLM also no longer have the financial guarantee for the $73,360,363 that was approved in the 2012 ROD for the "surface disturbance … associated with the first three years of operation of the Project." (2012 ROD at 30).  See February 11, 2019 BLM Decision ("the amount of $3,093,686 is sufficient to meet all anticipated reclamation requirements for this [first] three-year bond period.").

326.     Thus, DOI/BLM only hold a financial guarantee (in the amount of $3,093,686) for the ground disturbance and other reclamation obligations that EML already conducted during the brief months in 2013 before it suspended operations, i.e. Phase 0.  "EMLLC broke ground for the Project in early 2013 but stopped construction in mid-2013 due to unforeseen loss of Project funding." March 21, 2019 letter from BLM to EML.

327.     Despite approving the entire Plan of Operations in the new ROD, DOI/BLM failed to make the required reclamation cost determination, as it had done in the 2012 ROD, for future operations (or, like the 2012 ROD, at a minimum for the first three years of operations).  DOI/BLM simply stated that the reclamation cost determination will be made in the future. "Financial Guarantee Determination [:] In accordance with 43

CFR § 3809.552(a), EML will be required to provide a financial guarantee consistent with the Plan of Operations." ROD at 26.

328.     Yet failing to determine the reclamation cost amount in the ROD approving the Plan of Operations is **not** "in accordance with 43 CFR § 3809.552(a)," as the regulations and guiding Handbook quoted above require that the reclamation cost be determined by DOI/BLM in the ROD, not in some future decision.

329.     Regarding the LTFM, the new ROD also acknowledges that a new LTFM will be required:

> Long-Term Funding Mechanism [:]Pursuant to the Guidelines for Establishing a Long Term Funding Mechanism (LTFM) and in accordance with 43 CFR § 3809.552(c), the BLM has determined that a LTFM will be required for post-reclamation obligations (including long-term monitoring and mitigation) associated with the closure process of the Mount Hope Project.

ROD at 26.

330.     Yet like DOI/BLM's failure to include the reclamation cost determination in the ROD, the ROD fails to make any determination regarding the LTFM, in violation of 43 C.F.R. §§3809.552-556 and BLM's Handbook.

331.     Like it did in the 2012 ROD, the same BLM Mt. Lewis Field Office recently and correctly followed DOI/BLM's reclamation financial requirements for the determination of the reclamation cost estimate in the Decision approving the Prospect Mountain Mine Project southwest of Eureka (discussed above in the NEPA cumulative impacts section).  In approving the Plan of Operations for that mine, BLM stated:

> **AMOUNT OF FINANCIAL GUARANTEE**
> This office has determined that the amount of $489,175 is sufficient to meet all anticipated reclamation requirements for the Project.
> …
> The operator must submit an acceptable financial guarantee in the amount of $489,175 to the Bureau of Land Management.

July 12, 2019 "<u>Decision, Plan of Operations Approval, Determination of Required</u>

<u>Financial Guarantee Amount [Prospect Mountain Project]</u>," at 3-4.

https://eplanning.blm.gov/epl-front-

office/projects/nepa/108000/176864/215537/20190712_Gullsil_ProspectMtn_Decisio

nRecord.pdf (viewed October 28, 2019).  As noted above, DOI/BLM failed to make

these required determinations in the new ROD for the Mt. Hope Project.

332.     Similar to the reclamation financial requirements for mining Plans of Operations,

DOI/BLM must determine the reclamation costs for the Right of Ways when

approving ROWs under FLPMA. *See* 43 C.F.R. § 2805.20.

> *Reclamation cost estimate (RCE)* means the estimate of costs to restore the land to a condition that will support pre-disturbance land uses.  This includes the cost to remove all improvements made under the right-of-way authorization, return the land to approximate original contour, and establish a sustainable vegetative community, as required by the BLM.  The RCE will be used to establish the appropriate amount for financial guarantees of land uses on the public lands, including those uses authorized by right-of-way grants or leases issued under this part.

