1   Julie Cavanaugh-Bill (Nevada Bar #11533)
    CAVANAUGH-BILL LAW OFFICES. LLC
2   401 Railroad St., Ste. 307
    Elko, Nevada 89801
3   (775) 753-4357
4   julie@cblawoffices.org

5   Roger Flynn (Colo. Bar #21078) *Pro Hac Vice*
    Jeffrey C. Parsons (Colo. Bar #30210) *Pro Hac Vice*
6   WESTERN MINING ACTION PROJECT
7   P.O. Box 349, 440 Main St., #2
    Lyons, CO 80540
8   (303) 823-5738
    wmap@igc.org
9

10  Attorneys for Plaintiffs

11
                        UNITED STATES DISTRICT COURT
12                          DISTRICT OF NEVADA
13

14                                              )     Case No: 3:19-cv-00661-LRH-WGC
                                                )
15  GREAT BASIN RESOURCE WATCH; et al.,         )
                                                )
16              Plaintiffs,                      )     PLAINTIFFS' MOTION for
                                                )     SUMMARY JUDGMENT and
17                                              )     MEMORANDUM IN
                                                )     SUPPORT
18  vs.                                          )
                                                )
19                                              )
    UNITED STATES DEPARTMENT OF THE             )
20  INTERIOR; et al.,                            )
                                                )
21              Defendants.                      )
                                                )
22  EUREKA MOLY, LLC,                            )
                                                )
23              Defendant-Intervenor.            )
                                                )
24                                              )

25

26

27

28

                                                                              i

**TABLE OF CONTENTS**

EXHIBIT LIST ...................................................................................................iv

TABLE OF AUTHORITIES ................................................................................v

SUMMARY OF BLM PERMITTING, LITIGATION, AND NINTH CIRCUIT DECISION .................1

THE SEVERE AND PERMANENT IMPACTS FROM THE MT. HOPE MINE PROJECT .................3

PLAINTIFFS' STANDING .................................................................................6

STANDARD OF REVIEW ..................................................................................6

ARGUMENT ......................................................................................................7

I.   BLM Failed to Protect Federal Reserved Water Rights and
     Surrounding Withdrawn Lands ................................................. 7

     A.   Legal Background for Public Water Reserve 107 .................... 7

     B.   The Project Will Eliminate or Significantly and Adversely Affect
          PWR 107 Reserved Waters and Withdrawn Lands................... 9

     C.   BLM Failed to Protect the PWR 107 Withdrawn Lands and Waters ....... 12

II.  BLM Failed to Properly Protect Public Resources Under FLPMA
     Due to BLM's Erroneous Assumption that EML Had Statutory Rights to
     Occupy and Possess Public Land for the Permanent Waste Rock and
     Tailings Facilities ............................................................................16

     A.   Any Right to Permanently Occupy Public Lands Must Be Supported by
          Evidence that the Lands Meet the Mining Law's Prerequisites for
          Such Rights................................................................................. 16

     B.   BLM Failed to Apply the Proper Regulatory Structure, Based on Its
          Unsupported Assumption of EML's Statutory Right to Use Its
          Mining Claims for Waste Dumps .................................................. 18

III. BLM Violated NEPA ................................................................ 20

     A.   The FEIS Failed to Fully Analyze the Project's Direct, Indirect,
          and Cumulative Impacts .............................................................. 20

     1.   Cumulative Air Pollution.................................................. 21

2.   Cumulative Impacts to Water ................................... 27

B.   *BLM Failed to Fully Analyze the Project's Baseline Conditions* ............. 28

C.   *Failure to Adequately Analyze Mitigation and Related Project Impacts* ........................................ 31

IV.   **BLM Violated FLPMA** ........................................ 36

A.   *Failure to "Prevent Unnecessary or Undue Degradation" of Public Resources* ........................................ 36

B.   *Failure to Determine the Project's Reclamation Costs and Financial Assurances* ........................................ 37

CONCLUSION ........................................ 40

**EXHIBIT LIST**

A.    Declaration of John Hadder (GBRW)

B.    Declaration of Carolyn Bailey (GBRW)

C.    Declaration of Larson Bill (WSDP)

D.    Declaration of Ian Bigley (PLAN)

E.    PWR 107 Executive Order, 1926

F.    Stock Raising Homestead Act of 1916, 39 Stat. 865

G.    51 I.D. 457-58, 1926 I.D. LEXIS

H.    Desert Survivors, 80 IBLA 111 (1984)

I.    Memorandum, Interior Dept. Regional Counsel to Manager, Land & Survey Office, dated September 24, 1953

J.    1935 I.D. LEXIS 52

K.    Pickett Act (1910), 36 Stat. 847, as amended (1912), 37 Stat. 497

L.    AMERICAN LAW OF MINING (excerpt)

M.    BLM Surface Management Bond Processing Handbook, H-3809-2, (excerpt)

N.    BLM Surface Management Handbook H-3809-1, (excerpt)

iv

# TABLE OF AUTHORITIES

***Federal Caselaw***

Cameron v. U.S.,
252 U.S. 450 (1920) ...................................................................................................18

Camp v. Pitts,
411 U.S. 138 (1973) ....................................................................................................7

Cappaert v. United States,
426 U.S. 128 (1976) .................................................................................................8, 9

Center for Biological Diversity v. U.S. Dept. of the Interior,
623 F.3d 633 (9th Cir. 2010) .................................................................................20, 36

Center for Biological Diversity v. U.S. Fish and Wildlife Service,
409 F.Supp.3d 738 (D. Ariz. 2019) ...................................................................14, 17, 18

Center for Biological Diversity v. Zinke,
900 F.3d 1053 (9th Cir. 2018) .....................................................................................27

Cole v. Ralph,
252 U.S. 286 (1920) ..................................................................................................17

Colville Confederated Tribes v. Walton,
752 F.2d 397 (9th Cir. 1985) ........................................................................................9

Davis v. Nelson,
329 F.2d 840 (9th Cir. 1964) ................................................................................14, 17

Freeman v. Dept. of Interior,
37 F.Supp.3d 313 (D.D.C. 2014) .................................................................................17

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,
528 U.S. 167 (2000) ...................................................................................................6

Gibson v. Chouteau,
80 U.S. 92 (1871) ......................................................................................................9

Great Basin Mine Watch v. Hankins,
456 F.3d 955 (9th Cir. 2006) ...........................................................................5, 6, 7, 9, 21

Great Basin Resource Watch v. BLM,
844 F.3d 1095 (9th Cir. 2016) ........................................2, 6, 10, 15, 19, 21, 22, 24, 29, 32, 33, 35

Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci,
857 F.2d 505 (9th Cir. 1988) ........................................................29

High Country Citizens Alliance v. Norton,
448 F.Supp.2d 1235 (D. Colo. 2006) ...................................................9

Lake Berryessa Tenants' Council v. U.S.,
588 F.2d 267 (9th Cir. 1978) ...........................................................9

Lands Council v. Powell,
395 F.3d 1019 (9th Cir. 2005) .........................................................7

Lara v. Secretary of Interior,
820 F.2d 1535 (9th Cir. 1987) .........................................................17

Lombardo Turquoise Milling & Mining Co. v. Hemanes,
430 F.Supp. 429 (D. Nev. 1977) ......................................................14

Marsh v. Oregon Natural Resources Council,
490 U.S. 360 (1989) .....................................................................20

Mineral Policy Center v. Norton,
292 F.Supp.2d 30 (D.D.C. 2003) ......................................................36

Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.,
463 U.S. 29 (1983) ................................................................18, 27

Mount Royal Joint Venture v. Kempthorne,
477 F.3d 745 (D.C. Cir. 2007) ........................................................14

N. Plains Resource Council v. Surf. Transp. Brd.,
668 F.3d 1067 (9th Cir. 2011) .......................................................29

Or. Nat. Res. Council Fund v. Brong,
492 F.3d 1120 (9th Cir. 2007) .......................................................21

Robertson v. Methow Valley Citizens Council,
490 U.S. 332 (1989)................................................................20, 32

San Juan Citizens Alliance v. BLM,
326 F.Supp.3d 1227 (D.N.M. 2018) ..................................................25

Shiny Rock Mining Corp. v. United States,
825 F.2d 216 (9th Cir. 1987) ........................................................14

Sierra Club v. Yeutter,
911 F.2d 1405 (10th Cir. 1990) ........................................................36

Te-Moak Tribe v. U.S. Dep't of Interior,
608 F.3d 592 (9th Cir. 2010) ...........................................................21

United States v. Coleman,
390 U.S. 599 (1968) .......................................................................17

Waskey v. Hammer,
223 U.S. 85 (1912) .........................................................................14

Western Land Exchange Project v. U.S. BLM,
315 F.Supp.2d 1068 (D. Nev. 2004) ....................................................7

Wild Earth Guardians v. Zinke,
368 F.Supp.3d 41 (D.D.C. 2019) .......................................................25

***Federal Administrative and Executive Decisions***

Consolidated Ores Mines Co.
46 Pub. Lands Dec. 468, 1918 WL 1078................................................13

David E. Hoover and Lester F. Whalley,
99 IBLA 291, 1987 WL 110721 .........................................................13

Desert Survivors,
80 IBLA 111 (1984), 1984 IBLA LEXIS 337 ..........................................8

Memorandum, Interior Dept. Regional Counsel to Manager, Land & Survey Office,
September 24, 1953 ..........................................................................8

Public Water Reserve # 107 (April 17, 1926) ................................... *passim*

51 I.D. 457, 1926 I.D. LEXIS 45 (1926) ...............................................8

1935 I.D. LEXIS 52 (1935) ................................................................8

***Federal Statutes***

Administrative Procedures Act ("APA"),
5 U.S.C. § 706 ................................................................................7

Federal Land Policy Management Act of 1976 ("FLPMA"),
43 U.S.C. § 1701 <u>et seq.</u> .................................................................1

Federal Land Policy Management Act of 1976 ("FLPMA"),
43 U.S.C. § 1701(a)(8) ............................................................9, 18

Federal Land Policy Management Act of 1976 ("FLPMA"),
43 U.S.C. § 1701 note (c) .............................................................8

Federal Land Policy Management Act of 1976 ("FLPMA"),
43 U.S.C. § 1732(b) ........................................................9, 18, 36

Fed. R.Civ.P. 56 ...................................................................   1

Mining Law of 1872,
30 U.S.C. §§ 21-43 ...................................................................16

Mining Law of 1872,
30 U.S.C. § 22 .........................................................13, 17, 18

Mining Law of 1872,
30 U.S.C. § 23 ...........................................................................17

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 <u>et seq.</u> ................................................. *passim*

Pickett Act of June 25, 1910, c. 421, § 1, 36 Stat. 847, as amended by the
Act of August 24, 1912, c. 369, 37 Stat. 497, ...............................8, 12

Stock-Raising Homestead Act of 1916,
39 Stat. 865, §10 ("SRHA") ......................................................8, 15

Surface Resources and Multiple Use Act of 1955 (Common Varieties Act)
30 U.S.C. § 611 ..................................................................14, 17, 18

***Federal Regulatory Material***

40 C.F.R. § 1500.1 ..........................................................................20

40 C.F.R. § 1502.14 ..................................................................19, 31

40 C.F.R. § 1502.15 ......................................................................29

40 C.F.R. § 1502.16 ..................................................................20, 31

40 C.F.R. § 1508.7 .................................................................................21, 24

40 C.F.R. § 1508.8 ...........................................................................................20

40 C.F.R. § 1508.20 .........................................................................................24

40 C.F.R. § 1508.25 .........................................................................................20

40 C.F.R. § 1508.27 .........................................................................................19

43 C.F.R. § 2801.5 ...........................................................................................40

43 C.F.R. § 2805.20 .........................................................................................40

43 C.F.R. § 2920.1 ...........................................................................................19

43 C.F.R. § 2920.7 ...........................................................................................19

43 C.F.R. Part 3809 .........................................................................................18

43 C.F.R. § 3809.1 .....................................................................................18, 19

43 C.F.R. § 3809.411 .......................................................................................36

43 C.F.R. § 3809.420 .......................................................................................36

43 C.F.R. § 3809.5 ...........................................................................................36

43 C.F.R. § 3809.552 ..................................................................................37, 38

43 C.F.R. § 3809.554 .......................................................................................37

BLM Surface Management Handbook, H-3809-1 ...........................................37

BLM Surface Management Bond Processing Handbook, H-3809-2 ...............37

85 Fed. Reg. 43304 (July 16, 2020)................................................................20

**Other Authority**

AMERICAN LAW OF MINING ....................................................................... 16

Pursuant to Fed.R.Civ.P. 56, Plaintiffs, Great Basin Resource Watch (GBRW), Western Shoshone Defense Project (WSDP), and the Progressive Leadership Alliance of Nevada (PLAN), file this Motion for Summary Judgment and Memorandum in Support. Plaintiffs request that this Court set aside and vacate the actions of the Department of the Interior and Bureau of Land Management (BLM) in reviewing and approving the Mt. Hope Project.

