TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

LEILANI DOKTOR
MICHELLE-ANN C. WILLIAMS
Trial Attorney (HI Bar)
Natural Resources Section.
150 M Street NE
Washington, D.C. 20002
Tel.: (202) 305-0447
Fax: (202) 305-0506
Email: leilani.doktor@usdoj.gov

*Attorneys for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| GREAT BASIN RESOURCE WATCH, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, et al., <br><br> Federal Defendants, <br><br> and <br><br> EUREKA MOLY, LLC., <br><br> Intervenor Defendant. | No. 3:19-cv-00661-LRH-WGC <br> **FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

A.    INTRODUCTION ................................................................................................ 1

B.    STATUTORY AND REGULATORY BACKGROUND................................. 2

    I.    The Mining Law of 1872 ...................................................................... 2

    II.    The Pickett Act, Stock Raising Homestead Act, and Public Water Reserve No. 107................................................................................................... 2

    III.    The Federal Land Policy and Management Act and the Bureau of Land Management's Regulations................................................................... 4

    IV.    The National Environmental Policy Act .............................................. 5

C.    FACTUAL AND PROCEDURAL BACKGROUND..................................... 6

    I.    The Mt. Hope Mine Project .................................................................. 6

    II.    Proceedings Below................................................................................ 7

D.    STANDARD OF REVIEW ................................................................................ 8

E.    ARGUMENT ....................................................................................................... 9

    I.    BLM's Approval of the Mine Did Not Violate PWR 107...................... 9

    II.    BLM Complied With the National Environmental Policy Act.......................... 15

        a)    BLM Took a "Hard Look" at Impacts to Air Quality.............................. 15

        b)    BLM Took a "Hard Look" at the Cumulative Impacts to Water Resource.......................................................................................... 24

        c)    BLM Adequately Analyzed Mitigation Impacts to Water Quantity......... 24

    III.    BLM Complied With the Federal Land Policy and Management Act ................. 28

F.    CONCLUSION................................................................................................ 34

i

# TABLE OF AUTHORITIES

**Cases**

*Andrus v. Shell Oil Co.*,
   446 U.S. 657 (1980) ................................................................................... 2

*Arizona v. Thomas*,
   824 F.2d 745 (9th Cir. 1987) ..................................................................... 8

*Ark. Wildlife Fed'ne v. U.S. Army Corps of Eng'rs*,
   431 F.3d 1096 (8th Cir.2005) ................................................................... 21

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982) ..................................................................... 8

*Chem. Mfrs. Ass'n. v. Env't Prot. Agency*,
   28 F.3d 1259 (D.C. Cir. 1994) ................................................................. 23

*Chrisman v. Miller*,
   197 U.S. 313 (1905) ................................................................................... 2

*Citizens Against Burlington, Inc. v Busey*,
   938 F.2d 190 (D.C. Cir. 1991) ........................................................... 21, 22

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) ................................................................................... 8

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
   623 F.3d 633 (9th Cir. 2010) ................................................................... 28

*Davis v. Nelson*,
   329 F.2d 840 (9th Cir. 1964) ................................................................... 14

*Davis v. Wiebbold*,
   139 U.S. 507 (1891) ................................................................................. 12

*Freese v. United States*,
   639 F.2d 754 (Ct. Cl. 1981) ..................................................................... 14

*Great Basin Mine Watch v. Hankins*,
   456 F.3d 955 (9th Cir. 2006) ..................................................................... 3

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
   844 F.3d 1095 (9th Cir. 2016) ................................... 7, 10, 15, 17, 20, 21, 25, 26, 27

*Great Basin Res. Watch v. U.S. Dep't of the Interior*,
   No. 3:13–cv–00078–RCJ–VPC, 2014 WL 3696661 (D. Nev., July 23, 2014). 7, 11, 12, 13, 23, 27

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't. of the Navy*,
   860 F.3d 1244 (9th Cir. 2017) ................................................................. 27

*Idaho Wool Growers Ass'n. v. Vilsack,*
  816 F.3d 1095 (9th Cir. 2016) .................................................................... 26, 27

*Indep. Acceptance Co. v. California,*
  204 F.3d 1247 (9th Cir. 2000) ............................................................................ 8

*Lands Council v. Powell,*
  395 F.3d 1019 (9th Cir. 2005) .......................................................................... 21

*McMaster v. United States,*
  731 F.3d 881 (9th Cir. 2013) ............................................................................ 33

*Mont. Wilderness Ass'n v. Connell,*
  725 F.3d 988 (9th Cir. 2013) .............................................................................. 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,*
  463 U.S. 29 (1983) ............................................................................................. 8

*N. Pac. Railway v. Soderberg,*
  188 U.S. 526 (1903) ......................................................................................... 12

*Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.,*
  222 F.3d 677 (9th Cir. 2000) ............................................................................ 25

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
  422 F.3d 782 (9th Cir. 2005) ............................................................................ 23

*Nw. Env't Advocates v. Nat'l Marine Fisheries Serv.,*
  460 F.3d 1125 (9th Cir. 2006) ............................................................................ 5

*Okanogan Highlands All. v. Williams,*
  236 F.3d 468 (9th Cir. 2000) ............................................................................ 25

*Oregon Env't Council v. Kunzman,*
  817 F.2d 484 (9th Cir. 1987) .............................................................................. 8

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy,*
  898 F.2d 1410, 1414 (9th Cir. 1990) .................................................................. 8

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ................................................................................. 5, 9, 24

*S. Fork Band Council v. U.S. Dep't. of the Interior,*
  588 F.3d 718 (9th Cir. 2009) ..................................................................... 25, 26

*S. La. Env't Council, Inc. v. Sand,*
  629 F.2d 1005 (5th Cir.1980) ........................................................................... 21

*Schweiker v. Hansen,*
  450 U.S. 785 (1981) ......................................................................................... 33

*Stryker's Bay Neighborhood Council v. Karlen,*
  444 U.S. 223 (1980) ........................................................................................... 9

iii

*United States v. Bush*,
   157 I.B.L.A. 359 (Oct. 31, 2002)..................................................................... 11

*United States v. Clark*,
   912 F.2d 1087 (9th Cir. 1990) ........................................................................ 8

*United States v. Coleman*,
   390 U.S. 599 (1965)...................................................................................... 30

*United States v. Idaho*,
   959 P.2d 449 (Idaho 1998) .............................................................................. 3

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc*.,
   435 U.S. 519 (1978)...................................................................................... 31

*Wilbur v. United States ex rel. Krushnic*,
   280 U.S. 306 (1930)...................................................................................... 14

**Statutes**

2 U.S.C.§ 4332(C)(ii)......................................................................................... 24

30 U.S.C. § 181 .............................................................................................. 12

30 U.S.C. § 29 ..................................................................................... 14, 15, 28

30 U.S.C. § 612(a) ........................................................................................... 13

30 U.S.C. §§ 22-54 ....................................................................................... 2, 14

42 U.S.C. § 4332 ............................................................................................... 5

42 U.S.C. § 4332(2)(C).......................................................................................... 5

43 U.S.C. § 1701(a)(12)................................................................................. 4, 28

43 U.S.C. § 1701(a)(8)....................................................................................... 28

43 U.S.C. § 1714 .............................................................................................. 11

43 U.S.C. § 1732(b) ...................................................................................... 4, 28

5 U.S.C. § 706 ................................................................................................... 8

5 U.S.C. §§ 701-706 .......................................................................................... 8

Pub. L. No 316, ch. 369 ................................................................................. 2, 9

Pub. L. No. 316, 37 Stat. 497 ...................................................................... 11, 13

**Regulations**

36 C.F.R. § 228.15 ........................................................................................... 14

40 C.F.R. § 1502.16(a)(9) .................................................................................. 24

40 C.F.R. § 1508.11 ........................................................................................... 5

40 C.F.R. § 1508.25(c)(3) ................................................................................................. 5

40 C.F.R. § 1508.7 ............................................................................................................. 6

40 C.F.R. Part 1500 (2018) .............................................................................................. 5

43 C.F.R. § 2805.20(a) .................................................................................................... 34

43 C.F.R. § 2805.20(a)(4) ............................................................................................... 34

43 C.F.R. § 2920.0-1 ....................................................................................................... 29

43 C.F.R. § 2920.0-3 ....................................................................................................... 29

43 C.F.R. § 2920.1-1 ....................................................................................................... 30

43 C.F.R. § 3715.0-5 ....................................................................................................... 13

43 C.F.R. § 3809.100 ....................................................................................................... 15

43 C.F.R. § 3809.2(a) ...................................................................................................... 29

43 C.F.R. § 3809.2(e) ...................................................................................................... 31

43 C.F.R. § 3809.412 ....................................................................................................... 32

43 C.F.R. § 3809.415(a) .................................................................................................... 4

43 C.F.R. § 3809.420 (2012) .......................................................................................... 28

43 C.F.R. § 3809.420(a)(6) (2012) ................................................................................. 29

43 C.F.R. § 3809.423 ....................................................................................................... 28

43 C.F.R. § 3809.5 ..................................................................................................... 13, 29

43 C.F.R. § 3809.5(1)-(3) (2012) ................................................................................... 29

43 C.F.R. § 3809.551 ....................................................................................................... 32

43 C.F.R. § 3809.552(a) .................................................................................................. 32

43 C.F.R. §3809.552(c) ................................................................................................... 33

43 C.F.R. Part 2920 .................................................................................................... 29, 30

43 C.F.R. Part 3809 ......................................................................................................... 28

43 C.F.R. Part 3809(a) ...................................................................................................... 4

**Other Authorities**

43 Fed. Reg. 55978 (Nov. 29, 1978) ................................................................................ 5

51 Fed. Reg. 15618 (Apr. 25, 1986) ................................................................................. 5

81 Fed. Reg. 92,161 (Dec. 19, 2016) .............................................................................. 34

*Brady's Mortgagee v. Harris*,
   9 Pub, Lands Dec. 426, 433 (1900) ........................................................................ 12

## A.  INTRODUCTION

Plaintiffs once again ask the Court to vacate the U.S. Bureau of Land Management's ("BLM") decision to approve the mining plan of operations for the Mount Hope Mine Project. Plaintiffs' claims should be rejected, however, because BLM's decision complied with the Mining Law of 1872, the National Environmental Policy Act ("NEPA), and the Federal Land Policy and Management Act ("FLPMA").

