JIM B. BUTLER, Nevada Bar No. 8389
ASHLEY C. NIKKEL, Nevada Bar No. 12838
PARSONS BEHLE & LATIMER
50 West Liberty Street, Suite 750
Reno, NV 89501
Telephone: (775) 323-1601
Facsimile: (775) 348-7250
JButler@parsonsbehle.com
ANikkel@parsonsbehle.com
ECF@parsonsbehle.com

*Attorneys for Defendant-Intervenor*
*Eureka Moly, LLC*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| GREAT BASIN RESOURCE WATCH; and WESTERN SHOSHONE DEFENSE PROJECT, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; U.S. BUREAU OF LAND MANAGEMENT; CASEY HAMMOND, Acting Assistant Secretary; and JON D. SHERVE, Field Manager of the BLM's Mount Lewis Field Office, <br><br> Defendants, <br><br> EUREKA MOLY, LLC, <br><br> Defendant-Intervenor. | Case No. 3:19-cv-00661-LRH-CSD <br><br><br> **DEFENDANT-INTERVENOR'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND CROSS-MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56, Defendant-Intervenor Eureka Moly, LLC (EML") hereby opposes Plaintiffs' Motion for Summary Judgment (ECF 57) and cross-moves for summary judgment, requesting this Court affirm the review and decision of the Department of Interior and Bureau of Land Management in approving the Mt. Hope Project. This Opposition and Cross-Motion is based on the following memorandum of points and authorities, supporting exhibits, and all pleadings and papers on file herein.

PARSONS
BEHLE &
LATIMER

16620.047\4863-9126-8613.v1

## MEMORANDUM OF POINTS AND AUTHORITIES

The supplemental environmental analysis performed by the United States Bureau of Land Management ("BLM") cures the limited deficiencies identified by the United States Court of Appeals for the Ninth Circuit in its narrow reversal, vacatur and remand. Plaintiffs' additional arguments are outside the scope of the revised analysis and/or have been waived. Therefore, the Court should grant Eureka Moly, LLC's Cross-Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment ("Mtn.").[1]

## I.    FACTUAL BACKGROUND

This case comes back to the Court for consideration following initial challenge and judicial review in 2013-2014, and remand for narrowly-focused supplemental analysis. That supplemental analysis has been completed and the shortcomings identified by the Ninth Circuit more than sufficiently remedied.

### A.    BLM Has Completed Substantial Environmental Analysis of the Mount Hope Project.

In June 2006, Intervenor-Defendant Eureka Moly, LLC ("EML") submitted a proposed Plan of Operations to the United Statutes Bureau of Land Management ("BLM") for the Mount Hope Project ("Project"), a molybdenum mine to be constructed in Eureka County, Nevada (approximately 23 miles north of the town of Eureka). AR 066811[2] (2019 Record of Decision ("ROD") p. 2). The Plan of Operations was subject to review and approval by BLM under the Federal Land Policy and Management Act ("FLPMA") and BLM's surface management regulations. 43 C.F.R. Subpart 3809. AR066812 (2019 ROD p. 3). BLM determined its review and approval of the Plan of Operations constituted a major federal action under the National Environmental Policy Act ("NEPA") and that an environmental impact statement ("EIS") was

---

[1]    To the extent they are applicable, EML also joins with the arguments of Defendants United States Department of Interior and the United States Bureau of Land Management, Casey Hammond and Jon D. Sherve ("Defendants").

[2]    Like Plaintiffs, EML cites to the Administrative Record previously submitted to the Court using the "AR [Page No.]" format.

required. *Id.* In December 2011, BLM published a Draft EIS and initiated a 90-day public comment period. *Id.* After reviewing and considering all the comments received, BLM published a Final EIS ("FEIS") in October 2012. *Id.* The FEIS included revisions to the analysis and responses to every substantive comment. *Id.* On November 16, 2012, the BLM issued a Record of Decision ("2012 ROD") approving the Project. AR066813 (2019 ROD, p. 4).

B.       **The Ninth Circuit Instructed BLM to Revisit its Air Quality Analysis and Clarify its PWR 107 Position.**

After the BLM State Director for Nevada rejected their petition for review, two of the three Plaintiffs in this action (Great Basin Resource Watch ("GBRW") and Western Shoshone Defense Project ("WSDP")) challenged the 2012 ROD in this Court under the Administrative Procedures Act and EML intervened. *Id.* In resolving cross-motions for summary judgment, this Court rejected GBRW's and WSDP's arguments that BLM violated the APA, NEPA, FLPMA, or the August 17, 1926 Executive Order known as Public Water Reserve No 107 ("PWR 107"). *Id.*; *see also Great Basin Resource Watch v. United States Dep't of Interior*, 2014 WL 3696661 (D. Nev., July 23, 2014). Accordingly, the Court rejected GBRW's and WSDP's motion for summary judgment and granted BLM's and EML's motion for summary judgment. *Id.* GBRW and WSDP appealed. AR05607 (*Great Basin Resource Watch. v. Bureau of Land Mgm't*, 844 F.3d 1095 (9th Cir. 2016) ("Ninth Circuit Decision").

On appeal, the Ninth Circuit upheld BLM's approval of the Mount Hope project with three exceptions. The Ninth Circuit remanded the decision to BLM for further work on three specific issues: (1) BLM's selection of baseline levels of certain air pollutants in the air quality modeling analysis, (2) BLM's air quality modeling analysis of cumulative air quality impacts, and (3) BLM's description of the status of four seeps and springs as potential public water reserves ("PWRs"). AR054602-0546030 (Ninth Circuit Decision). On the remainder of GBRW and WSDP's arguments, the Ninth Circuit was not persuaded, and the supplemental environmental analysis that was performed is not an invitation for Plaintiffs to revive those arguments. *Id.*

1

2

**1.**     ***The Ninth Circuit Directed BLM to More Fully Explain the Reasoning for Certain Baseline Decisions in the Air Quality Modeling.***

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

As part of the underlying environmental review, BLM conducted numerical modeling of potential air quality impacts and concluded that the Mount Hope project would comply with air quality standards. AR050072-050088 (FEIS pp. 3-288 to 3-305). The Ninth Circuit remanded to the agency to essentially show its work, emphasizing that "whatever method the agency uses, its assessment of baseline conditions must be based on accurate information and defensible reasoning." AR054609 (Ninth Circuit Decision, p. 9, internal quotations and citations omitted). In line with that analysis, the Ninth Circuit observed that when BLM determined baseline air pollution levels for the Project, BLM "did not use actual measurements from the Project site because none were available." *Id.* The Ninth Circuit rejected GBRW and WSDP's arguments that it was unreasonable for the BLM to use data from Great Basin National Park to establish baselines for 2.5-micron particulate matter because the BLM had explained its choice adequately and its explanation was reasonable. AR054610 (Ninth Circuit Decision p. 10). Likewise, the Ninth Circuit rejected GBRW and WSDP's arguments concerning the baseline choices for 10-micron particulate matter and the two longest time-averaged sulfur dioxide concentrations because the BLM acknowledged the shortcomings in its data while using that data to make an estimate of baseline conditions, therefore complying with NEPA. *Id.*

19

20

21

22

23

24

25

26

27

The air issue the Ninth Circuit remanded on—the BLM's use of a baseline value of zero for three pollutants, carbon monoxide (CO), nitrogen dioxide ($NO_2$) and sulfur dioxide ($SO_2$)—was based  on the fact that the only support for the zero baseline value in the administrative record  was an e-mail from an official in Nevada's Bureau of Air Quality recommending that BLM use the zero baseline value for these three pollutants in the air quality modeling for the Mount Hope project. *Id.* The Ninth Circuit objected because the email did "not explain *how or why* the [state] arrived at zero." AR054612 (Ninth Circuit Decision p. 12). A "bare assertion of opinion" by an expert (state or federal) does "not pass muster in an EIS." *Id.* Critically, the Ninth Circuit clarified:

28

> We might reach a different conclusion had the NDEP official explained why an estimate of zero was appropriate, or had the BLM independently scrutinized that estimate and decided that it was reasonable, and then explained why . . . the BLM simply used baseline estimates of zero for some pollutants in reliance on one conclusory sentence in an email from an NDEP official, an email that itself contained no supporting reasoning. This important information, which affects the air impacts analysis, was essentially immune from meaningful scrutiny by the public because the BLM never provided any data or reasoning in support of it.