43 C.F.R. §2801.5.

333.     For the ROW approvals, the new ROD makes the same error as it did with the

omission of the reclamation cost determination for the mining Plan of Operations,

when it re-affirmed the Plans of Development for the two ROWs without determining

the reclamation costs – postponing the reclamation cost determination until sometime

in the future.

> **Bond Determination**
> In accordance with 43 CFR § 2805.20(a) and (3), EML will be required to provide a bond for its Plans of Development based upon periodic review by the BLM.  The bond will be determined based upon the preparation of a reclamation cost estimate, which the BLM may require EML to prepare and submit.

ROD at 29.

334.     Also, like the reclamation costs for the mine itself, the 2012 ROD had followed its

regulations and determined the reclamation costs for the ROWs:

> Based on the BLM's estimates of reclamation costs for the 88.7 acres of
> disturbance on public land associated with the short term ROW (NVN-091272)
> for the Mount Hope Project, as described in the applicable POD, the BLM has
> determined that the required financial guarantee amount is hereby set at $287,496.
> The BLM has also determined, based on estimates of the reclamation costs of
> removal of the powerline infrastructure associated with the long term ROW
> (NVN-082096) for the Mount Hope Project, as described in the applicable POD,
> that the required financial guarantee amount is hereby set at $1,037,694. The
> proponent must provide financial guarantees these amounts using one or more of
> the acceptable financial guarantee instruments.

> EML shall provide the Authorized Officer proof that bonds in the required
> amounts have been obtained prior to receiving a Notice to Proceed. The bonds
> must be maintained in effect until removal of improvements and restoration of the
> right-of-way authorizations have been accepted by the Authorized Officer.

2012 ROD at 34-35.

335.     The 2012 ROD further stated that the bonds/financial guarantees for both the mine

Plan of Operations and the ROW Plans of Development would be reviewed at least

every three years "to ensure adequacy of the bond amounts":

> The Authorized Officer will review the bonds every three years, corresponding
> with the review of the financial guarantee required under the Mount Hope Project
> Plan of Operations Approval, as described above, to ensure adequacy of the bond
> amounts.

2012 ROD at 35.

336.     Further, the 2012 ROD stated that:  "The bonds will also be reviewed at the time of

any assignment, modification, or renewal of the ROW grants."

337.     Contrary to these stated requirements in the 2012 ROD, DOI/BLM has not reviewed

or updated the reclamation cost bond/financial guarantee amount for either the mine

Plan of Operations or the ROW Plans of Development, in violation of FLPMA and its

implementing regulations, as the new ROD fails to contain the required reclamation

cost determinations for the activities/operations approved in the new ROD.

1

FIRST CAUSE OF ACTION

2

3

4

**Failure to Protect Federal Reserved Water Rights and Withdrawn Lands, Unauthorized Disposal of Federal Property in These Waters and Lands, Violation of FLPMA, Public Water Reserve 107, NEPA and Related Laws**

5

338.    The allegations in the previous paragraphs are reasserted as if fully stated herein.

6

339.    DOI/BLM's actions and omissions in reviewing and approving the Mt. Hope Project

7

noted above, including the ROD and FSEIS and 2012 FEIS, fail to fully protect the

8

waters, and the federal reserved water rights in the waters, reserved and protected by

9

Public Water Reserve 107, FLPMA, and the statutes underlying the Executive Order

10

noted above.

11

340.    DOI/BLM's actions and omissions in reviewing and approving the Mt. Hope Project

12

noted above, fail to fully protect the lands withdrawn and protected by Public Water

13

Reserve 107, FLPMA and the statutes underlying the Executive Order noted above.

14

Further, DOI/BLM failed to keep the withdrawn lands open for public use under

15

PWR 107, the SRHA, and FLPMA, and failed to obtain congressional or Presidential

16

authorization for the disposal of federal property in the reserved waters and lands.