BLM failed to fully evaluate and protect public land resources, including the federal reserved water rights and lands on and around Mt. Hope that will be destroyed by the Project. BLM violated the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§1701 et seq., and the National Environmental Policy Act (NEPA), 42 U.S.C. §§4321 et. seq. BLM also violated the President's Executive Order of April 17, 1926 (known as Public Water Reserve 107) and related laws which established federal reserved water rights in the springs that will either be buried by mine waste or eliminated by the massive groundwater pumping operations. That Executive Order also withdrew and protected the lands surrounding the springs from the type of industrial operations approved by BLM at Mt. Hope – lands that will be either buried by mine waste and other Project facilities, or shut-off from public access.

### SUMMARY OF BLM PERMITTING, LITIGATION, AND NINTH CIRCUIT DECISION

In 2006, Eureka Moly, LLC (EML) submitted a Plan of Operations (PoO) for the Mt. Hope Project (Project) to the BLM. In 2008, EML submitted a Plan of Development (PoD) for a long term right-of-way (ROW), and later a second PoD for a short term ROW for a 230-kilovolt transmission line. BLM issued a Record of Decision approving the Project (including the PoO and PoDs) on November 16, 2012 (2012 ROD). AR066808-838.[1] BLM also prepared a Final Environmental Impact Statement (FEIS) for the Project. AR068677-070310. The 2012 ROD authorized EML to construct and operate one of the country's largest open-pit mines, impacting over 200 square miles for hundreds of years.

---

[1] "AR" refers to the pages of the Administrative Record submitted by BLM to this Court and all parties. BLM submitted an additional AR in 2020 covering the record since the first litigation, with bates numbered pages continuing sequentially from the first AR. Many of the critical documents from the initial record were included in the 2020 AR (e.g., 2012 ROD and Final EIS), so this brief will cite the pages of the resubmitted/renumbered documents where applicable.

BLM's actions reviewing and approving the Project were found to be arbitrary and capricious and in violation of NEPA, by the Ninth Circuit Court of Appeals in GBRW/WSDP's challenge to the FEIS and 2012 ROD. Great Basin Resource Watch v. BLM, 844 F.3d 1095 (9th Cir. 2016). BLM summarized that decision:

> [T]he court held that "the BLM's analysis of air impacts in the FEIS was inadequate because the agency did not provide any support for its use of baseline values of 'zero' for several air pollutants" and that "the cumulative impacts portion of the FEIS does not comply with NEPA [National Environmental Policy Act of 1969]" because it failed to quantify or fully discuss effects of certain other actions that potentially affect the air resource. The plaintiffs also raised on appeal the issue of whether the BLM had adequately considered impacts on land withdrawals and reserved water rights associated with PWR 107. The Ninth Circuit declined to address this claim before BLM had an opportunity to clarify the status of springs in the vicinity of the Project with respect to Public Water Reserves noting that the FEIS was "internally contradictory" and asked BLM to clarify its position. Accordingly, the Ninth Circuit affirmed in part, reversed in part, vacated in part, and remanded with instructions to vacate the record of decision and remand to the BLM.
> On remand, the District Court entered an order approving the parties' stipulation that the ROD be vacated and the matter remanded to the BLM, based on the Ninth Circuit decision.
> The BLM published the Draft SEIS (DSEIS) in February, 2019, and published the Final SEIS (FSEIS) in July, 2019 as a response to the Ninth Circuit's decision of December 28, 2016.

2019 ROD 4, AR066813.

The Circuit also held that "the analysis of ground water pumping in the FEIS does *not* take into account the roughly 200 gallons per minute needed to replace depleted spring and stream water." 844 F.3d at 1110 (emphasis in original). The additional water extraction was proposed by BLM as a purported mitigation measure for the lost stream and spring flows caused by the dewatering of the aquifer resulting from the Project's decades-long pumping operations. The Court rejected EML's argument that "the FEIS thoroughly analyzed the effect of using water from its production wells" to replace the waters eliminated by the dewatering, finding EML's "argument … factually incorrect." Id. The Court ultimately declined to rule on this NEPA claim "because the BLM's NEPA analysis is deficient in other respects, the ultimate disposition of this appeal does not depend on the resolution of this portion of Plaintiffs' NEPA claim." Id. at 1111.

2

Upon remand, BLM conducted a limited review of the Project, and Plaintiffs submitted extensive comments highlighting BLM's continuing failure to comply with federal law. BLM issued the Final Supplemental EIS (FSEIS) in August 2019. AR066344-449. On September 27, 2019, DOI Assistant Secretary Hammond signed the 2019 ROD, approving operations under the PoO and PoDs. Except for minor additional disturbed acreage proposed since 2012, Project operations/activities (and their associated environmental impacts) approved in the 2019 ROD and reviewed in the FSEIS in 2019 are the same operations/activities (and their associated impacts) approved in the 2012 ROD, and reviewed in the 2012 FEIS. FSEIS 4-5, AR066353-54.

According to BLM, the 2019 ROD and FSEIS comply with the Ninth Circuit's decision and applicable federal law. As shown herein, that is not the case. BLM's 2019 ROD and FSEIS (as well as the underlying 2012 ROD and FEIS) not only fail to comply with federal law and the Court's decision, but ignore critical new information that further exemplifies BLM's continued failure to meet the strict requirements of federal public land, mining, and environmental law.

### THE SEVERE AND PERMANENT IMPACTS FROM THE MT. HOPE MINE PROJECT

The Project would be one of the country's largest open-pit mines, with direct operations lasting for more than 70 years, permanently altering the landscape, and completely reworking the surface and ground water hydrology of three separate watersheds. The Project will have immediate, irreparable, and permanent impacts to the local ranching and farming communities and families which have lived there since the 1860s and to the critical environmental, historical, cultural and wildlife resources that will be outright eliminated or significantly degraded by the Project. "The 80-year project will have an 18- to 24-month construction phase, 44 years of mining and ore processing, 30 years of reclamation, and five years of post-closure monitoring. Concurrent reclamation will not commence until after the first 15 years of the Project." 2019 ROD 3, AR066812. The Project Area covers 21,523 acres, of which 8,355 will be directly disturbed (8,092 public land acres, 259 acres of EML controlled private land). Id. "The ultimate pit depth would be approximately 2,600 feet below ground surface." FEIS 2-4, AR068772. *See also* Figure 2.1.6 (pit cross-section), AR068778.

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> The Project would generate approximately 1.7 billion tons of waste rock that would occupy a total footprint of approximately 2,246 acres. Waste rock would be placed in two distinct WRDFs [Waste Rock Disposal Facility] over the life of the mine, which would almost encircle the open pit (Figure 2.1.9). The PAG [potentially acid generating] WRDF would ultimately contain approximately 0.5 billion tons of waste and the non-potentially acid generating (Non-PAG) WRDF approximately 1.3 billion tons. … The total height of the WRDFs would range from 750 feet to 950 feet (Table 2.1-3).

FEIS 2-23, AR 068783.

In addition, the Project will pump and remove massive amounts of water from the regional aquifer in order to keep the mine pit dry and supply water for mine operations.

> Dewatering would be required in the open pit during the mining phase of the Project. … The average pit inflow rate is estimated to range between 60 to 460 gpm (100 to 750 afy), commencing in Year 1 of the Project and continuing through Year 32, as shown in Table 3.2-7. In addition, ground water pumping in the KVCWF [Kobeh Valley Central Well Field] area for process-water supply would be achieved with high capacity production wells completed in the basin-fill and carbonate bedrock aquifers. The average total combined pumping rate of the well field is estimated to range between 6,540 to 7,000 gpm (10,550 to 11,300 afy), commencing in Year 1 of the Project (2012) and continuing through Year 44 (2055), as shown in Table 3.2-7.

FEIS 3-74, AR068914. One acre-foot of water equals approximately 325,851 gallons.

Thus, the "combined pumping rate of the well field," at 10,550 to 11,300 afy (acre-feet per year), coupled with the 750 afy of pit pumping, equals over 3.92 billion gallons of water pumped per year. With the predicted pumping to last roughly 43 years, this means that, in total, the project will remove up to 168.8 billion gallons of water from the region. Due to this dewatering "significant water table drawdown in the aquifer would occur in an area measuring approximately 232 square miles around the Project Area." FEIS 3-424, AR069230. The dewatering will result in "Irreversible Impacts" and "Irretrievable Impacts" to "Water Resources-Water Quantity": "Water removed from the aquifer and used in the operations would not be available for other uses. In addition, springs and surface waters may have decreased flows and limited uses." Table 4.9-1, FEIS 4-102, AR069591.

"The ground water drawdown under the Proposed Action is predicted to be more than ten feet for two perennial stream segments (Roberts Creek and Henderson Creek) and at 22 perennial or potentially perennial spring sites (Table 3.2-8) for varying periods up to at least 400 years

4

after the end of the mining and milling operations." FEIS ES-19, AR068720. BLM "assumed that all of the springs located in the area projected to experience ten feet or more of drawdown are interconnected with the regional groundwater system and potentially could be impacted due to water-table lowering attributable to the Proposed Action." FEIS 3-87, AR068922. "[F]or the springs nearest to the open pit, flows would be reduced or eliminated in perpetuity." FEIS 3-88, AR068923. Also, "Impacts to surface water resources could occur in areas with less than ten feet of predicted drawdown." FEIS 3-79, AR0068917. Table 3.2.8 (Affected Springs). Id.

At least four of these springs that will be dewatered are protected by Public Water Reserve 107, which established federal reserved water rights in the springs on and around Mt. Hope and required BLM to protect the lands surrounding the springs which were withdrawn by PWR 107. See Great Basin Mine Watch v. Hankins, 456 F.3d 955, 966-67 (9th Cir. 2006) (discussing applicability of PWR 107 to BLM's review and approval of mining operations).

"The BLM previously found that there were no PWR 107 sites within the ten-foot drawdown contour. Through this re-evaluation of the six springs within this contour subject to prior PWR notifications as described in Section 3.2.2.7 above, four of the springs (Garden Spring [Spring 597], Unnamed Spring [Spring 604], Mount Hope Spring [Spring 619], and Lone Mountain Spring [Spring 742]) meet PWR eligibility criteria." FSEIS 15, AR066364.

In addition to the loss of the reserved water from the groundwater pumping, some of these springs will be completely and physically eliminated due their burial under Project facilities. BLM approved the construction or location of mine facilities within one quarter mile of Springs 597, 604, 619, and 646, which is within the area withdrawn from entry under PWR 107. See FEIS Figure 2.1.5 (Project facilities), AR068777. The construction or location of mine facilities such as the massive waste rock dumps will be located/constructed either right on top of, and/or immediately adjacent to, these springs. "[S]prings (619, 639, 646) would also be directly affected by construction of Project components." FEIS 3-79, AR068917.

The Project will also produce substantial air pollution from the blasting, processing facilities and constant heavy equipment and truck traffic. The Ninth Circuit found that BLM's

5

previous analysis was based on unsupported findings and failed to account for the cumulative nearby pollution from other sources. Great Basin Resource Watch, 844 F.3d at 1101-06.

The Project, and BLM's review, was severely criticized by the U.S. Environmental Protection Agency (EPA), which determined that BLM failed to meet the public review and related requirements under NEPA and failed to adequately protect water and air quality. *See* EPA letters to BLM, AR034558-577 (March 28, 2012); AR051591-97 (Nov. 13, 2012). The Eureka County Commissioners submitted over 170 pages of comments objecting to BLM's failures to fully review the Project's impacts and protect public resources – especially the devastating impacts to water and the area's agricultural communities. AR033910-034055 (comments on Draft EIS); AR051524-49 (comments on FEIS). BLM's refusal to protect water is a "failure to protect resources critical to Eureka County agriculture and recreation and the health and wellbeing of the County residents." AR069994 (FEIS copy of County comments).