In a prior phase of the litigation, the Ninth Circuit determined that BLM had failed to provide support for its use of a zero baseline for certain criteria pollutants and that BLM's analysis of cumulative impacts to air quality was deficient under NEPA. The Ninth Circuit also found that although BLM had generally provided a reasonable discussion on impacts to water quantity, it had failed to adequately analyze the effects of using additional, replacement water to mitigate the impacts to spring and stream flows. The court also directed BLM to confirm whether springs 612, 619, 597, and 742, were indeed PWR 107 springs.

BLM has now corrected the deficiencies identified by the Ninth Circuit. Specifically, BLM prepared a robust analysis of cumulative impacts to air quality in its 2019 supplemental environmental impact statement ("2019 FSEIS"), including quantifying the cumulative impacts, and thoroughly explained its rationale for using a zero baseline value for background concentrations of $SO_2$, $NO_2$, and CO. BLM also confirmed that springs 619, 597, and 742 are indeed PWR 107 sites. The 2019 FSEIS discussed the impacts from the project on surface waters, including PWR 107 sites, and articulated measures to mitigate those impacts. Additional specific discussion of Defendant-Intervenor's plans to mitigate impacts from replacement water would have minimal impact on the outcome of BLM's decision in light of the existing water analysis in the 2019 FSEIS.

Because BLM, on remand, reasonably addressed the NEPA deficiencies identified by the Ninth Circuit, and because BLM complied with FLPMA, the court should deny Plaintiffs' motion for summary judgment.

## B. STATUTORY AND REGULATORY BACKGROUND

### I. The Mining Law of 1872

The Mining Law of 1872, 30 U.S.C. §§ 22-54, authorizes citizens to enter federal lands to pursue and develop "valuable mineral deposits." 30 U.S.C. § 22; *see Andrus v. Shell Oil Co.*, 446 U.S. 657, 658 (1980). In addition to this threshold statutory authorization for free access, the Mining Law authorizes citizens to self-initiate property interests against the federal government by staking or "locating" a mining claim, which becomes an enforceable property right upon "discovery" of a valuable mineral deposit and compliance with all other applicable statutory or regulatory requirements. *Chrisman v. Miller*, 197 U.S. 313, 321-23 (1905).

### II. The Pickett Act, Stock Raising Homestead Act, and Public Water Reserve No. 107

The Pickett Act, as originally enacted in 1910, gave the President broad authority to "temporarily" withdraw lands from the operation of the mining laws:

> the President may in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States...[provided] that all lands withdrawn under the provisions of this Act shall at all times be open to exploration, discovery, occupation, and purchase under the mining laws of the United States so far as the same apply to metalliferous minerals.

Act of June 25, 1910, Pub. L. No. 303, *as amended* by act of August 24, 1912, Pub. L. No 316, ch. 369.  Accordingly, withdrawals under the amended Pickett Act have no effect on the operation of the Mining Law with respect to deposits of metalliferous minerals in those lands.

In the Stock Raising Homestead Act of 1916 (SRHA), Congress further clarified the characteristics of public water reserves, noting that the actual reservation would occur under the

Pickett Act rather than the SRHA. Section 10 explained that its purpose is to reserve the springs that are significant enough to be used by the public for watering purposes.

> That lands containing water holes or other bodies of water needed or used by the public for watering purposes **shall not be designated under this Act but may be reserved under the provisions of the Act of [June 25, 1910 – i.e., the Pickett Act], and such lands heretofore or hereafter reserved shall, while so reserved, be kept and held open to the public use** for such purposes under such general rules and regulations as the Secretary of the Interior may prescribe: *Provided*, That the Secretary may, in his discretion, also withdraw from entry lands necessary to insure access by the public to watering places reserved hereunder and needed for use in the movement of stock to summer and winter ranges or to shipping points, and may prescribe such rules and regulations as may be necessary for the proper administration and use of such lands[.]

Stock Raising Homestead Act, Act of Dec. 29, 1916, ch. 9, § 10, 39 Stat. 862, 865 (emphasis added).

In 1926, invoking these authorities, President Coolidge issued a blanket Executive Order known as PWR 107, which provided, in relevant part, that

> every smallest legal subdivision of the public land surveys which is vacant unappropriated unreserved public land and contains a spring or water hole, and all land within one quarter of a mile of every spring or water hole located on unsurveyed public land be, and the same is hereby, withdrawn from settlement, location, sale, or entry, and reserved for public use in accordance with the provisions of Sec. 10 of the act of December 29, 1916 [SRHA]

Exec. Order, April 17, 1926. *See generally Great Basin Mine Watch v. Hankins,* 456 F.3d 955, 966 (9th Cir. 2006); *United States v. State of Idaho,* 959 P.2d 449, 470-71 (Idaho 1998). The executive order thus served to withdraw lands within one-quarter mile of seeps and springs meeting the criteria in Section 10 of the SRHA from the public land laws, including the mining laws, but only to the extent authorized under the Pickett Act, as amended.

1

2   **III.     The Federal Land Policy and Management Act and BLM's Regulations**

3           In 1976, Congress enacted FLPMA, establishing a comprehensive framework for BLM's

4   management of public lands. BLM is to manage the public lands "in a manner which recognizes

5   the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands

6   including implementation of the Mining and Minerals Policy Act of 1970 . . . as it pertains to the

7   public lands." 43 U.S.C. § 1701(a)(12) (citation omitted). In addition, the statute provides that, in

8   managing public lands, BLM "shall, by regulation or otherwise, take any action necessary to

9   prevent unnecessary or undue degradation of the lands." *Id.* § 1732(b).

10          BLM implemented both these statutory provisions by promulgating regulations for

11  surface management of public lands mined under the Mining Law that authorize and encourage

12  the exploration and development of federal mineral resources while preventing "unnecessary or

13  undue degradation." 43 C.F.R. Part 3809(a). Under BLM's regulations, a mine operator prevents

14  "unnecessary or undue degradation" by, *inter alia*, "[c]omplying with . . . Federal and State laws

15  related to environmental protection." 43 C.F.R. § 3809.415(a); *see also id.* § 3809.1(a)

16  (incorporating FLPMA "unnecessary or undue degradation" requirement into BLM's process for

17  reviewing mining plans); *id.* § 3809.5 (defining unnecessary or undue degradation). BLM's

18  regulations require persons wishing to conduct mining operations of a particular intensity on

19  public lands to submit a plan of operations to the agency for approval. *Id.* §§ 3809.2, 3809.11. If

20  a plan of operations is approved, the operator must provide a financial guarantee to cover the

21  estimated cost of reclamation before any BLM-authorized surface disturbance can occur. *Id.* §§

22  3809.412, 3809.500.

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.    The National Environmental Policy Act

NEPA establishes the process by which agencies must evaluate the environmental effects of proposed "major Federal actions." 42 U.S.C. § 4332. NEPA is a purely procedural statute that requires evaluation of a proposal's environmental effects, but does not tell the decision-maker what course of action to choose. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("NEPA itself does not impose substantive duties mandating particular results, but simply prescribes the necessary process.").

NEPA provides that federal agencies should prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11.[1] The EIS is to address, among other things, the environmental impact of the proposed action and a reasonable range of alternatives to that proposed action. 42 U.S.C. § 4332(2)(C). The EIS should take a "hard look" at the environmental impacts of the proposed action. *See, e.g., Nw. Env't Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1139 (9th Cir. 2006) ("NEPA requires not that an agency engage in the most exhaustive environmental analysis theoretically possible, but that it take a 'hard look' at relevant factors.").

An EIS must also examine cumulative impacts. 40 C.F.R. § 1508.25(c)(3). A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what

---

[1] The Council on Environmental Quality promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15618 (Apr. 25, 1986).  More recently, the Council published a new rule, effective September 14, 2020, further revising the 1978 regulations.  The claims in this case arise under the 1978 regulations, as amended in 1986.  All citations to the Council's regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2018).