AR054613 (Ninth Circuit Decision p. 13). BLM conducted a "double check" analysis of the air quality modeling in response to EPA comments on the FEIS by using measured baseline (non-zero) values from an undeveloped area in New Mexico (another rural, western area) instead of the zero values. AR054614 (Ninth Circuit Decision p. 14). BLM concluded that the project would have met air quality standards even if BLM had assumed a different set of baseline values for the three pollutants at issue, but the Ninth Circuit ruled that "a post-EIS analysis—conducted without any input from the public—cannot cure deficiencies in an EIS." *Id.* The Ninth Circuit remanded for BLM to "provide support for use of its baseline values of zero for several air pollutants," but recognized that using either a zero or non-zero baseline, air quality standards would be satisfied. *Id.*

### 2. The Ninth Circuit Remanded for Additional Analysis of Cumulative Air Quality Impacts.

On the question of cumulative impact analysis, the Ninth Circuit concluded the BLM had properly identified the relevant "past, present, and reasonably foreseeable future actions" that might affect the environment in the Project area as well as providing a "useful analysis" of the cumulative impacts of those actions "on some environmental resources." AR054615-054616 (Ninth Circuit Decision p. 15-16). However, the Ninth Circuit concluded the discussion of cumulative air quality impacts was insufficient because:

> [T]he BLM made no attempt to quantify the cumulative air impacts of the Project together with the Ruby Hill Mine and vehicle emissions. Nor did the BLM attempt to quantify or discuss in any detail the effects of other activities, such as oil and gas development, that are identified elsewhere in the FEIS as

PARSONS BEHLE & LATIMER

16620.047\4863-9126-8613.v1

> potentially affecting air resources. . . . The cumulative air impacts analysis also suffers from the same problem that plagued the air impacts analysis—namely, the choice of a baseline value of zero for certain pollutants.

*Id.* The Ninth Circuit instructed the BLM to "enumerate the environmental effects of [other] projects" and "consider the interaction of multiple activities" on remand. AR054618 (Ninth Circuit Decision p. 18, *quoting Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1133 (9th Cir. 2007)).

### 3. *The Ninth Circuit Directed BLM to Clarify the Status of Four Springs Under the 1926 Executive Order Creating Public Water Reserves.*

The final issue the Ninth Circuit remanded was clarification of whether four springs discussed in the FEIS as potentially impacted qualified as public water reserves under a 1926 Executive Order: McBride's Spring, Mt. Hope Spring, Garden Spring, and Lone Mountain Spring. AR054630 (Ninth Circuit Decision p. 30). The Ninth Circuit found the text of the FEIS confusing and remanded so that BLM could clarify the record. *Id.*

### C. BLM Responded to the Ninth Circuit Remand with Additional Analysis and a Supplemental Environmental Impact Statement.

In response to the Ninth Circuit's order, BLM determined to supplement the environmental impact statement. BLM described the Supplemental Environmental Impact Statement ("SEIS") as "provid[ing] updated information and discussion regarding certain air quality data and analysis used in the original EIS" as well as "provid[ing] clarifying language regarding PWRs potentially impacted by the project." AR054810 (Notice of Intent to Prepare Supplemental Environmental Impact Statement for the Mount Hope Project).

BLM published a Draft SEIS ("DSEIS") for public review and comment on March 6, 2019. AR063726 (Notice of Availability of DSEIS). The FSEIS tiers to and updates the FEIS, as well as a 2015 Plan Amendment Environmental Assessment (which reflected minor boundary and design changes in the Project Plan of Operations). AR066234-066235 (FSEIS pp. 4-5). After public comments were received, including those from GBRW, WSDP, and PLAN (AR063985-

064020 (comment letter)), BLM responded to the comments and issued a final SEIS in August 2019, with responses to comments received included in that final SEIS ("FSEIS"). AR066219-066222 (NOA), AR066109-066214 (FSEIS, responses to comments in App'x D (AR066182-066214)). A ROD was issued on September 27, 2019. AR066808-066838 (2019 ROD).

## 1. Supplemental Air Quality Modeling and Analysis.

BLM conducted additional baseline air quality analysis consistent with the Ninth Circuit's direction. AR056609-056625 (Air Sciences Report, April 7, 2017). The findings of this analysis were included in the FSEIS. *See* AR066253-066264 (FSEIS pp. 24-25).

BLM also included additional discussion of the quantitative cumulative impacts of air emission sources within the air quality Cumulative Effects Study Area ("CESA"), including the Ruby Hill Mine. BLM also addressed the rationale for the zero baseline values in the cumulative effects analysis. AR066265 (FSEIS p. 36). The reasonably foreseeable future actions ("RFFAs") were identified in the 2012 FEIS. *Id.* Following the remand, additional air quality modeling was performed to include potential air emissions from the Gold Bar, Ruby Hill, and Prospect Mountain Mine and the results are discussed in the FSEIS. AR066266 (FSEIS p. 37). From this modeling, BLM once again concluded the cumulative potential air emissions were below the National Ambient Air Quality Standards ("NAAQS"), a conclusion consistent with the cumulative air impacts analysis in the 2012 FEIS. *Id.*

## 2. Reevaluation of Springs for Possible PWR 107 Status.

BLM reviewed the status of the four springs identified in the Court's decision. BLM also reviewed additional springs and applied new eligibility criteria to "more conservatively assess the eligibility of potential PWR 107 water sources." AR066239 (FSEIS p. 10). Based on the revised analysis, BLM determined that three of the four springs listed in the Ninth Circuit decision met the revised eligibility criteria. One spring, McBride's Spring (Spring 612), did not. Based on a site visit to the site in 2016, BLM withdrew the PWR claim for McBride's Spring from the Diamond Valley adjudication pending before the State Engineer. AR066127 (FSEIS p. 13). However, BLM identified an additional spring that met the revised PWR criteria, an Unnamed

Spring (Spring 604). The FSEIS includes photographs of each of the springs evaluated together with checklists describing each spring and applying the revised PWR criteria. AR066155-066158 (FSEIS App'x A).

The administrative record concerning these springs, is at times, confusing because they have common names, BLM Spring numbers, and different identifying numbers that have been used by different agencies and in different proceedings over the past thirty years. For ease in following the arguments and the record, the following table links the three primary identifiers for each of the springs determined to be eligible for PWR status in the FSEIS and also shows flow monitoring results included in the FSEIS:

| Springs Determined Eligible for PWR Status in the FSEIS | | | |
|---|---|---|---|
| Common Name | Notice of Intent filed with State Engineer | BLM Spring Number | Flow From FSEIS Table 3.2-1 |
| Garden Spring | R-06942 | 597 | <0.1 gpm |
| Unnamed Spring | R-06943 | 604 | <0.1 gpm |
| Mt. Hope Spring | R-06940 | 619 | 0.03 gpm |
| Lone Mountain Spring | R-06951 | 742 | -- |

The spring locations are shown on Figure 3.2.2 in the FSEIS.[3] AR066134 (FSEIS p. 20). Springs 597, 604 and 619 are in a cluster of springs in the northeast portion of the map, near Highway 278. *Id.* Spring 742 is shown in the south-central portion of the map. *Id.* Appendix A also includes photographs of each of the springs. AR066155-066158. The spring characteristics are important to understanding BLM's requirements for mitigation of potential impacts of the springs and continued use of the springs for livestock watering, so the photographs of the four springs are included below together with the description of the spring from the FEIS.

---

[3]    These same springs, together with other springs within a 5-mile radius of Mount Hope, were identified, discussed and evaluated in the 2012 FEIS. AR049847-049853 (FEIS at Figure 3.2.9 and pp. 3-32 to 3-39).

**Garden Spring (Spring 597) (AR066156):**



The Garden Springs site consists of two separate points of discharge within the same general area; both were reported to be perennial water with no visible outlet for surface water. Water that emanates from the spring collects in local depressions. AR049849 (FEIS p. 3-35).

**Unnamed Spring (Spring 604) (AR066156):**



The site consists of a permanent pond with no visible inlet or outlet for surface water flow. Since the site has been monitored, no flow measurements have been obtained from the spring, although the pond has been observed to contain varying amounts of water released from an upgradient artesian well, which is located approximately one mile from the spring site. AR049899 (FEIS p 3-97).

**Mount Hope Spring (Spring 619) (AR066157):**



This site consists of a buried steel pipe that daylights out of the hillside under a tree and runs above ground for about 30 feet to a cattle trough. The pipe is a permanent source of water for a partially buried cattle trough, which fully captures the inflow of water. The rate of inflow has been observed to vary by season, with a maximum recorded discharge of approximately 0.3 gpm in May 2006. AR049902 (FEIS p. 3-100).

PARSONS
BEHLE &
LATIMER

16620.047\4863-9126-8613.v1

**Lone Mountain Spring (Spring 742) (AR066158):**



The site consists of a spring emerging from the alluvium creating a pond in the valley. Riparian vegetation is supported at the site. AR049906 (FEIS p. 3-104).

Plaintiffs assert, without qualification, that these four springs contained "Federal Reserved Water Rights" that BLM has failed to protect. Mtn. p. 8. That assertion is doubly incorrect. No reserved water rights have been adjudicated for any of these springs. BLM filed the claims for these springs (together with dozens of others) in the general determination for the Diamond Valley Hydrographic Basin[4] pending before the Nevada State Engineer. *See* Ex. 1 (Excerpt of Order of Determination in the Matter of the Determination of the Relative Rights in and to all Waters of the Diamond Valley, Hydrographic Basin No. 10-153, Elko and Eureka Counties, Nevada (January 31, 2020), pp. 419-421, attached). That determination has been ongoing for years and has not reached a final conclusion. *Id.* Nevertheless, BLM has taken specific measures to protect each of the four springs and described those measures in the FEIS and FSEIS.

---

[4]      The Lone Mountain Spring is not in the Diamond Valley hydrographic basin and is not included in the Order of Determination. It is located in the Kobeh Valley.