17

341.    DOI/BLM's failure to adequately consider the alternative of keeping Project facilities

18

away from the PWR 107 Springs and the corresponding surrounding withdrawn lands

19

violates DOI/BLM's duty under NEPA to take a "hard look" at all reasonable

20

alternatives to, and the environmental impacts from, Project operations.

21

342.    DOI/BLM's actions and omissions in reviewing and approving the Project are

22

arbitrary, capricious, an abuse of discretion, not in accordance with law, without

23

observance of procedure required by law, and in excess of statutory jurisdiction,

24

authority, or limitations, within the meaning of the judicial review provisions of the

25

APA. 5 U.S.C. §§ 701-706.

26

27

28

89

SECOND CAUSE OF ACTION

**Failure to Properly Review and Regulate the Project and Protect Public Resources Under FLPMA and NEPA**

343. The allegations in the previous paragraphs are reasserted as if fully stated herein.

344. In the ROD, FSEIS, and 2012 FEIS, DOI/BLM based their review and approval of the Project on an erroneous legal assumption that EML had statutory rights to conduct all of their proposed operations, including the permanent use and occupation of public lands for the waste rock and tailings dumps, without the necessary factual evidence to support the establishment of those rights, thus failing to properly review and regulate the Project under FLPMA to protect public resources and the public interest, in violation of FLPMA and its implementing regulations.

345. DOI/BLM's failure to adequately consider the alternative of regulating (and/or potentially denying) these facilities under the 43 C.F.R. Part 2920 regulations, as well as the "Environmentally Preferred Alternative," the No-Action Alternative, violates DOI/BLM's duty under NEPA to take a "hard look" at all reasonable alternatives to, and the environmental impacts from, Project operations.

346. DOI/BLM's actions and omissions noted above regarding its review and approval of the Mt. Hope Project violate FLPMA and its implementing regulations. BLM's actions and omissions in reviewing and approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

THIRD CAUSE OF ACTION

**Violation of NEPA – Failure to Adequately Analyze Mitigation Measures and Their Effectiveness**

347. The allegations in the previous paragraphs are reasserted as if fully stated herein.

90

348.    In the FSEIS, 2012 FEIS and ROD, DOI/BLM failed to adequately and accurately analyze mitigation measures, and the effectiveness of those measures, as required by NEPA.

349.    DOI/BLM's actions and omissions noted above regarding its review and approval of the Mt. Hope Project, violate NEPA and its implementing regulations.

350.    DOI/BLM's actions and omissions in reviewing and approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

## FOURTH CAUSE OF ACTION

**Violation of NEPA – Failure to Adequately Analyze Direct, Indirect, and Cumulative Impacts**

351.    The allegations in the previous paragraphs are reasserted as if fully stated herein.

352.    In the FSEIS, 2012 FEIS and ROD, DOI/BLM failed to adequately and accurately analyze the Project's direct, indirect and cumulative impacts to air and water resources, as required by NEPA.  This includes the failure to adequately and accurately analyze the impacts from the implementation of mitigation measures contained in the 2012 FEIS, FSEIS, and ROD.

353.    DOI/BLM's actions and omissions noted above regarding its review and approval of the Mt. Hope Project, violate NEPA and its implementing regulations.

354.    DOI/BLM's actions and omissions in reviewing and approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

FIFTH CAUSE OF ACTION

**Violation of NEPA – Failure to Adequately Analyze Background/Baseline Conditions**

355.    The allegations in the previous paragraphs are reasserted as if fully stated herein.

356.    In the FSEIS, 2012 FEIS and ROD, DOI/BLM failed to adequately and accurately analyze the background/baseline conditions of resources that will be affected by the Project, including air quality, as required by NEPA.

357.    DOI/BLM's actions and omissions noted above regarding its review and approval of the Mt. Hope Project, violate NEPA and its implementing regulations.

358.    DOI/BLM's actions and omissions in reviewing and approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

SIXTH CAUSE OF ACTION

**Violation of FLPMA – Failure to Ensure Compliance with Air Quality Standards and Protect Public Resources**

359.    The allegations in the previous paragraphs are reasserted as if fully stated herein.

360.    DOI/BLM's determination that the Project will comply with all applicable Clean Air Act standards, based on an erroneous and factually-deficient NEPA analysis, and erroneous public access compliance locations, was arbitrary and capricious, made without the consideration of all relevant factors, and violates FLPMA and its implementing regulations.