## PLAINTIFFS' STANDING

Plaintiffs have standing to sue, because members have suffered, and will continue to suffer, injuries in fact that are fairly traceable to, and would thus be redressed by invalidation of, the BLM actions in this case. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-181, 183 (2000). *See also* Great Basin Mine Watch v. Hankins, 456 F.3d 955, 966-67 (9th Cir. 2006)(finding the same plaintiff organizations had standing to challenge BLM approval of mining operation, including failure to protect PWR 107 reserved waters and lands). Plaintiffs and their members are concerned about the effects of these mineral operations and will be adversely affected by the approved activities. *See* Declarations of John Hadder (GBRW)(Exh. A); Carolyn Bailey (GBRW)(Exh. B); Larson Bill (WSDP)(Exh. C); Ian Bigley (PLAN)(Exh. D); Amended Complaint at 10-13 (environmental protection and other purposes of Plaintiffs are tied to this litigation). These Declarations also show how the procedural rights of the Plaintiffs to fully participate in proper NEPA and FLPMA processes have been adversely affected by BLM.

## STANDARD OF REVIEW

"Because this is a record review case, we may direct that summary judgment be granted

6

to either party based upon our de novo review of the administrative record." <u>Lands Council v. Powell,</u> 395 F.3d 1019, 1026 (9th Cir. 2005). A federal court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] … (D) without observance of procedures required by law." 5 U.S.C. §706(2). A court "need not rubber stamp a clear error of judgment." <u>Western Land Exchange Project v. BLM</u>, 315 F.Supp.2d 1068, 1086 (D. Nev. 2004). BLM's actions are "arbitrary and capricious if the agency fails to consider an important aspect of the problem, if the agency offers an explanation that is contrary to the evidence, … or if the agency's decision is contrary to the governing law." <u>Lands Council,</u> 395 F.3d at 1026. If an agency's decision "is not sustainable on the administrative record made, then the [agency's] decision must be vacated and the matter remanded to [the agency] for further consideration." <u>Camp v. Pitts</u>, 411 U.S. 138, 143 (1973).

<u>**ARGUMENT**</u>

**I.** **BLM Failed to Protect Federal Reserved Water Rights and Surrounding Withdrawn Lands**

*A.* *Legal Background for Public Water Reserve 107.*

It is undisputed that groundwater pumping by EML will significantly reduce, and/or eliminate a number of springs in the area. Springs and waterholes on public land in the West are reserved for public use by PWR 107, which was created by Executive Order by President Calvin Coolidge in 1926. PWR 107 provides:

> [I]t is hereby ordered that every smallest legal subdivision of public land surveys which is vacant, unappropriated, unreserved public land and contains a spring or water hole, and all land within one quarter of a mile of every spring or water hole located on unsurveyed public land, be, and the same is hereby, withdrawn from settlement, location, sale, or entry, and reserved for public use in accordance with the provisions of Section 10 of the Act of December 29, 1916.

Executive Order of Apr. 17, 1926 (Exhibit E), *quoted in* <u>Great Basin Mine Watch</u>, 456 F.3d at 966. "The purpose of PWR 107 was to prevent the monopolization by private individuals of springs and waterholes on public lands needed for stock watering." <u>Id.</u> The reserved water rights and associated land withdrawals were promulgated under the authority of Section 10 of the

1
2
3
4
5
6
7
8
9

Stock-Raising Homestead Act of 1916, 39 Stat. 865 (SRHA)(Exhibit F), which provided that withdrawn "lands containing water holes or other bodies of water needed or used by the public for watering purposes … shall, while so reserved, be kept and held open to the public use for such purposes…."[2]  As stated by the Interior Department shortly thereafter:  "The above order was designed to preserve for general public use and benefit unreserved public lands containing water holes or other bodies of water needed or used by the public for watering purposes." 51 I.D. 457-58, 1926 I.D. LEXIS 45 (1926)(Exhibit G). *See also* <u>Desert Survivors</u>, 80 IBLA 111, 115 (1984)(rejecting BLM approval of a mining plan that did not adequately consider and protect PWR 107 waters), 1984 IBLA LEXIS 337, *10 (Exhibit H).

10
11
12
13
14
15
16
17
18
19
20

These waters are held by BLM pursuant to a federal reserved water right and are to be used for the purposes of the reservation – i.e. public watering uses. Under PWR 107, BLM cannot authorize activities that will impair the public use of the reserved waters. As the Interior Department has held, "if this is a public water reserve of the class contemplated by Executive Order of April 17, 1926, a mineral entryman cannot legally divert or make inaccessible the water." <u>Memorandum, Interior Dept. Regional Counsel to Manager, Land & Survey Office,</u> dated September 24, 1953, at 1 (Exhibit I). If springs on public land are "needed or used by the public for watering purposes" then "they are not subject to appropriation, either by individuals or by any branch of the Government, but shall, while so reserved, be kept and held open to the public use for such purposes." 1935 I.D. LEXIS 52, *8-9 (1935)(Exhibit J).

21
22
23
24
25

BLM is under an obligation to ensure that federal reserved water rights are not impaired, used, or appropriated by private interests to the detriment of the purposes for which the right was created. In <u>Cappaert v. U.S.</u>, 426 U.S. 128 (1976), the Supreme Court rejected a challenge by private appropriators and the State of Nevada to federal protection of reserved lands and waters that would be impacted by groundwater pumping. Federal reserved water rights and lands are

26
27
28

[2] Although the SRHA and the underlying authority of the President to withdraw such lands pursuant to the Pickett Act of 1910, 36 Stat. 847, was repealed by FLPMA in 1976, withdrawals (such as the 1926 Executive Order) made pursuant to those authorities remain in force. 43 U.S.C. §1701 note (c).

federal property and are "superior to the rights of future appropriators." Cappaert, 426 U.S. at 138. "[T]he United States can protect its water from subsequent diversion, whether the diversion is of surface or groundwater." Id. at 143. "Where reserved rights are properly implied, they arise without regard to equities that may favor competing water uses. See Cappaert v. U.S., 426 U.S. 128, 138-39." Colville Confederated Tribes v. Walton, 752 F.2d 397, 405 (9th Cir. 1985).

BLM cannot disregard its duty to protect such federal property. "Only Congress, and not an executive branch agency, can authorize the disposition of federal property." High Country Citizens Alliance v. Norton, 448 F.Supp.2d 1235, 1248 (D. Colo. 2006)(Interior Department illegally allowed the private appropriation and use of a federal reserved water right below the level needed to protect that use) citing Gibson v. Chouteau, 80 U.S. 92, 99 (1871). See also Lake Berryessa Tenants' Council v. U.S., 588 F.2d 267, 271 (9th Cir. 1978)(federal agency "cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act."). Thus, BLM is under an obligation to prevent any impairment of the PWR 107 reserved water rights, both under PWR 107 itself (and the SRHA) as well as the general duty to not dispose of federal property without appropriate authorization. That it failed to do here.

Failure to review and fully protect the reserved water rights, waters, related withdrawn lands, and public uses of these lands and waters, violates PWR 107, the SHRA, and BLM's duty under FLPMA to "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. §1732(b). BLM's failure to review and fully protect these resources also violates FLPMA's mandate that: "the public lands be managed in a manner that will protect the quality of … ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. §1701(a)(8).

B.     *The Project Will Eliminate or Significantly and Adversely Affect PWR 107 Reserved Waters and Withdrawn Lands*

At least four of the springs that will be dewatered are protected by PWR 107. See Great Basin Mine Watch v. Hankins, 456 F.3d 955, 966-67 (9th Cir. 2006)(discussing applicability of PWR 107 to BLM's review and approval of mining operations). In the previous lawsuit,

Plaintiffs argued that BLM violated FLPMA and other laws due to BLM's failure to protect the water rights reserved by PWR 107 for at least four springs that would be dewatered, and illegal approval of the permanent waste dumps and other ancillary operations within the public lands withdrawn by PWR 107. Great Basin Resource Watch, 844 F.3d at 1111 (discussing PWR claims). The Ninth Circuit stated that "the proper analysis of the PWR 107 claim turns in large part on whether the four springs in the area of the project are 'covered' by PWR 107 – that is, whether the four springs are located on lands that were withdrawn by PWR 107 – but BLM's position on that question is unclear." Id. The Court stated that:

> The FEIS is internally contradictory, suggesting in some places that the four springs *are* covered by PWR 107 and in other places that they are *not*. We note that the BLM had previously submitted "Notification of Public Water Reserve" forms for the four springs to the State of Nevada. Each of those forms lists an amount of water that the United States wishes to claim as a federal reserved water right and cites PWR 107 as authority for the reservation. The notifications have never been rescinded.

844 F.3d at 1111, n. 12 (emphasis in original). As a result, "we remand the case to the agency for clarification." Id. at 1111. Relatedly, because the Court remanded the FEIS back to the agency "to fix the errors in its analysis of the Project under NEPA," Id. at 1111, "we also decline to address Great Basin's FLPMA claim" associated with the PWR 107 issues. Id. at 1111, n. 10.

Upon remand, BLM clarified that at least four springs are covered by PWR 107. "The BLM revisited all of its existing PWR claims in April and May of 2016 to determine if they were still valid." FSEIS 13, AR066362. BLM determined that: "Springs 597, 604, 619, and 742 do have prior PWR notifications filed with the State Engineer and remain PWR sites." FSEIS 14, AR066363. "The BLM previously found that there were no PWR 107 sites within the ten-foot drawdown contour. Through this re-evaluation of the six springs within this contour subject to prior PWR notifications as described in Section 3.2.2.7 above, four of the springs (Garden Spring [Spring 597], Unnamed Spring [Spring 604], Mount Hope Spring [Spring 619], and Lone Mountain Spring [Spring 742]) meet PWR eligibility criteria." FSEIS 15, AR066364.

In addition to the loss of the reserved water from the groundwater pumping, the construction or location of mine facilities such as the massive waste rock dumps will be

located/constructed either right on top of, and/or immediately adjacent to, these springs. "[S]prings (619, 639, 646) would also be directly affected by construction of Project components." FEIS 3-79, AR068917. These facilities are within one quarter mile of Springs 597, 604, and 619, which is within the area withdrawn from entry under PWR 107. *See* FEIS Figure 2.1.5 (Project facilities), AR068777.

Spring 619 ("Mt. Hope Spring") was submitted by BLM as a PWR 107 Reserved Right to Nevada in 1994 (R06940), covering water for 400 cattle and 75 horses. AR066334-35. Spring 619 is also shown as Spring # SP-4 in the FEIS. *Compare* FEIS Figure 2.1.5 (map of Project), AR068777, with Figures 3.2.18 and 3.2.20 (maps of spring locations), AR068919, 068921. "The Mt. Hope Spring, 619/SP-4, is located immediately adjacent to, or within, the proposed north Waste Rock Disposal Facility (WRDF), which will receive the Potentially Acid Generating Waste Rock (PAG-WRDF), and is less than 1,000 feet from the Non-PAG WRDF. 2012 FEIS Figure 2.1.5." BLM Answer (Dkt. 25), admitting Amended Complaint ¶90 (Dkt. 14).

Spring 597 ("Garden Spring") was submitted by BLM as a PWR 107 Reserved Right to Nevada in 1994 (R06942), covering water for 400 cattle and 75 horses. AR066336-37. Spring 597 is also shown as Spring #SP-2/SP-2A in the FEIS. *Compare* 2012 FEIS Figure 2.1.5 (map of Project facilities), AR068777, with Figures 3.2.18 and 3.2.20 (maps of spring locations), AR068919, 068921. The Garden Spring is located within or immediately adjacent to the proposed "Growth Media Stockpile" near the northern boundary of the Project Area, where soil, dirt, and other growth media will be dumped. FEIS Figure 2.1.5, AR068777.

Spring 742 ("Lone Mtn. Spring") was submitted by BLM as a PWR 107 Reserved Right to Nevada in 1994 (R06951), and amended in 2016, covering water for 400 cattle and 75 horses and 10 deer. AR066338-41. According to BLM's amended filing: "The amount of water claimed is that volume which will support healthy, vigorous riparian vegetation necessary to maintain the claimed surface flow for the identified purposes." AR066341.