5

agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7;

*see also, e.g., Mon. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1001 (9th Cir. 2013) (same).

## C.  FACTUAL AND PROCEDURAL BACKGROUND

### I.  The Mt. Hope Mine Project

The proposed project is a mine for molybdenum, operated by Intervenor-Defendant

Eureka Moly, LLC ("EML"). Molybdenum is commonly used to produce high-strength steel

alloys that can retain their strength at high temperatures (molybdenum's melting point is

2623°C). *See* http://periodic.lanl.gov/42.shtml. The mine is located in central Nevada, 23 miles

northwest of Eureka, Nevada, and 65 miles south of Carlin, Nevada. AR068753. EML will mine

an estimated 966 million tons of molybdenite (molybdenum disulfide) ore. AR066812. This ore

will produce approximately 1.1 billion pounds of recoverable molybdenum. *Id*. The project

consists of the mine itself and ancillary facilities, such as waste rock disposal facilities, milling

facilities, and plants that will convert the molybdenite ore to technical-grade molybdenum oxide

or ferromolybdenum. AR068707.

The project will disturb 8,355 acres out of a total project area of 22,886 acres.

AR068753. Approximately 259 acres of the project area are EML's private lands. AR066774.

The rest of the project area is on public lands administered by BLM. On the public lands, EML

holds 1,550 approximately unpatented lode mining claims and mill sites. *Id*. The mine project

will last for 80 years. The construction phase will last 18 to 24 months, followed by 44 years of

mining and processing, 30 years of reclamation, and 5 years of post-closure monitoring. *Id*. EML

will pump water from the aquifer at the project site in order to keep the mine pit dry. AR066244.

This is expected to lower the water table in the project area, potentially affecting nearby springs.

*Id*. EML committed, as part of its plan of operations, to monitor air quality, water quality and

quantity, tailings-effluent and solids chemistry, noxious weeds, reclamation, slope stability, storm water, waste-rock chemistry, and wildlife. AR066474-AR066475.

## II.     Proceedings Below

EML first submitted to BLM a plan of operations for the mining project in June 2006. BLM prepared a final EIS pursuant to NEPA in October 2012 ("2012 FEIS") and issued a Record of Decision in November 2012 ("2012 ROD") approving EML's plan of operations. AR066813. Plaintiffs petitioned the District Court of Nevada for review of that decision on grounds that BLM's review of the project violated NEPA and its approval of the project contravened FLPMA and PWR 107. The District Court ruled in BLM's favor on all claims and Plaintiffs appealed to the Ninth Circuit. *See Great Basin Resource Watch v. United States Dep't of Interior*, No. 3:13–cv–00078–RCJ–VPC, 2014 WL 3696661 (D. Nev., July 23, 2014). The Ninth Circuit held that BLM failed to provide support for its use of a zero baseline value for certain pollutants and that BLM's cumulative impacts analysis of air emissions was deficient under NEPA. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1102 (9th Cir. 2016). The Ninth Circuit also found that although BLM generally provided a reasonable discussion on impacts to water quantity, it failed to adequately analyze the effects of using additional, replacement water to mitigate the impacts to spring and stream flows. *Id.* at 1110.

On remand, BLM conducted, in accordance with the Ninth Circuit's ruling, a supplemental EIS ("2019 FSEIS"), and issued a Record of Decision ("2019 ROD") on September 27, 2019. AR066808-066838. On October 31, 2019, Plaintiffs filed suit challenging BLM's decision. *See* ECF No. 1.

7

# D.  STANDARD OF REVIEW

Plaintiffs seek judicial review of final agency action by BLM.  This Courts review is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Pursuant to the APA, 5 U.S.C. § 706, a reviewing court's task is to determine whether the agency's decision was arbitrary, capricious or an abuse of discretion, or otherwise not in accordance with law, and whether the agency complied with all applicable procedural requirements. *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 413-14 (1971); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990). Courts are to engage in a substantial inquiry, but should not substitute their judgment for that of the agency. *Citizens to Pres. Overton Park*, 401 U.S. at 415-16; *Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir. 1987). An agency's action would be arbitrary and capricious:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)*, accord United States v. Clark*, 912 F.2d 1087, 1090 (9th Cir. 1990).   "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Indep. Acceptance Co. v. State of California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotation marks omitted).

In reviewing the sufficiency of an EIS under NEPA, a court need only ensure that the agency has presented a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted).  Thus, "'[t]he reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies.'" *Oregon Env't Council v. Kunzman,* 817 F.2d

484, 492 (9th Cir. 1987)(internal citations omitted).  In addition, a reviewing court may not force an agency to elevate environmental concerns over other appropriate considerations.  *Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227-28 (1980).  "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action."  *Methow Valley*, 490 U.S. at 350-51.

## E.  ARGUMENT

### I.  BLM's Approval of the Mine Did Not Violate PWR 107

Plaintiffs complain that BLM failed to protect PWR 107 springs in proximity to the project area, in violation of the Mining Law and Pickett Act. They also argue that BLM erred in approving EML's mining plan of operations around the PWR 107 springs because those lands are withdrawn and the record does not show that "valuable mineral deposits of metalliferous minerals" existed on those lands. ECF No. 57 at 23. But the lands in dispute have always been open to "exploration, discovery, occupation, and purchase under the mining laws of the United States" for metalliferous minerals. Pickett Act of June 25, 1910, Pub. L. No. 303, *as amended by* act of August 24, 1912, Pub. L. No 316, ch. 369. Furthermore, as this court previously held and the Ninth Circuit's ruling did not disturb, the Mining Law does not require an operator to establish a valid mining claim in order to enter, use, and occupy open lands.

   a)  *BLM identified PWR 107 springs, analyzed the projects effects on those springs and discussed mitigation measures for their protection.*

The 2019 FSEIS belies Plaintiffs' contention that BLM failed to review and protect PWR 107 sites near the proposed project area.  As initial matter, BLM identified all applicable PWR 107 sites and confirmed, in accordance with the Ninth Circuit's directive, that springs 597, 604,

9

619 and 742, are covered by PWR 107.[2] *See* AR066366; *GBRW I*, 844 F.3d at 1111. The 2019

FSEIS also specifically discussed impacts to surface waters, including these confirmed PWR 107

sites, explained that the impacts analysis would be the same as articulated in the 2012 FEIS (to

which the 2019 FSEIS is tiered), *see* AR066364-72, and identified measures to mitigate impacts

to those resources, *see* AR068923-53, AR066483-85; *see also* Argument I.C, *infra*.  In fact, the

2012 FEIS discusses BLM's methodology for assessing impacts, including water flow modeling,

and explained that impacts could include diminished surface water flow, or for springs located

nearest to the open pit, a "reduc[tion] or elimination of water flow in perpetuity." AR068923.

Accordingly, the Court should reject Plaintiffs' argument because BLM considered the effects on

the PWR 107 sites.

   b) *The lands surrounding the PWR 107 Springs are open to operation of the Mining Law for
      metalliferous minerals and related reasonably incidental uses.*

      Plaintiffs' suggestion that the lands around PWR 107 sites have been withdrawn from

operation of the Mining Law since issuance of the 1926 Executive Order, and that BLM's

decision was arbitrary and capricious because the approved mine plan did not qualify for the

withdrawal exception articulated in the Pickett Act, is unsound.

      Congress, the President, or the Department of the Interior has the power to withdraw

lands from operation of the public land laws, including the mining laws, if, for example, they

---

[2] The ongoing Nevada state basin adjudication for the Diamond Valley basin, which includes
PWR 107 springs 597, 604, and 619 is not relevant for the purposes of this proceeding. The
adjudication is ongoing and BLM's position in that proceeding remains that these three springs
are valid PWR 107 sites. As to Spring 742, there is currently no Nevada state basin adjudication
for the Kobeh Valley Basin and BLM's position as to this spring, as explained in the FSEIS, is
that it also is a valid PWR 107. As explained in the 2019 FSEIS, BLM determined that Spring
612—one of the four springs noted in the Ninth Circuit's opinion— "is no longer a valid PWR."
*See* AR066362-63. In addition to analyzing the four springs discussed in the Ninth Circuit's
opinion, BLM conducted a broader evaluation, analyzing other springs with potential PWR 107
status and within proximity to the proposed project. AR66361-66364. As a result of this broader
analysis, the agency identified Spring 604 as a PWR 107 site. *Id.*

decide that other values weigh against allowing mineral development in those areas. *See, e.g.*, 43 U.S.C. §§ 1714 (authorizing Interior to withdraw lands and explaining procedure), *see id.* § 1702(j) (explaining that Interior may withdraw lands "to maintain other public values in the area or reserv[e] the area for a particular public purpose or program"). But the withdrawal authority provided to the President by Congress in the Pickett Act, as amended in 1912, was not absolute. Rather, it provided "[t]hat all lands withdrawn under the provisions of this Act shall at all times be open to exploration, discovery, occupation, and purchase under the mining laws of the United States, so far as the same apply to metalliferous minerals." Amendment to Pickett Act, Act of Aug. 24, 1912, Pub. L. No. 316, ch. 369, 37 Stat. 497. Thus, as to metalliferous minerals, lands would remain open for exploration and occupation under the Mining Law. *See Great Basin Res. Watch v. U.S. Dep't. of the Interior,* 2014 WL 3696661 at *7-8, *aff'd in part, rev'd in part and remanded*; *see also United States v. Bush*, 157 I.B.L.A. 359, 360 & n.1 (Oct. 31, 2002) (confirming that lands remained open for entry for metalliferous minerals).