In January 2020, the Nevada State Engineer issued an Order of Determination for all claims in the Diamond Valley basin, including asserted PWR 107 federal reserved water right claims. *See* Ex. 1. The State Engineer determined that twenty of the BLM claims were valid, but that others, including Garden Spring, the Unnamed Spring and Mt. Hope Spring, were not. *Id.* BLM has filed a notice of exceptions to the State Engineer's determinations concerning thirty-six federal reserved water right claims, including the claims for Garden Spring, the Unnamed Spring and Mt. Hope Spring with the Seventh Judicial District Court of the State of Nevada. Ex. 2 (United States' Notice of Exceptions dated November 2, 2020, attached). Those exceptions have not yet been heard by the court.

For purposes of the NEPA analysis and the application of 43 C.F.R. Subpart 3809 (the "3809 regulations"), BLM has treated the four springs as PWR 107 springs with reserved water rights.

## II.    ARGUMENT

The Ninth Circuit's narrow remand provided BLM with a clear "to-do" list in its supplemental environmental analysis: (1) clarify its position on whether four specific springs are "covered" by PWR 107, (2) explain the zero baseline values used in the air quality  analysis, and (3) enumerate the environmental effects of other projects and consider the interaction of multiple activities in the cumulative air quality impacts analysis. BLM addressed all these tasks in its supplemental analysis in accordance with law, and the fact that Plaintiffs disagree with the agency's conclusions on environmental impacts and the ultimate outcome is not a basis for reversal. In reviewing both the BLM's analysis and Plaintiffs' arguments, it is important to keep in mind the narrow scope of the Ninth Circuit's remand, as this is not an opportunity for Plaintiffs to rehash points GBRW and WSDP argued and lost in the first round of litigation, or to raise new arguments that were previously forfeited. Accordingly, the Court should affirm the BLM's approval of the Project, as it was not arbitrary nor capricious.

**A.**     **Review of Supplemental Environmental Analysis is Highly Deferential.**

Summary judgment is an appropriate procedure in reviewing agency decisions under the Administrative Procedures Act ("APA"). *City & County of San Francisco v. U.S.*, 130 F.3d 873, 877 (9th Cir. 1997). Judicial review of FLPMA and NEPA decisions is limited under the APA to the administrative record. 5 U.S.C. §§ 700 *et seq.*; *Tablada v. Thomas*, 533 F.3d 800, 805 (9th Cir. 2008); *Oregon Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1124-25 (9th Cir. 2007); *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

Under the APA, to succeed on their claims, Plaintiffs have the burden of demonstrating that BLM's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Northwest Ecosystem Alliance, v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal citations and quotations omitted). Arbitrary and capricious review "is narrow, and [the court does] not substitute [its] judgment for that of the agency." *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 6-7 (2001); *see also North Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 2008 WL 4459073 (9th Cir., Oct. 6, 2008). An agency's decision will only be overturned if the agency relied on factors Congress did not intend it to consider, failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before it, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *McFarlane v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008). Reversal is not appropriate if the plaintiff merely disagrees with the agency's decision or with the agency's conclusions about environmental impacts. *See River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

This Court's review is limited to the agency's administrative record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883-84 (1990). In this review, particularly in deciding a motion for summary judgment, the Court is not tasked with resolving factual issues; instead, must determine whether the agency's record supports its decision under the APA's arbitrary and capricious

standard of review. *See Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1172 (9th Cir. 1994); *Occidental Eng'g Co. v. Immigration and Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985). The impact statement must contain "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992).

An agency action is not "arbitrary and capricious," unless the agency has (1) relied on factors which Congress has not intended it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Natural Res. Def. Council v. U.S. E.P.A.,* 526 F.3d 591, 602 (9th Cir. 2008).

Moreover, an agency's factual findings are reviewed under the substantial evidence test. *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 414 (1971), *overruled on other grounds*, *Califano v. Sanders,* 430 U.S. 99 (1977) (*followed by Beucke v. U.S. Dep't of Agric.*, 2008 WL 3266657 (9th Cir., Aug. 6, 2008)). Under that test, the administrative record supports an agency's factual determination if there exists "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938). Accordingly, Plaintiffs cannot merely contest facts; they bear the burden of demonstrating that BLM's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," which they cannot do if there is evidence that "a reasonable mind might accept as adequate to support" BLM's "conclusion."

**B.      BLM did not violate FLPMA or the Mining Law in Approving the Mount Hope Plan of Operations.**

Plaintiffs' argument that BLM failed to comply with its obligations under FLPMA is based on an incorrect and unsupported reading of the Mining Law. Plaintiffs argue that BLM could not approve the Mount Hope Plan of Operations without first confirming a "valuable

1   mineral deposit," on each claim and demand that BLM complete a claim validity determination as

2   a prerequisite for mining plan approval. Mtn. pp. 17-18.

3       But that is not the law. Plaintiffs are wrong because there is direct, unequivocal authority,

4   binding on the agency, that Plaintiffs fail to disclose, discuss, or distinguish. BLM's review and

5   approval of the Mount Hope plan of operations is subject to Department of Interior Solicitor's

6   Opinion M-37012 (2005) (Exhibit 3, attached) which states clearly that nothing in the federal

7   Mining Law, statutes amending the Mining Law, or FLPMA requires that BLM conduct a

8   validity determining before approving mining operations.[5] *Id.* at 2.

9       Plaintiffs have already made and lost this argument in this proceeding. Plaintiffs' brief

10  repeats (almost verbatim) its comments on the 2012 Draft EIS. *See* AR035113-035135 (March 1,

11  2012 comment letter from GBRW). BLM responded that no validity determination was required,

12  citing the 2005 Solicitor's Opinion. AR051271 (FEIS p. 468). The Federal District Court's Order

13  in the case also cited the 2005 Solicitor's Opinion in concluding that "BLM was not required to

14  assess the validity of EML's mining claim[s] before approving the Project." *Great Basin*

15  *Resource Watch v. U.S. Dep't of Interior*, 2014 WL 3696661 at *15 (D. Nev., July 27, 2014).

16  Plaintiffs appealed the District Court's judgment on the PWR 107 lands but did not appeal this

17  part of the decision. The issue has therefore been decided. *See Jones v. Dist. of Columbia.*, 646 F.

18  Supp. 2d 42, 46 (D.D.C. 2009) (where issue decided by summary judgment not raised on appeal,

19  same issue may not be re-litigated on remand for consideration of another issue).

20      Plaintiffs cite to a 2019 decision from the Federal District Court for Arizona, *Center for*

21  *Biological Diversity v. U.S. Fish and Wildlife Service*, 409 F. Supp. 3d 738 (D. Ariz. 2019)

22  *(appeal pending)*. But that case did not involve FLPMA, the BLM, or 43 C.F.R. Subpart 3809

23  (the "3809 regulations"). The decision involved approval of mining plan on Forest Service lands

24  and the United States has appealed that decision to the Ninth Circuit Court of Appeals. In 2020,

25  after *Center for Biological Diversity*, the Department of Interior Solicitor revisited the 2005

26  opinion and subsequently issued an M-opinion expanding on the reasoning of the 2005 Opinion

---

5       Interior Department M-Opinion are also signed by the Secretary and are binding on the
Department and all agencies until rescinded or modified.

and "reaffirming the Department's longstanding legal position that a valid mining claim is not required for reasonably incident mining uses of open lands, and BLM need not determine mining claim validity before deciding whether to approve such uses under any of the [BLM regulations] . . ." Department of Interior Solicitor's Opinion M-37057 (2020), p. 24 (Exhibit 4, attached).

## C.    BLM did not unlawfully manage PWR 107 lands or waters.

### 1.    BLM Properly Interpreted and Applied the Pickett Act to the Mount Hope Project.

Plaintiffs' incorrect interpretation of the mining law is the legal basis for the claim that BLM has failed to protect PWR 107 lands or waters as they extend the same false requirement that BLM must determine claim validity as a prerequisite to mine plan approval to the lands associated with PWR 107 springs. But that is not correct. Plaintiffs' arguments regarding PWR 107 springs are premised on another incorrect interpretation of the law.

The Pickett Act of 1910 limited the President's withdrawal authority in response to disputes over Presidential withdrawal of federal lands with petroleum reserves. The dispute arose when, in 1909, President Taft withdrew millions of acres from location under the mining laws for purposes of a petroleum reserve. In response, Congress acted to limit the withdrawal authority asserted by the President. The Pickett Act authorized withdrawals for a long list of public purposes (including range and stock watering) subject to the limitation that "all lands withdrawn . . . *shall at all times be open* to exploration, discovery, occupation and purchase *under the mining laws of the United States* so far as the same apply to metalliferous minerals." 37 Stat. 497 (1912) (emphasis added) (Mtn., Exhibit K);[6] AR066127 (FSEIS p. 13).