361.    DOI/BLM's actions and omissions in reviewing and approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction,

92

authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

<u>SEVENTH CAUSE OF ACTION</u>

**Violation of FLPMA – Failure to Determine Reclamation Costs and Related Financial Assurances**

362.    The allegations in the previous paragraphs are reasserted as if fully stated herein.

363.    DOI/BLM's failure to determine the amount of the Project's full reclamation and related costs, as well as the long-term funding mechanism (LTFM), as part of the ROD's approval of the Plan of Operation violates FLPMA and its implementing regulations.

364.    DOI/BLM's failure to determine the amount of the Project's full reclamation and related costs as part of the ROD's approval of the Plans of Development for the ROWs violates FLPMA and its implementing regulations.

365.    DOI/BLM's actions and omissions in reviewing and approving the Project and ROWs are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

<u>EIGHTH CAUSE OF ACTION</u>

**Violation of FLPMA – Failure to Prevent Unnecessary or Undue Degradation**

366.    The allegations in the previous paragraphs are reasserted as if fully stated herein.

367.    Violations of NEPA, PWR 107, FLPMA, air quality regulations and requirements, and other laws/regulations noted in this Complaint constitute "unnecessary or undue degradation" (UUD) that FLPMA prohibits. *See* 43 C.F.R. §3809.5 (definition of UUD includes "failure to comply with one or more of the following: … Federal and

93

state laws related to environmental protection."). "To the extent BLM failed to meet its obligations under NEPA, it also failed to protect public lands from unnecessary or undue degradation." <u>Island Mountain Protectors</u>, 144 IBLA 168, 202, 1998 WL 344223, * 28 (citations omitted).

368.    DOI/BLM's actions and omissions noted above regarding its review and approval of the Mt. Hope Project, violate NEPA, FLPMA and its implementing regulations.

369.    DOI/BLM's actions and omissions in reviewing and approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs pray this court:

A.    Enter an order declaring that DOI/BLM's actions, omissions, and decisions reviewing and approving the Mt. Hope Project and related actions such as the granting of the ROWs, including the ROD, FSEIS, 2012 FEIS, and Project approvals, violate NEPA, FLPMA, the 1926 Executive Order for PWR 107 and related laws, the APA, and their implementing regulations;

B.    Pursuant to the APA, Set Aside and Vacate the ROD, FSEIS, 2012 FEIS, and Project approvals, including the granting of the ROWs.

C.    Issue an immediate and permanent injunction prohibiting Defendants, their agents, servants, employees, and all others acting in concert with them, or subject to their authority or control, from proceeding with any aspect of the Mt. Hope Project, pending full compliance with the requirements of federal law;

D.      Issue an order granting Plaintiffs their costs and reasonable attorneys fees incurred in

bringing this action, pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C.

§2412 et seq., and any other applicable statutory or equitable principles; and

E.      Issue an order granting such further relief this court deems just and proper.


Respectfully submitted this 17th day of December, 2019.

*/s/ Roger Flynn*
Roger Flynn, (Colo. Bar # 21078), *Pro Hac Vice*
Jeffrey C. Parsons, (Colo. Bar # 30210), *Pro Hac Vice*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

Julie Cavanaugh-Bill, Nevada Bar # 11533
CAVANAUGH-BILL LAW OFFICES, LLC
401 Railroad St., Ste. 307
Elko, Nevada 89801
(775) 753-4357
julie@cblawoffices.org

Attorneys for Plaintiffs

### Certificate of Service

I, Roger Flynn, attest that on this 17th day of December, I served the foregoing to all parties, by filing it with this Court's ECF filing system, and that all parties are represented by counsel and registered on this Court's ECF system.

*/s/ Roger Flynn*