Spring 604 ("Unnamed Spring"), was submitted by BLM as a PWR 107 Reserved Right to Nevada in 1994 (amended in 2016)(R06943), covering water for 400 cattle and 75 horses and

11

10 deer. AR057385-86. As with the Lone Mtn. Spring, BLM highlighted the important human, wildlife and environmental uses supported by this Spring. AR057386. "Spring 604, depicted as SP-3 in the 2012 FEIS, is located immediately adjacent to, or within, the proposed PAG WRDF. 2012 FEIS Figure 2.1.5." BLM Answer (Dkt. 25), admitting Amended Complaint ¶96 (Dkt. 14).

Since the Mt. Hope, Garden, Lone Mtn., and Unnamed Spring 604 existed on April 17, 1926, the priority date of the PWR 107 federal reserved water rights, as well as the withdrawal from entry for other uses, is that date. *See* BLM's asserted PWR 107 reserved right for Spring 619 (Mt. Hope Spring) listing the priority date as "April 17, 1926" and the "Authority" for the right as "Executive Order of April 17, 1926 (PWR 107)." AR066334. *See also* above AR cites for BLM's filings for the Garden, Lone Mtn., and 604 Springs (same priority date and authority).

It is undisputed that BLM approved the construction or location of mine facilities (shown on FEIS Figure 2.1.5) within one quarter mile of Springs 597, 604, and 619, or at a minimum within the 40 acres surrounding each spring withdrawn by PWR 107, whichever is applicable. AR068777. The mine facilities would be located/constructed either right on top of, and/or immediately adjacent to, these Springs. "[S]prings (619, 639, 646) would also be directly affected by construction of Project components." FEIS 3-79, AR068917.

C.      *BLM Failed to Protect the PWR 107 Withdrawn Lands and Waters*

There is one exception to BLM's duty to protect the PWR 107 waters and withdrawn lands. Under the Pickett Act (the statutory source for the SHRA and PWR 107), lands withdrawn around PWR 107 waters containing valuable deposits of "metalliferous minerals" were opened for claiming under the 1872 Mining Law. Pickett Act of June 25, 1910, c. 421, 36 Stat. 847, as amended by the Act of August 24, 1912, c. 369, 37 Stat. 497 (Combined in Exhibit K). "[A]ll lands withdrawn under the provisions of this Act shall at all times be open to exploration, discovery, occupation, and purchase under the mining laws of the United States, so far as the same apply to metalliferous minerals." 37 Stat. 497, §2.

There is no evidence in the record showing that EML's mining claims covering the PWR springs, and the withdrawn lands around the PWR springs, contain valuable deposits of

1   metalliferous minerals "under the mining laws of the United States." Pursuant to the 1872

2   Mining Law, only claims for metalliferous minerals that contain "valuable mineral deposits" are

3   valid against the United States. 30 U.S.C. §22. As the Interior Department has long held:

4       Regarding the use of "metalliferous minerals" in the Picket[t] Act, the [Consolidated
        Ores] decision concluded that the term "was used to describe those minerals or ores of
5       economic value from which the useful metals could be directly and advantageously
        extracted." Consolidated Ores at 472.
6

7   David E. Hoover and Lester F. Whalley, 99 IBLA 291, 294 (1987), 1987 WL 110721 at **4,

8   quoting Consolidated Ores Mines Co., 46 Pub. Lands Dec. 468 (1918), 1918 WL 1078.

9       Despite this, BLM asserts that the Pickett Act exemption for metalliferous mineral

10  deposits applies equally to the unmineralized lands approved for the waste rock and tailings

11  dumps around the PWR 107 Springs, even though no mining would occur on these lands and no

12  valuable deposits of metalliferous minerals exist on these lands. FSEIS 15-16, AR066364-65.

13      Yet without evidence that the claims at/around the PWR 107 Springs contain the requisite

14  discovery of valuable metalliferous minerals (i.e., "those minerals or ores of economic value

15  from which the useful metals could be directly and advantageously extracted"), the claimant

16  "cannot sustain valid locations on land withdrawn from the location of mining claims except for

17  metalliferous minerals." David Hoover at **5.

18      BLM erroneously believed that the fact that there may be a valuable deposit of a

19  metalliferous mineral within the mining claims covering the core pit area automatically extends

20  rights under the Mining Law, and the associated Pickett Act exemption from PWR 107, to the

21  lands and claims covering the waste rock dumps and other ancillary facilities far away from the

22  pit. FSEIS 15-16, AR066364-65. The Mt. Hope Spring (SP-4) is located roughly ½ mile north of

23  the edge of the pit; the Garden Spring (SP-2) is located over 1 mile north of the edge of the pit.

24  FEIS Figure 2.1.5 (showing locations of Springs and Project facilities), AR068777.

25      This ignores the longstanding rule that rights to occupy lands containing valuable

26  minerals "under the mining laws of the United States" do not extend to lands that do not contain

27  such valuable minerals. "A claimant may not use the deposit present in one location to lend

28

13

validity to an adjacent location. *See Waskey v. Hammer*, 223 U.S. 85, 91 (1912)('A discovery without the limits of the claim, no matter what its proximity, does not suffice.'); *Lombardo Turquoise Milling & Mining Co. v. Hemanes*, 430 F.Supp. 429, 443 (D. Nev. 1977)." Center for Biological Diversity v. U.S. Fish and Wildlife Service, 409 F.Supp.3d 738, 754 (D. Ariz. 2019). "[I]t is clear under both the mining law and the regulations that a discovery of valuable mineral is the sine qua non of an entry to initiate vested rights against the United States." Davis v. Nelson, 329 F.2d 840, 844-45 (9th Cir. 1964).

BLM cannot approve a mining operation on withdrawn lands, such as within the Project site around the PWR 107 Springs, unless valid claims for metalliferous minerals exist on the withdrawn lands. Any mining claims filed or located on lands withdrawn by PWR 107 are null and void unless they meet the requirements under the Mining Law for the discovery of a valuable mineral deposit. "Mining claims located on lands not open to appropriation are null and void *ab initio*." Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745, 756 (D.C. Cir. 2007), *citing* Shiny Rock Mining Corp. v. United States, 825 F.2d 216, 219 (9th Cir. 1987) (same).

There is nothing in the record showing that the lands within ¼ mile (or within the withdrawn 40 acres) of springs # 597, 604, 619, and 742 contain valuable mineral deposits of metalliferous minerals. Instead, the record shows that waste dump and tailings lands contain mere "common variety" rock, which under the Surface Resources and Multiple Use Act of 1955, are not locatable (i.e., cannot be legitimately claimed) under the Mining Law. 30 U.S.C. §611 (Common Varieties Act). *See* FEIS 3-254 (mineralized ore limited to the pit), AR069073; Figure 3.4.2 (geologic map showing waste rock lands contain mere "Alluvium"), AR069066; Figure 3.4.3 (mineralized ore limited to the pit), AR069067. That makes sense, as the metalliferous minerals are in the pit, not in distant lands that will be buried under hundreds of millions of tons of waste. In fact, the location of the waste rock dumps were chosen due in part to the lack of "suitable mining reserves underneath the waste rock disposal facilities." FEIS ES-7, AR068712. Yet, BLM's review/approval of the Project was based on its view that EML has a "statutory right … [to] develop federal mineral resources" and use and possess all the lands around the PWR 107

14

Springs. FEIS 1-9, AR068759.

Instead, BLM asserts that the lands at and around the PWR 107 waters were never withdrawn by the President in 1926 because EML eventually and purportedly found metalliferous molybdenum in the mine pit decades later. FSEIS 15-16, AR066364-65. This is wrong for a number of reasons. First, as shown above, the fact that the mine pit may arguably contain such minerals does not extend the Pickett Act exemption from PWR 107 to lands miles away covered by separate and distinct mining claims, as the record shows that there are no valuable metalliferous minerals on these lands.

Second, BLM ignores the plain language of PWR 107 which withdrew the lands around the PWR 107 Springs from entry. As the Ninth Circuit stated in this case, "the proper analysis of the PWR 107 claim turns in large part on whether four springs in the area of the Project are 'covered' by PWR 107 – that is, whether those four springs are located on lands that were withdrawn by PWR 107." Great Basin Resource Watch, 844 F.3d at 1111. Here, because these four springs "are 'covered'" by PWR 107, they are on "lands that were withdrawn by PWR 107."

BLM admits that it must verify whether mining claims on lands surrounding PWR 107 Springs are valid (i.e., contain the requisite discovery of valuable minerals) "if the lands are withdrawn." 2012 ROD 8, AR066817. Yet BLM refused to inquire into whether the claims covered the waste dumps are valid, by erroneously ignoring the fact these lands were withdrawn from entry in 1926, subject only to the future location of valid mining claims for valuable deposits of metalliferous minerals.

**The fact that EML claimed these lands decades after 1926 does not automatically eliminate the 1926 withdrawal.** It requires BLM to verify that the Pickett Act exemption applies to these claims within the withdrawn lands – and that requires evidence that the lands contain the required valuable deposit of metalliferous minerals. Without this evidence, the mere fact that EML or its affiliates have filed mining claims on these lands does not mean that these lands and waters are exempt from the PWR 107 withdrawals and protections.

Also, even if metalliferous minerals exist on all of the public lands around the PWR springs, BLM must ensure that these lands are kept and held open to the public use for watering purposes under the 1926 Executive Order and the Stock-Raising Homestead Act. "Any such mining location … is subject, however, to the provision of the Stock-Raising Homestead Act of 1916 that it be 'held open to the public use' for water purposes." 2 AMERICAN LAW OF MINING § 14.06[11][a] (Exhibit L). Yet BLM did not ensure that the lands would be kept and held open to the public for watering purposes, as the lands at and around the PWR 107 Springs will be outright buried by millions of tons of waste or eliminated from public access.

## II.  BLM Failed to Properly Protect Public Resources Under FLPMA Due to BLM's Erroneous Assumption that EML Had Statutory Rights to Occupy and Possess Public Land for the Permanent Waste Rock and Tailings Facilities

*A.  Any Right to Permanently Occupy Public Lands Must Be Supported by Evidence that the Lands Meet the Mining Law's Prerequisites for Such Rights*

Even if the land and water protections of PWR 107 do not apply, BLM based its decisions on the erroneous assumption that EML had statutory rights to conduct all of its proposed operations based on the mere staking of claims under the 1872 Mining Law, 30 U.S.C. §§21-43. This includes the permanent waste rock and tailings dumps, which cover 2,246 acres (waste rock) and 3,276 acres (tailings). FEIS 2-3 (Table 2.1-1), AR068771.

BLM's review and approval of the Mt. Hope Project was based on its legal view that the 1872 Mining Law "recognize[s] the statutory right of mineral claim holders, such as EML, to explore for and develop federal mineral resources" at the site. FEIS 1-9, AR068759. According to BLM, the 1872 Mining Law gives EML "the underlying right to access and develop minerals." FEIS 3-241, AR069063.

Based on this purported statutory right, BLM rejected the Environmentally Preferred Alternative, the No-Action Alternative. 2019 ROD 6, AR066815. BLM thus believed EML has a "statutory right" to conduct its waste rock and tailings dumping, processing, and other operations based solely on the fact that the company has blanketed the Project's lands with mining claims.

16

1   BLM's position is legally wrong. Such "statutory rights" can only accrue to the company if these

2   claims satisfy the requirements of the 1872 Mining Law for possessory rights. "A mining claimant has

3   the right to possession of a claim only if he has made a mineral discovery on the claim." Lara v.

4   Secretary of the Interior, 820 F.2d 1535, 1537 (9th Cir. 1987). *See also* Davis v. Nelson, 329 F.2d

5   at 845 (9th Cir. 1964)("right to occupation" of the claimed lands is limited to only those lands "in

6   which valuable mineral deposits are found."). The Mining Law limits the permanent use and

7   development of mining claims on public lands to only those lands that contain a "valuable

8   mineral deposit." "All valuable mineral deposits in lands belonging to the United States … shall

9   be free and open to exploration and purchase, and the lands in which they are found to

10  occupation and purchase." 30 U.S.C. §22.