Here, Plaintiffs contend that the lands at issue here do not contain "valuable deposits of metalliferous minerals" and therefore were subject to the PWR107 withdrawal, and further, that BLM's authorization of EML's mining operations was unlawful without a determination that EML had valid mining claims that predated the withdrawal. ECF No. 57 at 21-22. However, as an initial matter, Plaintiffs previously conceded that PWR 107 lands otherwise withdrawn are open to the mining of metalliferous minerals such as the molybdenum mined by EML in the Project Area. *See Great Basin Res. Watch,* 2014 WL 3696661, at *7-8.

Plaintiffs now assert that for the exception under the Pickett Act to apply, the lands around the PWR107 springs would themselves have to contain "valid claims for metalliferous minerals" or "valuable deposits of metalliferous minerals." ECF No. 57at 23. But this

mischaracterizes the language of the Pickett Act and demonstrates a fundamental misunderstanding of the provisions of the Mining Law. The Pickett Act does not condition its exception or include any language referring to lands "containing valuable mineral deposits," nor does it refer to mining claims at all, let alone "valid claims for metalliferous minerals."[3] Moreover, the reference to "valuable mineral deposits" in the Mining Law is broadly "construed as including all lands chiefly valuable for other than agricultural purposes, and particularly as including nonmetallic substances." *N. Pac. Railway v. Soderberg*, 188 U.S. 526, 534 (1903); *see also Davis v. Wiebbold*, 139 U.S. 507, 522 (1891) (distinguishing between agricultural land and "mineral land"). Historically, phrases like "lands known to be valuable for minerals," "for mineral deposits," "known mines," and "land containing known mines" were "equivalent in meaning." *Brady's Mortgagee v. Harris*, 29 Pub, Lands Dec. 426, 433 (1900). Thus, Plaintiffs' contention that the Mining Law's reference to "valuable mineral deposit" necessarily equates to minerals of economic value is without merit.[4] *See* ECF No. 57 at 22. The Court, in sum, should

---

[3] As the district court noted in the previous litigation, Congress originally authorized the President to withdraw lands from the Mining Law under the Pickett Act only with respect to "coal, oil, gas, and phosphates," *see Great Basin Res. Watch*, 2014 WL 3696661, at *7 – minerals that Congress would later remove from the disposal under the Mining Law altogether. *See* Mineral Leasing Act of 1920, 30 U.S.C. § 181. In the 1912 amendment, Congress changed the exception in the statutory language to describe the lands that the President could not withdraw under the Pickett Act, rather than the lands that the President could withdraw. This rewording had the effect of broadening the President's withdrawal authority to include common variety stone and nonmetalliferous mineral deposits in addition to coal, oil, gas, and phosphates. But neither the original 1910 Pickett Act nor the 1912 amendment used the phrases "valuable mineral deposits" or "valid claims" to set the parameters for the President's withdrawal authority.

[4] Also, as the district court explained in the previous litigation, at the time President Coolidge executed the Pickett Act, Section 2's mining exception provided that

> [a]ll lands withdrawn under the provisions of this Act shall at all
> times be open to exploration, discovery, occupation, and purchase,
> under the mining laws of the United States, *so far as the same
> apply to minerals other than coal, oil, gas, and phosphates*.

reject Plaintiffs' attempt to broaden the scope of the withdrawal authority under the Pickett Act because it conflicts with the plain language of the statute and Congress' intent.

Plaintiffs also argue that BLM's authorization was unlawful because the "metalliferous minerals are in the pit, not in distant lands [around the PWR 107 springs] that will be buried under…waste," and therefore the Pickett Act exception does not apply. *See* ECF No. 57 at 23-24. But Plaintiffs once again attempt to broaden the withdrawal authority in the Pickett Act by inferring additional requirements.  Under the Mining Law, the Secretary is empowered to authorize exploration, mining, or processing "operations and uses reasonably incident thereto", such as the placement of tailings and waste rock in areas surrounding the mine. *See* 30 U.S.C. § 612(a); *see also* 43 C.F.R. § 3809.5 (defining mining operations); 43 C.F.R. § 3715.0-5 (defining "reasonably incident"). Moreover, the Pickett Act is unequivocal that the mining laws would continue to apply to the extent necessary to develop metalliferous materials. Amendment to Pickett Act, Act of Aug. 24, 1912, Pub. L. No. 316, ch. 369, 37 Stat. 497 (declaring that any lands withdrawn by the President under that authority "shall at all times be open to exploration, discovery, occupation, and purchase under the mining laws of the United States, so far as the same apply to metalliferous minerals."). Thus even if the open lands in issue did not themselves contain metalliferous minerals and contained instead "common variety rock" as Plaintiffs suggest, BLM would not be precluded from approving use of those lands for operations reasonably incidental to the mining of metalliferous minerals like molybdenum, and Plaintiffs have failed to cite to any authority rebutting this fact.

---

*See Great Basin Resource Watch*  2014 WL 3696661, at *7-8 (emphasis added). When Congress amended the Pickett Act in 1912, it substituted "metalliferous minerals" for "minerals other than coal, oil, gas and phospates.[4] *Id.*

1

2

    *c)  A valid mining claim is not required to use and occupy lands near PWR 107 springs for uses reasonably incidental to mining metalliferous minerals*

3

    Next, Plaintiffs erroneously suggest that a valid mining claim is a condition precedent to

4

use and occupy open lands near the PWR 107 springs, and that BLM erred by not ensuring that

5

EML had a valid mining claim before the agency approved the mine plan. *See* ECF No. 57at 23,

6

25-27. Plaintiffs' contentions find no support in the Mining Law, which creates two separate

7

rights: it confers upon all miners or operators a *statutory right* to access, explore, and occupy

8

federal lands for mining purposes, 30 U.S.C. § 22; and it confers the ability to obtain separate

9

rights —property rights — on those miners who locate mining claims, discover a valuable

10

mineral deposit, and comply with applicable regulatory requirements, *id.* §§ 23, 26, 35, 36. *See*

11

*Davis v. Nelson*, 329 F.2d 840, 846 (9th Cir. 1964) (explaining that "the validity of [a miner's]

12

*title*" turns on whether "there [has] been a discovery of valuable mineral within the limits of the

13

claim" (emphasis added)). Regarding the latter category of rights, mining claims are "property in

14

the fullest sense of that term; and may be sold, transferred, mortgaged, and inherited." *Wilbur v.*

15

*United States ex rel. Krushnic*, 280 U.S. 306, 316 (1930) *disapproved of on other terms*; *accord*

16

*Freese v. United States*, 639 F.2d 754, 757 (Ct. Cl. 1981) ("[F]ederal mining claims are 'private

17

property' enjoying the protection of the Fifth Amendment."). But a property right is necessary

18

only if a miner seeks to assert that right against the United States —for example, if the miner

19

attempts to patent his claim or mine on "withdrawn" lands.  *Id.* § 29; 36 C.F.R. § 228.15.  Miners

20

who desire fee simple ownership of claimed lands may take additional steps to patent those

21

claims.30 U.S.C. § 29 (describing patenting process). And the Mining Law provides a similar

22

invitation to miners to obtain property interests in non-mineral land by staking and patenting mill

23

sites. *Id.* § 42. Nevertheless, a miner need not establish a property right to exercise the statutory

24

right to use and occupy open lands for mining. *See* 30 U.S.C. § 22.

25

26

27

28

Here, Plaintiffs erroneously conflate the statutory right to enter and occupy open lands with the assertion of a property right against the United States. *See* ECF No. 57 25-27. They assert that "[s]uch 'statutory rights' can only accrue" to EML if EML has possessory rights under the Mining Law. *Id.* at 26. But based on the explanation above, Plaintiffs either misunderstand the law or the facts. The lands at issue are open, pursuant to the exception under the Pickett Act, and as such EML has a statutory right under Section 22 to engage in uses incidental to its mining operations without asserting a property right. There is no evidence in the record that EML is staking a mining claim over the lands it seeks to use for its waste rock and tailings facility, such that it may be construed that EML is asserting a property right against the United States. Because EML is not asserting a mining claim over the open lands at issue BLM was not required to assess whether EML had a valid mining claim before approving EML's mining plan. *See* 30 U.S.C. § 29; 43 C.F.R. § 3809.100 (requiring the verification of mining claim validity before approving a plan of operations only where the lands are withdrawn).

## II.      BLM Complied With NEPA

Contrary to Plaintiffs' contention, BLM's air and water quality impacts analysis complied with NEPA and the Ninth Circuit's decision in the previous litigation.