---

[6]    As originally enacted, the Pickett Act stated that the mining laws would continue to apply to minerals "other than coal, oil, gas and phosphates." 36 Stat. 847. That phrase was changed to "metalliferous minerals" in 1912. 37 Stat. 497. In 1976, the Federal Land Policy and Management Act, 43 U.S.C. § 1701 et seq. ("FLPMA") repealed the authorizing statutes under which the 1926 Executive Order was issued, but included a savings clause providing that "all withdrawals, reservations, classifications, and designations in effect as of the date of approval of this Act shall remain in full force and effect until modified under the provisions of this Act or other applicable law." FLPMA § 701(c).

PARSONS
BEHLE &
LATIMER

16620.047\4863-9126-8613.v1

There is no dispute that the molybdenum that will be mined and processed for the Mount Hope project is a metalliferous mineral within the meaning of the Pickett Act, so lands that were "withdrawn" under the 1926 Executive Order still remain open "at all times" to "exploration, discovery, occupation and purchase" for molybdenum under the mining laws. In other words, the Executive Order was only a limited withdrawal; the lands remained open for all lawful activities under the mining law.  Plaintiffs ignore clear this language and invent a different requirement for the Pickett Act, i.e., that the mining law only applies where the BLM confirms that there has been a "valuable deposits of metalliferous minerals." Mtn. pp. 12-14.

Plaintiffs rely on a 1987 decision by the Interior Board of Land Appeals, *David E. Hoover and Lester F. Whalley*, 99 IBLA 291 (1987), 1987 WL 110721, but mischaracterize that decision. In the *Hoover* case, BLM invalidated lode and placer claims which had been located for pozzolan, which was defined as "a material which is capable of reacting with lime in the presence of water at ordinary temperature to produce a cementitious compound." *Id.* at 294 (*quoting* Bureau of Mines, "A Dictionary of Mining, Mineral and Related Terms," 856 (1968).

*Hoover* concluded that the "proper and controlling standard as to the definition of 'metalliferous' in the Pickett Act was adopted by the Department in 1918 when the issue was first raised." *Id.* That 1918 decision stated that, "[i]f the mineral deposit contains a metal chemically and physically akin to the primary metals and is worked essentially for the production of that metal which is extracted and used in the trades as such, the deposit should be classified as metalliferous." *Consolidated Ores Mines Co.*, 46 L.D. 468, 471 (1918).

The Board applied this standard in the *Hoover* case to the pozzolan claims and concluded that claimants intended to use the material "as a component of cement rather than as ore to be processed" and intended to "produce and sell pozzolan as a nonmetalliferous mineral, and did not intend to use the mineral as raw ore" to produce metals. *Hoover*, 99 IBLA at 294. Accordingly, BLM's decision invalidating the claims was upheld. *Hoover* and *Consolidated Ores* considered the physical and chemical qualities of the ore and not whether a "valuable mineral deposit," within the meaning of the mining law, was present on the claims.

Plaintiffs complain that Eureka Moly will not "mine" these claims, but will use them for mine support facilities, including waste rock storage. Mtn. pp. 13-14. But the mining law authorizes not only exploration for and removal of minerals, but also use of federal lands for uses "reasonably incident" to mining, such as storage of waste rock or tailings. *See* 43 C.F.R. § 3809.5 ("Operations" includes "all functions, work, facilities and activities on public lands in connection with prospecting, exploration, discovery and assessment work, development, extraction and processing of mineral deposits locatable under the mining laws . . . and all other reasonably incident uses whether on a mining claim or not . .").

The application of the mining law to such uses was considered in detail in the 2020 Solicitor's Opinion, which concluded that a valid mining claim was not a condition precedent to reasonably incident mining uses on open lands. Ex. 4 (2020 Solicitor's Opinion p. 13). The opinion explained that:

> All stages of mineral development involve removal of minerals and reasonably incident mining uses—even those stages that occur before "discovery" and after a mining claim has been "mined out."  . . . As a practical matter, requiring a discovery of a valuable mineral deposit before allowing any reasonably incident mining uses, including the removal of any minerals, puts the cart before the horse, since such uses and removal are necessary to make a discovery. If entering open lands to explore for and develop minerals is considered "unauthorized" unless or until miners have proven a discovery of a valuable mineral deposit, they could not, as a practical matter, ever discover a valuable mineral deposit and all mining would be effectively prohibited. Such an outcome was clearly not the intent of Congress . . .

*Id.* at p. 13-14 (citations omitted).

Plaintiffs' reading of the law would create the Catch-22 described in the Solicitor's Opinion for all exploration and mining on PWR 107 lands. The statutory requirement that such lands remain "open to the mining laws" for metalliferous minerals would be rendered a nullity.

### 2.    BLM Properly Evaluated Potential Impacts to PWR 107 Springs and Required Appropriate Mitigation.

The FEIS described and required a site-specific mitigation plan for each spring that might be impacted by the Mount Hope project. Mitigation Measure 3.2.3-3.2a identified specific mitigation plans for the two perennial stream segments and 22 perennial or potentially perennially

springs sites that might be affected by the Mount Hope Project. AR049891 (FEIS p. 3-88). Those measures are described and evaluated for **all** potentially impacted springs, including the four eligible PWR springs in FSEIS Table 3.2-9. AR049895-049908 (FEIS Table 3.2-9). For each spring, the table includes a site characterization, a description of the use of the spring, a mitigation trigger, a contingency mitigation plan and an evaluation of the effectiveness of the site-specific plan. *Id.* For example, Garden Spring is described as "two adjacent ponded sources of water . . with piping and an old trough downgradient" that provides water for livestock, horses and wildlife. The mitigation plan would pipe replacement water to "provide a perennial water supply for livestock, wildlife and wild horse uses." *Id.* Mitigation measures for the other small springs are similar—a small amount of water (*see supra* p. 8) would be piped to a trough or pond that would be improved or reconstructed to provide water for livestock and wildlife.

BLM also considered specifically how the mitigation measures on Table 3.2-9 would mitigate the potential impacts to existing water sources for livestock (the purpose of the PWR 107 springs) and incorporated those measures into a separate mitigation measure for impacts to livestock water sources:

> Mitigation Measure 3.12.3.3-3: Mitigation for the potential loss of water availability for livestock from stock water rights and other surface waters are describe in the Water Resources – Water Quantity Impacts discussion (Mitigation Measures 3.2.3.3-2 and 3.2.3.3-3). Implementation of any of the specific mitigation measures for springs located on private land would be subject to the authorization of the private land owner. Mitigation for loss of water available would also mitigation the loss of vegetation (livestock forage). Additionally, where livestock and wild horse use overlap those mitigation measures identified for wild horses (Mitigation Measure 3.13.3.3-1) would also benefit livestock.

AR050199 (FEIS p. 3-425).

Plaintiffs argue that all lands and waters associated with PWR 107 springs must be held inviolate from any impact. Mtn. pp. 9-12. But that is not what the law requires. BLM's policy and specific guidance on managing PWR 107 sites is set forth in BLM's Water Rights Manual. Ex. 5 (BLM 7250-Water Rights Manual (Sept. 30, 2013), attached). BLM has complied with its own guidance and Plaintiffs cite no contrary authority.

1    The objectives of the BLM water rights program are to: "[p]rotect Federal reserved water

2    rights and water rights obtained through state-based administrative and judicial systems." *Id.* at p.

3    1-1. In granting land use authorizations to third parties, such as the approval of a mining plan of

4    operations, BLM is directed to ensure that such authorizations "contain appropriate terms and

5    conditions to protect water rights administered by the BLM and water uses implemented by the

6    BLM." *Id.* at p. 1-6.[7]

7    BLM's evaluation of potential impacts, development of site-specific mitigation measures

8    and decision to require implementation of a site-specific mitigation plan based on specified

9    monitoring triggers for all potentially impacted seeps and springs provides the "appropriate terms

10   and conditions" and is fully consistent with agency guidance in the BLM Water Rights Manual.

11   The purpose of Section 10 of the Stock-Raising Homestead Act of 1916 ("SHRA"), as

12   implemented by the 1926 Executive Order was to withdraw entry to springs "so that a person

13   cannot monopolize on control a large territory by locating as a homestead the only available water

14   supply for stock in the vicinity." House Committee on Public Lands, Rep. No. 35 (Jan. 11, 1916),

15   64th Cong., 1st Sess.. Plaintiffs cite no law, regulation or other authority that precludes BLM

16   from achieving that purpose through mitigation.[8] In the case of the Mount Hope springs, BLM

17   went beyond the narrow purposes of PWR 107 and required mitigation to achieve multiple

18   purposes: livestock grazing, wildlife and wild horses. Plaintiffs' view would freeze the status of

19   every spring on the public range as of 1926. BLM could take no action, under the mining

20   regulations or any of its other multiple use authorities, that would affect a spring or the lands

21   around it. Plaintiffs argue, without citation, that BLM must "prevent any impairment" of the PWR

22   107 reserved water rights, Mtn. p. 9, but fail to describe how BLM's decision, including the site-

---

23   [7]    The Manual also describes how, in appropriate circumstances, BLM may relinquish or
24   dispose of federal reserved water rights. *Id.* at p. 1-10. Plaintiffs' references to an absolute
     standard of protection for any and all potential rights is without any legal support.
25

26   [8]    Plaintiffs argue that BLM cannot dispose of federal water rights, Mtn. p. 9, but BLM is
27   doing no such thing at Mount Hope. Impacts to springs, without regard to whether BLM holds a
     reserved water right, must be mitigated. The uses of that "federal" water are protected in every
28   case.

specific mitigation measures for each spring, causes such impairment. Plaintiffs obviously disagree strongly with BLM's decision to authorize construction of mine facilities near eligible springs but fail to identify any unnecessary or undue impact given the mitigation requirements.