11      "Thus, although a claimant may explore for mineral deposits before perfecting a mining

12  claim, without a discovery, the claimant has no right to the property against the United States or

13  an intervenor. 30 U.S.C. §23 (mining claim perfected when there is a 'discovery of the vein or

14  lode'); *see also Cole v. Ralph,* 252 U.S. 286, 295–96 (1920)." Freeman v. Dept. of Interior, 37

15  F.Supp.3d 313, 319 (D.D.C. 2014). "If there is no valuable mineral deposit beneath the purported

16  unpatented mining claims, the unpatented mining claims are completely *invalid* under the 1872

17  Mining Law, and no property rights attach to those invalid unpatented mining claims." Center for

18  Biological Diversity, 409 F.Supp.3d 738, 748 (D. Ariz. 2019)(emphasis in original). To satisfy

19  the discovery requirement necessary for an occupancy right, "[I]t must be shown that the mineral

20  can be extracted, removed and marketed at a profit." U.S. v. Coleman, 390 U.S. 599, 602 (1968).

21      Here, there is no evidence that the mining claims covering the public lands approved for the

22  tailings and waste dumps contain the requisite valuable deposit of metalliferous minerals. BLM

23  never inquired into whether the mining claims at the Project site are valid. BLM Answer (Dkt. 25) to

24  Amended Complaint, ¶143 (Dkt. 14). BLM admits that there is an "absence of suitable mining

25  reserves underneath the waste rock disposal facilities." FEIS ES-7, AR068712.

26      Instead, as detailed above, the record shows that waste dump and tailings lands contain

27  mere "common variety" non-mineralized rock, which under the Surface Resources and Multiple

28

17

Use Act of 1955, are not locatable (i.e., cannot be legitimately claimed) under the Mining Law. 30 U.S.C. §611. Thus, these lands do not contain the requisite valuable deposits of locatable minerals, which is a prerequisite for EML to establish use and occupancy rights. *See* 30 U.S.C. §22. "Any decision made without first establishing a factual basis upon which the [land agency] could form an opinion on surface rights would entirely ignore an important aspect of this problem." Center for Biological Diversity, 409 F.Supp.3d at 757-58, *citing* Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)(State Farm).

B.     *BLM Failed to Apply the Proper Regulatory Structure, Based on Its Unsupported Assumption of EML's Statutory Right to Use Its Mining Claims for Waste Dumps*

Based on this erroneous reliance on EML's purported "rights" under the Mining Law, BLM failed to properly apply its public land special use permitting regulations, 43 C.F.R. Part 2920 (Leases, Permits, Easements). Instead, BLM reviewed and approved all aspects of the Project under its regulations at 43 C.F.R. Part 3809. These Part 3809 regulations only apply to "operations authorized by the mining laws." 43 C.F.R. §3809.1(a). Here, because the waste rock dumps, tailings facilities and other Project activities are not "authorized by the mining laws," and are not governed under any rights under the 1872 Mining Law, the agency's decision to regulate all of these activities under Part 3809 instead of Part 2920 violates FLPMA.

Under FLPMA, BLM has full discretion and authority over operations proposed on public lands, including hardrock mining operations such as the Mt. Hope Project, to "protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. §1701(a)(8). However, such discretion/authority is limited to the broader "preventing unnecessary or undue degradation" of public resources standard if the application of that discretion/authority "impair[s] the rights of any locators or claims under that Act [the 1872 Mining Law]." 43 U.S.C. §1732(b).

Here, as detailed above, EML has not shown, nor has BLM attempted to show, that EML has met the legal prerequisites of the Mining Law to have "rights of any locators" to the use and possession of its mining claims (e.g., no evidence that the claims covering all of the

18

waste/tailings facilities contain the requisite valuable deposit of a locatable mineral). As such, there are no "rights" that can be "impaired" by BLM's full discretionary authority over those aspects of the Project that do not have the necessary factual basis to support such rights.

BLM's discretionary authority is implemented via its special use FLPMA regulations, which apply whenever activities are not "authorized" by other laws. "Any use not specifically authorized under other laws or regulations and not specifically forbidden by law may be authorized under this part." 43 CFR §2920.1-1. Thus, because EML's waste dumps are not "authorized by the mining laws," absent evidence that these uses satisfy the Mining Law's requirements for the establishment of such rights, they are governed by Part 2920, not Part 3809.

The Part 2920 regulations give BLM full discretion over whether to approve operations and include significant environmentally protective mandates, which BLM ignored here. For example, BLM must: "(b)(2) Minimize damage to scenic, cultural and aesthetic values, fish and wildlife habitat and otherwise protect the environment; … (c)(1) Protect Federal property and economic interests; … and (6) Otherwise protect the public interest." 43 C.F.R. §2920.7. These FLPMA requirements are not found in the basic command to "prevent unnecessary or undue degradation" that applies to "operations authorized by the mining laws." 43 C.F.R. §3809.1(a).

Lastly, under NEPA, the agency is required to fully consider all "reasonable alternatives." The consideration of alternatives is "the heart of the environmental impact statement." 40 CFR §1502.14. Based on BLM's erroneous legal assumption that EML had a "statutory right" to use and possess the public lands for the waste dumps, tailings, and other ancillary facilities, BLM did not seriously consider the alternative of regulating (and/or potentially denying) these facilities under the Part 2920 regulations. Nor did BLM properly consider the "Environmentally Preferred Alternative," the No-Action Alternative. 2019 ROD 6, AR066815. This violates BLM's duty to take a "hard look" at all reasonable alternatives to, and the environmental impacts from, Project operations. Great Basin Resource Watch. 844 F.3d at 1101 (requiring BLM to provide a "thorough analysis … of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.").

**III.**     **BLM Violated NEPA**

NEPA "prevent[s] or eliminate[s] damage to the environment and biosphere by focusing

government and public attention on the environmental effects of proposed agency action." Marsh v.

Oregon Natural Resources Council, 490 U.S. 360, 371 (1989).

> NEPA establishes "action-forcing" procedures that require agencies to take a "hard look"
> at environmental consequences.
> …
> An EIS serves two purposes:
>
> First, [i]t ensures that the agency, in reaching its decision, will have available, and
> will carefully consider, detailed information concerning significant environmental
> impacts. Second, it guarantees that the relevant information will be made available to
> the larger audience that may also play a role in both the decisionmaking process and
> the implementation of that decision.

Center for Biological Diversity v. Dept. of Interior, 623 F.3d 633, 642 (9th Cir. 2010). By

focusing the agency's attention on the environmental consequences of the proposed action,

NEPA "ensures that important effects will not be overlooked or underestimated only to be

discovered after resources have been committed or the die otherwise cast." Robertson v. Methow

Valley Citizens Council, 490 U.S. 332, 349 (1989). "NEPA procedures must ensure that

environmental information is available to public officials and citizens before decisions are made

and before actions are taken." 40 CFR §1500.1(b).[3]

*A.     The FEIS Failed to Fully Analyze the Project's Direct, Indirect, and Cumulative Impacts.*

NEPA requires that BLM fully consider all direct, indirect, and cumulative impacts of the

proposed action. 40 C.F.R. §§1502.16; 1508.8; 1508.25(c). Direct effects are caused by the

action and occur at the same time and place as the proposed project. 40 C.F.R. §1508.8(a).

Indirect effects are caused by the action and are later in time or farther removed in distance, but

are still reasonably foreseeable. 40 C.F.R. §1508.8(b). Impacts that must be analyzed include

"effects on natural resources and on the components, structures, and functioning of affected

---

[3] The national NEPA regulations were recently revised, which became effective on September 14, 2020. 85 Fed. Reg. 43304-43376 (July 16, 2020). Because BLM conducted its NEPA review for this Project before the new regulations became effective, the CEQ NEPA regulations existing prior to September 14, 2020, at 40 C.F.R. Part 1500, apply here.

ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." Id.

Cumulative impacts are:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. §1508.7.  As this Circuit noted in rejecting a BLM analysis of a mining project:

> In a cumulative impact analysis, an agency must take a "hard look" at all actions. … [A]nalysis of cumulative impacts must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment... Without such information, neither the courts nor the public ... can be assured that the [agency] provided the hard look that it is required to provide.

Te-Moak Tribe v. U.S. Dep't of Interior, 608 F.3d 592, 603 (9th Cir. 2010). NEPA requires "mine-specific . . . cumulative data," a "quantified assessment of their [other projects] combined environmental impacts," and "objective quantification of the impacts" from other existing and proposed operations in the region. Great Basin Mine Watch, 456 F.3d at 971-74.

1.      Cumulative Air Pollution

The Ninth Circuit previously determined that BLM failed to conduct an adequate analysis of the air emissions from all current projects as well as all "Reasonably Foreseeable Future Actions" [RFFAs] in the Project's "Air Quality Cumulative Effects Study Area" [AQ CESA]:

> [T]he BLM in this case did not provide sufficiently detailed information in its cumulative air impacts analysis.  The BLM made no attempt to quantify the cumulative air impacts of the Project together with the Ruby Hill Mine and vehicle emissions. Nor did the BLM attempt to quantify or discuss in any detail the effects of other activities, such as oil and gas development, that are identified elsewhere in the FEIS as potentially affecting air resources.
> …
> The cumulative air impacts portion of the FEIS fails to "enumerate the environmental effects of [other] projects" or "consider the interaction of multiple activities." *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1133 (9th Cir. 2007). Accordingly, we hold that the cumulative impacts portion of the FEIS does not comply with NEPA.

844 F.3d at 1105-06. Upon remand, BLM makes the same mistakes, refusing to analyze the reasonably foreseeable air pollution from the oil and gas and other activities in the Project area.

The 2012 FEIS acknowledges that other sources of air pollution in the CESA will emit Clean Air Act Criteria Pollutants (National Ambient Air Pollution Quality Standards, NAAQS). BLM admits that mining, oil and gas, agriculture and commercial operations in the area all "generate fugitive dust and combustion emissions." FEIS 4-54, AR069545. *See also,* Figure 4.3.5, FEIS 4-45 (showing mineral and oil and gas projects, including the 100+ oil and gas leases, within the air quality CESA), AR069537.

BLM nevertheless repeated its previous conclusion that the Project would not result in any potential violation of air quality standards and related laws. "Air impacts from the Proposed Action, in combination with air impacts from past and present actions, and RFFAs, would result in total impacts below the NAAQS. This conclusion is consistent with the cumulative air impacts analysis in the FEIS." FSEIS 37, AR066386.

For this conclusion, BLM relies on a new report prepared by EML's contractor. But EML's air quality report failed to account for the true cumulative air impacts. For example, the only current and reasonably foreseeable sources of air pollution added to the Mt. Hope Project's emissions were three distant mining operations: "Cumulative Impact" calculated from "Combined impact from Mount Hope, Gold Bar, Ruby Hill, and Prospect Mountain Mine." FSEIS 37, Table 4.1-1 ("Mount Hope Project Cumulative Modeling Analysis"), AR066386.

The 2019 FSEIS relies on the FEIS, which admitted that there will be cumulative impacts from various other oil and gas, agricultural, commercial, and other activities.  FEIS Section 4, 4-1 to -104, AR069500-593. But the FEIS merely listed these activities, notes that they will result in cumulative impacts along with the Project to various resources (e.g., air, water, wildlife, cultural/historical), provides a summary of the acreages of these activities, and a cursory mention of impacts. *See*, *e.g.*, Table 4.2-2, FEIS 4-10 to -12 (AR069507-09).

For "Past and Present Actions" in the area, Table 4.2-2 lists over a dozen "Activities that May Cumulatively Affect Air Resources." Yet the 2012 FEIS and 2019 FSEIS are devoid of any

22

calculation or even estimate of the emissions from these sources. Similarly, Table 4.2-2 lists over a dozen "Reasonably Foreseeable" "Activities that May Cumulatively Affect Air Resources" in the area. Yet there is no analysis of the potential emissions from these activities.