### a)  BLM Took a "Hard Look" at Impacts to Air Quality

In the previous litigation, the Ninth Circuit determined that BLM's cumulative air impacts analysis was insufficient. *See GBRW I*, 844 F.3d 1095, 1105 (9th Cir. 2016). While the Ninth Circuit acknowledged BLM's discussion of relevant past, present, and reasonably foreseeable future actions, the court held that BLM's cumulative air impacts analysis failed to: (1) quantify the cumulative air impacts of the Project together with the Ruby Hill Mine and vehicle emissions; and (2) quantify or discuss in any detail the effects of other activities, such as

1   oil and gas development, that are identified elsewhere in the FEIS as potentially affecting air

2   resources. *Id*. The court also found that "[i]t was impossible for the BLM to take a 'hard look' at

3   cumulative air impacts given its unjustified use of a zero baseline for those pollutants." *Id*. The

4   court concluded that the "cumulative air impacts portion of the FEIS fails to 'enumerate the

5   environmental effects of [other] projects' or 'consider the interaction of multiple activities.'" *Id*.

6   at 1106. (citation omitted)

7

8        BLM has now corrected the deficiencies identified by the Ninth Circuit. The 2019 FSEIS

9   explained more fully the cumulative impacts of emission sources within the Cumulative Effects

10  Study Area (CESA). *See* AR066385. BLM relied on supplemental air quality analysis prepared

11  consistent with the Ninth Circuit's decision. *See* AR060676-90. In its supplemental cumulative

12  impacts analysis, BLM discussed impacts from past mining and agricultural operations within

13  the CESA on air quality. AR066385. BLM explained that air quality impacts from those

14  operations were "substantial, consisting of heavy particulates and metal emissions," and

15  discussed impacts from wildland fires, which "contribute substantial amounts of particulates." *Id*.

16  BLM further discussed the impact of present actions on air quality in both qualitative and

17  quantitative terms. In its qualitative discussion, BLM explained that mining-related activities,

18  along with agricultural and commercial operations, would result in the generation of fugitive dust

19  and combustion emissions. *Id*. BLM also considered impacts from oil and gas development and

20  vehicular emissions, determining that there were no oil and gas developments within the CESA,

21  and that vehicular emissions were already accounted for in background concentrations data. *Id*.

22  With respect to its analysis of present and reasonably foreseeable projects, BLM identified

23  individual projects within the CESA, including existing and proposed mining operations that

24  constitute major sources of criteria pollutants. *See* AR066385. It also conducted a modeling

25

26

27

28

analysis to determine the cumulative impacts of the combined emissions from the challenged action, present actions of the Gold Bar Project and the Ruby Hill Mine Project, and the reasonably foreseeable Prospect Mountain Mine Project. *Id.* BLM explained that it obtained the emissions data for its analysis from separate NEPA documents prepared for those projects, and that it relied on an updated modeling tool, AERMOD version 1621r, to run the modeling analysis. *See* AR066385-86; *see also* AR066385-86 (explaining BLM's methodology). BLM presented the data in Table 4.1-1, which

> shows that the total ambient concentrations that include the Project impacts, the nearby Gold Bar, Ruby Hill, and Prospect Mountain impacts, and background concentrations, are below the [National Ambient Air Quality Standards] ("NAAQS") for each pollutant and averaging period. The table also shows that the impacts from sources within CESA are cumulatively negligible due to the relative distance to the other projects and the localized nature of the emissions.

AR066386. Next, BLM distinguished the air quality analysis previously presented in the 2012 FEIS, explaining that the impacts shown in Table 4.1-1 differed from the results presented in 2012 because it utilized the latest version of the AERMOD modeling system, which included newer default options. *Id.* This resulted, in some cases, in a finding that certain air quality impacts would have actually decreased since the 2012 analysis. *Id.* BLM ultimately concluded that based upon the qualitative and quantitative data from past, present, and future actions, impacts to air quality within the CESA "would result in total impacts below the NAAQS." *Id.*

      BLM also provided a well-reasoned explanation for its use of a zero baseline for criteria pollutants assessed within the CESA. The Ninth Circuit determined that BLM's air impacts analysis "did not provide any support for its use of baseline values of zero for several air pollutants," in violation of NEPA. *GRBW I*, 844 F. 3d at 1104. More specifically, the court found that BLM unreasonably relied on a brief "expert recommendation" from Nevada's Department of

Environmental Protection ("NDEP") "as the sole source of the zero baseline value." *Id.* at 1103. The recommendation did not "explain *how or why* the NDEP arrived at zero." *Id.* The court opined that "[w]e might reach a different conclusion had the NDEP official explained *why* an estimate of zero was appropriate, or had the BLM independently scrutinized that estimate and decided that it was reasonable, and then explained why." *Id.*

On remand, the record shows that BLM provided a thorough explanation for its use of a zero baseline value. As an initial matter, unlike the previous cursory email from NDEP's Bureau of Air Quality Planning ("BAQP") recommending use of zero baseline value, NDEP explained in a two-page letter to BLM the methodology it used and the data it considered in support of its recommendation. *See* AR066415-16. First, NDEP explained how it determined the appropriate background concentrations, for $NO_2$, $SO_2$, and CO. *Id.* It discussed that "ambient monitoring is sparse and seldom representative on large spatial scales," and that although BAQP[5] maintains a monitoring network for the State of Nevada, it has no monitors for the pollutants in issue in remote areas. *Id.* NDEP further explained that "human activities in the remote areas of Nevada are considered to be an insignificant influence on ambient air quality," and that "[t]o the extent that these pollutants are generated by anthropogenic activities, their background concentrations are not significantly different from zero when used for modeling purposes." *Id.* Consequently, BAQP "selected zero background concentrations for $NO_2$, $SO_2$, and CO for air dispersion modeling in remote areas of the State." *Id.* NDEP also cautioned against selecting certain sites for background concentration because "they may not be representative." Finally, NDEP

---

[5] BAQP has responsibility under its State Implementation Plan to improve air quality is areas designated non-attainment and maintain air quality is designated attainment areas under the National Ambient Air Quality Standards ("NAAQS"). *See* AR066415-16.

explained that the background concentrations utilized by BAQP for the pollutants in issue have

been used successfully in air dispersion modelling "for permitted stationary sources within

Nevada for many years," and that BAQP has successfully "us[ed] zero background

concentrations for $NO_2$, $SO_2$, and CO, for air dispersion modelling in remote areas of the State."[6]

*Id*. In fact, the State of Nevada is designated as being in attainment under the NAAQS for these

particular pollutants "across the entire state." *Id*.

The contractor, Air Sciences Inc., ("Air Sciences") similarly confirmed the propriety of

using a zero background concentration. *See* AR066373-84; *see also* AR060676-88 (Air

Sciences' analysis). Like the NDEP analysis, Air Sciences' supplemental air quality analysis

considered several factors, including the location, terrain, traffic volume, and population within

proximity of Mount Hope project area. *See* AR060676-77. It reviewed ambient monitoring

stations collecting $NO_2$, $SO_2$, and CO data across the state to determine if "representative

background monitoring sites for rural Nevada like the Mt. Hope project were available." *Id*. It

found none. *Id*.; *see also* AR060680-83. The analysis also considered data from stations located

relatively far away from major population centers, but found that they were still "not

representative of rural settings like the Mount Hope project area." *Id*.  The supplemental analysis

also went a step further than NDEP's—it expanded its review of representative background

concentrations to include neighboring states within a reasonable distance of the Nevada border.

*See* AR060684-87 (considering data from Arizona, Utah, California, Idaho, and Oregon). Based

on data collected from some of those monitoring stations, the analysis determined that some

"might be used to provide conservative background concentrations for rural areas like the Mt.

---

[6] The State of Nevada is designated as being in attainment under the NAAQS for these particular
pollutants "across the entire state." *See* AR066415-16.

Hope project site," AR060684, and noted limitations in collecting data on certain pollutants from others, *id*. Ultimately, the analysis concluded that a zero baseline concentration for $NO_2$, $SO_2$, and CO for rural Nevada, was "reasonably justified." AR060687.

Finally, BLM's independent analysis confirmed NDEP and Air Sciences' conclusions. *See* AR066373-84. In considering similar factors and based upon an assessment of monitoring data from representative and non-representative areas, BLM concluded that "the background concentrations of $NO_2$, $SO_2$, and CO at the Project boundary are expected to be minimal, which is functionally equivalent to zero for modeling purposes." AR066376 (also explaining most of the monitoring stations in Nevada are located in urban settings and consequently the "measurements do not provide representative background concentrations for rural settings like the Project."); *see also* AR066383-84.

Although BLM complied with NEPA and the Ninth Circuit's order by conducting a comprehensive cumulative air impacts analysis and providing a well-reasoned explanation why it chose a zero background concentration, Plaintiffs insist this is insufficient. Plaintiffs assert that BLM failed to consider impacts from reasonably foreseeable activities, *see* ECF No. 57 at 29-33, but this is false. As an initial matter, the Ninth Circuit determined that BLM's cumulative impacts analysis was deficient because it did not "quantify the cumulative impacts of the Project together with the Ruby Hill Mine and vehicle emissions." *GBRW I*, 844 F.3d at 1106. BLM has now filled that gap as instructed by the Court, *see* AR066385-86 (Table 4.1-1), and included in that modeling analysis is the reasonably foreseeable impacts from the Prospect Mountain Mine, *id; see also* AR060405.