BLM also continues to provide access to all springs for livestock watering and wildlife. Once again, there is nothing in SHRA Section 10 that says BLM, a livestock permittee, or a third party acting under a use authorization (such as a mining plan of operation) can't improve or move the water source to provide continued access. In each and every case, BLM's mitigation measures provide access for continued use of the springs in the same manner as before the mine plan was approved.

### D. BLM complied with NEPA.

"[A] Court's role is to ensure that NEPA's procedural requirements have been satisfied, not to 'interject itself within the area of discretion of the executive as to the choice of action to be taken.'" *Fund for Animals v. Kempthorne*, 538 F.3d 124, 137 (2nd Cir. 2008) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). Plaintiff raises three NEPA challenges, based on (1) background baseline for air emissions, (2) the air emissions cumulative effects analysis, and (3) mitigation and "related project impacts." All three challenges lack support.

### 1. BLM explained its selection of baseline values for air quality modeling and analysis.

Plaintiffs argue the supplemental environmental analysis performed by BLM did not "obtain any data regarding the existing baseline levels of air pollutant levels at or near the Project site." Mtn. p. 29. But this argument misstates the prior decision and direction from the Ninth Circuit—its instruction was to "provide [] support for its use of baseline values of zero for several air pollutants."[9] AR054614 (Ninth Circuit Decision p. 14). The Ninth Circuit did not require

---

[9]    As noted earlier, the Ninth Circuit rejected GBRW and WSDP's arguments that it was unreasonable for the BLM to use data from Great Basin National Park to establish baselines for 2.5-micron particulate matter because the BLM had explained its choice adequately and its explanation was reasonable. AR054610. And the Ninth Circuit discussed *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016), which held it is not impermissible for BLM to estimate baseline conditions in one area by extrapolating from another area). AR054609. In spite of

PARSONS
BEHLE &
LATIMER

16620.047\4863-9126-8613 v1

BLM to collect any new data and stressed that it may have reached a different conclusion had the NDEP official explained why an the zero value was appropriate, or had the BLM independently scrutinized that estimate and decided that it was reasonable and then explained why AR054613 (Ninth Circuit Decision p. 13); BLM performed both those tasks in its supplemental environmental analysis, providing both explanation of why an estimate of zero was appropriate and independent scrutiny of that estimate with an explanation of why it was reasonable.

The FSEIS explains that BLM again contacted NDEP Bureau of Air Quality Planning (BAQP) to obtain representative background concentration for modeling analysis and provided recommended background concentrations in Table 3.6-1. AR066138-066139 (FSEIS pp. 24-25). The BAQP again recommended assuming zero background for CO, $NO_2$, and $SO_2$ for unmonitored rural areas similar to the Project Area. AR066139 (FSEIS p. 25). This assumption is further explained in Appendix C to the FSEIS, which is April 17, 2017 correspondence between BAPC and BLM. AR066180-066181 (FSEIS App'x C). BAQP explains that "ambient monitoring is sparse and seldom representative on large special scales," and while a monitoring network exists, there are no monitors for the specified pollutants in remote areas like the Project area. AR0066181 (FSEIS App'x C). Second, "[h]uman activities in the remote areas of Nevada are considered to be an insignificant influence to ambient air quality." *Id.* To the extent that these pollutants "are generated by anthropogenic activities, their background concentrations are not significantly different from zero when used for modeling purposes." *Id.* The BAQP stressed that the background concentrations used by BAQP for these pollutants have successfully been used in air dispersion modeling for permitted stationary sources within Nevada for many years and meets its affirmative responsibility to maintain or improve air quality using zero background concentration for the pollutants in remote areas. *Id.* Therefore, BAQP explained why the selection of a zero background concentration for air emissions was reasonable and appropriate for the air quality analysis for the Mount Hope project.

---

Plaintiff's arguments to the contrary, this acceptance of data and caselaw makes clear that BLM was not required to develop independent site-specific data for this analysis.

BLM performed additional scrutiny of that estimate and described why it was reasonable. The April 7, 2017 Air Sciences, Inc. (a BLM contractor) analysis discussed the technical rationale for a zero baseline (or background) concentration for all pollutants except for particular matter. AR054666 (Air Sciences Report). The air analysis reviewed the geographic location and nature of the Project area (pristine, rural, with no development or major roads in the immediate vicinity), along with the results from ambient monitoring stations collecting air quality data (concluding that the majority of such monitoring stations are located near urban settings or near relatively highly populated areas). AR054669 (Air Sciences Report). The FSEIS evaluated 34 separate air quality monitoring states in Nevada and identified only four ambient monitoring stations located relatively away from major population centers, but the four stations were too influenced by urban, traffic, and power plant emissions to be representative. AR066140-066146 (FSEIS pp. 26-32). In an effort to determine representative background concentrations for pristine rural areas, the analysis was expanded to include monitoring stations located away from population centers within a reasonable distance of the Nevada Border, including Yosemite and White Mountain in California. *Id.* The monitored concentrations of $CO$, $NO_2$, and $SO_2$ were below EPA-established significant impact levels ("SILs"). *Id.* Therefore, "estimating a zero baseline concentration for $CO$, $NO_2$, and $SO_2$ standards for rural Nevada in accordance with guidance from NDEP-BAPC is reasonably justified by the best available representative monitoring data and trends shown herein." AR066148 (FSEIS p. 34).

Both the NDEP and BLM analyses were incorporated into and explained in the FSEIS. AR066148-066149 (FSEIS pp. 34-35). The FSEIS explains, "[i]n consideration of the concentration data provided in Table 3.6-4, these concentration values illustrate why estimating a zero baseline concentration for $CO$, $NO_2$ and $SO_2$ standards for rural Nevada, in accordance with guidance from NDEP-BAQP, is reasonably justified by using the beset available representative monitoring data and trends (NDEP BAQP 2017; Appendix C)." *Id.* Therefore, the supplemental environmental analysis responded directly to the Ninth Circuit's remand instructions and was based on "accurate information and defensible reasoning." *Or. Nat. Desert Ass'n*, 840 F.3d 562 at 570.

1

2     **2.**  ***BLM properly analyzed potential cumulative impacts to air quality.***

3    Plaintiffs argue that BLM "refus[ed] to analyze the reasonably foreseeable air pollution

4 from the oil and gas and other activities in the Project area." Mtn. p. 31. That is incorrect. The

5 adequacy of the agency's discussion here is guided by the "rule of reason test" to determine

6 whether the discussion of cumulative impacts is "reasonably thorough" and would allow an

7 agency decision-maker to make an informed decision. *See Westside Property Owners v.*

8 *Schlesinger*, 597 F.2d 1214, 1217 (9th Cir. 1979). But this analysis does not require the agency to

9 quantify impacts from relatively insignificant projects or actions. *See Bering Strait Citizens for*

10 *Responsible Resource Development v. U.S. Army Corps of Engineers*, 524 F.3d 938, 954-55 (9th

11 Cir. 2008) (an environmental analysis does not always need to consider all cumulative effects,

12 especially those from relatively insignificant projects or actions); *Wilderness Watch, Inc. v.*

13 *Bureau of Land Management*, 799 F.Supp.2d 1172, 1182-83 (D. Nev. 2011).

14    In direct response to the Ninth Circuit's instructions, the April 7, 2017 analysis by Air

15 Sciences, Inc. looked at impacts from two different approved or likely mining projects near the

16 Project—the Gold Bar project (7 miles west of the Project) and the Ruby Hill project (15 miles

17 southeast)—concluding that "because of these distances, it was estimated that the air impacts

18 from these projects at the Mt. Hope project would be insignificant." AR056624 (Air Sciences

19 Report). To verify this estimate, a separate quantitative modeling analysis was performed to

20 determine the cumulative impacts of the combined emissions from the Mt. Hope, Gold Bar, and

21 Ruby Hill projects. *Id.* The modeling showed total ambient concentrations that include the Mt.

22 Hope Project impacts, the Gold Bar and Ruby Hill impacts, together with estimated background

23 concentrations, to be below the National Ambient Air Quality Standards ("NAAQS") for each

24 pollutant and averaging period. *Id.* In its analysis of present emissions within the Cumulative

25 Effects Study Area ("CESA"), BLM included mining-related activities like the generation of

26 fugitive dust (from blasting, exploration drilling, road building, haul truck operations, and mining

27 operations). AR066150 (FSEIS p. 36).

28

PARSONS
BEHLE &
LATIMER

16620.047\4863-9126-8613.v1

Additionally, BLM included emissions from processing facilities and the burning of fossil fuels by heavy equipment and other vehicles, travel on dirt roads, recreation, and wildland fires. *Id.* BLM chose not to include an estimate of emissions from potential oil and gas developments because that development was unlikely:

> In response to the remand from the Ninth Circuit Court of Appeals, the BLM confirmed that there are no oil and gas developments in the CESA, and vehicular emissions are generally considered included in background concentrations and are not specifically included in air models for NEPA analysis. The State has determined that the background values for $NO_2$, $SO_2$, and CO in this part of Nevada are zero due to the very dispersed nature of emission sources.