The FSEIS fails to calculate or even estimate cumulative air emissions within the AQ CESA, particularly the air emissions from all "reasonably foreseeable future actions" such as oil and gas operations, other mineral operations, gravel mines, truck/vehicle traffic, and other activities within the AQ CESA listed in Table 4.2-2. For these reasonably foreseeable activities, the FSEIS does not include any analysis of air emissions from any of the RFFAs, except from one other mine, the Prospect Mtn. Mine. "A modeling analysis was conducted to determine the cumulative impacts of the combined emissions from the Proposed Action (i.e., Project-related emissions including heavy-duty mobile equipment [e.g., haul trucks, dozers, graders, water trucks, etc.]), the present actions of the Gold Bar Project and the Ruby Hill Mine Project, and the RFFA of the Prospect Mountain Mine Project." FSEIS 36, AR066385. The Prospect Mtn. Mine "is located about 3.5 miles southwest of the town of Eureka in Eureka County, Nevada." BLM Decision Record, Plan of Operations Approval, Determination of Required Financial Guarantee Amount," Prospect Mountain Project, July 12, 2019, at 1. ARSUPP000110.[4]

Thus, the only "reasonably foreseeable future action" (RFFA) that BLM considered in the FSEIS's air quality discussion was the Prospect Mtn. Mine, located on the other side of Federal Highway 50, well over 20 miles from Mt. Hope. Yet **none** of the other RFFAs within the AQ CESA, most of them north of Highway 50 and many closer to Mt. Hope than the Prospect Mtn. Mine, were ever considered by BLM. *See* FEIS 4-45 (showing mineral and oil and gas projects, including the 100+ oil and gas leases, within the air quality CESA), AR069537; FEIS

---

[4] BLM had refused to include this and other documents in the administrative record, despite the fact that they were BLM's own documents that provide important evidence regarding air quality impacts from these other activities. Plaintiffs filed a motion requesting that these critical documents be provided, as they are key "relevant factors" that BLM failed to consider. Magistrate Judge Cobb agreed and ordered that BLM produce a Supplemental Record with these documents. Dkt. 52.

23

Table 4.2-2, listing over a dozen "Past and Present" and over a dozen "Reasonably Foreseeable" "Activities that May Cumulatively Affect Air Resources" in the area, AR069507-09.

BLM is under the mistaken belief that the only inadequacy found by the Ninth Circuit on cumulative air emissions was the failure to include the air emissions from two other current, and one future (Prospect Mtn.), mining projects noted in the 2012 FEIS. The Court found that the FEIS's "discussion of cumulative air impacts is insufficient." 844 F.3d at 1105. The Court cited FEIS section 4.4.4 to support its NEPA inadequacy ruling. Id. Yet the FSEIS merely relies upon that same section 4.4.4 to calculate the cumulative air emissions. "Reasonably foreseeable future actions (RFFAs) are described in Section 4.4.4 of the Final EIS." FSEIS 36, AR066385. BLM thus failed to correct the NEPA violation found by the Ninth Circuit: "Nor did the BLM attempt to quantify or discuss in any detail the effects of other activities, such as oil and gas development, that are identified elsewhere in the FEIS as potentially affecting air resources." 844 F.3d at 1105.

These emissions are significant. There are well over 100 "Authorized Oil and Gas Leases" within the Mt. Hope AQ CESA. FEIS Figure 4.3.5, AR069537. Yet neither the 2012 FEIS (found legally inadequate under NEPA by the Ninth Circuit) or the new FSEIS (which relies on Section 4.4.4 of the 2012 FEIS) contain any analysis of potential cumulative air pollutant emissions from exploration and/or development on these leases, or from any other potential sources outside of the three distant mines.

Instead, BLM merely stated that "[i]n response to the remand from the Ninth Circuit Court of Appeals, the BLM confirmed that there are no oil and gas developments in the CESA, and vehicular emissions are generally considered included in background concentrations and are not specifically included in air models for NEPA analysis." FSEIS 36, AR066385. This ignores the Ninth Circuit's order that BLM analyze the **future** potential air emissions from oil and gas activity within the AQ CESA – not just the present situation. Under NEPA, cumulative impacts necessarily include air emissions from "past, present, and reasonably foreseeable **future** actions." 40 CFR §1508.7 (emphasis added).

Recent BLM NEPA analyses for oil and gas leasing, including from the very same BLM office here, include quantified estimates and analysis of potential air pollutant emissions from future exploration and development of oil and gas leases – estimates and analysis lacking from any of the air quality discussion in the FSEIS and 2012 FEIS. BLM included these calculations in its review of these leases despite the fact that oil and gas leases themselves do not approve any drilling, or pollutant emissions. *See* April 2019 Lease Sale Environmental Assessment (EA) for over 40 new leases within the Mt. Hope Air Quality CESA. SUPPAR000143-365. *Compare* 2012 FEIS Figure 4.3.5, AR069537 (showing existing oil and gas leasing within the CESA) with April 2019 Leasing EA at 12, showing new lease parcels in the area. ARSUPP000155.

The fact that BLM's approval of the Mt. Hope Project does not authorize oil and gas leasing does not mean that BLM can ignore the indirect and cumulative impacts that will foreseeably result from activities on these current BLM leases. Nor does the fact that leasing does not initially approve actual oil and gas operations mean that BLM is not capable of analyzing foreseeable air emissions – indeed, BLM did so in its own Lease Sale EA. Federal courts regularly require BLM to analyze potential future air emissions that may result from oil and gas leasing, including both the indirect and cumulative emissions. *See, e.g.*, San Juan Citizens Alliance v. BLM, 326 F.Supp.3d 1227 (D.N.M. 2018); Wild Earth Guardians v. Zinke, 368 F.Supp.3d 41 (D.D.C. 2019).

The U.S. EPA criticized BLM, at Mt. Hope, for failing to consider what BLM itself admits in the 2019 Lease Sale EA are the reasonably foreseeable potential air pollution emissions that can be expected to result from activities on the leases:

> The EPA continues to recommend that the BLM consider nearby sources and reasonably foreseeable future actions as a part of assessing cumulative air quality impacts associated with the proposed molybdemum [*sic*] mine. EPA notes that a recent BLM March 2019 Competitive Oil and Gas Lease Sale Environmental Assessment (Lease Sale EA) estimated approximately 25 wells could be developed within the next ten years in the district, and a map of proposed oil and gas lease parcel locations within the Lease Sale EA shows **at least 15 of the parcels offered for sale are within 10 miles of the Mt. Hope Mine.** Even though the Final SEIS states that potential oil and gas development emissions need not be considered because of the "reduced likelihood" that applications for permits to drill will be filed (FSEIS p. 36

and Response to Comment C-9), **the Lease Sale EA provides current information that anticipates an increase in overall criteria pollutants, hazardous air pollutants, and greenhouse gas emissions.**

2019 EPA letter to BLM, at 1 (emphasis added) AR066756. Five of the proposed leases are on the same side of Highway 278, just a few miles south of the Mt. Hope Mine. 2019 Lease Sale EA Figure 2, ARSUPP000155. Another cluster of proposed leases is just across the Highway from the Mine, in Diamond Valley. Id.

Because of the potential for cumulative air pollution emissions from activities on these proposed leases that "anticipates an increase in overall criteria pollutants, hazardous air pollution, and greenhouse gas emissions," "EPA recommends that BLM update the Mount Hope cumulative impact analysis, and provide updated conclusions in the ROD, to reflect total anticipated cumulative increases in each criteria air pollutant and hazardous air pollutant when considering the proposed mine operating along with 25 anticipated oil or natural gas wells." EPA letter, AR066756-57. BLM refused EPA's direction.

In that 2019 Lease Sale EA, BLM prepared a detailed "Air emissions inventory for a representative oil and gas well" to estimate air pollution emissions from a typical well. 2019 Lease Sale EA 22 (Table 3), ARSUPP000165. To estimate potential air emissions from the leasing, BLM prepared a "Reasonably Foreseeable Development (RFD) Scenario." "The RFD scenario (Appendix G) predicts a maximum of 25 wells in the Battle Mountain District. The number in any given area is unknown but potential emissions would be multiplied appropriately." Id.

BLM estimated that one "representative oil and gas well in the western U.S." could reasonably be expected to emit 15.6 tons per year of NOx. 6.9 tons per year of PM10, and 10.4 tons per year of Hazardous Air Pollutants (HAPs), among at least a dozen other pollutants. Id. As EPA noted, the BLM Leasing EA "estimated approximately 25 wells could be developed within the next ten years" in the area. 2019 EPA letter 1, AR066756, citing the Lease Sale EA.

1    Despite the fact that the same BLM office prepared these emission estimates for a typical

2    oil and gas lease, and recognized that these emissions are reasonably foreseeable to occur, the

3    SFEIS failed to mention, let alone estimate or analyze, these cumulative emissions. Indeed, in its

4    attempt to preclude this Court's consideration of the Lease Sale EA (ARSUPP000143-355) and

5    lease approval decision (ARSUPP000366-369), BLM stated to Magistrate Judge Cobb that it did

6    not consider its own Lease Sale EA and lease approval at all. BLM Response to Plaintiffs'

7    motion on the record, at 7 (Dkt. 50).[5]

8    Judge Cobb agreed with Plaintiffs that these documents were important "relevant factors"

9    that should have been considered, and accordingly ordered BLM to supplement the record with

10    them. BLM's review and approval of the Project, without considering these "relevant factors," is

11    arbitrary and capricious, as it "failed to consider an important aspect of the problem" and

12    "offered an explanation for its decision that runs counter to the evidence before the agency."

13    State Farm, 463 U.S. at 43; see also Ctr. for Biological Diversity v. Zinke, 900 F.3d 1053, 1067

14    (9th Cir. 2018)(courts must "ensure that the agency considered the relevant factors and articulated

15    a rational connection between the facts found and the choices made.").

16    The lack of any quantified analysis or data of the cumulative air emissions from the

17    activities within the air quality CESA is especially problematic when coupled with the below-

18    detailed lack of any background/baseline data or adequate analysis of air quality at and near the

19    Project site. Thus, BLM's position that there will be "zero" emissions from the over 100+

20    previous oil and gas leases within the Air Quality CESA over the life of the Mt. Hope Project, let

21    alone the additional new 40+ leases in the AQ CESA approved a few months before the 2019

22    was issued, contradicts the agency's own position and lacks scientific credibility.

23

24    2.    Cumulative Impacts to Water

25    In addition to ignoring the cumulative air pollution from the acknowledged reasonably

26    foreseeable oil and gas operations around Mt. Hope, BLM also failed to consider the impacts

27    _____

28    [5] Plaintiffs submitted BLM's 2019 Leasing EA and Record of Decision approving the leases as
exhibits to their motion on the record (Dkt. 38). See also Reply (Dkt. 51).

27

from these operations on critical water supplies. Neither the FSEIS nor the 2019 ROD considered at all the cumulative impacts on water resources that may occur as a result of the significant water removals caused by predicted drilling on the leases. EPA specifically alerted BLM to this omission and NEPA deficiency:

> *Cumulative Impacts*
> **Potential impacts to water resources from oil and gas development are acknowledged as "potentially severe" in terms of further drawdown of water levels.** EPA notes that the March 2019 Lease Sale EA identified that oil and gas exploration, drilling, and production could include well stimulation and hydraulic fracturing which uses "appreciable" amounts of water, up to 800,000-10 million gallons (Lease Sale EA, p. 17, 28-29).

EPA letter to BLM, at 2, AR066757 (emphasis added). "EPA notes that a recent BLM March 2019 Competitive Oil and Gas Lease Sale Environmental Assessment (Lease Sale EA) estimated approximately 25 wells could be developed within the next ten years in the district, and a map of proposed oil and gas lease parcel locations within the Lease Sale EA shows at least 15 of the parcels offered for sale are within 10 miles of the Mt. Hope Mine." EPA letter at 1, AR066756.

The map of proposed leases (Lease Sale EA at 12, Figure 2), ARSUPP000155, when compared with the 2012 FEIS, shows over 40 new proposed leases north of Highway 50 within the "Cumulative Action Scenario – Projected Water Table Drawdown" for the Mt. Hope Project. FEIS Figure 4.4.1, AR069542. As a result of this omission, "EPA recommends the ROD disclose and discuss the significance of these cumulative aquatic resource effects and what restrictions, buffers, engineering controls or other mitigations would be most appropriate to protect scarce water resources." Id. Yet BLM never analyzed these cumulative impacts, or even mentioned the proposed leasing and anticipated drilling and other impacts.

B.     *BLM FEIS Failed to Fully Analyze the Project's Baseline Air Quality Conditions.*

A central finding of the Ninth Circuit's decision was that the 2012 FEIS and ROD violated NEPA by failing to properly analyze background/baseline air quality conditions, and by failing to adequately consider the cumulative air emissions of other air pollution sources within

28

the cumulative impacts study area around the Project site. <u>Great Basin Resource Watch</u>, 844 F.3d at 1101-06. As a result, the Court vacated and remanded the ROD and required BLM to comply with NEPA in any subsequent review. The new FSEIS and 2019 ROD purport to satisfy the Ninth Circuit's direction and NEPA. They do not.