Plaintiffs further contend that BLM failed to consider reasonably foreseeable impacts from oil and gas leases within the CESA. *See* ECF No. 57 at 33. But the record discredits

Plaintiffs' contention. As BLM explained, the supplemental air quality analysis tiers from and updates the 2012 FEIS, *see* AR066354, which discussed the reasonably foreseeable future actions from activities including oil and gas leasing and development, *see* AR069536-38. Contrary to Plaintiffs' contention, *see* ECF No. 57, 33, the Ninth Circuit did not identify BLM's discussion of reasonably foreseeable future actions in the 2012 FEIS as one of the "shortcomings as the BLM's analysis," *see GBRW I*, 844 F.3d at 1105. In any event, the 2019 FSEIS quantified the cumulative air impacts including from reasonably foreseeable future actions at the Prospect Mountain Mine. Furthermore, BLM explained that there were no leases under development within the area. *See* AR066441. To engage in a cumulative impacts analysis of oil and gas development projects that have not yet been proposed and that are remote in time would be "speculative and premature." *See Lands Council v. Powell*, 395 F.3d 1019, 1023 (9th Cir. 2005). To the extent Plaintiffs cite two non-binding, out-of-circuit, district court decisions to support their contention that NEPA required BLM to do more, *see* ECF No. 57 at 34, the Court should reject their argument.

Insofar as Plaintiffs contend that NEPA required BLM to adopt recommendations from the Environmental Protection Agency ("EPA") on cumulative air quality impacts, Plaintiffs are wrong. *Id.* at 35. NEPA does not require defendant agencies "to accept the input or suggestions of other agencies." *Ark. Wildlife Fed'ne v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1101 (8th Cir.2005) (internal citations omitted); *see also S. La. Env't Council, Inc. v. Sand*, 629 F.2d 1005, 1017 (5th Cir.1980). Indeed, while Congress "wants the EPA to participate when other agencies prepare environmental impact statements," it is the preparing agency who bares "the ultimate statutory responsibility…and under the rule of reason, a lead agency does not have to follow the EPA's comments slavishly—it just has to take them seriously." *Citizens Against Burlington, Inc.*

*v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991) (citation omitted). Here, BLM gave reasoned consideration to EPA's comments on BLM's air quality impacts analysis and explained its position, and this complied with NEPA. *See* AR066472. "EPA's criticism of [BLM's NEPA analysis] and the agencies' subsequent deal, do not change [the Court's] view of the [agency's] findings." *Busey*, 938 F.2d at 201.

Next, BLM considered and incorporated comments from EPA in determining the appropriate baseline values for background concentrations of $NO_2$, $SO_2$, and CO. As previously discussed, the 2019 FSEIS included three separate analyses, prepared on remand by the State of Nevada, EML, and BLM, articulating the methodologies and rationale for arriving at a zero baseline. Yet Plaintiffs complain that BLM "refus[ed] to consider the representative background/baseline levels for CO, $NO_2$, and $SO_2$, as above 'zero'," and that "EPA recommended against the use of 'zero' as a background concentration value for modelling criteria air pollutants." ECF No. 57 at 39-40. In its April 22, 2019 correspondence to BLM, EPA recommended that the FSEIS consider data from monitoring stations outside of Nevada, including "representative Yosemite and White Mountain monitored background concentrations (or any other geographically representative numbers that are above zero), in clear table form." AR063815. BLM complied, and Plaintiffs concede as much. *See* ECF No. 57 at 39; *see also* AR066383; AR06442 (response to EPA's comments). BLM accounted for baseline values above zero and explained the occurrence, stating that although those locations are "relatively rural" in terms of nearby population centers and traffic activity, they included other emission sources such as an airport. *See* AR066383. Moreover, BLM did not rely solely on the above zero background concentration values from Yosemite and White Mountain to support its decision to use a zero baseline value. Instead, BLM added that data to the other "modeled impacts for the Project" and

22

found that "the total concentrations [were] still well below the NAAQS." AR066383-84.

Plaintiffs have failed to cite to any authority that BLM's chosen methodology was unreasonable and the Court should therefore defer to BLM's technical expertise. *See Chem. Mfrs. Ass'n. v. Envt. Prot. Agency*, 28 F.3d 1259, 1265-66 (D.C. Cir. 1994) (noting that deference is owed to an agency's chosen methodology so long as it bears a "rational relationship between the [method] and [that] . . . to which it is applied") (citation omitted); *see also Nat'l. Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005) (opining that deference is generally due to the "informed discretion of the responsible federal agenc[y]," particularly when "the agency's decision involves a high level of technical expertise")(citation omitted). As the district court explained, "[a] selection of background values for an air quality model is exactly the type of technical decision that demands a reviewing court's deference." *Great Basin Res Watch*, 2014 WL 3696661, at *10

The record also belies Plaintiffs' assertion that BLM "refused to obtain any data regarding the existing baseline levels of air pollutant levels at or near the Project site." ECF No. 57 at 38. The 2019 FSEIS explained that given the remoteness of the Project area, BLM had to consider data from representative background monitoring stations much farther afield, including neighboring states as recommended by the EPA. *See* AR066375-84. Finally, Plaintiffs falsely allege that BLM relied on the 2007 cursory recommendation from NDEP to use a zero baseline value that was rejected by the Ninth Circuit. *See* ECF No. 57 at 38-39. As already explained, NDEP prepared a more recent, robust recommendation that BLM independently scrutinized in addition to the supplemental analysis prepared by EML's contractor.

*b)*        *BLM Took a "Hard Look" at the Cumulative Impacts to Water Resources*

Plaintiffs further argue that BLM failed to consider cumulative impacts on water supplies from the potential development of oil and gas leases. *Id.* at 37. More specifically, they claim that future development of oil and gas leases within the CESA will result in "further drawdown of water levels." *Id.* Plaintiffs' argument is without merit. BLM provided extensive analysis on the cumulative impacts, including reasonably foreseeable future actions, from oil and gas development and to surface and ground water quality and quantity. *See* AR069536-43. Contrary to Plaintiffs' contention, *see id.* at 37, there is no evidence that any of the leases within the CESA will be developed. In fact, BLM has confirmed that there are no oil and gas developments within the area. AR066385. Moreover, Plaintiffs have failed to provide any citation to the record that significant quantities of water will be required for any purported future drilling or that there will be "significant water removals caused by predicted drilling on the leases," such as from hydraulic fracturing, that would require additional NEPA analysis. *See* ECF No. 57 at 37. Consequently, the Court should reject Plaintiffs' claims.

*c)*   *BLM Adequately Analyzed Mitigation Impacts to Water Quantity*

Plaintiffs argue that BLM failed to adequately discuss measures that would mitigate impacts to ground and surface water resources. *Id.* at 41-44. They assert that BLM failed to discuss impacts from the additional 302 acre-feet of water annually that would be required to replace lost groundwater, and that the plan to mitigate impacts from the loss of surface water is insufficient. *Id.*

To satisfy NEPA's "hard look" requirement, an EIS must contain "a reasonably complete discussion of possible mitigation measures." *Methow Valley,* 490 U.S. at 352; *see also* 42 U.S.C. § 4332(C)(ii)); *see also* 40 C.F.R. § 1502.16(a)(9) (stating that an EIS must contain

"[m]eans to mitigate adverse environmental impacts"). NEPA does not impose "a substantive requirement that a complete mitigation plan be actually formulated and adopted," *Methow Valley* 490 at 352, or that "harms actually be mitigated," *S. Fork Band Council v. U.S. Dep't. of the Interior*, 588 F.3d 718, 727 (9th Cir. 2009). "A mitigation plan 'need not be legally enforceable…or even in final form to comply with NEPA's procedural requirements.'" *Okanogan Highlands All. v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000), *citing National Parks & Conservation Ass'n v. United States Dep't of Transp.*, 222 F.3d 677, 681 n. 4 (9th Cir.2000). A mitigation plan must include "at least *some* evaluation of effectiveness." S. *Fork Band Council*, 588 F.3d at 727.

The 2019 FSEIS satisfied NEPA's requirement to include "at least *some* evaluation of effectiveness." *Id*. The FSEIS described and analyzed the effectiveness of specific mitigation plans. *See* AR049893 (explaining the effectiveness of surface water mitigation); AR049913 (discussing the effectiveness of groundwater mitigation); AR066247 (describing both what would trigger the mitigation measures and the mitigation measures themselves for each of the springs and streams that might be impacted by the project). Moreover, the Ninth Circuit, in its evaluation of the 2012 SEIS, acknowledged that BLM discussed mitigation measures aimed at addressing impacts to springs and streams,

> [t]he FEIS discusses several mitigation measures aimed at addressing those impacts, including a monitoring scheme to keep track of the status of spring and stream segments, water hauling, and piping in water from other locations to replace lost surface water.