*Id.* In analyzing the Mt. Hope, Gold Bar, Ruby Hill, and Prospect Mountain Mine (which are the major sources of criteria pollutants within the CESA), the BLM then quantified emissions using the NEPA documents for those projects and conducted modeling analysis with emissions and source parameters for all four projects. *Id.* The results from that modeling analysis are summarized in Table 4.1-1 of the FSEIS. AR066151. The "total ambient concentrations that include the Project impacts, the nearby Gold Bar, Ruby Hill, and Prospect Mountain (Gulsil, LLC) impacts, and background concentrations,[10] are below the NAAQS for each pollutant and averaging period. *Id.* The table also demonstrates the "impacts from sources within the CESA are cumulatively negligible" due to the distance between projects and localized emissions. *Id.* BLM's final conclusion on this point was that the air impacts "from the Proposed Action, in combination with air impacts from past and present actions, and RFFAs, would result in total impacts below the NAAQS," a conclusion consistent with the cumulative air impacts from the 2012 FEIS. *Id.*

The specific issue that Plaintiffs have raised in this appeal appears to be that the 2012 FEIS listed oil and gas projects, along with other agricultural, commercial, and other activities and reasonably foreseeable future actions. Mtn. p. 22. But Plaintiffs take issue with the fact that

---

10    In this regard, BLM took into consideration its additional explanation and analysis of the zero baseline for air emissions in the Project area, therefore addressing the Ninth Circuit's point about the baseline data as it related to cumulative air impacts. *See* AR054617-054618.

no projected emissions from oil and gas projects were included in the cumulative air analysis (or other unidentified projects), and ignore that: first, in 2012, the agency identified potential oil and gas development in the area, but determined it was not within the CESA and not worth quantifying, and second, seven years later, the agency revisited the question and came to the same conclusion. To the first point, the 2012 FEIS expressly discussed the history of oil and gas projects in and around the CESA, along with the fact that no wells had gone into production since at least 1946, and no exploration wells had even been drilled since 2004.[11] AR050506-050507 (FEIS pp. 4-47, 4-48). Second, in response to a GBRW comment that argued BLM failed to adequately calculate cumulative air emissions within the air quality CESA, the agency responded that:

> BLM confirmed, through the lack of any Applications for Permit to Drill since 2012, that there were no oil and gas developments within the Air Quality CESA in the future. Although the 2012 Final EIS stated there was a moderate to high potential for oil and gas development, the BLM has now revised its opinion to conclude that there is a low probability and thus the BLM did not include such in the revised air quality modeling for the Final SEIS.

AR066206 (FSEIS App'x D); *see also* AR066150 ("In response to the remand . . . the BLM confirmed that there are no oil and gas developments in the CESA, and vehicular emissions are generally considered included in the background concentrations and not specifically included in air models for NEPA analysis."). Plaintiff fails to identify any non-oil and gas projects that the BLM should have taken into consideration.

On the oil and gas lease issue, the Ninth Circuit requires "reasonably foreseeable" actions that have potential cumulative impacts to be addressed in the EIS. *See Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998). The selection of such actions by the agency is guided by the "rule of reason." *See Bering Strait Citizens for Responsible Resource*

---

[11]    Plaintiffs' argument is littered with misrepresentations to the Court. For example, Plaintiffs represent that Table 4-2.2 is titled "Activities That May Cumulatively Impact *Air* Resources," (Mtn. p. 22:27-28 (emphasis added)) when Table 4-2.2 is actually titled "Summary of Activities that May Cumulatively Affect Resources," and lists potential actions that may impact *all resources*, not just air. AR050475-050477 (FEIS p. 4-10 through 4-12.)

*Development*, 524 F.3d at 954-55 (9th Cir. 2008). This Court recently considered a similar argument from the Center for Biological Diversity and highlighted the distinction between the impacts of issuing leases and the development of surface disturbing infrastructure, recognizing that the leasing stage is the earliest stage in development and therefore "there is no way of knowing what plans for development, if any, may materialize." *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 3:17-CV-553-LRH-WGC, 2019 WL 236727, at *5 (D. Nev. Jan. 15, 2019), on reconsideration in part, No. 3:17-CV-553-LRH-WGC, 2019 WL 3848788 (D. Nev. Aug. 15, 2019) (quoting *Northern Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 974 (9th Cir. 2006)). "[I]f not enough information is available to give meaningful consideration now, an agency may not be invalidated based on the failure to discuss an inchoate, yet contemplated, project." *Environmental Protection Information Center. v. U.S. Forest Service*, 451 F.3d 1005, 1014 (9th Cir. 2006). Here, BLM did not to speculate on the potential air emissions from inchoate, yet to be completed projects and engaged in a reasonably thorough evaluation to guide its decision-making.

Instead, the BLM properly distinguished between applications for or approvals of leases and applications for permits to drill, concluding surface disturbance was unlikely due to the lack of any applications for permits to drill in the CESA since 2012. AR066206. Plaintiffs criticize BLM for failing to analyze potential cumulative air pollutants from exploration and/or development on these leases, but neglects to recognize that BLM must prepare an EA/FONSI or EIS for each stage of the oil and gas drilling process: leasing, exploration, and production and development. *See Center for Biological Diversity*, 2019 WL 3848788, at *6 (discussing oil and gas leasing stages in *Village of False Pass v. Clark*, 733 F.2d 605, 614 (9th Cir. 1984)). The existence of leases does not equate to emissions from exploration and drilling as those stages must be separately permitted; BLM determined no applications to drill were on the horizon and therefore elected not to include them. Indeed, BLM is not required to "invent other actions or pretend that other actions will have cumulative impacts in order to generate a sufficiently lengthy or impressive cumulative impacts section," and can "succinctly but adequately discuss the

PARSONS
BEHLE &
LATIMER

cumulative impacts of the project," as it has done here. *See Wilderness Watch, Inc.*, 799 F. Supp. at 1183.

And BLM's consideration of reasonably foreseeable development scenarios for oil and gas leasing is inapposite to the environmental analysis here; for example, in the 2019 EA that Plaintiffs rely upon, BLM explained that an "oil and gas lease sale does not involve a specific project proposal, but rather is a first step in making certain lands available for future oil and gas development," which requires the BLM to make certain assumptions "based on current exploration and development trends and projections." ARSUPP000158 (2019 Battle Mountain District Competitive Oil and Gas Lease Sale, Environmental Assessment). It was reasonable for BLM to evaluate the impacts of an oil and gas development scenario in this context, even if it was, as a practical matter, unlikely. This scrutiny is not analogous to the analysis BLM performs in the cumulative effects/reasonably foreseeable future actions portion of a project-specific hard rock mining EIS. *See Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 962 (9th Cir.2003) (recognizing that the scope of the EIS is a "delicate choice" and should be entrusted to the agency but the agency must have "considered the relevant factors and articulated a rational connection between the facts found and the choice made") (citation omitted); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 513 (D.C. Cir. 2010) (concluding two oil and gas projects whose notices of intent had just been filed did not need to be included in the cumulative effects analysis for an oil and gas EIS because they were "too preliminary to meaningfully estimate."). Therefore, BLM considered the relevant factors in oil and gas lease development and rationally articulated that these projects were unlikely to come to fruition, therefore excluding them from the cumulative effects analysis.

### 3.    *Plaintiffs' remaining NEPA arguments do not require the Court's consideration.*

Plaintiffs make two additional NEPA arguments lacking merit: (1) that BLM failed to consider cumulative impacts to water quality as a result of "the acknowledged reasonably foreseeable oil and gas operations around Mt. Hope" (Mtn. p. 27), and (2) that BLM failed "to fully analyze mitigation measures, their effectiveness, and any impacts that might result from

their implementation" (Mtn. p. 31). In both arguments, Plaintiffs seek to impose burdens on BLM that are not required by law.

On the first issue, cumulative impacts to water, the Court can dispense with this issue because it was not an identified error nor a subject of the Ninth Circuit remand. The Ninth Circuit only remanded on the cumulative effects analysis for air quality impacts. Plaintiffs' attempt here to revive arguments related to the 2012 FEIS that could have been brought in its previous appeal and were not, while simultaneously expanding the agency's required scope of analysis should be summarily denied under claim preclusion doctrine.[12] *See Cell Therapeutics, Inc. v. Lash Group*, 586 F.3d 1204, 1212 (9th Cir. 2009) (outlining three elements of claim preclusion, which bars a subsequent suit on claims that were raised or could have been raised in a prior action—first, identity of claims, second, a final judgment on the merits, and third, identity or privity between the parties); *see also Lathman v. Burdette*, 366 F.3d 774, 783 (9th Cir. 2004) (claim preclusion bars re-litigation of issues actually litigated in a prior suit as well as issues that could have been litigated in the prior action).   In any event, BLM's conclusion not to include oil and gas development in cumulative impact analysis to water quality is justified by the same rationale that was used for air quality analysis.  Such development was unlikely.