Regarding background/baseline levels, DOI/BLM is required to "describe the environment of the areas to be affected or created by the alternatives under consideration." 40 CFR §1502.15. "Without establishing the baseline conditions which exist ... before a project begins, there is simply no way to determine what effect the project will have on the environment, and consequently, no way to comply with NEPA." <u>Great Basin Resource Watch</u>, 844 F.3d at 1101, *quoting* <u>Half Moon Bay Fisherman's Mktg. Ass'n. v. Carlucci</u>, 857 F.2d 505, 510 (9th Cir. 1988). "[W]ithout [baseline] data, an agency cannot carefully consider information about significant environment impacts. Thus, the agency fails to consider an important aspect of the problem, resulting in an arbitrary and capricious decision." <u>N. Plains Resource Council, Inc. v. Surface Transp. Bd.</u>, 668 F.3d 1067, 1085 (9th Cir. 2011).

But like the legally-inadequate 2012 FEIS, the 2019 FSEIS refused to obtain any data regarding the existing baseline levels of air pollutant levels at or near the Project site. "No monitoring has been performed within the Project Area for ambient concentrations of CO, NO2, ozone, or SO2, nor does the Nevada Division of Environmental Protection (NDEP) Bureau of Air Pollution Control (BAPC) specify background concentrations for these pollutants. However, background values are necessary for the purpose of comparing modeled results to the National Ambient Air Quality Standards (NAAQS) and Nevada State Ambient Air Quality Standards." FSEIS 24, AR066373. Also, like the 2012 FEIS, the FSEIS sets the baseline/background levels for Clean Air Act Criteria Pollutants noted in the Ninth Circuit's decision (carbon monoxide (CO), nitrogen dioxide (NO2), one- and three-hour time-averaged sulfur dioxide (SO2), and lead (Pb)), at "zero." FSEIS 24, Table 3.6-1, <u>Id</u>.

BLM again relies on a 2007 discussion with a state employee of the Nevada Division of Environmental Protection (NDEP)'s Bureau of Air Pollution Control (BAPC) to set the

baseline/background levels of these pollutants at zero – the exact same employee discussion relied upon in the 2012 FEIS and found to be legally inadequate by the Ninth Circuit. *Compare* FSEIS Table 3.6-1 ("Reference" for background levels described as "Greg Remer, BAPC, March 19, 2007"), AR066373-74, *with* FEIS 3-288 (Table 3.6-7)("Reference" for background levels described as "Greg Remer, BAPC, March 19, 2007"), AR069104.

The FSEIS acknowledged that "representative" baseline/background levels for CO, $NO_2$ and $SO_2$ for rural areas similar to the Project site are well above zero. FSEIS 34, Table 3.6-4 (showing "background concentrations for rural areas like the Project" for CO, $NO_2$ and $SO_2$), AR066383. Yet despite acknowledging these above-zero representative background/baseline levels, the FSEIS's new air quality analysis still set the baseline/background levels for CO, $NO_2$ and $SO_2$ as "zero." FSEIS Table 4.1-1, AR066386.

BLM's refusal to consider the representative background/baseline levels for CO, $NO_2$ and $SO_2$ as above "zero" also contradicts BLM's own recent review and approval of the Prospect Mountain Mine, within the same air quality Cumulative Effect Study Area as Mt. Hope. BLM's Mt. Lewis Field Office approved that mine in July 2019, relying on an air quality report that determined that background/baseline levels were well above "zero." ARSUPP000136.

The background/baseline levels for the pollutants in that report are the same as found in FSEIS Table 3.6-4. Yet while BLM included these levels in its air quality review for the Prospect Mountain Mine, BLM's "Cumulative Modeling Analysis" for the Mt. Hope Project still listed the "Background Concentration" for CO, $NO_2$ and $SO_2$ as "zero." FSEIS 37, AR066386.  It was arbitrary and capricious for BLM to conclude that the background/baseline level for these pollutants is "zero" at Mt. Hope, when BLM's own review of a project within the same air quality area shows these levels to be well above zero.

As BLM acknowledges, "[B]ackground values are necessary for the purpose of comparing modeled results to the National Ambient Air Quality Standards (NAAQS) and Nevada State Ambient Air Quality Standards." FSEIS at 24, AR066373. The FSEIS combined these "zero" levels to calculate the predicted air pollution emissions from the Project, concluding

that none of the predicted levels of these criteria pollutants (combined with the background levels) would be above the applicable standards. FSEIS Table 4.1-1. AR066386. Yet without adequate background/baseline data, this conclusion is unsupportable.

The EPA notified BLM that the failure to conduct baseline analysis and obtain baseline data violates NEPA. EPA 2012 comments, AR051596. Although BLM asserts that the FSEIS properly responded to the Ninth Circuit's remand order on the "zero" baseline/background issue, EPA again determined that the FSEIS stills suffers from an inadequate analysis of these levels. "The EPA recommended against the use of 'zero' as a background concentration value for modelling criteria air pollutants, as no air is completely free from background pollutants; however, the FSEIS continues to include a background concentration of zero. For future analyses, the EPA recommends that the BLM use available representative data to estimate background concentrations, as has been done for other environmental reviews for mining sites in Nevada." EPA 2019 letter to BLM, at 2, AR066757.

This reliance on "zero" for background conditions of $NO_2$, as with the other pollutants, contradicts the record and admissions in the FEIS and FSEIS. BLM admits that: "Combustion of diesel in the trucks and drilling rigs can produce elevated levels of CO, $NO_2$, $SO_2$, $PM_{10}$, $PM_{2.5}$, and $O_3$. The amount of these emissions under the No Action Alternative would be substantially less than under the Proposed Action." FEIS 3-305, AR069120. Although no analysis is provided to show how "substantially less" the current emissions are (itself a violation of NEPA's mandate to analyze these issues), it is clear that they are more than "zero."

C.    *Failure to Adequately Analyze Mitigation and Related Project Impacts*

NEPA requires BLM to fully analyze mitigation measures, their effectiveness, and any impacts that might result from their implementation. An EIS must: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 CFR §1502.14(f); and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." 40 CFR §1502.16(h).

> Putting off an analysis of possible mitigation measures until after a project has been
> approved, and after adverse environmental impacts have started to occur, runs counter to
> NEPA's goal of ensuring informed agency decisionmaking. *See Robertson*, 490 U.S. at
> 353, 109 S.Ct. 1835 ("Without [a reasonably complete] discussion [of mitigation], neither
> the agency nor other interested groups and individuals can properly evaluate the severity
> of the adverse effects.").

Great Basin Resource Watch, 844 F.3d at 1107. The "mitigation" plan to purportedly reduce the adverse impacts to the surface and ground waters that will be dewatered is largely a plan to monitor the predicted drop in the water table and only then develop a plan to purportedly replace the lost flows to some of the impacted springs. FEIS 3-88 to -106, AR068923-940. *See also* 2012 ROD at 19-20 (discussing mitigation measures for lost spring flows), AR066828-29. According to the 2012 ROD, this mitigation measure will not even be considered, at a minimum, until after the "44 years of mining and ore processing" are completed. 2012 ROD 3, AR066812.

Even this mitigation is inadequately analyzed. "Implementation of the mitigation outlined in Table 3.2-9 would result in up to approximately 37.2 acres of additional surface disturbance associated with road and pipeline construction and maintenance, as well as the need for approximately 302 acre-feet of water that will at least initially come from EML's existing water rights if additional water rights have not yet been secured." 2019 ROD 19, AR066828. Despite the acknowledgement that an additional "302 acre-feet of water" would be needed for this mitigation, there is no analysis of where this water will come from, or the impacts from its withdrawal and discharge into these waters. Although BLM says that this water "would at least initially come from EML's existing water rights," id., there is no analysis of the impacts stemming from the EML's extraction of this additional water.

The EPA was strongly critical of this omission: "The Final EIS does not discuss the additional impact that this mitigation would have upon groundwater levels should the entire 302 afy be supplied by groundwater extraction in excess of EML's current allocation." 2012 EPA comment letter to BLM, at 2, AR051596. To cure this NEPA deficiency, EPA recommended that: "The Supplemental FEIS or ROD should include the results of revised groundwater modeling showing the additional groundwater drawdown impacts that would result from the up

32

to 302 afy of additional groundwater extraction required to replace lost surface water flows. Alternatively, it should include a restriction that all mitigation water be diverted from EML's existing 11,300 afy water rights." EPA 2012 letter, id. *See also* Eureka County's similar concerns, AR069994. BLM never prepared the analysis requested by EPA and Eureka County.

In its comments on the Draft SEIS in 2019, EPA again highlighted the inadequacies of BLM's analysis of the replacement waters: "The DSEIS does not appear to address the estimated shortfall needed to replace depleted spring and stream water, or the source of this replacement supply. … Neither the FEIS or this DSEIS discuss the additional impact that this mitigation would have upon groundwater levels should the entire 302 afy be supplied by groundwater extraction in excess of EML's current allocation." FSEIS Appendix D (emphasis added), AR066422. As a result of these deficiencies, EPA recommended that BLM substantially revise its NEPA mitigation analysis. Id. Outside of repeating its previous list of mitigation measures in the FEIS, BLM refused to undertake any additional analysis or mitigation measures. Id. (BLM response to EPA).

In its comments on the 2019 FSEIS, EPA again reiterated its serious concerns with BLM's failure to provide the needed analysis of this replacement water: "the FSEIS does not clearly identify the source of alternative mitigation water once the initial replacement water from existing water rights is expended or otherwise unavailable." 2019 EPA letter to BLM, AR066757. As a result of these NEPA deficiencies, "EPA recommends that the ROD identify the alternative supplemental water source that will replace the quantity, functions and values of all lost surface water resources, as well as the impacts to transport alternative water." Id. Again, BLM took no action.

Overall, regarding impacts from the dewatering, BLM failed to respond to the Ninth Circuit's finding that "the analysis of ground water pumping in the FEIS does *not* take into account the roughly 200 gallons per minute needed to replace depleted spring and stream water." Great Basin Resource Watch, 844 F.3d at 1110 (emphasis in original). The Court rejected EML's argument that "the FEIS thoroughly analyzed the effect of using water from its production wells"

to replace the waters eliminated by the dewatering," finding EML's "argument … factually incorrect." Id.  The 2019 ROD and FSEIS did not undertake any additional analysis of the environmental effect of extracting and using this additional water, despite the Ninth Circuit's finding that the 2012 FEIS was legally deficient on this account. *See also* 2019 EPA letter at 2, AR066757 (noting BLM's failure to conduct the required analysis).

In addition, despite the purported "mitigation" of some of the water losses to the affected waters, other springs will be permanently lost (including PWR 107 springs), as noted above, due to the location of the Project's waste dumps and other facilities. For example, Springs 619, 639, and 646 (and likely 612), will no longer exist and the only "mitigation" for their complete loss is a plan to "install a guzzler east of the Project fence and west of SR [State Route] 278 designed for large game," or "install a guzzler designed for large game." FEIS Table 3.2.9, AR068934-37. As noted above, based on the FEIS, it also appears that other springs will be unusable due to the location of Project facilities (e.g., Springs 597 and 604).

For the Springs to be covered and/or destroyed by Project facilities, no mention is made of keeping these lands open for stockwatering or public use, as required by the SRHA, PWR 107, and FLPMA. The "mitigation" plan to "install a guzzler for large game" fails to protect the current livestock and other uses, which is acknowledged to be a current use of these springs. *See* FEIS Table 3.2.9, AR068934-37. Although the FEIS states that all of these mitigation measures will be "effective," or "highly effective," no supporting scientific analysis is provided. Id.

For the PWR 107 Lone Mtn. Spring, BLM's purported mitigation to replace the lost flows is to "Pipe water along a new road, approximately 1.4 miles long, from the Project water supply at a sustained rate of approximately 0.5 gpm." FEIS Table 3.2-9, AR068938. No details are given regarding where this additional "Project water" will come from. EPA strongly objected to this lack of information and BLM's refusal to consider these impacts, as detailed in its letter to BLM on the FSEIS. AR066757.

BLM also asserts that the purported mitigation measure to replace lost stream and spring flows, discharging undefined "replacement water" into dewatered streams, "would be effective at

preventing degradation of water quality in Roberts Creek." FEIS 3-218, AR069029. Yet there is no discussion or analysis as to the quality of the water that will be discharged into Roberts Creek, or the current conditions of the receiving waters.