*GBRW I*, 844 F.3d 1110; *see also* AR068904-39. The Ninth Circuit did not determine that those measures were inadequate, and therefore, to the extent Plaintiffs complain that it was insufficient to pipe in water for the Lone Mountain Spring or to install guzzlers for large game at various

springs, *see* ECF No. 57 at 43, this Court should reject Plaintiffs' argument. Moreover, and

contrary to Plaintiffs' suggestion, NEPA does not require BLM to present a full, detailed, and

final mitigation plan in the 2019 FSEIS, or to show that the impacts identified will actually be

mitigated. *See Methow Valley*, 490 at 352; *S. Fork Band Council,* 588 F.3d at 727 (noting that

the discussion could be "tentative or contingent"). BLM's evaluation of the effectiveness of these

mitigation measures, *see* AR068904-39, thus suffices under NEPA.

The Ninth Circuit criticized BLM's analysis of mitigation measures for dewatering only

to the extent that BLM did not discuss impacts from the additional 302 acre-feet of water that

would be required to replace lost groundwater.[7] *GBRW I*, 844 F.3d at 1110-11. The 2012 FEIS

explained that the additional 302 acre-feet of water would initially come from EML's existing

water rights. The Ninth Circuit rejected the argument that BLM had already analyzed any

impacts in its discussion of the effects of EML using the water from its production wells. *Id.*  The

Ninth Circuit opined "the analysis of ground water pumping in the FEIS does *not* take into

account the roughly 200 gallons per minute needed to replace depleted spring and stream water."

*Id*. It further noted, however, "that error appears to be quite small, raising questions about

whether it might be harmless." *Id.*

Federal Defendants agree—the error is small and harmless. "The harmless-error analysis

asks whether the failure to consult materially impeded NEPA's goals—that is, whether the error

caused the agency not to be fully aware of the environmental consequences of the proposed

action, thereby precluding informed decision-making and public participation, or otherwise

---

[7] In the 2012 FEIS, BLM explained that  the additional "302 acre-feet of water that would at
least initially come from EML's existing water rights if additional water rights have not yet been
secured." AR068924.

materially affected the substance of the agency's decision." *Idaho Wool Growers Ass'n. v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016) (citation omitted). Here, Plaintiffs have failed to establish that NEPA's twin goals of public participation and informed decision-making were materially impeded. As previously explained, the 2019 FSEIS, which is tiered to the 2012 FEIS, provided a reasonably thorough discussion of the impacts from the project to surface and ground water, including the effect of groundwater drawdown on steams, springs, and surface water resources. *See* AR068859-AR069005; AR068914-40; AR066364-72; *see also Great Basin Res. Watch,* 2014 WL 3696661, at *16  (recognizing that "Chapter 3 of the [2012] FEIS dedicates at least 145 pages" to analyzing mitigation and monitoring plans "for each of the affected water sources."). Importantly, the 2012 FEIS and 2019 FSEIS assumed a ground water pumping rate of between 6,450 and 7,000 gallons per-minute, which represents approximately 10,550 and 11,300 acre-feet per year. *See* AR066365; AR068914. Considering this information, the Ninth Circuit recognized that "failing to include the additional 200 gallons per minute needed to replace spring and stream flows amounts to a roughly 3% error." *GBRW I*, 844 F.3d at 1110, n.9. Plaintiffs have failed to articulate how this minor error upends approximately 100 pages of well-reasoned analysis on the effects of groundwater drawdown on stream and spring flow, and the mitigation measures proposed, such that it would have made a material difference in the public's understanding of the Project's impacts or the agency's decisionmaking. *See Idaho Wool Growers Ass'n. v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016); *see also Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't. of the Navy*, 860 F.3d 1244, 1252 (9th Cir. 2017). The Court should therefore reject Plaintiffs' claims.

1

2

3       III.    **BLM Complied With FLPMA**

4           Plaintiffs allege that BLM violated FLPMA because it improperly relied on 43 C.F.R.

5   Part 3809, instead of Part 2920, when it authorized EML's mining plan. *See* ECF No. 57, 27-28.[8]

6   Plaintiffs also contend that BLM violated FLPMA by failing to estimate the project's

7   reclamation costs in the 2019 ROD. *Id.* at 46-49.  None of Plaintiffs' arguments has merit.

8           Under FLPMA, Congress declared that it is the policy of the federal government, through

9   the Secretary of the Interior, to manage public land "in a manner which recognizes the Nation's

10  need for domestic sources of minerals . . . from the public lands." *Ctr. for Biological Diversity v.*

11  *U.S. Dep't Of the Interior*, 623 F.3d 633, 646 (9th Cir. 2010) (citing to 43 U.S.C. § 1701(a)(12)).

12  Congress also recognized the need to manage public lands "'in a manner that will protect the

13  quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water

14  resource and archaeological values.'" *Id.* (citing to 43 U.S.C. § 1701(a)(8)).  Accordingly, while

15  managing public lands under FLMPA, the Secretary and BLM must "take any action necessary

16  to prevent unnecessary or undue degradation of the . . . lands." *Id.* at 644. (citing to 43 U.S.C. §

17  1732(b)).  "Unnecessary or undue degradation" is defined as activities that fail to comply with

18  the performance standards in 43 C.F.R. § 3809.420 (2012) or other Federal and state laws related

19

20

21

22  _____

23  [8] In addition to misstating the basis for BLM's decision, plaintiffs also misrepresent the extent of
    BLM's decision, suggesting that BLM's approval of EML's plan of operations gave the operator
24  the "Right to Permanently Occupy Public Lands." ECF No. 57 at 25.  While BLM mine plans
    do not have a specific expiration date, the regulations make clear that the challenged BLM
25  surface use authorization is not, in fact, "permanent," but rather remains effective only as long as
    EML is conducting mining operations, unless revoked earlier for failure to comply with the
26  regulations.  *See* 43 C.F.R. § 3809.423; *see also id.* §§ 3809.401(b)(3) (requiring mine plans to
    include a reclamation plan), 3809.590 (describing conditions for release of bonds after
27  completion of reclamation).  While some mine features will certainly remain after closure, EML
    may "permanently occupy" these lands for mining purposes only by obtaining fee title to the
28  lands.  *See* 30 U.S.C. § 29.

to environmental protection.  43 C.F.R. § 3809.5(1)-(3) (2012).  The performance standards

include conducting "all operations in a manner that complies with all pertinent Federal and state

laws."  43 C.F.R. § 3809.420(a)(6) (2012).

FLMPA's implementing regulations also specify "procedures for the orderly and timely

processing" of applications for non-federal use of public lands, and authorizes Interior to "issue

regulations providing for the use, occupancy, and development of the public lands through

leases, permits, and easements." 43 C.F.R. § § 2920.0-1, 2920.0-3. Part 2920 also provides that

"[a]ny use not specifically authorized under other laws or regulations and not specifically

forbidden by law may be authorized under this part." *Id*. at § 2920.1-1.

Here, Plaintiffs' FLPMA argument is largely based upon the erroneous premise that EML

does not have a statutory right under the Mining Law to occupy and use open lands for its waste

rock and tailings facilities. *See* ECF No. 57 at 27. They claim that BLM could only have

authorized any use of those lands under its special use regulations, Part 2920. *Id*. at 27-28.

Plaintiffs' argument fails for three reasons.

First, BLM's authorization of EML's mining plan falls squarely within the regulatory

scope of Part 3809 of BLM's surface management regulations. Part 3809 "applies [in part] to

all operations authorized by the mining laws on public lands where the mineral interest is

reserved to the United States." 43 C.F.R. § 3809.2(a) (discussing the regulatory scope)[9]. Here,

and as previously explained, Section 22 of the Mining Law grants a statutory right to use and

---

[9] Operations, as defined under subpart 3809 include "all functions, work, facilities, and activities on public lands in connection with prospecting, exploration, discovery and assessment work, development, extraction, and processing of mineral deposits locatable under the mining laws; reclamation of disturbed areas; and all other reasonably incident uses, *whether on a mining claim or not*[.]" 43 C.F.R. § 3809.5 (emphasis added).

occupy open lands for mining operations or uses reasonably incidental thereto, and proof of a valid mining claim is not required. Argument I.a, *supra*. To the extent Plaintiffs suggest that FLPMA requires EML to establish an "occupancy right" to use open public lands under the Mining Law before these regulations may apply, again, Plaintiffs are wrong. ECF No. 57 at 26. An "occupancy right" in the manner Plaintiffs argue, refers to an assertion of a *property right* as against the government. *See, e.g.*, *United States v. Coleman*, 390 U.S. 599, 601 (1965) (affirming Interior's decision to reject a patent application where the applicant had not complied with the requirements for obtaining fee title from the United States, including demonstrating a valid mining claim). Here EML's request for surface use authorization under the Mining Law is not based on an assertion of a property right over open lands as against the government, nor does BLM's approval of EML's plan of operations under Part 3809 constitute a recognition or grant of such a property right. The cases Plaintiffs rely on for support—which uniformly discuss what is necessary for the recognition of property rights, rather than whether the Mining Law applies—are thus inapposite.  Because the regulations do not contain any provision stating that they apply only where the operator has a recognized property right, BLM's application of Part 3809 to EML's plan of operations was reasonable.