On the second issue, alleged failure to analyze mitigation measures, Plaintiffs similarly seek to expand the scope of the remand to evaluate the sufficiency of the mitigation plan; GBRW and WSDP raised the issue of the pit lake mitigation with the Ninth Circuit, which rejected their arguments. AR054618-054622 (Ninth Circuit Decision pp. 18-22). Now here, Plaintiffs take issue with the mitigation for seeps and springs outlined in the 2012 FEIS and ROD, before pivoting to the limited supplemental discussion of mitigation for potential PWR spring impacts in the 2019 FSEIS and ROD. *See* Mtn p. 31-35; AR 066129-066132 (FSEIS pp. 15-18). That mitigation and

---

[12]    And without the aid of a time machine, the BLM could not have considered the matters outlined in a 2019 environmental assessment on oil and gas leases when it engaged in the original environmental analysis in 2012. The Ninth Circuit's limited remand was not an invitation for Plaintiffs to wholesale reopen the NEPA process.

monitoring plan is outlined in Section 2.1.15 and Appendix C of the 2012 FEIS. AR066132 (FSEIS p. 18).

The Ninth Circuit declined to reach this claim; if the Court is inclined to revisit this argument,[13] Plaintiffs' arguments still fail.[14] Plaintiffs claim that no water mitigation plans will be developed, considered, or implemented until after impacts occur and that BLM failed to analyze the effectiveness of the potential mitigation. Mtn. p. 32. Plaintiffs' argument is incorrect because the FEIS describes and analyzes the effectiveness of specific water resource mitigation plans and measures, including monitoring that will trigger implementation of identified mitigation measures, if necessary. The FEIS contains a detailed examination of potential dewatering impacts to all streams and springs and groundwater within the Project area. AR049827-49972 (FEIS pp. 3-4 to 3-182). BLM used two three-dimensional ground water flow models developed by the U.S. Geological Survey ("U.S.G.S."), one that is regional in scope and the other focused on the immediate vicinity of the Project facilities, to assess the Project's water use impacts. AR049874-49875 (FEIS pp. 3-65 to -66). BLM uses the ten-foot drawdown contour from the regional model to assess dewatering impacts because the ten-foot value was determined "to be commensurate with the predictive qualities and uncertainties associated with this particular model."  AR049881

---

[13]     The Ninth Circuit indicated that minor errors may exist because the groundwater pumping in the FEIS did not take into account the roughly 200 gallons per minute needed to replace depleted spring and stream water (assuming all mitigation measures were implemented), the error was quite small and probably harmless. AR054628 (Ninth Circuit Decision p. 28). EML agrees this error was harmless, because this error, if there was one, did not cause BLM not to be fully aware of the environmental consequences of the proposed action, thereby precluding informed decisioning or public participation, or otherwise materially affected the substance of the BLM's decision. AR054628-054629 (Ninth Circuit Decision pp. 28-29). Indeed, in response to this re-raised point in comments, BLM responded that in the 2012 FEIS, BLM identified three major impacts to surface water quantity, AR049872 (2012 FEIS. Section 3.2.3.1.1, p. 3-62), and that the mitigation proposed in the 2012 FEIS, AR049895-049908 (Section 3.2.3.3.1, Table 3.2-9, pp. 3-93 through 3-106), were designed to address those identified impacts. Plaintiffs have offered no argument in their revised briefing on the harmlessness issue.

[14]     Because PLAN did not participate or comment on the original environmental analysis, it lacks standing argue this point. *See City and County of San Francisco v. U.S.*, 615 F.2d 498, 502 (9th Cir. 1980) (party may not assert claim initially in litigation); *Sierra Club v. Penfold*, 857 F.2d 1307, 1315-16 (9th Cir. 1988) (applying statute of limitations under APA to NEPA claims).

(FEIS p. 3-73). For the FEIS, the area of potential impact to surface waters is synonymous with the modeled ten-foot drawdown contour. AR049881 (FEIS p. 3-73).

BLM's decision to consider every surface water within the 10-foot drawdown contour was conservative because the modeling was linked to mine induced drawdown in the regional aquifer. "The actual impacts to individual stream reaches or springs would depend on the source of ground water that sustains the flow (perched or hydraulically isolated aquifer versus regional ground water system) and the actual extent of mine-induced drawdown that occurs in the area. The interconnection (or lack thereof) between surface water features and deeper ground water sources is controlled in large part by the specific hydrogeologic conditions that occur at each site." AR049891 (FEIS p. 3-88).

Further, the FEIS requires EML to comply with a detailed monitoring plan that will provide early warning of potential adverse impacts. AR050689-50708 (FEIS Vol. III, Appx. C (Water Resource Monitoring Plan, "Monitoring Plan")). Mitigation is not delayed until flows cease. Instead, the FEIS describes site-specific triggers and mitigation plans for each of the 22 springs and two streams that are within the predicted ten-foot drawdown area.[15] AR049891-49892, 49895-59908, 50715-50717 (FEIS Table 3.2-9, pp. 3-88 to 3-89, 3-93 to 3-106; FEIS Vol. III, Appx D (D4-D6)). If monitoring shows impacts from pumping for the Project, then EML must implement the applicable mitigation measure described in the FEIS. AR049891-49893 (FEIS pp. 3-88 to 3-90). These specific mitigation measures describe mitigation "triggers," *i.e.*, the particular results from monitoring efforts that would trigger implementation of the mitigation measures. AR049895-49908 (FEIS pp. 3-93 to 3-106). The triggers are ground water levels, surface water flows, and vegetation changes. AR049895-49908 (FEIS pp. 3-93 to 3-106). For each water resource, the FEIS describes the mitigation plan and analyzes the effectiveness of each measure. AR049895-49908 (FEIS p. 3-93 (Table 3.2-9)). The FEIS contains a fourteen-page table that includes an assessment of the effectiveness of mitigation measures for each of the twenty-

---

[15]    Similar mitigation measures will be applied to springs or streams that are outside the predicted drawdown area if monitoring shows that they are being impacted by EML's groundwater pumping. AR049891 (FEIS p. 3-88).

four different water resources. *Id.* BLM analyzed the impact of these site-specific mitigation measures and determined that up to 37.2 acres would be disturbed and up to 302 acre-feet-annually would be needed to provide a substitute source of water if mitigation has to be implemented for every single surface water source identified in the mitigation plan. AR049892, 49894 (FEIS p. 3-89, Figure 3.2.21).

Plaintiffs assert that the FEIS does not describe the source of the substitute water or the effect of using it for mitigation. As stated above, however, the FEIS states that the substitute water would initially come from EML's existing groundwater rights if EML does not obtain additional water rights specifically for mitigation water. AR049892 (FEIS p. 3-89). And because the FEIS thoroughly analyzed the effect of using water from EML's production wells, the effect of supplying substitute water was also thoroughly analyzed. Accordingly, the FEIS adequately reviewed the source of substitute water and the effect of using it to mitigate adverse impacts to existing water sources. Plaintiffs go to great lengths to emphasize that the project will "pump and remove massive amounts of water from the regional aquifer." Mtn. p. 4. Plaintiffs note that combined pumping from the at the well field will range from 10,550 to 11,300 acre-feet per year coupled with 750 acre-feet for year of pit pumping. Mtn p. 4. BLM's acknowledgement that water for mitigation, which is typically a few gallons per minute, can be taken from other mining uses, is eminently reasonable.

Next, the FEIS describes and analyzes site-specific mitigation plans for each of the seven wells that are within the predicted ten-foot drawdown area. AR049910-49912, 50717-50718 (FEIS pp. 3-108 to 3-111, Vol. III Appx. D at D6-D7). If dewatering impacts a well, EML must pay the water right holder for the incremental cost of pumping from a lower groundwater level, lowering the pump in the well, deepening the well, or provide a substitute source of water. AR049910-49913 (FEIS pp. 3-108 to 3-112).

Further, the FEIS addressed potential impacts that may occur outside of the ten-foot drawdown area. If dewatering causes impacts to springs, streams, or wells located outside the predicted ten-foot drawdown area, then the FEIS requires EML to develop and implement site-specific mitigation plans for each affected source using the surface water or groundwater

mitigation measures described above. For example, BLM may require EML to reduce or stop pumping from a production well or to supply a substitute source of water by piping water from EML's production wells, installing a guzzler, or hauling water. AR049892-49893 (FEIS pp. 3-89 to 3-90). Therefore, while there are specific mitigation plans for all seeps, spring or wells within the area where the modeling predicted that impacts could occur, even impacts that might occur outside of the predicted impact area are subject to mitigation. *Id.*

Lastly, BLM reviewed the effectiveness of surface water mitigation and determined that it would be effective because it was designed to restore or enhance water flow, has proven effective on public lands in Nevada in the past, and would be reviewed by BLM through the mandatory monitoring requirements set forth in the FEIS. AR049893 (FEIS p. 3-90). BLM also reviewed the effectiveness of groundwater mitigation and determined that it would be effective because the mitigation measures require financial compensation or replacement of water and would be reviewed and assessed by BLM after being implemented. AR049913 (FEIS p. 3-112). Plaintiffs again disagree with BLM, but nothing in the record supports their assertion that mitigation would not be effective, and NEPA does not require that BLM choose the option preferred by Plaintiffs.