The same is true for the other springs and streams that will suffer significant loss or elimination of flows. *See generally,* FEIS at 3-91, Figure 3.2.21 (showing the various pipelines and new roads that would transport water for discharge into Roberts Creek, the PWR 107 Springs, and other affected waters), AR068926. No analysis was done regarding the baseline conditions of these lands and waters or the significant impacts from all this additional construction and development. BLM never analyzed the quality of this replacement water, nor its effects upon the streams and springs.

BLM cannot rely on additional waters to be discharged into affected streams and springs as mitigation for those lost flows when it has not analyzed the impacts to those streams and springs (and to the wildlife, recreation, livestock, and other public uses of those waters and lands), including whether the discharged mitigation waters would fully protect these uses and comply with all water quality standards for those waters.

The failure to analyze the baseline conditions and impacts from all this purported mitigation – clearly relevant factors that should have been considered – is the hallmark of an arbitrary and capricious decision in violation of NEPA.

Lastly, because of the erroneous assumptions and conclusions regarding air pollution detailed above, BLM did not prepare or consider **any** mitigation measures for the Project's air pollution. "No mitigation is proposed for this impact." FEIS 3-293-94. AR069109-110. The lack of any mitigation measures for air pollution violates NEPA and its implementing regulations. Great Basin Resource Watch, 844 F.3d at 1107.

///

///

///

///

1

2

IV.   **BLM Violated FLPMA**

A.   *Failure to "Prevent Unnecessary or Undue Degradation" of Public Resources*

3

4

5

6

7

8

9

10

FLPMA requires that the BLM "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. §1732(b). This is the "prevent UUD" standard. This duty to "prevent undue degradation" is "the heart of FLPMA [that] amends and supercedes the Mining Law." Mineral Policy Center v. Norton, 292 F.Supp.2d 30, 42 (D.D.C. 2003). BLM cannot approve a mining project that would cause UUD. 43 C.F.R. §3809.411(d)(3)(iii). "FLPMA's requirement that the Secretary prevent UUD supplements requirements imposed by other federal laws and by state law." Center for Biological Diversity v. Dept. of Interior, 623 F.3d 633, 644 (9th Cir. 2010).

11

12

13

14

15

16

17

18

19

20

21

In addition, BLM must ensure that all operations comply with the Performance Standards found at §3809.420. *See* 43 C.F.R. §3809.5 (definition of UUD, specifying that failing to comply with the Performance Standards set forth at §3809.420 constitutes UUD). One of the most important Performance Standards requires BLM to ensure that all operations comply with all environmental protection standards, including air and water quality standards. *See, e.g.,* 43 C.F.R. §3809.5 (definition of UUD includes "fail[ure] to comply with one or more of the following: … Federal and state laws related to environmental protection."); §3809.420(b). BLM also failed its duty under FLPMA to protect the PWR 107 reserved rights and withdrawn lands. BLM has a duty to protect federal reserved water rights under its statutory mandates to manage and protect public land and water. Sierra Club v. Yeutter, 911 F.2d 1405 (10th Cir. 1990).

22

23

24

25

26

27

The Project's severe degradation of and elimination of the PWR 107 waters and lands constitutes UUD under FLPMA which BLM failed to prevent. In addition, BLM's conclusion that the Project will not violate any air and water quality standards, as noted above, was based on the lack of credible and accurate information, and otherwise contradicts the record. BLM thus failed to show that the Project will not violate these standards, which constitutes UUD and a violation of FLPMA (in addition to the NEPA violations noted above).

28

*B.*      *Failure to Determine the Project's Reclamation Costs and Financial Assurances*

In the 2019 ROD, BLM approved EML's Plan for the Mine as well as the Plans of Development for the ROWs without determining the reclamation and related costs as required by BLM's FLPMA mining and ROW regulations. BLM mining regulations require that all activities in the mining plan be covered by a "financial guarantee" that "must cover the estimated cost as if BLM were to contract with the third party to reclaim your operations according to the reclamation plan, including construction and maintenance costs for any treatment facilities necessary to meet Federal and State environmental standards." 43 C.F.R. §3809.552(a).

The "reclamation cost determination" made by BLM is the amount of monies that must be covered by the financial guarantee. 43 C.F.R. §3809.554. The required Reclamation Cost Estimate (RCE) submitted by the operator forms the basis for the reclamation cost determination made by BLM. As BLM's policy governing bonding for mining operations states: "The BLM FO [Field Office] or other delegated AO [Authorized Officer] issues a written determination of the named operator's reclamation cost estimate (RCE) and required bond amount for existing and/or proposed disturbance on the specified operations." BLM Surface Management Bond Processing Handbook, H-3809-2, at II-1 (excerpts in Exhibit M). Further, BLM's overall mining policy, governing the review and approval of mining operations, requires that the RCE determination be made and established at the time the ROD approving the mining plan is issued:

> A decision approving a Plan of Operations and stating the conditions of approval must be sent to the operator by certified mail, return receipt requested. **The decision must state the estimated reclamation cost determination and the financial guarantee amount.** The decision must also remind the operator that surface disturbing activity cannot begin until the financial guarantee has been accepted and obligated by the BLM.

BLM Surface Management Handbook H-3809-1, at 4-45 (emphasis added)(excerpts in Exhibit N). That did not happen here.

BLM had, however, met these requirements when it issued the 2012 ROD. Back then, EML submitted the RCE to BLM to cover operations in the proposed Plan of Operations. Pursuant to these regulatory requirements, BLM accepted EML's RCE and the 2012 ROD approved EML's Plan of Operations, and included the required reclamation cost determination.

The 2012 ROD "determined that the required financial guarantee amount is hereby set at $73,360,363 for the 7,992 acres of surface disturbance on public and private lands associated with the first three years of operations for the Project (NVN-082096), as described in the Plan." 2012 ROD 30, AR070348.

In addition, the 2012 ROD established a "Long-Term Funding Mechanism" (LTFM) for the Project to cover required long-term monitoring and mitigation, including "*The Mt. Hope Project Long-Term Irrevocable Trust* and the *Mt. Hope Project Long-Term Trust Agreement*." 2012 ROD 31, AR070349. "[Y]ou must establish a trust fund or other funding mechanism available to BLM to ensure the continuation of long-term treatment to achieve water quality standards and for other long term, post-mining maintenance requirements. The funding must be adequate to provide for construction, long-term operation, maintenance, or replacement of any treatment facilities and infrastructure, for as long as the treatment and facilities are needed after mine closure. BLM may identify the need for a trust fund or other funding mechanism during plan review or later." 43 C.F.R. §3809.552(c). "Upon issuance of the 2012 ROD, EML submitted the financial guarantee for the reclamation costs of $73,360,363. EML also submitted the initial amount of the LTFM. Construction then commenced at the Project site in early 2013." BLM Answer (Dkt. 25), admitting Amended Complaint ¶314 (Dkt. 14).

The 2019 ROD, however, contains no RCE for the operations it approved. Instead, BLM allowed EML to rely on a previously-submitted RCE for what BLM and EML label "Phase 0," which covers only the ground disturbance and reclamation obligations for the initial work EML did in early 2013 before it suspended operations due to financial concerns. In 2015, BLM approved the RCE for the already completed Phase 0 work. AR054331. In that Decision, BLM approved the RCE for Phase 0 at $2,696,685. Id. AR054332. That Decision thus reduced EML's required RCE for the approved Project from $73,360,363 to just $2,696,685. In February, 2019, BLM issued a similar decision revising the RCE and reclamation cost determination for Phase 0, which was "issued to update the reclamation cost estimate for the operator's Project." AR063712. That decision set the revised RCE for Phase 0 in "the amount of $3,093,686 [which]

38

is sufficient to meet all anticipated reclamation requirements for this three-year bond period." Id.

EML has yet to submit the updated RCE for any ground disturbance except the Phase 0 work already done. BLM has not made the required reclamation cost determination for the operations approved in the 2019 ROD. This is despite the fact that Phase 1 of the newly-approved operations will disturb at least 4,269 acres which are in addition to the already-disturbed 1,689 acres from Phase 0. BLM 2015 decision, AR05431.

The 2019 ROD approved EML's mining plan for the entire life of the Project, including at least another 4,269 acres in the next three years (Phase 1), yet the 2019 ROD contains no RCE to cover EML's reclamation obligations on any of these acres. In addition, the 2019 ROD makes no mention of the LTFM, which was required in the 2012 ROD. Indeed, in March of 2019, EML requested that BLM dissolve the LTFM and return the monies that EML has provided to BLM after the 2012 ROD was issued. BLM quickly approved that request. AR063735 (BLM March 20, 2019 letter to EML). *See also* BLM letter to the financial institution acting as Trustee for the LTFM, informing the bank that, in response to EML's request, BLM "terminate[d] the Trust Fund." AR063733. In addition to releasing all the monies for the LTFM and terminating the LTFM, BLM also no longer has the financial guarantee for the $73,360,363 that was approved in the 2012 ROD for the "surface disturbance … associated with the first three years of operation of the Project." 2012 ROD 30, AR070348. *See* February 11, 2019 BLM Decision ("the amount of $3,093,686 is sufficient to meet all anticipated reclamation requirements for this [first] three-year bond period."). AR063712.

Thus, BLM only holds a financial guarantee (in the amount of $3,093,686) for the ground disturbance and other reclamation obligations that EML **already conducted** during the brief months in 2013 before it suspended operations, i.e. Phase 0. "EMLLC broke ground for the Project in early 2013 but stopped construction in mid-2013 due to unforeseen loss of Project funding." March 20, 2019 letter from BLM to EML, AR063735.

Despite approving the entire Plan of Operations in the new ROD, BLM failed to make the required reclamation cost determination, as it had done in the 2012 ROD, for future operations

1   (or, like the 2012 ROD, at a minimum for the first three years of new operations).  BLM simply

2   stated that the reclamation cost determination will be made in the future. 2019 ROD 26,

3   AR066835.

4          This is not only contrary to BLM's previous positions and actions, but also contradicts

5   other recent decisions from the same Mt. Lewis Field Office, which recently and correctly

6   followed BLM's reclamation financial requirements for the determination of the reclamation cost

7   estimate in the Decision approving the Prospect Mtn. Mine southwest of Eureka (discussed

8   above in the NEPA section). In approving the Plan of Operations for that mine, BLM specifically

9   required the submission of a full financial guarantee "sufficient to meet all anticipated

10  reclamation requirements for the Project." ARSUPP000112.

11         Similar to the reclamation financial requirements for mining Plans of Operations, BLM

12  must also determine the reclamation costs for the approved ROWs under FLPMA. *See* 43 C.F.R.

13  §2805.20; 43 C.F.R. §2801.5. Yet that did not happen here. For the ROW approvals, the 2019

14  ROD makes the same error as it did with the omission of the reclamation cost determination for

15  the mining Plan of Operations, when it re-affirmed the Plans of Development for the two ROWs

16  without determining the reclamation costs – postponing the reclamation cost determination until

17  sometime in the future. 2019 ROD 29, AR066838 ("The bond will be determined based upon

18  the preparation of a reclamation cost estimate."). Also, like the reclamation costs for the mine

19  itself, the 2012 ROD had followed BLM regulations and determined the reclamation costs for the

20  ROWs. 2012 ROD 34-35 (requiring bond of $1,037,694), AR070352-53. Yet that did not happen

21  in the 2019 ROD.

22                                                   **CONCLUSION**

23

24         Due to the numerous violations of federal law and regulation, and the arbitrary and

25  capricious nature of BLM's actions, Plaintiffs respectfully ask this Court to grant this motion for

26  summary judgment and set aside and vacate the FSEIS, 2019 ROD, and BLM's actions

27  reviewing and authorizing the Mt. Hope Mine Project.

28

Respectfully submitted this 25th day of October 2021.

*/s/ Roger Flynn*
Roger Flynn (Colo. Bar # 21078), *Pro Hac Vice*
Jeffrey C. Parsons (Colo. Bar # 30210), *Pro Hac Vice*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

Julie Cavanaugh-Bill (Nevada Bar # 11533)
CAVANAUGH-BILL LAW OFFICES, LLC
401 Railroad St., Ste. 307
Elko, Nevada 89801
(775) 753-4357
julie@cblawoffices.org

Attorneys for Plaintiffs

## Certificate of Service

I, Roger Flynn, attest that on this 25th day of October 2021, I served the foregoing to all parties, by filing it with this Court's ECF filing system, and that all parties are represented by counsel and registered on this Court's ECF system.

*/s/ Roger Flynn*