Second, Part 2920 is inapplicable on its face. Plaintiffs erroneously argue that because EML's proposed use of open public lands for its waste rock and tailings facility is "not 'authorized by the mining laws,' and not governed under any rights under the 1872 Mining Law," BLM can only authorize such activities pursuant to its "special use permitting regulations" under 43 C.F.R. Part 2920. ECF No. 57 at 27-28. This is incorrect. Part 2920 is a "catch-all" authority, applying only if the proposed use is "not specifically authorized under other laws or regulations and not specifically forbidden by law[.]" 43 C.F.R. § 2920.1-1. As previously

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

discussed, Part 3809 specifically authorizes operations involving minerals subject to disposal under the Mining Law—such as the molybdenum here. 43 C.F.R. § 3809.2(e) (defining scope). In consideration of the plain language in Section2920.1-1, BLM reasonably determined that Part 2920 was inapplicable and appropriately authorized EML's mine plan under subpart 3809.[10]

Third, Plaintiffs have failed to establish that the proposed action would cause "unnecessary or undue degradation" of public lands. *See* ECF No. 57 at 45. Plaintiffs argue that the project purportedly violates "Federal and state laws related to environmental protection," and therefore, BLM's authorization of the project violates its duty under FLPMA to prevent

---

[10] The Court should reject Plaintiffs' argument that BLM violated NEPA by failing to "consider the alternative of regulating (and/or potentially denying) [EML's] facilities the under Part 2920," ECF No. 57 at 28, because Plaintiffs failed to alert BLM of this proposed alternative during the formal public comment process on the 2019 DSEIS. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978) (requiring plaintiffs challenging an agency action to raise it with specificity "so that it alerts the agency to [their] position and contentions" during the NEPA comment period, lest they waive their objection). Plaintiffs instead first asserted the alleged applicability of Part 2920 in a September 18, 2019 letter sent to BLM during the 30-day review period following publication of the 2019 FSEIS. Pursuant to its policy, BLM reviewed Plaintiffs' post-FEIS comments to ascertain their merit, specifically, whether "they identify significant new circumstances or information relevant to environmental concerns and bear upon the proposed action." BLM NEPA Handbook, H-1790, § 9.6.1. If the comments met this requirement, BLM would determine "whether to supplement the draft or the final EIS or if minor changes can be made to the existing EIS." *Id.* Here, Plaintiffs' comment was primarily based on a District of Arizona case vacating the Forest Service's approval of a mining plan of operations, in part because the agency's NEPA analysis failed to consider an alternative where the mine plan would be reviewed under the agency's special use regulations. *See* AR066527-40 (citing *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. 17-cv-00475, ECF No. 248, 27-34 (D. Ariz. July 31, 2019)). In their comment, Plaintiffs never specifically requested that BLM supplement the FSEIS to analyze a new alternative of regulating EML's activities pursuant to Part 2920, or articulated how the alternative should be structured in the context of the Proposed Action at issue here. Nevertheless, BLM considered whether supplementation was necessary and determined that it was not because a validity determination is not required before approving a mine plan on open lands. Moreover, "[b]ecause approval of the Project by the BLM does not constitute a determination regarding the validity or ownership of any unpatented mining claims involved in the mining operation, nor is such a determination required, BLM has determined that no additional environmental analysis was warranted in response to GBRW's comment." *See* AR066817. The Court should therefore reject Plaintiffs' assertions related to Part 2920.

unnecessary or undue degradation of the public lands in issue. *Id*. More specifically, they claim that the project will violate air and water quality standards. *Id.* This is false. As an initial matter, BLM determined that the proposed operations, in consideration of the identified monitoring and mitigation measures articulated for the Preferred Alternative, would not cause "unnecessary or undue degradation" and were otherwise in compliance with applicable legal requirements. *See* AR066469, AR066480-89 (ROD discussing mitigation and monitoring measures). Indeed, BLM's authorization expressly required EML to "comply with all other applicable federal, state, and local regulations," AR066490, and "fulfill[] any other applicable FLPMA requirements before proceeding with this Project." AR066474-75. Moreover, and as explained above, the 2019 FSEIS adequately analyzed impacts to air and water resources in accordance with the Ninth Circuit's directive and NEPA, and discussed measures for mitigating impacts that could cause unnecessary or undue degradation. Argument, II.a and II.b *supra*.

Finally, Plaintiffs' allegation that BLM's decision was arbitrary and capricious because the 2019 ROD failed to provide an updated reclamation cost estimate ("RCE") determination or establish "Long-Term Funding Mechanism" ("LTFM") is without merit. *See* ECF No. 57, 46-49. BLM's regulations require operators to provide a financial guarantee that "cover[s] the estimated cost as if [BLM] were to contract with a third party to reclaim [EML's] operations according to the reclamation plan, including construction and maintenance costs for any treatment facilities necessary to meet Federal and State environmental standards." 43 C.F.R. § 3809.552(a). "[S]urface disturbing activity cannot begin until the financial guarantee has been accepted and obligated by BLM. *Id.* § 3809.412 (stating that operations may not commence until BLM approves the plan of operations and the operator provides the financial guarantee required under 43 C.F.R. § 3809.551).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Nothing in BLM's regulations requires an RCE determination to be included in or even made before the issuance of a ROD, nor do Plaintiffs cite to any binding legal authority requiring BLM to do so.[11]   Moreover, BLM considers the process by which it establishes the amount of and accepts financial guarantees to be in the nature of enforcement and compliance actions between BLM and the party providing the financial guarantee. *See* BLM 3809 Manual at 2-6 (Rel. 3-335) (Sept. 17, 2012).   Therefore, in the absence of an updated RCE determination, EML would be precluded from commencing additional ground disturbing activities until the financial guarantee has been undertaken and accepted by BLM. *Id*.

Plaintiffs' assertions related to the LFTM similarly fail. *See* ECF No. 57 at 48. BLM's regulations do not require the establishment of a trust fund or other LTFM, let alone require that it must be established at the time the ROD is issued. *See* 43 C.F.R. §3809.552(c). A trust fund is only required if BLM "identifies a need for it, . . . or [some] other funding mechanism," and "BLM may identify the need for a trust fund or other funding mechanism during plan review *or later*." *Id*.  (emphasis added).

The Court should also reject Plaintiffs' assertion that BLM violated FLPMA because BLM did not "determine the reclamation costs for the approved [rights-of-way ("ROW")]" at the time of the ROD's issuance. ECF No. 57 at 49. FLPMA's implementing regulations provide BLM with discretion whether to require a reclamation bond "to cover any losses, damages, or injury to human health, the environment, or property in connection with [the operator's] use and

---

[11] Although BLM's policy guidance provides that a decision approving a plan of operations "must state the estimated reclamation cost determination and the financial guarantee amount," *see* BLM Surface Management Handbook H-3809-1 at 4-45, such internal policy does not have the force and effect of law and is not binding on the agency.  *McMaster v. United States*, 731 F.3d 881, 888-89 (9th Cir. 2013) ("BLM manuals are not legally binding." (citing *Schweiker v. Hansen*, 450 U.S. 785, 789-90 (1981)).

occupancy of the [ROW]." 43 C.F.R. § 2805.20(a); *see also* 81 Fed. Reg. 92,161, 92,161 (Dec. 19, 2016) (rulemaking preamble noting that the "provisions [of § 2808.20] are moved from existing section 2805.12. Under the existing regulations, bonds are required only at the BLM's discretion. This expanded section explains the details of when a bond is required and what the bond must cover. This is not a change from existing practice and is intended to provide clarity to the public."). To the extent Plaintiffs suggest that BLM indicated it planned to exercise its discretion to require a bond for the right of way, *see* ECF No. 57 at 49, Plaintiffs have failed to cite to any authority that the exercise of that discretion would be a condition of the ROW grant itself, and not, at most, a condition of the notice to proceed with ground disturbing activities. Furthermore, the regulations do not impose a timing requirement for when BLM should exercise its discretion, stating only that the operator "must post a bond on or before the deadline" BLM specifies. *See* 43 C.F.R. § 2805.20(a)(4).

Because BLM complied with FLPMA, the Court should reject Plaintiffs' claims.

## F.   CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment and grant Federal Defendants' Cross-Motion for Summary Judgment.


Respectfully submitted this 4th day of February, 2022.

TODD KIM,
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ Leilani Doktor*
LEILANI DOKTOR, admitted to HI Bar
United States Department of Justice
150 M Street NE
Washington, D.C. 20002

Tel.: (202) 305-0447
Fax: (202) 305-0506
leilani.doktor@usdoj.gov

*Attorney for Federal Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 4, 2022, a true and correct copy of the above document was electronically filed with the Clerk of Court using CM/ECF. Copies of the document will be served upon interested counsel via the Notices of Electronic Filing that are generated by CM/ECF.

*/s/ Leilani Doktor*
Leilani Doktor

*Attorney for Federal Defendant*