Accordingly, Plaintiffs' claim fails because they cannot demonstrate that BLM acted arbitrarily or capriciously. NEPA requires that BLM follow a process to analyze impacts and mitigation, which BLM has done. The administrative record supports the FEIS and demonstrates BLM took a "hard look" at water resources mitigation.

**E.      BLM complied with its duties under FLPMA.**

Plaintiffs next summarily argue BLM violated FLPMA, first reiterating issues related to unnecessary or undue degradation of water and air resources that were previously unsuccessful, and (2) raising issues with bonding lack any basis in law or fact. EML addresses these arguments in turn.

1.      ***BLM prevented unnecessary or undue degradation of public resources.***

Yet again, Plaintiffs re-package their NEPA claims in terms of FLPMA, arguing the Project will violate FLPMA's prohibition against unnecessary or undue degradation of public resources. Plaintiffs allege (1) the Project will degrade PWR 107 and (2) inadequate study of air effects constitutes unnecessary or undue degradation. Mtn. p. 36. These arguments did not find a foothold before, and they do not now.

FLPMA requires that "[i]n managing the public lands, the Secretary [of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 302(b). BLM complies with Section 302(b) by requiring the project applicant to submit a plan of operations for review under BLM's surface management regulations. 43 C.F.R. Subpart 3809. These "3809 regulations" define "unnecessary or undue degradation" ("UUD") in this context to require that the mine operator comply with (1) performance standards in the 3809 regulations, (2) the terms and conditions of an approved plan of operations, and (3) other Federal and state laws related to protection of environmental and cultural resources. 43 C.F.R. § 3809.9. The approved activities must also be "reasonably incident" to prospecting, mining or processing operations. *Id.* Citing these regulations, in a nearly identical case, the Ninth Circuit defined UUD "as any harmful activity that is either not 'reasonably incident' to an approved mining operation or that violates a state or federal law relating to environmental or cultural resource protection." *South Fork Band v. U.S. Dep't of Interior*, 588 F.3d 718, 723-24 (9th Cir. 2009).

Plaintiffs argue that BLM's issuance of the ROD degrade and eliminate PWR 107 waters and lands, and therefore constitutes UUD. Mtn. p. 36. But the four PWR springs identified by BLM are also included in the mitigation plans. BLM concluded that no PWR 107 waters would be adversely affected by the project. AR049885 (FEIS p. 3-79). Plaintiffs disagree, but BLM's requirement for monitoring and mitigation applies to all potentially affected perennial surface waters, including PWR 107 waters, and monitoring and mitigation requirements are already in place.

And the Court need not address the throwaway inclusion of the air quality analysis in Plaintiff's FLPMA section, as it is not supported by any argument, authority, or evidence. The BLM evaluated, reevaluated, and then again reevaluated the data and background values for the analysis of different air pollutants, checked them against similar environments, and concluded they fell within applicable standards.

**2.      BLM approached the Project's reclamation costs and financial consistent with the applicable regulations.**

Finally, BLM required that EML provide a financial guarantee covering the estimated costs to reclaim the proposed operations under the reclamation plan consistent with the applicable regulations. As Plaintiffs admit, BLM satisfied the requirements of 43 C.F.R. § 3809.554 when it issued the 2012 ROD: EML submitted a reclamation cost estimate (RCE) covering the activities in the proposed Plan of Operations, BLM accepted the RCE, and the 2012 ROD included the required reclamation cost determination of $73,360,363. Mtn, p. 37:25-38:4. The narrow supplemental environmental analysis and the 2019 ROD resulted in no material changes to the authorized activities, which was why the 2019 ROD reinstated the RCE. AR066835 (2019 ROD p. 26.) But here, Plaintiffs appear to regurgitate in FLPMA-terms an argument that the Ninth Circuit already rejected when it held that the FEIS's discussion of long-term mitigation and reclamation in the FEIS was reasonably complete and did not violate NEPA. AR054626 (Ninth Circuit Decision p. 26).

The Plan of Operations breaks the Project into four phases for purposes of calculating the financial guarantee.  No activities have been conducted on the site since 2013, and that work was covered by the "Phase 0" bonding. AR054331-054485 (2015 Amendment to the Plan of Operations Approval Determination of Required Financial Guarantee). If operations beyond Phase 0 are conducted, the cost of reclaiming those operations will be calculated and sufficient financial assurance will be required before operations will be allowed. AR054485 (Letter from NDEP specifying that revised reclamation plan and reclamation cost estimates must be provided to the State and BLM for review and approval a minimum of 12 months prior to creating surface

disturbances described in the four operational phases outlined in the Plan of Operations). Indeed, BLM may authorize posting of the financial guarantee covering a part of the operations so long as operations do not go beyond the activities specifically covered by the partial guarantee. 43 C.F.R. § 3809.553. BLM reviews the amount and terms of the financial guarantee for each increment of operations at least annually. *Id.*

Here, BLM allowed posting of the financial guarantee in part so long as EML's operations did not go beyond the activities specifically covered by the Phase 0 partial guarantee, and Plaintiffs have not alleged that EML's operations have done so. *See*, e.g., AR063461-063547 (October 2018 Update - Reclamation Cost Estimator for Project). And the 2019 ROD specifically requires EML "provide a financial guarantee consistent with the Plans of Operations" and establish a Long Term Funding Mechanism for post-reclamation obligations associated with the closure process of the Project. AR066835 (2019 ROD p. 26).

The procedural posture of the narrow supplemental environmental analysis performed on remand is inapplicable to the procedures and processes that Plaintiffs outline in their Motion; this was not a wholesale reconsideration of the Plan of Operations, but rather the agency performing additional analysis to "show its work." Mtn. p. 37-38. Accordingly, Plaintiff cites no legal or factual basis for its claim that BLM violated FLPMA in its determinations related to the Project's financial guarantees.

### III. <u>CONCLUSION</u>

BLM complied with the Ninth Circuit's narrow remand on clarification of the PWR eligibility of the identified springs, the reconsideration and use of assumed baseline values for certain pollutants in the air quality analysis, and reconsideration of the cumulative air quality impact analysis. That compliance does not invite a wholesale reevaluation of all aspects of the Project's approval process, yet that is what the majority of Plaintiffs' arguments request. On the arguments that are properly in front of this Court, Plaintiff has failed to demonstrate the agency acted in an arbitrary and capricious manner. The agency's decision making was guided by the rule of reason, its analysis on the remanded points provided substantial support for its conclusions

about the environmental effects of the Project, and the agency should be afforded appropriate deference on review. Accordingly, the Court should deny Plaintiffs' Motion for Summary Judgment, and grant EML's Cross-Motion for Summary Judgment, thereby affirming the agency's decision to approve the Project.

DATED this 4th day of February 2022.          PARSONS BEHLE & LATIMER

_/s/ Ashley C. Nikkel_
Jim B. Butler, Nevada Bar No. 8389
Ashley C. Nikkel, Nevada Bar No. 12838
50 W. Liberty Street, Suite 750
Reno, Nevada 89501
Telephone: (775) 323-1601
JButler@parsonsbehle.com
ANikkel@parsonsbehle.com

*Attorneys for Intervenor-Defendant Eureka Moly, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I am an employee of the law firm of Parsons Behle & Latimer and that on the 4th day of February, 2022, I filed a true and correct copy of the foregoing document, **DEFENDANT-INTERVENOR'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND CROSS-MOTION FOR SUMMARY JUDGMENT,** with the Clerk through the Court's CM/ECF system, which sent electronic notification to all registered users as follows:

Julie Cavanaugh-Bill, Esq.
Cavanaugh-Bill Law Offices, LLC
401 Railroad St., Ste. 307
Elko, Nevada 89801
julie@cblawoffices.org

Roger Flynn, *Pro Hac Vice*
Jeffrey C. Parsons, *Pro Hac Vice*
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
wmap@igc.org

Attorneys for Plaintiffs


Laura K. Granier, Esq.
Holland & Hart LLP
5441 Kietzke Lane, 2nd Floor
Reno, Nevada 89511
lkgranier@hollandhart.com

Attorneys for Defendant-Intervenor-Applicant
American Exploration & Mining Association

Leilani Doktor, Esq.
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C., 20044-7611
leilani.doktor@usdoj.com

Attorneys for Federal Defendants

         */s/ Roni L. Shaffer*
Employee of Parsons Behle & Latimer

PARSONS
BEHLE &
LATIMER

16620.047\4863-9126-8613.v1

1

## INDEX TO EXHIBITS

2

| Exhibit | Document | Pages |
|---------|----------|-------|
| 1 | Excerpt of Order of Determination dated January 31, 2020 | 94 |
| 2 | United States' Notice of Exceptions dated November 2, 2020 | 5 |
| 3 | 2005 M Opinion (37012) | 5 |
| 4 | 2020 M Opinion (37057) | 24 |
| 5 | BLM Water Rights Manual | 17 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARSONS
BEHLE &
LATIMER

16620.047\4863-9126-8613.v1