# **EXHIBIT A**

American Exploration & Mining Association's
Amicus Curiae Brief

Laura K. Granier, Esq (SBN 7357)
Erica Nannini, Esq. (SBN 13922)
HOLLAND & HART LLP
5441 Kietzke Lane, 2nd Floor
Reno, Nevada 89511
Tel: 775-327-3000
Fax: 775-786-6179
lkgranier@hollandhart.com
eknannini@hollandhart.com

*Attorneys for Defendant-Intervenor-Applicant American Exploration & Mining Association*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

GREAT BASIN RESOURCE WATCH; and WESTERN SHOSHONE DEFENSE PROJECT,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; U.S. BUREAU OF LAND MANAGEMENT; CASEY HAMMOND, Acting Assistant Secretary; and JON D. SHERVE, Field Manager of the BLM's Mount Lewis Field Office,

Defendants.

**Case No. 3:19-cv-00661- LRH-WGC**

**AMERICAN EXPLORATION & MINING ASSOCIATION'S AMICUS CURIAE BRIEF**

American Exploration & Mining Association ("AEMA") is a 127-year-old, 1,300-member national trade association representing members across the entire mining life cycle. More than 80% of AEMA members are small businesses or work for small businesses. AEMA members are actively involved in prospecting, exploring, mining, and mine reclamation and closure activities on Public Lands the Bureau of Land Management ("BLM") administers in every western state. Access to these lands for all mineral activities is critical to AEMA members. Many AEMA members engage in the "research and development" arm of the industry – exploration which leads to the discovery of minerals, development of future mines and an assured domestic supply of important minerals. The certainty of access to public lands open to location ("Open Lands") under the Mining Law and tenure of the right to use those lands for the entire mining lifecycle is of paramount importance. If a miner cannot use public lands for mining operations, including all surface uses reasonably incident to mining ("ancillary use"), exploration would be pointless because development will never occur. While Plaintiffs acknowledge the right to enter and occupy Open Lands to conduct exploration, they seek to eliminate the ability to use those lands for purposes reasonably incident to mining like storing waste rock (which must be removed to uncover the valuable minerals) and tailings (the materials left after the valuable minerals are removed). This would leave any mineral discovery undevelopable.

Plaintiffs' novel interpretation of the Mining Law would have a devastating impact on the mining industry, create substantial adverse economic and social impacts nationwide, and threaten our ability to develop domestic minerals like the molybdenum at the Mt. Hope Project and lithium, copper, and other minerals critical to national security, domestic technology and manufacturing sectors, and to build the clean energy infrastructure and manufacture the products and facilities needed to achieve the Nation's carbon emission reduction objectives. Similarly, Plaintiffs' erroneous read of PWR 107 and the Pickett Act would have broad implications as they describe "minimum 40 acres surrounding each spring" as withdrawn, ignoring the clear statutory mandate that lands PWR 701 withdrawn lands ***shall*** remain open for mining of metalliferous metals.

Congress, agencies, and the judiciary all have repeatedly recognized and emphasized the economic and social importance of mining supported under the Mining Law, 30 U.S.C. § 22 *et seq.* ("Mining Law"), and multiple amendments to it. According to the U.S. Geological Survey ("USGS"), in 2021, U.S. mines produced raw (non-fuel) mineral materials valued at $90 billion.[1] In addition to providing critical minerals and helping mitigate the nation's dependence on foreign minerals, mining provides state and federal revenues and thousands of high paying jobs.[2] In Nevada, approximately 14,600 people were directly employed by the mineral industry in 2021, with an average annual salary of $110,344.[3] Mining is an "economically vulnerable activity" with "significant capital risk." Andrew P. Morriss, et al., *Homesteading Rock: A Defense of Free Access Under the General Mining Law of 1872*, 34 Envtl. L. 745, 754 (Summer 2004) ("Homesteading Rock"). Discovering a mineral deposit that can be developed into a mine is a very high-risk, time consuming, expensive endeavor. An average of 1,000 mineral targets must be identified and evaluated to discover a single deposit that can be an economically viable mine. Nat'l Research Council, Nat'l Acad. of Scis., Hardrock Mining on Federal Lands, 247 (1999). Secure rights throughout the mining lifecycle are "critical to inducing investment in long-term mining operations." Homesteading Rock, at 754. If lands necessary to develop a discovery – for uses reasonably incident to and, necessary to development of the minerals – are inaccessible or unusable, no mining will ever occur. Plaintiffs seek to upend long-established Mining Law rights necessary to develop a mineral deposit by eliminating the right to use lands for ancillary uses which are essential components of any mining project. This drastic deviation from more than 150 years of federal law precedent implementing the Mining Law, including decades of BLM's

---

[1] USGS Survey, Mineral Commodity Summaries 2022, at 4, available at <https://pubs.usgs.gov/periodicals/mcs2022/mcs2022.pdf> (last visited Feb. 15, 2022). Judicial notice may be taken of this publicly available information. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 750 (9th Cir. 2006) (judicial notice may be taken of matters of public record).

[2] The foundation of the manufacturing pyramid relies on mining raw materials. Without raw materials there are no manufactured products, no manufacturing jobs, and no goods for our citizens to utilize to sustain their way of life.

[3] NvMA Data & Analysis, available at <https://www.nevadamining.org/faqs/analysis/> (last visited Feb. 15, 2022, reporting average weekly salary).

implementation of its surface management regulations for locatable minerals (43 C.F.R. § 3809 (the "3809 Regulations")), would have potentially crippling impacts to the industry and our nation.

**INTRODUCTION**

AEMA submits this brief on two issues of critical importance: the proper interpretation of the Mining Law and the Picket Act/PWR 107 relative to mining. Plaintiffs seek to create a new requirement that would undermine over 150 years of precedent and the plain language of multiple statutes and regulations. Plaintiffs erroneously argue that mining activities on claims of unknown validity are not governed by the Mining Law and that before recognizing rights under the Mining Law, BLM must confirm that all mining claims to be used contain valuable mineral deposits. Plaintiffs blur Mining Law rights for ancillary use with rights to perfect title to mining claims. Instead of providing authority for their argument that BLM must not recognize rights under the Mining Law for ancillary use, Plaintiffs erroneously focus on cases related to *perfecting* property rights in mining claims, designed to qualify for a patent to the surface estate or to exclude claims from an area proposed for withdrawal from operation of the Mining Law. The Mining Law and its implementing regulations and caselaw have never required BLM to, as Plaintiffs argue, verify the "validity" of mining claims before approving a plan of operations on Open Lands. Nor does PWR 107 withdraw lands from use under the mining laws as they apply to metalliferous metals.

Plaintiffs seek to create a new mandate that ancillary activities necessary to mining, which generally cannot be conducted on the *same* lands where the minerals are discovered, are not governed by the Mining Law and can be subjected to BLM's discretionary authority to disapprove. Plaintiffs advocate that ancillary uses are governed by the Mining Law only when they occur on the *same* claims as the minerals to be developed. Plaintiffs' erroneous interpretation creates a practical impossibility because the same parcel of land cannot simultaneously be mined and also used for necessary ancillary activities such as placement of removed rock from the mineralized area. As a result, the claimant would not be able to develop the minerals, and our nation's reliance on foreign minerals would increase substantially. *See* USGS Summaries, at 5-8. Plaintiffs' novel interpretation contradicts the plain language of the Mining Law as amended by the Surface Use

Act which invites "*occupation*" of Open Lands for mining *and uses reasonably incident to mining*. 30 U.S.C. §§22 & 612(a). The statutes cover uses "reasonably incident to" mining because the minerals cannot be extracted without such use. Under Plaintiffs' interpretation, no mining would occur because a right to occupy lands with the minerals would be meaningless without the ability to use nearby lands for facilities and activities necessary to extract the minerals. Plaintiffs also conflate the use of properly located and maintained active mining claims under the Mining Law and BLM's proper and lawful authorization of a plan of operations on such claims with what is required to "perfect" title in mining claims to secure a patent to the surface estate (recognizing the claimant already owns the minerals) or exclude a claim from a mineral withdrawal (which, contrary to Plaintiffs' arguments, PWR 107 cannot constitute a mineral withdrawal).

The text of Section 22 of the Mining Law declares lands belonging to the United States that have not been withdrawn from mineral entry "free and open" to exploration and occupation for the purpose of prospecting, exploring for, and developing valuable mineral deposits. 30 U.S.C. §22. Congress has repeatedly recognized the importance of the policy underlying these rights to use Open Lands to support "the national interest to foster and encourage private enterprise in . . . the development of economically sound and stable domestic mining, minerals . . . and mineral reclamation industries . . .." 30 U.S.C. § 21a.[4] Plaintiffs seek to extend their erroneous interpretation of the Mining Law to lands withdrawn under PWR 107 (issued under authority provided by the Pickett Act). But, the Pickett Act expressly required that all lands withdrawn under its authority "shall at all times be open to exploration, discovery, occupation, and purchase under the mining laws of the United States, so far as the same apply to metalliferous minerals . . .." Pickett Act of June 25, 1910, Pub. L. No. 303, *as amended by* act of Aug. 24, 1912, Pub. L. No. 316, ch. 369, 37 Stat. 497. The plain language of the Pickett Act is clear that even lands withdrawn shall remain open to use under the U.S. mining laws as they apply to metalliferous minerals. This

[4] In addition to (but separate and distinct from) these Section 22 rights to explore and occupy Open Lands for mining, Sections 23, 26, 28 and 42 provide for location and maintenance of mining claims and mill sites for title purposes, due process, to exclude adverse miners, to keep a claim in good standing as an active claim, and (prior to 1994) to seek patents.

incorporates the Mining Law and its provision for occupation and use of lands, including for ancillary use. In 1926, President Coolidge issued an Executive Order known as PWR 107, withdrawing certain lands within one quarter of a mile of seeps and springs -- but only to the extent authorized under the Pickett Act, as amended. Plaintiffs acknowledge this exception, keeping lands withdrawn under PWR 107 open under the mining laws as they relate to metalliferous minerals (EF 57 at 12) but then try to impose their erroneous Mining Law interpretation on this clear statutory exception arguing that only the lands with the minerals are open and not any of the lands necessary for ancillary use to extract those minerals. Plaintiffs' interpretation is unsupported by law and, injecting uncertainty or undermining the BLM's authority to approve the use of lands for mining operations including all reasonably incidental use would have a crippling impact on this multi-billion dollar industry. Plaintiffs' insertion of their Mining Law interpretation into PWR 107 to prohibit ancillary use on these lands would nullify the Pickett Act mandate keeping withdrawn lands open for mining of metalliferous minerals under the U.S. mining laws.

## ARGUMENT

### I. Congress Could Have, But Has Not, Required a Validity Determination for Exercising Rights Under the Mining Law

Where Congress intended to require a validity determination prior to approval of a plan of operations, it expressly included that requirement. For example, legislation creating the Mohave National Preserves provides: "[t]he Secretary shall not approve any plan of operations prior to determining the validity of the unpatented mining claims . . . affected by such plan within the preserve . . .." 16 U.S.C. § 410aaa-49(a). No such mandate exists under the Mining Law on Open Lands, like the lands in question here and, therefore, none should be added through judicial action. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[t]he preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'"). Plaintiffs ignore Congress' deliberately chosen language that repeatedly reaffirms national policy to encourage mining. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to

their place in the overall statutory scheme." *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016). A statute should be construed to give effect to all of its provisions, "so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009). "[D]eference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill, generally requires [courts] to assume that 'the legislative purpose is expressed by the ordinary meaning of the words used.'" *United States v. Locke*, 471 U.S. 84, 95 (1985) (quoting *Richards v. United States,* 369 U.S. 1, 9 (1962)).

### A. Congress has not Required "Valid" Claims or Even Mining Claims at all for Mining Operations or Uses Reasonably Incident to Mining.

Section 22 of the Mining Law allows a miner to enter, prospect, explore, and occupy Open Lands and conduct activities to discover and mine valuable mineral deposits and makes no mention of a mining claim at all, much less distinguish between "valid," "invalid," or claims of unknown validity. 30 U.S.C. §22. Other provisions of the Mining Law -- Sections 23, 26, 35, and 36 -- allow for locating mining claims and Section 42 allows for locating mill sites. Plaintiffs' argument that mining use can only occur on claims with a proven discovery ignores this distinction and the rights Section 22 creates for occupation of Open Lands for mining without any mining claim. Plaintiffs ask this Court to eliminate the statutory right under Section 22 (and the subsequent amendments thereto in the Surface Use Act) to use Open Lands for surface use reasonably incident to mining, which would create an unworkable gap between mineral exploration and mineral development. This would render Section 22 rights pointless and undermine the plain language and repeatedly documented intent of Congress. Under Plaintiffs' framework, one could explore for minerals but once discovered, could not develop the discovered minerals because they could not use other Open Land for use reasonably incident to mining or Operations, such as storage of "waste" rock that must be removed in order to uncover the minerals.[5] Section 22 says nothing about a mining claim

[5] "Waste" rock is the unmineralized rock that must be removed to uncover the minerals. Finding a nearby location for waste rock storage is important for most mines. The "placement of these wastes is strongly influenced by their cost of handling, which limits their practical distance of transport." National Research Council, *Surface Mining of Non-Coal Minerals: A Study of Mineral*

because a mining claim is not required under this statute which intentionally authorizes access, exploration, occupation and use of Open Lands without regard to discovery status in order to create continuous cradle- to-grave rights that cover all aspects of mining and the entire mining lifecycle.

The Supreme Court has long recognized that those who accept the invitation under Section 22 to enter and occupy Open Lands and "are not treated as trespassers, but as licensees or tenants at will." *Union Oil v. Smith*, 249 U.S. 337, 346 (1919). Section 22 does not require a miner to locate a mining claim to accept the invitation and make use of this license which is revocable only by Congressional act specifically authorizing such revocation (such as 43 U.S.C. §1714, which authorize the Secretary of the Interior to withdraw lands from mineral entry). Congress and the Supreme Court have repeatedly recognized these rights after enactment of the 1872 Mining Law. *See, e.g.,* 30 U.S.C. §193 (preserving the rights under the Mining Law for claims of coal, oil, gas and related minerals existing on the date of enactment by excluding them from the Mineral Leasing Act requirements and allowing maintenance and perfection of such claims pursuant to the laws with which they were initiated). The Pickett Act, as amended, is yet another example of Congress' clear intention to encourage mining given the mining exception to withdrawn lands. *See infra* Sec. III. The Mining Law, "still in effect today, allow[s] . . . citizens to go onto unappropriated, unreserved public land to prospect for and develop certain minerals." *United States v. Locke*, 471 U.S. 84, 86 (1985). Without the invitation of Section 22, minerals could not be discovered and developed on public lands. *Union Oil Co.*, 249 U.S. at 346, 348-49 ("as a practical matter, exploration must precede the discovery of minerals" and occupation of the land is necessary for exploration; where a miner chooses to locate claims the right to use those claims is protected so

---

*Mining from the Perspective of the Surface Mining Control and Reclamation Act of 1977* at 122, 29 (1979), *available at* <https://www.nap.edu/catalog/19854/surface-mining-of-non-coal-minerals-a-study-of-mineral>. The biggest part of mine development "is preparing for the removal of waste overburden and establishment of waste dumps and tailings ponds, which is one of the major cost elements for many mines." *Id.* In addition, hauling what generally are substantial volumes of rock removed to uncover the minerals would lead to environmental impacts which could be unnecessary if a suitable site exists adjacent or nearby to the lands in which the valuable minerals are located and, notably, Plaintiffs did not propose such an alternatives analysis in their DEIS comments and, therefore, cannot seek judicial review of such an alternative here.

long as the miner "locates, marks, and records his claim" in accordance with applicable law and, in doing so, enjoys the right to extract the minerals subject to performance of the annual labor, without ever applying for a patent or seeking to obtain title to the fee).

Thus, Plaintiffs improperly conflate Section 22 rights to occupy and use Open Lands with rights in other sections of the Mining Law related to perfecting title to mining claims. Section 22 rights are enduring, separate, and distinct from rights acquired through the location, maintenance and perfection of mining claims, the latter of which establish rights to patent claims, and to establish a right against the government in the event the lands are subsequently withdrawn from mineral entry (which, as discussed below, these lands are not).

**B. Congress Authorized and Protected Locators' Use of their Claims for all Mining and Mining-Related Activities Regardless of Discovery Status.**

Plaintiffs' argument that mining use can only occur on the same claims where the minerals are discovered relies on cases involving Mining Law provisions that authorize *perfection* of mining claims to secure a patent or exclude a claim from mineral withdrawal. This is a distinct issue from occupying lands under Section 22 for mining and ancillary uses. In addition to Section 22 rights to occupy Open Lands, the Mining Law also provides miners the right to locate mining claims. Those who hold properly located mining claims (in compliance with the identification and recordation procedures) and pay annual maintenance fees have continuing rights to use and occupy those claims without a validity determination.[6] Nowhere in the Mining Law or amendments thereto has Congress ever required BLM to consider the discovery status of claims prior to approving a plan of operations. *See Earthworks v. United States DOI*, 496 F.Supp.3d 472, 492

[6] Section 26 of the Mining Law establishes a locator's "rights of possession and enjoyment" on their claims. 30 U.S.C. §26. The Supreme Court has long recognized that the order in which location, recording and discovery of a claim occurs is not essential to establishing claim "validity." *Union Oil*, 249 U.S. at 347; *Creede & Cripple Creek Mining & Milling Co. v. Uinta Tunnel Mining & Transp. Co.*, 196 U.S. 337, 354 (1905) ("[I]t is not a vital fact that there was a discovery of mineral before the commencement of any of the steps required to perfect a location . . . .").

(D.D.C. 2020) (emphasis original);[7] *see also* DOI Solicitor's Opinion M-37012 (2005) ECF 69-3. Nor should mining claims of unknown validity be presumed invalid as Plaintiffs suggest. *Earthworks*, 496 F.Supp.3d at 492.  Rather, a mining claim is "treated as a *de facto* valid claim until proven otherwise."[8]

As discussed below, Plaintiffs' position is inconsistent with well and long-established law. The Mining Law provides the comprehensive list of requirements for claimants to legally locate and maintain their claims.   The Mining Law historically required demonstration of annual assessment work.  30 U.S.C. § 28e.  Prior to 1993, Section 28 of the Mining Law required claimants to perform assessment work consisting of $100 of labor on their claims or subject their claims to potential entry and location by rival locators.  Claimants could perform assessment work on all claims regardless of discovery status. In 1993, Congress amended the Mining Law, modifying the Section 28 assessment work provision by requiring claimants who own more than ten mining claims or mill sites to pay an annual Claim Maintenance Fee ("CMF") in lieu of assessment work to keep their mining claim or mill sites. *See* 30 U.S.C. §§28f-28k. Section 28g, also enacted in 1993, requires claimants to pay a location fee when they file a notice of a new claim with the BLM.

While these rights associated with properly located claims are subject to reasonable regulation by BLM, the agency must not unreasonably circumscribe or prohibit mining.  *United States v. Weiss*, 642 F.2d 296, 299 (9th Cir. 1981).  The BLM requires proposed plans of operations for mining to avoid "unnecessary or undue degradation." *See* 43 U.S.C. §1732(b); 43 C.F.R. §3809.420.  Discovery status or "validity" of a claim has never been relevant to BLM's approval of a plan of operations on Open Lands. The regulations do not require that an operator submit any

---

[7] Plaintiffs may seek to rely on *Ctr for Biological Diversity v. USFWS*, 409 F.Supp.3d 738 (D. Ariz. 2019) which is inapposite. The *Earthworks* Court found it of limited relevance to the issue of whether the BLM must evaluate claim validity to approve a plan. 493 F.Supp.3d at 490 n.12 (noting that although it examined the Mining Law, that case dealt with a site-specific application of Forest Service regulations and a statute unique to the Forest Service, the Organic Act).

[8] Notably, counsel for Plaintiffs and certain Plaintiffs here participated in the *Earthworks* case and, unhappy with the decision, appealed it but then participated in filing a petition for rulemaking to change the regulations and then successfully stayed the appeal in a tacit acknowledgment that the existing law does not support the position they are advancing. *See infra* fn. 15.

information related to claim validity. In fact, the BLM's 3809 Regulations expressly require that BLM must investigate validity only when a mining claimant is seeking to obtain a mineral patent (*see* 43 C.F.R. §3862.1-1(a)) or has proposed operations on lands withdrawn from mining use (43 C.F.R. §3809.100) which, contrary to Plaintiff's arguments, these lands are not withdrawn from mining use. Plaintiffs ask this Court to rewrite the law in a manner that conflicts with plain statutory and regulation language and Eureka Moly's statutory and due process rights.

Even where there has been proper location, maintenance, and annual CMF payment as required to create and maintain mining claims, Plaintiffs seek to limit use of those claims based on a novel requirement of a discovery on *every* claim, even the ones where ancillary use is occurring as necessary for mining of the undisputed discovered mineral deposit.[9] It should be noted that today, there are nearly 400,000 active mining claims. Requiring validity examinations would create an even bigger financial burden for BLM than described in 2007 when there were many

---

[9] Plaintiffs' proposed requirement of a discovery on claims prior to approval of a plan of operations would come with a cost that far exceeds the Department of the Interior's resources. *See, e.g.*, 72 Fed. Reg. 8139, 8141 (Feb. 23, 2007) (noting the BLM "cannot feasibly embark on a program to make technical determinations of the validity of all unpatented mining claims."). BLM estimates that the "cost per mining claim for a full validity determination, including an administrative contest hearing, ranges between $12,000 and $80,000. There are over 250,000 active mining claims on the public lands. Conducting validity determinations for all 250,000 mining claims would exceed the BLM's annual operating budget many times over." *Id.* The agency further noted this would waste resources because even if a claim were determined "invalid" those same lands can simply be located once again. While Interior *may* investigate mining claim validity at any time, there are few circumstances in which Interior *must* determine validity. Mandatory validity investigations generally occur only when a mining claim is seeking to obtain a mineral patent (*see* 43 C.F.R. §3862.1-1(a)) or, has proposed operations on lands withdrawn from mineral use (43 C.F.R. §3809.100). When Interior does investigate validity, it conducts an on-the-ground mineral examination and an economic analysis. If a mineral examination discloses that the mining claim does not meet the Mining Law's requirements, the United States can seek to invalidate the claim in an administrative proceeding called a "contest." Unless and until a contest is resolved in favor of the government (including any administrative or judicial appeals), the mining claim cannot be declared invalid. *Collord v. U.S. Dep't of the Interior*, 154 F.3d 933, 937 (9th Cir. 1998)(recognizing mining and milling claims as property interests subject to due process). Plaintiffs' requested relief would impair properly located and maintained claims by prohibiting uses for storage of rock removed to uncover the valuable minerals, which is indisputably necessary to extract the valuable minerals from nearby claims.

fewer active claims.[10] Plaintiffs' position would amount to an unlawful mandate, contrary to the express provisions of the Surface Use Act as discussed below, on the BLM to improperly interfere with the ability to use Open Lands for use reasonably incident to mining (and, indeed, necessary to extract the minerals) under properly located and maintained claims.

An unperfected claim that is properly located and maintained still vests the locator with rights for mining and use reasonably incident to mining regardless of the discovery status of the claim. Plaintiffs provide no legal authority to support a judicial elimination of those rights as they propose to occur without any due process. Plaintiffs conflate the concept of "perfection" of a mining claim with proper location, maintenance and lawful use of active claims and other Open Lands. The Supreme Court has recognized rights of an operator holding claims of unknown validity (*Cameron v. United States*, 252 U.S. 450, 460 (1920)) and that "the government cannot find such a claim invalid without a degree of process." *Earthworks*, 496 F.Supp. 3d at 492. The Ninth Circuit has acknowledged that an unpatented mining claim is "property in the fullest sense of the word . . .." *United States v. Shumway*, 199 F. 1093, 1099, 1100 (9th Cir. 1999) (citing *Bradford v. Morrison*, 212 U.S. 389, 394 (1909) (internal quotations omitted)). The *Shumway* Court went on to explain that a "perfected" claim, that is, one with a discovery, protects the claimant against rival claimants and any change in law or land status by the government. *Id.* The government agency sought to evict the Shumways from their two mill sites alleging they were not conducting any milling, had no approved plan of operations, failed to post the required bond and, thus, were trespassing. *Id.* at 1097. The district court granted the agency summary judgment. The Ninth Circuit reversed that decision, distinguishing prior cases where there had been an administrative adjudication that the claimant "had no valid mining claim," from the *Shumway* case where claim validity had not been adjudicated concluding that in the latter summary judgment on the basis that the claims are invalid is improper. *Id.* at 1101. Here, there has been no administrative adjudication of Eureka Moly's mining claims (an action that can only be completed by the BLM).

---

[10] https://www.blm.gov/sites/blm.gov/files/docs/2021-09/PublicLandStatistics2020_UPDATED%20TABLE%203-22.pdf

Thus, it would violate due process for this Court to grant Plaintiffs' requested relief and deprive Eureka Moly of its protected rights under the Mining Law to make use of its active mining claims.

**C. FLPMA Recognizes that Active Mining Claims are Governed by the Mining Law Regardless of Discovery Status.**

Congress provided for BLM's management of properly located and maintained claims regardless of discovery status in the Federal Land Management and Policy Act of 1976, 43 U.S.C. § 1701 *et seq.* ("FLPMA"). FLPMA amended the Mining Law to require claimants to record each mining claim with the BLM by filing a copy of the notice of location and annual proof of having completed assessment work for each claim. 43 U.S.C. §1744(a)-(b). Congress did not require claimants to demonstrate validity nor did it require BLM to determine validity of mining claims to accept these filings. Congress created no distinction in FLPMA based on the discovery status of a claim, directing that Open Lands be managed "in a manner which recognizes the Nation's need for domestic sources of minerals" (43 U.S.C. §1701(a)(12)), and included a directive and savings clause for permissible activities under the Mining Law. 43 U.S.C. §1732(b) ("no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act, including, but not limited to, rights of ingress and egress."). In 1992, Congress again recognized and protected rights under active mining claims in the Appropriations Act (106 Stat. 1374 (1992)) which required holders of unpatented mining claims, without regard to discovery status, to pay an annual maintenance fee. 30 U.S.C. § 28f. Since 1993, claimants have paid nearly $1.35 billion in annual CMF and other Mining Law fees.[11]

Plaintiffs ignore Congress' numerous actions that intentionally protect rights under the Mining Law and, that under FLPMA and the Mining Law, active mining claims are in good standing where a claimant has complied with the filing and fee requirements. The lack of a proven discovery on certain claims is irrelevant to qualifying these claims as lawfully located and is not a basis to prohibit mining and ancillary uses nor is it a lawful basis to interfere with rights under the Mining Law to make reasonably incident use of Open Lands as necessary to extract discovered

[11] https://www.blm/gov/sites/blm.gov/files/docs/2021-08/PublicLandStatistics2020.pdf.

minerals. The prohibition Plaintiffs seek would unreasonably interfere with the rights that even Plaintiffs acknowledge under the Mining Law – to develop and extract a valuable mineral deposit.

### D. Congress Has Affirmatively Recognized the Right to Uses Reasonably Incident to Mining on Open Lands and Located Mining Claims.

Subsequent to the Mining Law, numerous Congressional enactments such as FLPMA and the Surface Use Act make clear that use of Open Lands includes uses reasonably incident to mining. In 1955, Congress carefully preserved broad rights under Section 22 when it amended the Mining Law by enacting the Surface Use Act to prohibit non-mining use of mining claims and illegal occupation of Open Lands for activities and facilities **unrelated** to mining. 30 U.S.C. §§ 610-615. The plain language of the Surface Use Act defines permissible uses of unpatented mining claims and is clear about authorized use of "located" mining claims – requiring no determination of "validity" of such a located mining claim. 30 U.S.C. §612(a). Congress could have used the word "valid" mining claims – it did not. Instead, Congress used the word "located" and made clear: (i) any claim **located** under the Mining Law can be used for mining and uses reasonably incident thereto;[12] and (ii) prior to patent, the use of the surface of located mining claims is not exclusive, provided that a third party's use must not materially interfere with prospecting, mining, or processing operations or uses reasonably incident thereto. 30 U.S.C. §612(b).

The legislative history to the Surface Use Act from the House Report sheds further light on the error in Plaintiffs' position. That history recognizes that the "Federal mining law has been designed to encourage individual prospecting, exploration, and development of the public domain" acknowledging the necessary use of Open Lands (under Section 22) and defining rights under **located** claims for all mining related activities, including reasonably incident uses such as storage of waste rock. H.R. Rep. No. 84-730 (1955) ("Report"), attached as **Exhibit 1** at 5 & 8-9. It also discusses the rights of locators which belies Plaintiffs' arguments here:

---

[12] Congress broadly defined legitimate mining activity on located mining claims to include "prospecting, mining or processing operations and uses reasonably incident thereto." *Id.* §612(a).

> [b]y posting notice of location, which notice contains the name of the claimant, date of location, and a description of the claim (forms used vary from mining district to mining district), the locator, ***without further requirement under Federal law, as of that moment, acquires the immediate right to exclusive possession, control and use of the land within the corners of his location stakes.*** He must, of course, to protect this right to exclusive possession –
>
> (1) comply with the State law having to do with recordation, etc.; and
>
> (2) carry out under the Federal law . . . annual assessment work. . . .
>
> Having thus complied, he retains exclusive possession, control and use of the area, and may remove the minerals from the land without first proceeding to patent.

*Id.* at 2477-78 (emphasis added). The Report recognizes the right to "control and use of the land within" properly located and maintained claims – with no mention of proving "validity" or evidence of a discovery. The Report notes that the "language, carefully developed, ***emphasizes the committee's insistence that this legislation not have the effect of modifying long-standing essential rights springing from location of a mining claim. Dominant and primary use of the locations hereafter made, as in the past, would be vested first in the locator . . .***" *Id.* at 2483, **Ex. 1** at 10 (emphasis added). This unequivocally confirms that Congress did not require evidence of a discovery to vest essential rights "springing from the location of a mining claim."

Congress again affirmed its commitment to encourage mining in the Mining and Minerals Policy Act of 1970 (30 U.S.C. § 21a) ("it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in . . . the development of economically sound and stable domestic mining . . .to help assure satisfaction of industrial, security and environmental needs") and again in the National Materials and Minerals Research, Policy and Development Act of 1980 declaring "it is the continuing policy of the United States to promote an adequate and stable supply of materials necessary to maintain national security, economic well-being and industrial production . . .." 30 U.S.C. § 1602. The Ninth Circuit has repeatedly recognized that Congress enacted the Mining Law to encourage mining. *Consolidated Mutual Oil Co. v. U.S.*, 245 F. 521, 523 (9th Cir. 1917); *U.S. v. Noguiera*, 403 F.2d 816, 823 (9th Cir. 1968)("the . . . purpose of the mining laws is to further the speedy and orderly development of the

mineral resources in our country"). This Court should reject Plaintiffs' attempt to impose an impermissible contradiction of Congressional objectives which would upend the very framework of the Mining Law.  Interpretations, such as that offered by Plaintiffs, that are "inconsistent with major congressional objectives, as revealed by the statute's language, structure and purpose" must be rejected.  *County of Maui v. Hawaii Wildlife Fund*, 140 S.Ct. 1462, 1477 (2020).

## II.   BLM Properly Applied its Regulations Which Plaintiffs Have Not Challenged

Plaintiffs also ignore BLM's long-established regulations which Plaintiffs have not challenged.  BLM has at least two comprehensive regulatory schemes governing these issues: (1) 43 C.F.R. Part 3715[13] adopted to implement the Surface Use Act, governing the "Use and Occupancy Under the Mining Laws;" and (2) BLM's mining regulations at 43 C.F.R. Part 3809.

### A.   BLM's Regulations Governing "Use and Occupancy Under the Mining Laws"

BLM has squarely and affirmatively answered the question Plaintiffs pose: whether ancillary use is permissible on public lands, with or without a mining claim and without regard to "validity" of the claim.  BLM has answered this unequivocally in its regulations governing "Use and Occupancy Under the Mining Law." The purpose and scope of those regulations is for BLM to "manage the use and occupancy of the public lands for the development of locatable mineral deposits by limiting such use or occupancy to that which is reasonably incident." 43 C.F.R. §3715.0-1(a).  The BLM is clear that it will prevent abuse of the public lands "while recognizing valid rights and uses under the Mining Law . . .." *Id.*  BLM defined "public lands" under these regulations to mean lands open to the operation of the Mining Law "**including** lands covered by unpatented mining claims or millsites." 43 C.F.R. §3715.0-5 (emphasis added).  This definition recognizes rights under Section 22 where there are no mining claims.  BLM also defined "reasonably incident" to mean "the statutory standard [of] 'prospecting, mining, or processing operations and uses reasonably incident thereto.'" 43 C.F.R. §3715.0-5. This definition "includes those actions or expenditures of labor and resources . . . to prospect, explore, define, develop, mine, or beneficiate a valuable mineral deposit, using methods, structures and equipment appropriate to

---

[13] Citing as authority, the Mining Law (30 U.S.C. §22) and the Surface Use Act (30 U.S.C. §612).

the geological terrain, mineral deposits, and stage of development and reasonably related activities." *Id.* BLM's regulations, adopted under the Administrative Procedure Act ("APA"), provide that "[i]n order to occupy the public lands under the mining laws for more than 14 calendar days in any 90-day period" activities that "are the reason" for occupancy must, among other things, be reasonably incident to mining and, be reasonably calculated to lead to the extraction and beneficiation of minerals. 43 C.F.R. §3715.2.

Plaintiffs' contrary interpretation would invalidate these regulations, wherein BLM clearly defined the activities allowable under the Mining Law. Plaintiffs' argument that disregards foundational canons of statutory interpretation should be rejected (*see Corley*, 556 U.S. at 314), as a textbook violation of the APA. If Plaintiffs want changes made to these regulations, then they must follow the process required under the APA (which Plaintiffs clearly understand as indicated by their recent petition to DOI and BLM demanding the agencies engage in rulemaking to change the 3809 regulations), rather than circumventing that process by requesting relief from this Court to undermine statutory rights and clear provisions of duly adopted regulations.

**B. BLM's 3809 Regulations Look Only at Land Status – Not Claim Validity**

The plain text of BLM's 3809 Regulations only consider whether the lands proposed for use in the project are open to or withdrawn from operation of the Mining Law -- to evaluate whether a validity determination of mining claims is required before authorizing reasonably incident mining use. 43 C.F.R. §3809.100(a) (requiring a mineral examination report to determine validity prior to BLM approving a plan of operations on lands withdrawn from appropriation under the Mining Law).[14] BLM has defined mining operations to mean "*all* functions, work, facilities, and activities on public lands in connection with prospecting, exploration, discovery and assessment work, development, extraction, and processing of mineral deposits locatable under the

[14] As discussed below, Plaintiffs' extend their erroneous Mining Law interpretation to PWR 107 to argue mining activities are prohibited other than on the same lands minerals are discovered. But the plain language of the Pickett Act incorporates all rights under U.S. mining laws and, thus, for the same reasons Plaintiffs' novel interpretations of the Mining Law should be rejected, the Court should reject the unsound argument that PWR 107 lands are withdrawn from mineral entry.

mining laws" and "all other reasonably incident uses, whether on a mining claim or not" for support facilities. 43 C.F.R. §3809.5 (emphasis added). BLM's regulations specify the reasons BLM can disapprove or withhold approval of a plan of operations for locatable minerals and makes no mention of requiring mining claim validity except on lands withdrawn or, "segregated" meaning they are proposed for withdrawal and awaiting decision. *Id.* §3809.411(d)(3). BLM must not approve a plan of operations if the proposed activities would violate FLPMA's unnecessary or undue degradation mandate (43 U.S.C. §1723b), which BLM must apply uniformly to regulate all mining activities on and off *any* claims regardless of "validity" status (43 C.F.R. §3809.415). Plaintiffs could have but did not challenge the BLM's regulations or seek amendment of them to require a validity examination or determination prior to any approval of a plan of operations. They cannot now ignore BLM's lawfully adopted regulations which they (jointly with a number of other organizations) have now petitioned the Department of the Interior and the BLM to revise.[15] Refusing to follow clear, on-point and unchallenged regulations is a textbook violation of the established standard of review under the APA. *See Ramon-Sepulveda v. INS*, 743 F.2d 1307, 1310 (9th Cir. 1984). Plaintiffs advocate something BLM cannot lawfully do – ignore the agency's longstanding policy or change it without compliance with APA requirements.

## III. PWR 107 Does Not Withdraw Lands from Use Under the Mining Law

Plaintiffs make similar interpretive arguments under PWR 107 as they do under the Mining Law, advocating that only the lands where the minerals are located remain open (and may be used for mining related activities) on lands otherwise withdrawn under the Pickett Act. Plaintiffs' errors interpreting the Mining Law carry over into their argument to prohibit mining related activities under PWR 107. The Pickett Act authorized withdrawal of lands for numerous public purposes

---

[15] *See* Notice of Petition and Petition to the U.S. Department of Interior and the BLM for Hardrock Mining Rulemakings and Policy Updates (filed Sept. 16, 2021), attached hereto as **Exhibit 2** at 24 (listing as item number 5 "the proper scope of BLM regulation of mineral operations is dependent on the extent of rights under the Mining Laws.") While the attachments to the Petition have not been made publicly available, portions that are available reflect the Plaintiffs' request that the agency revise the regulations to embrace the interpretation advocated by certain plaintiffs in the *Earthworks* case but rejected by the Court. This Court can take judicial notice of the Petition.

but provided that all lands withdrawn "shall at all times be open to exploration, discovery, occupation, and purchase under the mining laws of the United States, so far as the same apply to metalliferous minerals." 37 Stat. 497 (1912). Plaintiffs ask this Court to ignore the plain language of the Pickett Act which expressly covers "exploration" and "occupation" under the mining laws and, instead, hold that all lands are withdrawn under PWR 107 unless BLM determines that metalliferous minerals underlie those lands. This would eliminate exploration and occupation statutorily authorized under the Mining Law and, therefore, conflict with Congress' clear directive in the plain language of the Pickett Act. Plaintiffs' framework would have broad practical implications and, as they describe it, create 40 acre withdrawals around every spring on public lands in Nevada, creating potentially hundreds of unknown and unrecorded withdrawals. For all the reasons discussed above, Plaintiffs' arguments should be rejected because the Mining Law and its amendments are clear, and the Court should apply the statutes' plain language to avoid rendering that language and protected rights under the Mining Law a nullity.

## CONCLUSION

For the reasons discussed above, the Plaintiffs novel interpretations of the Mining Law and the Pickett Act should be rejected.

Respectfully submitted this 17th day of February, 2022.

/s/Laura K. Granier
Laura K. Granier
Erica Nannini
Holland & Hart LLP
*Counsel for Amicus American Exploration & Mining Association*

**TABLE OF EXHIBITS**

| | |
|---|---|
| 1 | House Report No. 84-730 |
| 2 | BLM for Hardrock Mining Rulemakings and Policy Updates |

**CERTIFICATE OF SERVICE**

I hereby certify that on February 17, 2022, a true and correct copy of the above document was electronically filed with the Clerk of Court using CM/ECF. Copies of the document will be served upon interested counsel via the Notices of Electronic Filing that are generated by CM/ECF.

/s/Laura K. Granier
Laura K. Granier
*Counsel for Amicus American Exploration & Mining Association*

18282175_v1

# **EXHIBIT 1**

House Report No 84-730

84TH CONGRESS 1st Session } HOUSE OF REPRESENTATIVES { REPORT No. 730

# AMENDING THE ACT OF JULY 31, 1947 (61 STAT. 681), AND THE MINING LAWS TO PROVIDE FOR MULTIPLE USE OF THE SURFACE OF THE SAME TRACTS OF THE PUBLIC LANDS

JUNE 6, 1955.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. ENGLE, from the Committee on Interior and Insular Affairs, submitted the following

## REPORT

[To accompany H. R. 5891]

The Committee on Interior and Insular Affairs, to whom was referred the bill (H. R. 5891) to amend the act of July 31, 1947 (61 Stat. 681), and the mining laws to provide for multiple use of the surface of the same tracts of the public lands, and for other purposes, having considered the same, report favorably thereon with amendments and recommend that the bill, as amended, do pass.

The amendments are as follows:

Page 2, line 1, following the word "States," insert the words:

including for the purposes of this Act land described in the Acts of August 28, 1937 (50 Stat. 874), and of June 24, 1954 (68 Stat. 270),

Page 3, line 10, strike the word "Agriculture." and insert in lieu thereof the words:

Agriculture: *Provided*, That, notwithstanding any other provisions of law, such leases or permits may be issued for lands administered for national park, monument, and wildlife purposes only when the President, by Executive order, finds and declares that such action is necessary in the interests of national defense.

Page 3, line 21, following the word "except" insert the words:

that revenues from the lands described in the Act of August 28, 1937 (50 Stat. 874) and the Act of June 24, 1954 (68 Stat. 270) shall be disposed of in accordance with said Acts and except.

Page 6, line 3, strike the words "The Secretary of the Federal Department" and insert in lieu thereof the words "The head of a Federal department or agency".

Page 16, line 3, change the period to a comma and add the words:

or to limit or repeal any existing authority to include any limitation or restriction in any such patent.

## LEGISLATION CONSIDERED

In reporting H. R. 5891, by Representative Rogers, of Texas, it is pointed out that the measure reported is 1 of a total of 10 bills having an identical purpose considered by the committee. The others: H. R. 5561, by Representative Dawson, of Utah; H. R. 5563, by Representative Fjare, of Montana; H. R. 5572, by Representative Young, of Nevada; H. R. 5577 by Representative Ellsworth, of Oregon; H. R. 5595, by Representative Cooley, of North Carolina; H. R. 5742, by Representative Hope, of Kansas; H. R. 6223, by Representative Udall, of Arizona; H. R. 6307, by Representative Budge, of Idaho; and H. R. 6372, by Representative Engle, of California.

## PURPOSE

H. R. 5891, if enacted into law, would amend the act of July 31, 1947 (61 Stat. 681; 43 U. S. C. 1185), commonly known as the Materials Act of 1947, in two respects: by barring future locations under the mining laws for certain materials commonly occurring throughout the United States; by giving to the Secretary of Agriculture administrative responsibility under the Materials Act.

If enacted, H. R. 5891 would also amend the general mining laws to permit more efficient management and administration of the surface resources of the public lands by providing for multiple use of the same tracts of such lands.

To achieve these objectives, the bill would:

(1) Amend the Materials Act of 1947 to prohibit future location and removal, under the mining laws, of common varieties of sand, stone, gravel, pumice, pumicite, and cinders, by requiring disposition of these materials under the Materials Act.

(2) Amend the Materials Act of 1947 to give to the Secretary of Agriculture the same authority with respect to mineral materials (including, but not limited to, sand, stone, gravel, pumice, pumicite, cinders, and clay), and vegetative materials (including, but not limited to, yucca, manzanita, mesquite, cactus, and timber or other forest products) located on lands under his jurisdiction as that which the Secretary of the Interior has with respect to lands under Interior's jurisdiction.

(3) Amend the general mining law to prohibit the use of any hereafter located unpatented mining claim for any purpose other than prospecting, mining, processing, and related activities.

(4) Amend the general mining law to limit the rights of a holder of an unpatented mining claim hereafter located to the use of the surface and surface resources. The bill would accomplish this by vesting in the responsible United States administrative agency authority to manage and dispose of vegetative surface resources on such locations, to manage other surface resources thereof (except minerals subject to the mining laws), and to use so much of the surface as is necessary for management purposes or for access to adjacent lands.

The legislation would limit surface use to those activities which do not endanger or materially interfere with established mining operations or related activities.

(5) Establish, with respect to invalid, abandoned, or dormant mining claims, located prior to enactment of the bill, an in rem procedure in the nature of a quiet-title action, whereby the United States

Case 3:19-cv-00661-LRH-CSD Document 73 Filed 03/30/22 Page 26 of 84

could expeditiously resolve uncertainties as to surface rights on such locations.

BACKGROUND OF THE LEGISLATION

The House Committee on Interior and Insular Affairs, through its Subcommittee on Mines and Mining and Public Lands Subcommittee, and working with coordinate legislative committees, has given continuing consideration to legislation proposing more effective management and utilization of the resources of the public lands of the United States.

In the more than 80 years since enactment of the Mining Act of 1872, and the period which has elapsed since passage of the Mineral Leasing Act of 1920, the principal problem faced by the Congress and responsible Federal administrative agencies has been this: the development of statutory authority and regulations thereunder which would operate to encourage mining activity on our vast expanse of public lands compatible with utilization, management, and conservation of surface resources such as water, soil, grass, timber, parks, monuments, recreation areas, fish, wildlife, and waterfowl.

The foregoing problem is one of surface versus subsurface competing uses.

In the same category, equally complex, is the problem posed by competition for surface resources on the public lands, for example: grazing and forestry with watershed management; utilization of reservoir sites for storage of water with the use of the same areas for park, monument, scenic, scientific, and recreational values; development of lands through irrigation, flooding, or drainage with use of the same lands as wildlife habitats, or for breeding, nesting, feeding, and resting places for migratory waterfowl, etc.

The latter problem is one of competing surface uses.

Finally, there has been the problem of developing statutory authority containing conditions under which multiple mineral development could go forward. Public Law 585, 83d Congress, the act of August 13, 1954 (68 Stat. 708), operates to permit multiple use of the same lands; that is, concurrent development under the mining law and the mineral leasing laws. Public Law 585 appears to have resolved many of the problems raised by competing subsurface uses.

It is with the first of these problems—surface versus subsurface competing uses—that H. R. 5891 and related measures deal. Consideration of these measures, which propose to modify established procedures and to redefine the surface rights of persons entering on public lands under the mining laws, must be considered in light of presently existing procedure.

*Procedure under mining laws, general*

Deposits of minerals, other than coal, oil, gas, oil shale, sodium, phosphate and potash (and sulfur in the States of Louisiana and New Mexico), in both surveyed and unsurveyed lands belonging to the United States, are open to entry under the act of May 10, 1872, as amended. The act of 1872, with amendments, embraces the general mining laws.

Minerals belonging to the United States and excepted from the operation of the general mining laws may be acquired under what are known as the mineral leasing laws, are not subject to location and

purchase under the mining laws, but may be developed only under rights acquired through license of lease.

Mineral resource utilization comes about only after: (1) prospecting; (2) exploration; and (3) development.

Historically, the Federal mining law has been designed to encourage individual prospecting, exploration, and development of the public domain. The incentive for such activity has been the assurance of ultimate private ownership of the minerals and lands so developed. Under these laws, prospectors may go out on the public domain not otherwise withdrawn, locate a mining claim, search out its mineral wealth and, if discovery of mineral is made, can then obtain a patent. The property, with issuance of patent, becomes the individual's to develop or sell, according to his initiative or desire.

A restatement of the traditional approach of Congress to this development of our mineral resources is to be found in section 1 of the act of May 10, 1872 (17 Stat. 91):

> * * * all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States.

*Initiation of rights to mineral lands*

Rights to mineral lands, owned by the United States, are initiated by prospecting, that is, searching for minerals thereon, and, upon the discovery of mineral, by locating the lands upon which such discovery has been made, or lands which the prospector believes to be valuable for minerals. A location is made by staking the corners of the claim, posting a notice of location thereon, and complying with the State laws regarding the recording of the location in the county recorder's office, discovery work, etc.

*National parks and monuments*

With the exception of Mount McKinley and Glacial Bay National Monuments, both in Alaska, Organ Pipe Cactus National Monument in Arizona, and Death Valley National Monument in California, mining locations may not be made on lands in national parks and monuments after their establishment.

*Minerals in Indian lands*

In general, the mineral deposits in Indian reservation lands are subject to special leasing provisions under the administration of the Bureau of Indian Affairs of the Department of the Interior, and not the general mining laws. An exception to this was the Papago Indian Reservation in Arizona. With enactment of Public Law 47, 84th Congress, 1st session, on May 27, 1955, (H. R. 2682) mineral rights in Papago Reservation lands were conveyed to the Papago Tribe with future control in the tribe, and administrative responsibility in the Indian Bureau.

*National forest lands*

The national forests of the United States are generally open to entry under the mining laws. An exception is made in some instances where Congress has enacted legislation to vest in the Secretary of

Agriculture authority to make regulations with respect to mineral entry in designated national forest areas.

An example is the act of May 24, 1949 (63 Stat. 75; 16 U. S. C. 482 n) which applies to lands within Coconino National Forest, Ariz., and declares that mineral locations made after the date of the act within a specified area (some 20,000 acres) would confer on the locator or patentee only mineral rights and the right to use timber and surface as needed for mining purposes.   The purpose of the act was to reduce the incentive to locate mining claims for nonmining activities without at the same time interfering with the development of bona fide mineral values.

Your committee reported, the House and Senate passed, and the President signed into law on May 13, 1955, H. R. 2679, which extends the application of the act of May 24, 1949, to an additional 78,000 acres in the Coconino National Forest.

*Location and its effect*

Upon entering the lands selected the prospector (also known as an entryman, locator, or claimant) must, to protect his claim, stake it out.   Under the law, he is limited in any one claim to an area of not to exceed 20 acres.   Under traditional practice, this claim will be approximately 600 by 1,500 feet, or less.   By posting notice of location, which notice contains the name of the claimant, date of location, and a description of the claim (forms used vary from mining district to mining district), the locator, without further requirement under Federal law, as of that moment, acquires the immediate right to exclusive possession, control, and use of the land within the corners of his location stakes.   He must, of course, to protect this right to exclusive possession—

(1) comply with the State law having to do with recordation, etc.; and

(2) carry out under the Federal law what is known as annual assessment work.   This simply means that he must perform $100 worth of labor during each assessment year (12-month period beginning July 1), or in the alternative, he must carry out improvements worth $100 in value during the same period.

Having thus complied, he retains exclusive possession, control, and use of the area, and may remove the minerals from the land without first proceeding to patent.

Failure to perform the assessment work for any year subjects the claim to relocation, unless work for the benefit of the claim is resumed before a relocation is made.   The determination of the question of the right of possession between rival and adverse claimants to the same mineral land is a function committed exclusively to the courts.

*Abuses under the mining laws*

The Committees on Interior and Insular Affairs of both the House and Senate have in the past several years been made increasingly aware of the abuses under the general mining laws by those persons who locate mining claims on public lands for purposes other than that of legitimate mining activity.

Because of the widespread and common occurrence in nature of certain materials named in the Materials Act of 1947, and greatly increased public interest in mining brought on by the "boom" in

uranium and other fissionable source materials, these abuses have multiplied in number in the past few years.

Numerous examples have been cited describing the activities of persons using the guise of mining locations for nonmining purposes, and the results of such activities:

The mining laws are sometimes used to obtain claim or title to valuable timber actually located within the claim boundaries. Frequently, whether or not the locator so intends, such claims have the effect of blocking access-road development to adjacent tracts of merchantable Federal timber, or to generally increase costs of administration and management of adjacent lands. The fraudulent locator in national forests, in addition to obstructing orderly management and the competitive sale of timber, obtains for himself high-value, publicly owned, surface resources bearing no relationship to legitimate mining activity.

Mining locations made under existing law may, and do, whether by accident or design, frequently block access: to water needed in grazing use of the national forests or other public lands; to valuable recreational areas; to agents of the Federal Government desiring to reach adjacent lands for purposes of managing wild-game habitat or improving fishing streams so as to thwart the public harvest and proper management of fish and game resources on the public lands generally, both on the located lands and on adjacent lands.

The ingenuity of American citizens which has made our Nation strong has also operated to develop new and better ways of abusing public land resources through obtaining color of title under the mining law.

Some locators in reality, desire their mining claims for commercial enterprises such as filling stations, curio shops, cafes, or for residence or summer camp purposes. If application is made for residence or summer camp purposes under Federal law other than the mining laws, sites usually embrace small tracts, that is, 5-acre tracts; on the other hand, mining locations provide for control and utilization of approximately 20-acre tracts. Fraudulent locators prefer 20 acres to 5 acres.

Under existing law, fishing and mining have sometimes been combined in another form of nonconforming use of the public lands: a group of fisherman-prospectors will locate a good stream, stake out successive mining claims flanking the stream, post their mining claims with "No trespassing" signs, and proceed to enjoy their own private fishing camp. So too, with hunter-prospectors, except that their blocked-out "mining claims" embrace wildlife habitats; posted, they constitute excellent hunting camps.

The effect of nonmining activity under color of existing mining law should be clear to all: a waste of valuable resources of the surface on lands embraced within claims which might satisfy the basic requirement of mineral discovery, but which were, in fact, made for a purpose other than mining; for lands adjacent to such locations, timber, water, forage, fish and wildlife, and recreational values wasted or destroyed because of increased cost of management, difficulty of administration, or inaccessibility; the activities of a relatively few pseudominers reflecting unfairly on the legitimate mining industry.

*Problems faced in developing corrective legislation*

Problems raised by abuses under the mining laws have for sometime been recognized by the legitimate mining industry, by the Federal agencies responsible for administration of the public's resources; by private groups and individuals sincerely interested in wise conservation and utilization of all of our surface and subsurface resources.

If fraudulent locations are made, under present law the United States has the right to refuse patents (if application is made), or to attack such locations in court.

Modification of presently authorized administrative action alone does not appear the answer. Presently available remedies are time-consuming, are costly, and, in the end, not conclusive. Where a location is based on discovery, it is extremely difficult to establish invalidity on an assertion by the United States that the location was, in fact, made for a purpose other than mining.

If locations must be proven fraudulent in court before dispossession, the mining laws must be so drawn or so framed as to make clear to locators what can and what cannot be done. On the other hand, continual interference by Federal agencies in an effort to overcome this difficulty would hamper and discourage the development of our mineral resources, development which has been encouraged and promoted by Federal mining law since shortly after 1800.

Congress and responsible Federal agencies have recognized this need for a balance between competing surface and subsurface demands, as have spokesmen outside of the Federal Government.

The American Mining Congress, a national organization composed of both large and small producers of all metals and minerals mined in the United States, included the following statement in its declaration of public land policy adopted at the annual meeting in San Francisco in September 1954:

> We believe * * * that suitable amendments can be made in the general mining laws which, with proper use of available procedures, will simplify enforcement and minimize bad-faith attempts through pretended mining locations to serve objectives other than the discovery and development of minerals. We believe that this can be accomplished in a manner which will protect the incentive and reward now inherent in the mining laws.

The nonprofit, noncommercial, educational American Forestry Association, with more than 25,000 members, echoes this industry position. With some 800 natural-resource leaders present, the Fourth American Forest Congress, in October 1953, adopted by an overwhelming referendum vote of the association as section III D, of its new program for American forestry, under the heading "Mining on Public Lands," this language:

> Efficient management of many millions of acres of Federal public lands, including the discovery and development of new or known mineral resources, is in the public interest. The legitimate miner and prospector should be encouraged to carry on such work. However, widespread abuses under the existing mining laws as a means of acquiring Government lands for other than mining purposes should be stopped. We therefore recommend that Congress revise the Federal mining laws to prevent their abuse by claimants or patentees who use their claims to tie up more valuable timber or other resources than they legitimately need to develop the minerals.

With this agreement on the end sought to be achieved by remedial legislation there has not always been agreement on what means should be employed to achieve that end.

There is, however, agreement that any corrective legislation providing for multiple use of the surface of the same tracts of public lands, compatible with unhampered subsurface resource development, must be aimed at—

First, prohibiting location of mining claims for any purpose other than prospecting, mining, processing, and related activities;

Second, providing for conservation and utilization of timber, forage, and other surface resources on mining claims, and on adjacent lands; and

Third, accomplishing these desirable ends without materially changing the basic concepts and principles of the general mining laws.

H. R. 5891 is, in the view of the Committee on Interior and Insular Affairs, responsive to the need for corrective action outlined.

### EXPLANATION OF THE BILL, H. R. 5891

H. R. 5891 would amend the Materials Act of 1947 by barring future locations under the mining laws for certain materials commonly occurring throughout the United States, would extend the act's operations to national forest lands, and would give to the Secretary of Agriculture Materials Act administrative responsibility for lands under his jurisdiction.

The bill would also amend the general mining laws by defining the rights of locators to surface resources prior to patent for locations hereafter made; would establish procedures for more efficient management and administration of the surface resources on mining locations hereafter made; and would permit quieting of title to surface resources on locations made prior to the effective date of the act through procedures established in the act.

*1. Amendment of Materials Act*

Section 1 of the reported bill when read together with section 3 of the bill would amend section 1 of the act of July 31, 1947 (61 Stat. 681; 43 U. S. C. 1185) to remove from the purview of the mining laws location and removal thereunder of common sand, stone, gravel, pumice, pumicite, and cinders. In the future, these commonly occurring materials cannot be the object of location and removal under the general mining law, but will be subject to disposal under the Materials Act.

The Secretary of Agriculture is given, by section 1, the same authority with respect to mineral materials and vegetative materials located on lands under his jurisdiction as that which the Secretary of the Interior has with respect to lands under his jurisdiction.

The provisions of section 1 of the 1947 act, as thus amended, will, by the terms of this bill, apply in the future to national forest and title III Bankhead-Jones lands, which lands are already subject to the general mining laws.

The provisions of section 1 of the 1947 act will remain inapplicable to national parks and national monuments or to Indian lands, or lands set aside or held for the use or benefit of Indians, including lands withdrawn for Indian use by Executive order.

Section 1 of the bill applies only to locations made after enactment, does not affect rights under existing valid mining claims.

*2. Receipts from materials disposal*

Section 2 of H. R. 5891 would amend section 3 of the 1947 act (43 U. S. C. 1187) to provide that moneys received from the disposal of materials thereunder shall be subject to disposition under the same provisions as moneys received from the sale of public lands, except that moneys received from the disposal of materials by the Secretary of Agriculture would be disposed of in the same manner as are other receipts from the lands from which the materials are removed.

Receipts from disposal of materials from Alaska school section lands will be treated as income from such lands is presently treated.

*3. Removal of common materials from mining location*

Section 3 of the bill specifically states that a deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders shall not be deemed a valuable mineral deposit within the meaning of the mining laws so as to give effective validity to any mining claim hereafter located under such mining laws.

Attention is called to two additional clauses contained in this section.

The proviso in this section reading—

> * * * nothing herein contained shall affect the validity of any mining location based upon discovery of some other mineral occuring in or in association with such a deposit—

has been incorporated in the bill to make clear the committee intent to not preclude mining locations based on discovery of some mineral other than a common variety of sand, stone, etc., occurring in such materials, for example, a mining location based on a discovery of gold in sand or gravel.

The last sentence of this section declares that—

> "Common varieties" as used in this act does not include deposits of such materials which are valuable because the deposit has some property giving it distinct and special value * * *,

which language would exclude materials such as limestone, gypsum, etc., commercially valuable because of "distinct and special" properties.

Finally, this section contains the clause—

> * * * and does not include so-called "block pumice" which occurs in nature in pieces having one dimension of two inches or more,

which clause recognizes a class of pumice having distinct and special properties.

Section 3 of the bill applies only to locations made after enactment, does not affect rights under existing valid mining claims.

*4. Rights of future locators to surface resources*

Section 4 of the bill delineates the rights, limitations, and restrictions which would apply to any unpatented mining claim located after the effective date of the act.

Subsection (a) specifically provides that, prior to issuance of patent, no mining claim hereafter located could be used for any purpose other than prospecting, mining, or processing operations and uses reasonably incident thereto. In short, this subsection recognizes essential rights—mining claims can, in the future, be used for activities related to prospecting, mining, processing and related activities, though not for unrelated activities.

Subsection (b) of section 4 provides that hereafter located claims under the mining laws shall be subject, prior to patent issuance, to the right of the United States to manage and dispose of the vegetative surface resources thereof and to manage other surface resources thereof, except mineral deposits subject to location under the mining laws.

This subsection would also make such claims subject, prior to issuance of patent, to the right of the United States, its permittees and licensees, to use so much of the location surface as may be necessary for access to adjacent land.

With respect to the reservations in the United States to use of the surface and surface resources as set out in the two preceding paragraphs attention is called to the proviso which qualifies them:

> * * * any use of the surface of any such mining claim by the United States, its permittees, or licensees, shall be such as not to endanger or materially interfere with prospecting, mining, or processing operations or uses reasonably incident thereto.

This language, carefully developed, emphasizes the committee's insistence that this legislation not have the effect of modifying long-standing essential rights springing from location of a mining claim. Dominant and primary use of the locations hereafter made, as in the past, would be vested first in the locator; the United States would be authorized to manage and dispose of surface resources, or to use the surface for access to adjacent lands, so long as and to the extent that these activities do not endanger or materially interfere with mining, or related operations or activities on the mining claim.

Subsection (c) of section 4 of the bill specifically imposes restrictions on the locator's use of surface resources not related to mining or related activities.

It prohibits removal or use, by the mining claimant, of timber or other surface resources made subject, by subsection (b) of section 4, to management and disposition by the United States; again, it will be noted—

> Except to the extent required for the mining claimant's prospecting, mining, or processing operations and uses reasonably incident thereto, or for the construction of buildings or structures in connection therewith, or to provide clearance for such operations or uses, or to the extent authorized by the United States * * *.

This language, read together with the entire section, emphasizes recognition of the dominant right to use in the locator, but strikes a balance, in the view of the committee, between competing surface uses, and surface versus subsurface competing uses.

Finally, subsection (c) requires that any timber cutting by the mining claimant, other than that to provide clearance, shall be done in accordance with sound principles of forest management.

The foregoing rights, reservations, limitations, and restrictions apply only to claims hereafter located, and operate only prior to issuance of patent.

After patent, the patentee, as under traditional law which has existed since 1872, acquires full title to the mining claim and its resources, surface, and subsurface. As members will understand, acquisition of patent requires compliance with the mining laws as to location, performance of assessment work, payment to the United States of the purchase price, and a determination by the Department of the Interior as to claim validity and full compliance with the law.

*5. Procedure for resolving title uncertainties on claims located prior to date of the act*

Section 5 of the bill would establish a procedure for determining expeditiously title uncertainties resulting from the existence of abandoned, invalid, dormant, or unidentifiable mining claims, located prior to the enactment of the bill.

At the present time, agencies administering federally owned lands encounter many difficulties because of the presence of unpatented mining claims the existence of which they may not even be aware. If section 4 of H. R. 5891 is to have the desired effect upon management and use of surface resources, it was concluded the section 5 provisions are necessary to identify which unpatented claims will be subject to its provisions; the in rem procedure established would permit a determination of those valid claims existing prior to enactment with respect to which claimants are asserting surface rights adverse to the United States.

The committee understands that this section does not impair authority under existing law to declare mining claims null and void for failure to comply with provisions of law governing such claims, and that nothing in this section or elsewhere in the bill would prevent the taking by the United States of any mining claim under the right of eminent domain.

Proceeding in a manner similar to that provided in the act of August 13, 1954 (Public Law 585, 83d Cong., 2d sess.; 68 Stat. 708), the Secretary of the Interior, at the request of the Federal department or agency having the responsibility for administering the surface of United States lands in a given area, shall initiate action for a determination of surface rights thereto. Under this procedure, a holder of a claim located prior to enactment could assert and establish his rights in the lands covered by his claim, and such claim would be unaffected by the proceeding.

If such a claimant fails to establish his rights, or fails to assert his rights, or if he voluntarily waives his rights to the surface, he will be in the same position as a holder of a claim located after enactment of this bill.

The procedure does not affect the right of a claimant to apply for patent, and if patent is granted he would acquire the same title as he would under the existing law.

*Initiating proceedings.*—Subsection (a) of section 5 would permit setting in motion this chain of events: the responsible Federal administrator would file with the Secretary of the Interior a request for publication of notice to mining claimants for the determination of surface rights to a described area.

The bill requires that such request be accompanied by affidavits of persons who had examined the lands involved in an effort to ascertain whether or not any persons were in possession of, or engaged in working, the lands. The affidavit would state the names and addresses of all persons so found, or if none were found, a statement to that effect.

It is further required that there accompany such request the certificate of an attorney, a title abstractor, or a title or abstract company, based upon an examination of tract indexes in the county office of record, setting forth the name of any person appearing in those records

as having an interest in the lands involved under an unpatented mining claim.

*Notice by publication, and registered mail, or in person.*—Upon receipt of such request, accompanied by the required affidavits and certificate of records abstract, the Secretary of the Interior, at the expense of the requesting department or agency, will publish notice to mining claimants in a newspaper of general circulation in the county in which the lands involved are situated.

If published in a daily newspaper, the bill requires publication in the Wednesday issue for 9 consecutive weeks; if in a weekly paper, in 9 consecutive issues; if in a semiweekly or triweekly paper, in the issue of the same day of each week for 9 consecutive weeks.

In addition, each person shown by name and address in the affidavits required will by registered mail or in person receive, within 15 days after first publication, a copy of the published notice; so too will persons whose names and addresses are set out in the required certificate of records abstract, and those filing requests for such notices under subsection (d) of section 5.

*Summary of notice requirements.*—Summarized, the detailed requirements of subsection (a) of section 5 as to notice of pendency of the "quiet title" proceeding would: require a preexamination of the lands, to ascertain, if possible, any parties in possession. Notice must be published in a newspaper of general circulation in the county in which the lands involved are situated. A copy of the notice must be personally delivered or sent by registered mail: (1) To each person found to be in possession or engaged in working the lands involved in the proceeding, and (2) to each person who has filed in the county office of record a request for such notice as contemplated under subsection (d), and a copy of the notice must be mailed by registered mail to each person who is shown by a title search to have an interest in the lands.

*Failure to assert rights, effect.*—Subsection (b) of section 5 establishes a time deadline for assertion of rights to lands involved, and spells out the consequences of failure on the part of claimants to act.

Any person asserting an unpatented mining claim in lands involved would be required to submit, within 150 days from the date of first publication, a statement setting forth pertinent information as to his claim.

Any claimant failing to submit such a statement would be conclusively deemed, except as provided in subsection (e) of section 5:

> (1) to have waived and relinquished any right, title, or interest under such mining claim contrary to or not in conflict with the limitations or restrictions specified in section 4 of the act as to hereafter located unpatented mining claims;
>
> (2) to have consented that such mining claim, prior to issuance of patent therefor, shall be subject to the limitations and restrictions specified in section 4 as to hereafter located unpatented mining claims; and
>
> (3) to have precluded any right in himself to thereafter, prior to issuance of patent, assert any right or title to, or interest in or under, such mining claim contrary to or in conflict with the limitations or restrictions specified in section 4 of the act as to hereafter located unpatented mining claims.

*Hearing on determination of rights.*—Subsection (c) of section 5 provides that if a mining claimant asserts rights contrary to or in

conflict with the provisions relating to the use and management of surface resources, as set forth in section 4 of this bill, the Secretary of the Interior shall hold a hearing to determine the validity of such rights.

Such hearings would, under the bill, follow the established general procedures and rules of practice of the Department of the Interior with respect to contests or protests affecting public lands.

To limit the length of the hearing and cost of transcripts, the bill limits any single hearing to a maximum of 20 mining claims, unless the parties otherwise stipulate.

*Assurance of receiving notice.*—Subsection (d) of section 5 permits a mining claimant to assure himself in advance of receiving notice of a proposed proceeding affecting his claim if the claimant files in the county office of record a request for a copy of any such notice, giving his name, address, and certain data as to each unpatented mining claim under which he asserts rights.

*Effect of Federal failure to notify.*—Subsection (e) of section 5 provides that the publication of notice shall be wholly ineffectual as to any person entitled to be served with, or to be mailed a copy of, the published notice, if the notice is not in fact so served upon or mailed to him.

*6. Waiver or relinquishment of surface rights*

Section 6 has as its objective permitting and encouraging cooperation and avoidance of controversy.

It permits the owner of any unpatented mining claim, heretofore located, if he so desires, to waive and relinquish all rights thereunder which are contrary to or in conflict with the limitations and restrictions specified in section 4; effect of such waiver and relinquishment would, in other words, result in such a claim having a surface rights status applicable to mining claims hereafter located.

This section specifically declares that such a waiver or relinquishment will not constitute any concession as to the validity of the owner's claim, or as to the date of priority of rights under the claim.

*7. General construction section*

Section 7 restates the scope of the bill to make it clear that—

(1) the bill will in no way limit or restrict existing rights under any valid mining claim except insofar as those rights are limited or restricted in actions taken pursuant to sections 5 by operation of section 5 or section 6; nor will

(2) the bill authorize the inclusion in patents issued for mining claims after the date of the act of any limitations or restrictions not otherwise authorized by law.

COMMITTEE AMENDMENTS TO H. R. 5891

The committee has adopted five amendments to the printed bill, as follows:

*Amendment 1.*—Insertion, after the words "United States", where they first occur in the first full sentence of section 1 of the words:

including for the purpose of this Act land described in the Acts of August 28, 1937 (50 Stat. 874) and of June 24, 1954 (68 Stat. 270).

This amendment would make the provisions of sections 1 and 2 specifically applicable to the revested Oregon and California Railroad

grant lands and the reconveyed Coos Bay Wagon Road grant lands, which otherwise would be excepted from the provisions of sections 1 and 2.

*Amendment 2.*—At the end of the last sentence in section 1, striking out the word "Agriculture.", and inserting in lieu thereof:

> Agriculture: *Provided*, That, notwithstanding any other provisions of law, such leases or permits may be issued for lands administered for national park, monument, and wildlife purposes only when the President, by Executive order, finds and declares that such actions necessary in the interests of national defense.

This proviso, identical to one included in the act of August 13, 1954 (Public Law 585, 83d Cong., 2d sess.; 68 Stat. 708), makes clear that lands administered for national park, monument, and wildlife purposes would be subjected to entry under the Materials Act of 1947 only after the President had, by Executive order, found and declared such action necessary in the interests of national defense.

*Amendment 3.*—Insertion, after the words "and except" following the second full clause of the quoted material in section 2 of the words:

> that revenues from the lands described in the Act of August 28, 1937 (50 Stat. 874) and the Act of June 24, 1954 (68 Stat. 270) shall be disposed of in accordance with said Acts and except.

This amendment also refers specifically to the revested Oregon and California Railroad grant lands and the reconveyed Coos Bay Wagon Road grant lands, and provides that revenues from Materials Act activities on these lands would be disposed of as are other revenues from them; this is entirely consistent with the language in the bill providing for disposal of revenues on lands under the Department of Agriculture, and Alaska school section lands.

*Amendment 4.*—In the first line of subsection (a) of section 5, striking the words "The Secretary of the Federal Department" and substituting the words: "The head of a Federal department or agency".

This amendment is clarifying only; later language of section 5 clearly indicates that its provisions apply to all departments and agencies, while the phraseology in the first sentence of the printed bill might have been interpreted as limiting the section's scope to the executive departments only.

*Amendment 5.*—Striking the period after the word "law" at the end of the last sentence in section 7, and inserting the words:

> or to limit or repeal any existing authority to include any limitation or restriction in any such patent.

Certain existing statutes limit or restrict mining activities upon lands owned by the United States, as for example, the act of April 8, 1948 (62 Stat. 162), which opened the revested Oregon and California Railroad grant lands and the reconveyed Coos Bay Wagon road grant lands to exploration, location, entry, and disposition under the general mining laws, but which limited—with respect to timber on such lands—the rights of persons making entry on those lands.

Reference to "* * * any limitation or restriction" is also of significance in view of the provisions of two congressional acts: the act of August 12, 1953 (Public Law 250, 83d Cong., 1st sess.; 67 Stat. 539), and the act of August 13, 1954 (Public Law 585, 83d Cong., 2d sess.; 68 Stat. 708).

Both of these acts operate, within the terms thereof, to create authority for, and to establish procedure whereby, there is reserved to the United States all Leasing Act minerals; further, they operate

to reserve to the United States, its lessees, permittees, and licensees, within the limits specifically set out, the right to entry upon and removal from mining locations (prior to, and after patent) of Leasing Act minerals. The right to use mining locations, or restricted mineral patent lands falling within the scope of the acts is similarly reserved to the United States, its lessees, etc., for access to adjacent lands for mineral leasing activities.

The committee understands that the effect of its amendment to section 7 of the bill makes clear that this saving language is broad enough to include and leave unaffected, the rights of reservation to the United States created by Public Law 250 and Public Law 585 of the 83d Congress.

SUPPORT FOR H. R. 5891

The language of the bill, as reported, has been developed with the support and cooperation of both the Departments of Agriculture and Interior.

Included in a long list of national, State, and local groups and individuals supporting this legislation are the following:

American Mining Congress; American Federation of Labor; Independent Timber Farmers of America; The American Forestry Association; Western Lumber Manufacturers; National Wildlife Federation; Sports Afield; National Lumber Manufacturers Association; National Farmers Union; Wildlife Management Institute; the Izaak Walton League of America; the National Grange; Northwest Mining Association; Northern Rocky Mountain Sportsmen's Association; Western Forest Industries Association; Western Forestry and Conservation Association; United States Chamber of Commerce; Society of American Foresters; and the American Nature Association.

Three States—California, Oregon, and Arizona—through conservation organizations, have endorsed its enactment, along with numerous other industry, labor, civic, educational, conservation, and hunting and fishing organizations and individuals.

The favorable reports of the Departments of Interior and Agriculture are set out following.

DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, D. C., May 17, 1955.*

Hon. CLAIR ENGLE,
*Chairman, Committee on Interior and Insular Affairs,*
*House of Representatives, Washington, D. C.*

MY DEAR MR. ENGLE: This is in reply to your request for the views of this Department on H. R. 5561, H. R. 5577, and H. R. 5891, all of which are bills to amend the act of July 31, 1947 (61 Stat. 681) and the mining laws to provide for the multiple use of the surface of the same tracts of the public lands and for other purposes. H. R. 5561 and H. R. 5891 are identical, and H. R. 5577 differs from them in only one respect. All references in this report are to H. R. 5561 unless otherwise noted.

We recommend that H. R. 5561 be enacted, and suggest that it be amended as indicated hereinafter.

H. R. 5561, if enacted, would make a number of significant changes in existing laws governing mining and the disposal of materials on the public lands particularly insofar as surface uses and rights are concerned. Briefly summarized, the bill may be said to provide as follows: (1) the first three sections would exclude certain minerals from among those on which claims under the mining laws may be based, and would provide a means for the disposal of the materials so excluded; (2) section 4 would limit the rights of a holder of an unpatented mining claim hereafter located to the use of the surface and surface resources; and (3) sections

5 and 6 would provide a procedure for the clarification of surface rights appurtenant to mining claims existing at the time of the bill's enactment. Existing rights would be protected by section 7.

Section 1 of the bill would amend section 1 of the act of July 31, 1947 (61 Stat. 681; 43 U. S. C., sec. 1185) to add certain common minerals to the materials subject to disposition under that act. Also, the Secretary of Agriculture would be given the same authority with respect to mineral materials, including, but not limited to, sand, stone, gravel, pumice, pumicite, cinders, and clay, and vegetative materials, including, but not limited to, yucca, manzanita, mesquite, cactus, and timber or other forest products, located on lands under his jurisdiction as that which the Secretary of the Interior has with respect to lands under his jurisdiction. The provisions of that section would remain inapplicable to national parks and monuments and to Indian lands, but would in future be applicable to national forests. The provisions of section 1 of H. R. 5577 differ in that they would also be inapplicable to the revested Oregon and California Railroad grant lands and the reconveyed Coos Bay Wagon Road grant lands.

Section 2 would amend section 3 of that act, as amended (43 U. S. C., sec. 1187) to provide that moneys received from the disposal of materials thereunder would be subject to disposition under the same provisions as moneys received from the sale of public lands, except that moneys received from the disposal of materials by the Secretary of Agriculture would be disposed of in the same manner as are other receipts from the lands from which the materials are removed. Moneys received from the disposal of materials from school section lands in Alaska would be treated as income from such school section lands is ordinarily treated.

Section 3 specifically states that a deposit of common varieties of sand, stone, gravel, pumice (except block pumice), pumicite, or cinders shall not be deemed a valuable mineral deposit within the meaning of the mining laws so as to give effective validity to any claim located thereunder.

Section 4 provides that, prior to the issuance of patent, no mining claim located subsequent to the enactment of H. R. 5561 could be used for any purpose other than prospecting, mining, or processing operations, and uses reasonably incident thereto, and all rights under the claim would be subject to the right of the United States to manage and use the surface; moreover, prior to the issuance of patent, no claimant could sever, remove or use vegetative or other surface resources, except to the extent required by mining operations or uses reasonably incident thereto.

At the present time, agencies administering federally owned lands encounter many difficulties in administering the lands under their jurisdiction because of the presence of unpatented mining claims of the existence of which they may not even be aware. This undesirable situation would be alleviated by the procedure which section 5 of H. R. 5561 would provide for determining expeditiously title uncertainties resulting from the existence of abandoned, invalid, dormant, or unidentifiable mining claims, located prior to the enactment of the bill. Not only is it necessary that some means be established for the expeditious determination of these uncertainties resulting from the existence of such claims, but, if section 4 of this bill is to have the desired effect upon the management and use of surface resources of unpatented mining claims, a procedure to identify which unpatented claims will be subject to its provisions is necessary. In our opinion, the procedure to be established by section 5 would answer this need, for it would permit a determination of those valid claims existing prior to the enactment of the bill with respect to which claimants are asserting surface rights adverse to the United States. We do not interpret the provisions of section 5 as impairing authority under existing law to declare mining claims null and void for failure to comply with provisions of law governing such claims. We have also assumed that nothing in the bill would prevent the taking by the United States of any mining claims under the right of eminent domain.

The procedure which section 5 would establish would commence with the Secretary of any Federal department, responsible for administering the surface resources of any lands belonging to the United States, filing with the Secretary of the Interior a request for publication of notice to mining claimants for the determination of surface rights. The filing of a request of that nature would be accompanied by affidavits of persons who had examined the lands involved in an effort to ascertain whether or not any persons were in possession of or engaged in working the lands; the affidavits would state the names and addresses of all persons so found or, if none were found, would state that fact.

The request would also be accompanied by the certificate of an attorney, a title abstractor, or a title or abstract company, based upon an examination of tract indexes in the county office of record, setting forth the name of any person

appearing in those records as having an interest in the lands involved under an unpatented mining claim. The Secretary of the Interior would, upon the receipt of such a request, publish notice to mining claimants in a newspaper having general circulation in the county wherein the lands involved are situated. Any person asserting an unpatented mining claim in those lands would be required to submit, within 150 days, a statement setting forth pertinent information as to his claim, and any claimant failing to submit such a statement would be conclusively deemed to have waived any rights to his claim which would be contrary to the limitations set forth in section 4 of the bill with respect to the use of the surface and to have consented to the subjection of his claim to the provisions of that section. Upon publication of notice in a newspaper, a copy of that notice would be delivered, either in person or by registered mail, to each person whose name and address appear in the affidavits and certificates submitted with the request for publication.

The bill also would provide a method by which any person desirous of receiving notice with respect to any particular lands might file a request for such notice in the appropriate county office of record. If any statement should be filed by a claimant in response to the publication or delivery of notice, the Secretary of the Interior would hold hearings to determine the validity and effectiveness of any right or title to that mining claim, or interest in or under that claim, which is contrary to or in conflict with the provisions relating to the use and management of surface resources, set forth in section 4 of the bill. Such hearings would follow the established general procedures and rules of practice of the Department of the Interior with respect to contests or protests affecting public lands. If, with respect to any person, the requirements as to personal delivery or mailing of notice should not be complied with, that person's rights would be affected in no way by the publication of notice.

Section 6 provides that, while any owner of an unpatented mining claim may waive or relinquish all rights thereunder contrary to or in conflict with the restrictions of section 4, such a waiver or relinquishment will not constitute any concession as to the validity of his claim or as to the date of priority of rights under that claim.

Section 7 provides that the bill will in no way limit or restrict existing rights under any valid mining claim except insofar as those rights are limited or restricted in actions taken pursuant to sections 5 and 6, nor will the bill authorize the inclusion in patents thereafter issued for mining claims of any limitations or restrictions not otherwise authorized by law.

H. R. 5561 is designed to meet a situation which has arisen because of more intensive Federal use of the public lands in recent years. Under the existing mining laws various abuses have been possible. For example, it has been possible for persons who have unpatented claims under the mining laws to prevent orderly management and disposition of valuable timber and other surface resources, and also to block access to such resources on unlocated Federal land while paying little or no attention to mining. Moreover, many claims have been based on deposits of the mineral materials listed in section 1 which, although technically of sufficient value to justify a location, are actually of minor worth as compared to other natural resources of the land. Another example of these abuses may be seen in the fact that it has been possible to acquire a color of right, through a mining location, for nonmining purposes, such as summer homesites.

This bill is designed to strike at these abuses, which violate the spirit of the mining laws. The bill provides that deposits of common minerals such as ordinary varieties of sand, stone, gravel, pumice, pumicite, and cinders shall not be deemed valuable mineral deposits within the meaning of the mining laws. Secondly, it prohibits the use of a claim for any nonmining purpose prior to the issuance of patent.

The type of practice against which this bill is directed has drawn the disapproval of the mining industry generally, conservation groups, and other public-land users. The national interest in encouraging the discovery of minerals dictates that the mining industry should have a continued opportunity to locate mining claims, to mine minerals found there, to discover and develop commercial deposits, and, if fortunate, to make a profit, but the national interest is not served by preventing the use of the surface of unpatented claims for other desirable uses which do not substantially interfere with mining operations and related activities. This legislation is based upon this sound premise, in our view.

At the same time as the proposed legislation would meet the wishes of the mining industry, it would also give full recognition to the vital importance of the forest and range resources of the public lands and the national forests, for the

bill provides for the multiple use of the surface of mining claims and thus permits the conservation and wise use of all surface resources in the public interest.

We have discussed above the need for a procedure for establishing the existence of unpatented mining claims and for determining the respective rights of the United States and holders of unpatented mining claims. Certainly, the procedure which section 5 would establish would eliminate many of the problems relating to ownership and management of surface resources which arise in the case of Government timber sales, grazing permits, and watershed and recreational development. Under the procedure which would be provided by this bill, it is hoped that an area in which a timber sale, for example, was contemplated could be subjected to a conclusive determination of surface rights within a reasonably short time.

We believe that the bill should be amended so that the provisions of sections 1 and 2 would be specifically applicable to the revested Oregon and California Railroad grant lands and the reconveyed Coos Bay Wagon Road grant lands. The other sections of H. R. 5561 are already applicable to these lands, and there is no reason why these lands should not be subject to the same provisions of law as other public lands in these respects. We suggest, therefore, that there be inserted immediately after "United States," at page 2, line 2, the following: "including for the purposes of this Act land described in the Acts of August 28, 1937 (50 Stat. 874) and of June 24, 1954 (68 Stat. 270),". For the same reason, we also suggest that there be inserted, immediately after "except" at page 3, line 22, the following: "that revenues from the lands described in the Act of August 28, 1937 (50 Stat. 874) and the Act of June 24, 1954 (68 Stat. 270) shall be disposed of in accordance with said Acts and except".

As we have pointed out above, the provisions of section 1 of H. R. 5577 only are inapplicable to the Oregon and California Railroad and the Coos Bay Wagon Road lands. We suggest, therefore, with respect to H. R. 5577 that the following words, beginning at page 3. line 4, be deleted: "or to lands described in the Act of August 28, 1937 (50 Stat. 874), or in Public Law 426, Eighty-third Congress."

It is also suggested that the language used at the beginning of section 5 requires clarification. Though the later language of section 5 clearly indicates that its provisions apply to all departments and agencies, the phraseology in the first sentence of the section could well be interpreted as limiting the section's scope to the executive departments only. We suggest, therefore, that all of line 3, page 6, be deleted and the following substituted in its place "The head of a Federal department or agency."

Certain existing statutes limit or restrict mining activities upon lands owned by the United States, as, for example, the act of April 8, 1948 (62 Stat. 162), which opened the revested Oregon and California Railroad grant lands and the reconveyed Coos Bay Wagon Road grant lands to exploration, location, entry, and disposition under the general mining laws, but which limited, with respect to the timber on those lands, the rights of persons making entry on those lands. We believe it essential that nothing in H. R. 5561 be interpreted as repealing or amending any of those laws imposing such special limitations or restrictions. Though the existing language of the bill may afford such a guaranty, we suggest that the period at the end of section 7 be replaced by a comma and the following added: "or to limit or repeal any existing authority to include any limitation or restriction in any such patent."

The Bureau of the Budget has advised that there is no objection to the presentation of this report to your committee.

Sincerely yours,

FRED G. AANDAHL,
*Assistant Secretary of the Interior.*

---

DEPARTMENT OF AGRICULTURE,
*Washington, D. C., May 17, 1955.*

Hon. CLAIR ENGLE,
*Chairman, Committee on Interior and Insular Affairs,*
*United States House of Representatives.*

DEAR CONGRESSMAN ENGLE: Reference is made to your request of May 11 for a report on H. R. 5891, a bill to amend the act of July 31, 1947 (61 Stat. 681), and the mining laws to provide for multiple use of the surface of the same tracts of the public lands and for other purposes.

We strongly recommend early enactment of this bill with one clarifying amendment as subsequently described.

H. R. 5891 is identical to S. 1713, H. R. 5561, 5563, 5572, 5595, 5742, and almost identical to H. R. 5577.

This bill would apply to all lands of the United States subject to the general mining laws. Its major provisions are:

(1) Common varieties of sand, stone, gravel, pumice, pumicite, and cinders would be removed from the purview of the United States mining laws and made subject to disposal only under the provisions of the Materials Act of July 31, 1947 (61 Stat. 681), by the Secretary of Agriculture for lands under his jurisdiction and by the Secretary of the Interior for other public lands of the United States. This part of the bill is similar to H. R. 230, which was reported by your committee earlier this session and which has passed the House.

(2) Mining claims located after enactment of the bill could not, prior to patent, be used for other than mining purposes without authorization from the United States, and such locations would be subject to the right of the United States to manage and dispose of the vegetative surface resources, to manage other surface resources thereof (except minerals subject to the mining laws), and to use so much of the surface as necessary for such purposes or for access to adjacent land; provided that any use of the surface by the United States, its permittees or licensees, could not endanger or materially interfere with mining uses. Mining claimants could not use surface resources subject to management and disposal by the United States except to the extent required for mining purposes, and any timber cut for such purposes, except for clearance, must be in accordance with sound principles of forest management.

(3) Under a procedure similar to that provided in Public Law 585 of the 83d Congress, the Secretary of the Interior shall, at the request of the Federal department having the responsibility for administering the surface of lands of the United States, initiate action for a determination of surface rights as to a given area. Under this procedure, a holder of a claim located prior to enactment of this bill could assert and establish his rights in the lands covered by his claim, and such claim would be unaffected by the proceeding. If such a claimant fails to establish his rights, or fails to assert his rights, or if he voluntarily waives his rights to the surface, he will be in the same position as a holder of a claim located after enactment of this bill. The procedure does not affect the right of a claimant to apply for patent, and if patent is granted he would acquire the same title as he would under the existing law.

We believe this bill, if enacted, would go far toward correcting some of the very difficult problems confronting this Department in its administration of those national forests and title III Bankhead-Jones lands subject to the general mining laws of the United States. We also believe that for the first time an area of agreement has been reached on this problem between the administrators of public lands under the jurisdiction of both the Departments of Interior and Agriculture, representatives of the mining industry, and conservation groups.

The Department of Agriculture desires to encourage legitimate prospecting, and effective utilization and development of mineral resources of the national forests and title III lands. We would not favor legislation which would interfere with such development of minerals nor work hardship on the bona fide prospector or miner. We also recognize that the mining industry does not condone the use of mining claims on the public lands for other than mining purposes.

However, on the national forests the mining laws are sometimes used to obtain claim or title to valuable timber, summer home sites, or lands blocking access to Government timber and to water needed in the grazing use of the national forests.

As of January 1, 1952, there were 36,600 mining patents on the national forests, covering 918,500 acres. Only about 15 percent of these mining patents have been or are commercially successfull mines. As of the same date, there were approximately 84,000 claims, covering 2.2 million acres. Only 2 percent of these claims were producing minerals in commercial quantities and probably not more than 40 percent could be considered valid under the requirements of the mining laws. Yet, on these national forest claims, there was tied up over 8 billion feet of commercial sawtimber, valued at about $100 million which the Government could not sell without consent of the claimant. In other words, national forest timber exceeding in quantity and value that cut from all national forests in any one year is tied up on mining claims and cannot be sold by the Government. The two tables attached to this report supply these basic statistics by States.

The effect of this situation is increased costs of administration, obstruction of orderly management and the competitive sale of timber, and obtaining high-value, publicly owned surface resources by a few individuals at nominal cost.

In the last 3 years there has been a tremendous increase in the number of mining claims on the national forests, principally as the result of prospecting for uranium

Case 3:19-cv-00661-LRH-CSD Document 73 Filed 03/30/22 Page 43 of 84

and other fissionable materials. For example as of January 1, 1955, it is estimated that there were 166,000 claims on the national forests, covering nearly 4 million acres, or about a 100-percent increase in the past 3 years. At the rate claims are currently being filed, we estimate that by the end of this calendar year there will be about 225,000 mining claims on the national forests. It is also estimated conservatively that there are now over 10 billion board-feet of timber tied up on national forest mining claims, having a current stumpage value of $112 million.

Following is an estimate of the number of claims and included acreage by States in the national forests as of January 1, 1955.

| State | Thousand claims | 1955 claims as multiple of 1952 claims | Thousand acres | 1955 acreage as multiple of 1952 acreage |
|---|---|---|---|---|
| Arizona | 34.3 | 6.9 | 684 | 6.2 |
| California | 21.0 | 1.1 | 602 | 1.0 |
| Colorado | 16.7 | 1.8 | 375 | 1.5 |
| Idaho | 18.4 | 1.2 | 408 | 1.2 |
| Montana | 14.6 | 2.1 | 282 | 2.1 |
| Nevada | 5.2 | 1.8 | 108 | 2.3 |
| New Mexico | 8.7 | 3.7 | 223 | 2.8 |
| Oregon | 6.7 | .9 | 215 | .8 |
| South Dakota | 4.8 | 1.9 | 103 | 2.0 |
| Utah | 28.4 | 3.6 | 583 | 3.2 |
| Washington | 5.3 | 1.8 | 94 | 1.3 |
| Wyoming | 2.1 | 2.5 | 78 | 2.4 |
| Total | 166.2 | 2.0 | 3,755 | 1.7 |

The number of claims is "snowballing" so fast that the situation on the national forests is rapidly getting out of hand. The above summary, for example, shows that there are nearly 7 times as many mining claims in Arizona as 3 years ago, and nearly 4 times as many in New Mexico and Utah. The increase has been large in other States, too. Equitable corrective action as would be provided by H. R. 5891 is urgently needed. It is needed quickly because new claims are being filed at the rate of about 5,000 per month.

We suggest the following be added after the word "except" in line 21, page 3 of H. R. 5891: "that revenues from the lands described in the Act of August 28, 1937 (50 Stat. 874), and the Act of June 24, 1954 (68 Stat. 270), shall be disposed of in accordance with the provisions of said Acts, and except".

The above amendment would make it clear that revenues from O. and C. lands under the administration of the Department of the Interior and lands administered by the Department of Agriculture under the 1954 act will be placed in the O. and C. fund.

To effectively implement the provisions of H. R. 5891, particularly those of section 5, it is estimated that about $750,000 to $1 million would be needed annually by this Department for roughly a 10-year period, after which costs would drop to a relatively small amount. After claims located prior to enactment of the bill had been processed in accord with section 5, costs relating to this bill would be limited largely to costs of issuing permits for disposal of materials under the Materials Act. Such costs would be offset in whole or in part by revenues from such permits.

In summary, this Department recommends enactment of H. R. 5891 since it will to much to solve the serious problems presented by mining claims in the management of public lands and resources. It will correct deficiencies in the mining laws and prevent many of the abuses by other than bona fide miners, but it will not obstruct or interfere with bona fide mineral prospecting, mining, and development. The Department is anxious to see these measures taken and strongly endorses this bill. However, H. R. 5891 does not include all of the changes in the mining laws which would be desirable from a good public land management standpoint and some problems would remain with respect to mining on the national forests and title III lands that this bill would not correct.

The Bureau of the Budget advises that from the standpoint of the program of the President there is no objection to the submission of this report.

Sincerely yours,

True D. Morse, *Acting Secretary.*

*Estimated number of unpatented mining claims on the national forests (as of Jan. 1, 1952)*

| State | Number of claims | Acres | Estimated percent which are producing minerals in commercial quantities | Estimated percent considered valid under the mining laws | Timber on claims | |
|---|---|---|---|---|---|---|
| | | | | | Volume (thousand feet, board measure) | 1951 value |
| Arizona | 5,000 | 95,400 | 9.0 | 22 | 70,000 | $700,000 |
| California | 19,040 | 582,700 | .8 | 30 | 3,400,000 | 50,177,000 |
| Colorado | 9,450 | 255,000 | 1.0 | 37 | 80,000 | 368,000 |
| Idaho | 15,840 | 355,100 | 4.3 | 42 | 1,170,000 | 8,425,000 |
| Montana | 6,860 | 132,000 | 1.7 | 45 | 85,000 | 440,000 |
| Nevada | 2,940 | 50,700 | 2.0 | 60 | | |
| New Mexico | 2,350 | 81,700 | 3.0 | 24 | 225,000 | 2,000,000 |
| Oregon | 7,780 | 267,300 | 1.8 | 55 | 2,301,000 | 36,307,000 |
| South Dakota | 2,600 | 52,500 | 4.5 | 30 | 81,000 | 542,000 |
| Utah | 7,810 | 185,300 | 2.0 | 50 | 7,000 | 40,000 |
| Washington | 2,920 | 71,700 | 2.2 | 52 | 751,000 | 4,111,000 |
| Wyoming | 860 | 32,300 | .6 | 55 | 36,000 | 417,000 |
| Total | 84,050 | 2,163,900 | 2.0 | 40 | 8,266,000 | 103,527,000 |

*Patented mining claims on the national forests (as of Jan. 1, 1952)*

| State | Number of claims | Acreage | Estimated percent which are or have ever been commercial mining operations | State | Number of claims | Acreage | Estimated percent which are or have ever been commercial mining operations |
|---|---|---|---|---|---|---|---|
| Arizona | 1,110 | 53,370 | 5 | Oregon | 1,370 | 26,634 | 22 |
| California | 3,068 | 134,807 | 14½ | South Dakota | 1,000 | 74,000 | 7 |
| Colorado | 17,000 | 300,000 | 12 | Utah | 1,359 | 57,210 | 10 |
| Idaho | 3,203 | 80,802 | 28 | Washington | 1,184 | 20,738 | 8 |
| Montana | 5,124 | 116,575 | 17½ | Wyoming | 761 | 17,687 | 1½ |
| Nevada | 675 | 12,205 | 50 | | | | |
| New Mexico | 706 | 24,498 | 16 | Total | 36,560 | 918,526 | 14¾ |

## Changes in Existing Law

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as introduced, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

### Section 1 of the Act of July 31, 1947 (61 Stat. 681)

[That the Secretary of the Interior, under such rules and regulations as he may prescribe, may dispose of materials including but not limited to sand, stone, gravel, yucca, manzanita, mesquite, cactus, common clay, and timber or other forest products, on public lands of the United States if the disposal of such materials (1) is not otherwise expressly authorized by law, including the United States mining laws, (2) is not expressly prohibited by laws of the United States, and (3) would not be detrimental to the public interest. Such materials may be disposed of only in accordance with the provisions of this Act and upon the payment of adequate compensation therefor, to be determined by the Secretary: *Provided, however*, That, to the extent not otherwise authorized by law, the Secretary is authorized in his discretion to permit any Federal, State, or Territorial agency, unit or subdivision, including municipalities, or any person, or any association or corporation not organized for profit, to take and remove, without charge,

materials and resources subject to this Act, for use other than for commercial or industrial purposes or resale. Where the lands have been withdrawn in aid of a function of a Federal department or agency other than the Department of the Interior or of a State, Territory, county, municipality, water district, or other local governmental subdivision or agency, the Secretary of the Interior may make disposals under this Act only with the consent of such Federal department or agency or of such State, Territory, or local governmental unit. Nothing in this Act shall be construed to apply to lands in any national forest, national park, or national monument or to any Indian lands, or lands set aside or held for the use or benefit of Indians, including lands over which jurisdiction has been transferred to the Department of the Interior by Executive order for the use of Indians.]

*The Secretary, under such rules and regulations as he may prescribe, may dispose of mineral materials (including but not limited to, sand, stone, gravel, pumice, pumicite, cinders and clay) and vegetative materials (including but not limited to yucca, manzanita, mesquite, cactus, and timber or other forest products) on public lands of the United States, if the disposal of such mineral or vegetative materials (1) is not otherwise expressly authorized by law, including the United States mining laws, and (2) is not expressly prohibited by laws of the United States, and (3) would not be detrimental to the public interest. Such materials may be disposed of only in accordance with the provisions of this Act and upon the payment of adequate compensation therefor, to be determined by the Secretary: Provided, however, That, to the extent not otherwise authorized by law, the Secretary is authorized in his discretion to permit any Federal, State, or Territorial agency, unit or subdivision, including municipalities, or any person, or any association or corporation not organized for profit, to take and remove, without charge, materials and resources subject to this Act, for use other than for commercial or industrial purposes or resale. Where the lands have been withdrawn in aid of a function of a Federal department or agency other than the Department headed by the Secretary or of a State, Territory, county, municipality, water district, or other local governmental subdivision or agency, the Secretary may make disposals under this Act only with the consent of such other Federal department or agency or of such State, Territory, or local governmental unit. Nothing in this Act shall be construed to apply to lands in any national park, or national monument or to any Indian lands, or lands set aside or held for the use or benefit of Indians, including lands over which jurisdiction has been transferred to the Department of the Interior by Executive order for the use of Indians. As used in this Act, the word "Secretary" means the Secretary of the Interior except that it means the Secretary of Agriculture where the lands involved are administered by him for national forest purposes or for the purposes of title III of the Bankhead-Jones Farm Tenant Act or where withdrawn for the purpose of any other function of the Department of Agriculture.*

SECTION 3 OF THE ACT OF JULY 31, 1947 (61 STAT. 681), AS AMENDED BY THE ACT OF AUGUST 31, 1950 (64 STAT. 571)

[SEC. 3. All moneys received from the disposal of materials under this Act shall be disposed of in the same manner as moneys received from the sale of public lands, except that moneys received from the disposal of materials from school section lands in Alaska, reserved under section 1 of the Act of March 4, 1915 (38 Stat. 1214; 48 U. S. C., sec. 353), shall be set apart as separate and permanent funds in the Territorial Treasury as provided for income derived from said school section lands pursuant to said Act.]

*All moneys received from the disposal of materials under this Act shall be disposed of in the same manner as moneys received from the sale of public lands, except that moneys received from the disposal of materials by the Secretary of Agriculture shall be disposed of in the same manner as other moneys received by the Department of Agriculture from the administration of the lands from which the disposal of materials is made, and except that moneys received from the disposal of materials from school section lands in Alaska, reserved under section 1 of the Act of March 4, 1915 (38 Stat. 1214), shall be set apart as separate and permanent funds in the Territorial treasury, as provided for income derived from said school section lands pursuant to said Act.*

Although not specifically required by clause 3 of rule XIII of the Rules of the House of Representatives, the committee sets forth below for information changes in existing law made by the bill, as reported (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change in proposed is shown in roman):

SECTION 1 OF THE ACT OF JULY 31, 1947 (61 STAT. 681)

[That the Secretary of the Interior, under such rules and regulations as he may prescribe, may dispose of materials including but not limited to sand, stone, gravel, yucca, manzanita, mesquite, cactus, common clay, and timber or other forest products, on public lands of the United States if the disposal of such materials (1) is not otherwise expressly authorized by law, including the United States mining laws, (2) is not expressly prohibited by laws of the United States, and (3) would not be detrimental to the public interest. Such materials may be disposed of only in accordance with the provisions of this Act and upon the payment of adequate compensation therefor, to be determined by the Secretary: *Provided, however*, That, to the extent not otherwise authorized by law, the Secretary is authorized in his discretion to permit any Federal, State, or Territorial agency, unit or subdivision, including municipalities, or any person, or any association or corporation not organized for profit, to take and remove, without charge, materials and resources subject to this Act, for use other than for commercial or industrial purposes or resale. Where the lands have been withdrawn in aid of a function of a Federal department or agency other than the Department of the Interior or of a State, Territory, county, municipality, water district, or other local governmental subdivision or agency, the Secretary of the Interior may make disposals under this Act only with the consent of such Federal department or agency or of such State, Territory, or local governmental unit. Nothing in this Act shall be construed to apply to lands in any national forest, national park, or national monument or to any Indian lands, or lands set aside or held for the use or benefit of Indians, including lands over which jurisdiction has been transferred to the Department of the Interior by Executive order for the use of Indians] *The Secretary, under such rules and regulations as he may prescribe, may dispose of mineral materials (including but not limited to, sand, stone, gravel, pumice, pumicite, cinders and clay) and vegetative materials (including but not limited to yucca, manzanita, mesquite, cactus, and timber or other forest products) on public lands of the United States, including for the purposes of this Act land described in the Acts of August 28, 1937 (50 Stat. 874), and of June 24, 1954 (68 Stat. 270), if the disposal of such mineral or vegetative materials (1) is not otherwise expressly authorized by law, including the United States mining laws, and (2) is not expressly prohibited by laws of the United States, and (3) would not be detrimental to the public interest. Such materials may be disposed of only in accordance with the provisions of this Act and upon the payment of adequate compensation therefor, to be determined by the Secretary: Provided, however, That, to the extent not otherwise authorized by law, the Secretary is authorized in his discretion to permit any Federal, State, or Territorial agency, unit or subdivision, including municipalities, or any person, or any association or corporation not organized for profit, to take and remove, without charge, materials and resources subject to this Act, for use other than for commercial or industrial purposes or resale. Where the lands have been withdrawn in aid of a function of a Federal department or agency other than the Department headed by the Secretary or of a State, Territory, county, municipality, water district, or other local governmental subdivision or agency, the Secretary may make disposals under this Act only with the consent of such other Federal department or agency or of such State, Territory, or local governmental unit. Nothing in this Act shall be construed to apply to lands in any national park, or national monument or to any Indian lands, or lands set aside or held for the use or benefit of Indians, including lands over which jurisdiction has been transferred to the Department of the Interior by Executive order for the use of Indians. As used in this Act, the word "Secretary" means the Secretary of the Interior except that it means the Secretary of Agriculture where the lands involved are administered by him for national forest purposes or for the purposes of title III of the Bankhead-Jones Farm Tenant Act or where withdrawn for the purpose of any other function of the Department of Agriculture: Provided, That, notwithstanding any other provisions of law, such leases or permits may be issued for lands administered for national park, monument, and wildlife purposes only when the President, by Executive order, finds and declares that such action is necessary in the interests of national defense.*

SECTION 3 OF THE ACT OF JULY 31, 1947 (61 STAT. 681), AS AMENDED BY THE ACT OF AUGUST 31, 1950 (64 STAT. 571)

[SEC. 3. All moneys received from the disposal of materials under this Act shall be disposed of in the same manner as moneys received from the sale of public lands, except that moneys received from the disposal of materials from school section lands in Alaska, reserved under section 1 of the Act of March 4, 1915 (38 Stat. 1214; 48 U. S. C., sec. 353), shall be set apart as separate and permanent funds in the Territorial Treasury as provided for income derived from said school section lands pursuant to said Act.] *All moneys received from the disposal of materials under this Act shall be disposed of in the same manner as moneys received from the sale of public lands, except that moneys received from the disposal of materials by the Secretary of Agriculture shall be disposed of in the same manner as other moneys received by the Department of Agriculture from the administration of the lands from which the disposal of materials is made, and except that revenues from the lands described in the Act of August 28, 1937 (50 Stat. 874) and the Act of June 24, 1954 (68 Stat. 270) shall be disposed of in accordance with said Acts and except that moneys received from the disposal of materials from school section lands in Alaska, reserved under section 1 of the Act of March 4, 1915 (38 Stat. 1214), shall be set apart as separate and permanent funds in the Territorial treasury, as provided for income derived from said school section lands pursuant to said Act.*

O

3

# **EXHIBIT 2**

BLM for Hardrock Mining Rulemakings and Policy
Updates

September 16, 2021

**NOTICE OF PETITION AND PETITION FOR RULEMAKING**
**BRINGING HARDROCK MINING REGULATIONS AND POLICY INTO THE 21ST CENTURY TO PROTECT INDIGENOUS AND PUBLIC LANDS RESOURCES IN THE WEST**

The Honorable Debra Haaland
Secretary of the Interior
Department of Interior
1849 C Street, NW
Washington, D.C. 20240

The Honorable Nada Wolff Culver
Deputy Director of Policy and Programs
Bureau of Land Management
1849 C Street, NW
Washington, D.C. 20240

Re: Petition to the U.S. Department of Interior and the U.S. Bureau of Land Management for Hardrock Mining Rulemakings and Policy Updates

Dear Secretary Haaland and Deputy Director Culver:

Pursuant to Federal Land Policy Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, and 5 U.S.C. § 553(e) of the Administrative Procedure Act (APA), the undersigned sovereign Indian tribes and nations and Indigenous organizations and conservation organizations hereby respectfully petition the U.S. Department of Interior (DOI), by and through the U.S. Bureau of Land Management (BLM), for a rulemaking to strengthen and modernize BLM's regulations at 43 C.F.R. §§ 3800 *et seq.* (Hardrock Mining Rules).

It's long past time to reform the nation's hardrock mining rules, end generations of mining-inflicted injustice to Indigenous communities, and chart a new course for public lands stewardship toward a sustainable, clean energy economy. For far too long, mining companies have had free rein to decimate lands of cultural importance to tribes and public lands at enormous cost to people, wildlife, and these beautiful wild places of historic and cultural significance. The harm is undeniable, severe, and irreparable. Reforming these rules will prevent more damage, help us transition to green infrastructure, and leave a livable planet to future generations.

Petitioners greatly appreciate the Biden-Harris Administration's Executive Memorandums and Executive Orders (EOs) on Tribal Consultation and Strengthening Nation-to-Nation Relationships,[1] Tackling the Climate Crisis at Home and Abroad,[2] Executive Order on

[1] "Tribal Consultation and Strengthening Nation-to-Nation Relationships: Memorandum for the Heads of Executive Departments and Agencies," by the Executive Office of the President, 86 Federal Register 7941 (2021).
[2] "Executive Order 14008, Tackling the Climate Crisis at Home and Abroad," by the Executive Office of the President, 86 Federal Register 7619 (2021). *See also* "National Environmental Policy Act (NEPA) Guidance on Consideration of Greenhouse Gas Emissions" by the Council on Environmental Quality, 86 Federal Register 10252 (2021).

Revocation of Certain Executive Orders Concerning Federal Regulation,[3] and America's Supply Chains.[4] In particular, the White House's report pursuant to the America's Supply Chains EO directing DOI and the U.S. Department of Agriculture (USDA) to "strengthen the regulations governing mining on public lands."[5]

Together, these EOs have committed this administration to the rapid, just, equitable, and fair transition to renewable energy. The need to end the obsolete system put in place by the Mining Law of 1872 is well-recognized. As Congress works toward legislative reform, 17 Members wrote on April 27, 2021, "the Biden Administration should take steps to reduce new mine waste, pollution, clean-up existing mine sites, protect public health, and close loopholes used by mining companies to evade their legal obligations."[6] This letter outlined essential regulatory reforms that are needed in the meantime, which are also reforms identified in the Attachments to this Petition.

These federal safeguard updates include, but are not limited to: meaningful Tribal consultation and Indigenous resource protections, clarifying federal land managers authority to decide whether to approve mining plan of operations and to reject proposals that may cause substantial irreparable harm, minimize and prohibit harm from tailings and waste piles, and require mining companies plan for climate change.[7]

As the Administration develops policies to build back better clean energy infrastructure, the DOI must also transition minerals policies to a modern framework that will prevent unnecessary or undue degradation and promote more responsible sourcing. While this transition will require more of certain types of metals, the current hardrock mining rules are no means to facilitate it and would be counterproductive. This century's mining rush must not repeat the tragic mistakes of the 19th century rush for precious metals and the 20th century rush for uranium. Those mining rushes killed and displaced untold numbers of Indigenous and other marginalized peoples, destroyed sacred and cultural resources, stole lands, scarred landscapes, and polluted water and climate.

Building a sustainable economy based on clean energy gives us an historic opportunity to confront the legacy of injustice to Indigenous communities and damage to the public lands held in trust for all Americans. Seizing that opportunity requires policies that prioritize metals recycling and reuse over new mining. Where new mining is acceptable, the mining industry must

---

[3] "Executive Order 13992, Revocation of Certain Executive Orders Concerning Federal Regulation" by the Executive Office of the President, 86 Federal Register 7049 (2021).

[4] "Executive Order 14017, America's Supply Chains," by the Executive Office of the President, 86 Federal Register 11849 (2021).

[5] *Building Resilient Supply Chains, Revitalizing American Manufacturing, and Fostering Broad-Based Growth, 100-Day Reviews under Executive Order 14017*, page 141, by The White House (2021), *available at* https://www.whitehouse.gov/wp-content/uploads/2021/06/100-day-supply-chain-review-report.pdf. Since DOI is the primary mining agency, it makes sense for USDA's new hardrock mining rule updates to closely follow during DOI's rulemaking process.

[6] "Letter to Interior Secretary Haaland and Agriculture Secretary Vilsack from Chair Grijalva et al.," by Chair Grijalva et al. (2021), *available at* https://naturalresources.house.gov/imo/media/doc/Grijalva%20Lowenthal%20Letter%20to%20Biden%20Admin%20on%20Mining%20Reform%20April%2027%202021.pdf.

[7] *Id*.

undertake the most responsible methods. And for DOI, this means promulgating and finalizing new hardrock mining rules.

**Justice and Equity Demands New Hardrock Mining Rules**

Our public lands agencies manage more than 700 million acres, including many of the most treasured places in the country. These agencies also bear a special responsibility to federally-recognized tribes whose land and resources they hold in Trust. The Federal Government's Trust responsibilities stem from their promises made in exchange for taking the vast majority of Tribal ancestral lands. Tribes retain sovereignty and other rights to use and occupy their ancestral lands, in addition to rights conferred by treaty.[8]

Between 1778-1871, the United States signed more than 380 Tribal treaties. In 1871, Congress ended new treaty making with tribes inside the United States.[9] The following year, Congress passed, and President Ulysses S. Grant signed, the Mining Law of 1872.

The Mining Law of 1872 is a glaring example of explicitly settler-colonial public land policy.[10] Its basic terms have not changed since it was enacted, although Congress has narrowed its reach over the years. Today, it governs mining of metals such as gold, silver, copper, lithium, and uranium, as well as "uncommon varieties" of common substances, like stone, on much of the U.S. Forest Service (USFS) and BLM land throughout the western United States. It allows companies to extract these publicly-owned minerals entirely for free, perhaps the last place on the planet where that is possible.

BLM's hardrock mining rules have not been significantly revised for decades, the USFS's regulations not for nearly a half-century.[11] The Trump administration initiated, but did not complete, hardrock mining rules at both BLM and USFS.[12] Continuing the processes for these unfinished hardrock mining rules provides a pathway for the Biden-Harris administration to put in place badly needed improvements to this regulatory framework. These rules must establish meaningful Tribal consultation, Indigenous resource protections, and seek to achieve the free, prior, and informed consent from impacted communities.

**New Hardrock Mining Rules Need to Prevent Unnecessary or Undue Degradation**

---

[8] Three early Supreme Court decisions, known as the Marshall trilogy, established the Trust doctrine. *Johnson v. M'Intosh*, 21 U.S. 543 (1823), *Cherokee Nation v. Georgia*, 30 U.S. 1 (1823), and *Worcester v. Georgia* 31 U.S. 515 (1832).

[9] *Improving Tribal Consultation and Tribal Involvement in Federal Infrastructure Decisions*, page 5, by the Departments of Interior, Army, and Justice (2017).

[10] 30 U.S.C. § 22 et seq. (1872).

[11] The Interior Department did briefly finalize new hardrock mining rules in the waning days of the Clinton Administration (65 Fed. Reg. 69,998 (Nov. 21, 2000)). Those rules were largely scrapped by the following Administration, with a few exceptions (e.g., rules on bonding and exploration notices) (66 Fed. Reg. 54,834 (Oct. 30, 2001)). Except for some minor revisions, the USFS' 36 CFR Part 228A hardrock mining rules have remained the same since they were initially promulgated in 1974.

[12] The Forest Service locatable minerals are 36 C.F.R. 228 and the BLM regulations are 43 C.F.R. 3800.

BLM's current hardrock mining rules govern operations occurring on an ever-more massive scale. Today, such operations literally reduce mountains to massive open pits, waste rock dumps, and tailings piles that extend over thousands of acres of land. Most of these open pits—some over a mile wide and deep—must constantly dewater by pumping, a process that severely disrupts hydrology over hundreds of thousands of acres.

Mine operations excavate and crush millions of tons of rock, then treat the ore with large quantities of toxic cyanide and sulfuric acid chemicals. Slurried mine tailings are deposited in giant piles that can pose safety threats to downstream resources and communities. Operators mine ever-lower grades of ore, producing waste rock and tailings measured in tons, in order to obtain quantities of metal measured in ounces.[13] Thus, the metals mining industry is the nation's single largest source of toxic waste.[14] According to the Environmental Protection Agency's (EPA) 2019 Toxic Release Inventory, the metal mining sector accounted for 41 percent of the 3.4 billion pounds of toxic substances released into the environment that year, even though the sector only manages five percent of all the toxic waste produced by American industries.[15]

Many mines generate pollution that persists for hundreds if not thousands of years, requiring costly, perpetual water treatment and long-term financial and environmental liability.[16] EPA estimates hardrock mines contaminated 40 percent of the Western watersheds.[17] Despite the promulgation of the current hardrock mining rules, modern mines have degraded water quality resulting from various spills, tailings failures, and water collection and treatment failures.[18] According to one study, more than three-quarters of modern mines fail to meet water quality standards, despite predicting otherwise when proposed.[19]

EPA also administers the Resource Conservation and Recovery Act (RCRA), the federal law that governs waste management. EPA's laws apply on and off public lands. Subtitle C of RCRA covers the management of waste deemed hazardous. Despite their high toxicity, a special

---

[13] "How the 20 tons of mine waste per gold ring figure was calculated," Earthworks (2004), *available at* https://41p14t2a856b1gs8ii2wv4k4-wpengine.netdna-ssl.com/assets/uploads/archive/files/publications/20TonsMemo_FINAL.pdf.

[14] "Toxics Release Inventory (TRI) National Analysis" Environmental Protection Agency (2019).

[15] "2019 TRI Factsheet: Industry sector: Metal Mining, 2122," Environmental Protection Agency (2020), *available at* https://enviro.epa.gov/triexplorer/industry.html?pYear=2019&pLoc=2122&pParent=TRI&pDataSet=TRIQ1.

[16] *Polluting the Future: How mining companies are polluting our nation's waters in perpetuity* by Bonnie Gestring and Lisa Sumi, Earthworks (2013), *available at* https://41p14t2a856b1gs8ii2wv4k4-wpengine.netdna-ssl.com/assets/uploads/archive/files/publications/PollutingTheFuture-FINAL.pdf.

[17] *Americans Pay for Dirty Water*, Environmental Protection Agency (2000), *available at* https://nepis.epa.gov/Exe/ZyPDF.cgi/20004GRW.PDF?Dockey=20004GRW.PDF.

[18] *U.S. Copper Porphyry Mines: The track record of water quality impacts resulting from pipeline spills, tailings failures and water collection and treatment failures* by Bonnie Gestring, Earthworks (2012, revised 2012), *available at* https://41p14t2a856b1gs8ii2wv4k4-wpengine.netdna-ssl.com/assets/uploads/2012/08/Porphyry_Copper_Mines_Track_Record_-_8-2012.pdf; "U.S. Operating Copper Mines: Failure to capture & treat wastewater" by Bonnie Gestring, Earthworks (2019), *available at* https://41p14t2a856b1gs8ii2wv4k4-wpengine.netdna-ssl.com/assets/uploads/2019/05/FS_Pebble-FAILURE-TO-CAPTURE-AND-TREAT-WASTEWATER.pdf.

[19] *Predicted Versus Actual Water Quality at Hardrock Mine Sites: Effect of Inherent Geochemical and Hydrologic Characteristics* by Ann Maest, James Kuipers, Kim MacHardy, and Gregory Lawson, American Society of Mining and Reclamation (2006), *available at* https://www.asrs.us/Portals/0/Documents/Conference-Proceedings/2006/1122-Maest.pdf.

loophole—created after BLM's current hardrock mining rules—categorically exempts mine waste from the hazardous waste provisions of RCRA.  Consequently, no hardrock mining wastes are subject to this federal hazardous waste statute.[20]

EPA's Clean Water Act (CWA) contains another loophole that allows mining companies to pollute clean water sources with impunity. In 2002, the George W. Bush administration weakened CWA rules specifically allowing mine operators to dump their tailings directly into waterways.  The law requires these same toxic materials from all other industries to be kept out of U.S. waters.[21]

There are no truly safe options for mine waste disposal.  Most waste storage occurs in enormous containment structures vulnerable to failure and that often require water capture and/or treatment indefinitely.  One of the primary causes of perpetual pollution from mines—acid mine drainage—is well understood.  Yet, no modern hardrock mine operations have demonstrated they can stop acid mine drainage once it occurs on a large scale.[22]  Instead, accidents and unintended seepage are commonplace:

- A 2012 review of currently operating United States copper porphyry mines, accounting for over 90 percent of domestic copper production, found that 82 percent resulted in water quality impacts from failure to capture and control mine-affected water.[23]
- A 2017 report of currently operating United States gold mines found that 20 out of 27 mines (74 percent) failed to capture and treat contaminated mine water, resulting in water quality impacts.[24]
- A 2018 review of all Montana's major operating hardrock mines, under current hardrock mining rules, found that water quality predictions made during the permitting process were consistently underestimated, with significant impacts resulting from repeated spills of cyanide and uncontrolled acid mine drainage among others.[25]

---

[20] 42 U.S.C. § 6921(b)(3)(A)(ii).

[21] "Final Revisions to the Clean Water Act Regulatory Definitions of 'Fill Material' and 'Discharge of Fill Material,'" U.S. Army Corps of Engineers, 67 Federal Register 31129 (2002).

[22] *Polluting the Future: How mining companies are polluting our nation's waters in perpetuity* by Bonnie Gestring and Lisa Sumi, Earthworks (2013), *available at* https://41p14t2a856b1gs8ii2wv4k4-wpengine.netdna-ssl.com/assets/uploads/archive/files/publications/PollutingTheFuture-FINAL.pdf.

[23] *U.S. Copper Porphyry Mines: The track record of water quality impacts resulting from pipeline spills, tailings failures and water collection and treatment failures* by Bonnie Gestring, Earthworks (2012, revised 2012), *available at* https://41p14t2a856b1gs8ii2wv4k4-wpengine.netdna-ssl.com/assets/uploads/2012/08/Porphyry_Copper_Mines_Track_Record_-_8-2012.pdf.

[24] *U.S. Gold Mines Spills & Failure Report: The Track Record of Environmental Impacts Resulting from Pipeline Spills, Accidental Releases and Failure to Capture and Treat Mine Impacted Water* by Bonnie Gestring and John Hadder, Earthworks (2017), *available at* https://earthworks.org/assets/uploads/archive/files/publications/USGoldFailureReport2017.pdf.

[25] *Track Record: Montana Modern Hardrock Mining Water Quality Impacts and Reclamation Bonding*, by Laura Zanolli, Montana Trout Unlimited and Earthworks (2018), *available at* https://41p14t2a856b1gs8ii2wv4k4-wpengine.netdna-ssl.com/assets/uploads/2018/09/Montana-Predictions-Report.pdf.

- A 2020 report on Alaska's major hardrock mines found that 80 percent failed to capture or control contaminated mine water, resulting in water quality violations that often occurred over an extended period of time.[26]

In addition to these severe and permanent environmental effects, industrial mining has resulted in, and continues to disproportionately impact, Indigenous communities across the West and Alaska. The decades of pollution and destruction of cultural and environmental values at the Zortman-Landusky open pit cyanide leach gold mine adjacent to the Ft. Belknap Reservation in Montana is just one example of the woeful shortcomings of the current federal regulations.[27] The devastation from open pit gold mining in Nevada and the Great Basin has been particularly egregious on Western Shoshone communities.[28]

Large-scale mining currently threatens the land base, Sacred Sites, Treaty rights, and invaluable cultural resources of Indigenous communities in every western state, including from uranium mining in New Mexico, Arizona, Utah, and Colorado, gold and uranium in the Black Hills, gold and copper in Alaska and Montana, copper in Arizona, multiple metals in Idaho, gold and lithium in Nevada and California, and gold and other metals in and along the streams and rivers of the Pacific Northwest–to name just a few.

BLM's existing hardrock mining rules perpetuate inequities while failing to adequately protect tribal resources and other natural resources. Modernizing BLM's hardrock mining rules would help correct these unacceptable risks and burdens that the current rules all too often permit.

**Climate Change Risks and Tailings Dams Disasters Require New Hardrock Mining Rules**

BLM's current hardrock mining rules went into effect long before global scientific consensus formed around the risks of tailings dam failures and the impending climate emergency. As of this date, humanity has roughly 30 years to cap global temperature rise at 1.5 degrees Celsius to avoid the most catastrophic climate impacts. According to the United Nations Environmental Programme (UNEP), mining and mineral processing accounts for 10 percent of global climate change impacts.[29] Mitigating mining's climate risks is necessary to protect global and local impacted communities.

Climate change exacerbates the risks and uncertainties associated with hardrock mining. The increasing frequency of extreme weather events, changing temperatures, and precipitation

---

[26] *Alaska Metal Mines: The track record of impacts to land and water from the failure to capture and treat mine pollution* by Bonnie Gestring, Earthworks (2020), *available at* https://41p14t2a856b1gs8ii2wv4k4-wpengine.netdna-ssl.com/assets/uploads/2020/03/AK-MINE-POLLUTION-REPORT-2020.pdf.
[27] "*Tribes and Hardrock Mining*," National Wildlife Federation, *available at* https://www.nwf.org/~/media/PDFs/Wildlife/Mining-Loopholes/Tribal_v4.ashx.
[28] *Digging Holes in the Spirit, Gold Mining and the Survival of the Western Shoshone Nation*, Western Shoshone Defense Project (1999).
[29] "Global Resources Outlook 2019 Fact Sheet: Natural Resources for the Future We Want," United Nations Environmental Program (2019), *available at* https://www.resourcepanel.org/reports/global-resources-outlook.

patterns affect the safety and stability of mining operations and infrastructure.[30] Mine-specific examples of these types of impacts include major spills resulting from large storm events[31] and damage to mine waste cover systems from unexpected wildfires.[32] These climate risks pose particularly acute problems in Alaska, where disruptions to mining operations have occurred from permafrost thaws caused by temperatures warming much faster than the national rate.[33] Climate changing temperatures and precipitation patterns also affect the structural integrity of tailings dams.[34]

Disastrous waste containment failures are a tragic and continuous problem around the world, as shown at Brazil's Brumadinho,[35] British Columbia's Mount Polley,[36] and Florida's Piney Point.[37] Tailings dams on public lands could also fail. A 2019 report identified an increasing trend in the number of catastrophic tailings failures globally, including in the United States.[38] The report attributes this, in part, to more mining of lower grade ore deposits facilitated by new technology.[39]

---

[30] *Adapting to Climate Change: A Guide for the Mining Industry* by Ryan Schuchard and Julia Nelson, BSR (2011), *available at* https://www.bsr.org/reports/BSR_Climate_Adaptation_Issue_Brief_Mining.pdf.

[31] "Climate Change – Extreme Conditions: Do Plans of Operations Need to Include an Ark?" by R. David Williams, Mine Design, Operations & Closure Conference (2012), *available at* https://www.mtech.edu/mwtp/presentations/2012_presentations/Dave%20Williams.pdf.

[32] "July Wildfire: Zortman Landusky Mine" by Bill Maehl, Mine Design Operations and Closure Conference (2018), *available at* https://www.mtech.edu/mwtp/presentations/2018_presentations/wednesday/Bill-Maehl.pdf.

[33] "As Arctic warming accelerates, permafrost thaw hits Red Dog mine with $20 million bill" by Nathaniel Herz, Alaska Public Radio (2020), *available at* https://www.alaskapublic.org/2020/09/01/as-arctic-warming-accelerates-permafrost-thaw-hits-red-dog-mine-with-20-million-bill/#:~:text=Alaska%20Public%20Media-,As%20Arctic%20warming%20accelerates%2C%20permafrost%20thaw%20hits%20Red,mine%20with%20%2420%20million%20bill&text=The%20multinational%20company%20that%20operates,its%20water%20storage%20and%20discharge.

[34] *Safety First: Guidelines for Responsible Mine Tailings Management* by Jamie Kneen, Ugo LaPointe, Jan Morrill, Payal Sampat, Earthworks (2020), *available at* https://41p14t2a856b1gs8ii2wv4k4-wpengine.netdna-ssl.com/assets/uploads/2020/06/REPORT-Safety-First-Requirements-for-Safe-Tailings-Management-FINAL.pdf.

[35] "Brumadinho Dam Collapse: A Tidal Wave of Mud" by Shasta Darlington, James Glanz, Manuela Andreoni, Matthew Bloch, Sergio Peçanha, Anjali Singhvi, and Troy Griggs, The New York Times (2019), *available at* https://www.nytimes.com/interactive/2019/02/09/world/americas/brazil-dam-collapse.html.

[36] *Report on Mount Polley Tailings Storage Facility Breach* by the Independent Expert Engineering Investigation and Review Panel, Province of British Columbia (2015), *available at* https://www.mountpolleyreviewpanel.ca/sites/default/files/report/ReportonMountPolleyTailingsStorageFacilityBreach.pdf.

[37] "Letter to the Chairs of the House of Representatives Committees on Energy and Commerce and Oversight and Reform" by the Center for Biological Diversity et al., Center for Biological Diversity (2021), *available at* https://www.biologicaldiversity.org/campaigns/phosphate_mining/pdfs/2021_04_12_Piney_Point_letter_Congress.pdf.

[38] *The Increasing Number of Tailings Facility Failures: Navigating the Decade 2020-2029* by Dr. Dave M. Chambers, Canadian Dam Association Annual Conference (2019), *available at* http://www.csp2.org/files/reports/Increasing%20Number%20of%20Tailings%20Facility%20Failures%20-%20Chambers%20Oct19.pdf.

[39] *The Risk, Public Liability, and Economics of Tailings Storage Facility Failures* by Lindsay Newland Bowker and David M. Chambers, Earthworks (2015), *available at* https://files.dnr.state.mn.us/input/environmentalreview/polymet/request/exhibit3.pdf.

Every mine and mine location is unique, posing technical challenges that better performance standards and robust climate analysis in new hardrock mining rules would help solve. Mine sites vary in hydrology, which affects how much excess water they will need to discharge and where accidental releases are likely to migrate. Geology varies, dictating what kinds of storage facilities the land can support and how much waste the mine will produce. Seismology varies, affecting the potential for waste storage failures and seepage. The ecological setting, the cultural and historical resources, and the communities near mines vary as well.

Updated performance standards in new hardrock mining rules could also help account for recent advances in extraction technologies. Mines use different processes for mineral extraction, and different excavation approaches to develop the ore deposits. They vary in footprint and throughput volume. Typically, a mine operates for many decades, constantly expanding its footprint and increasing its waste storage, with ever-increasing risk of new toxic releases and other impacts.

All this suggests we need more rigorous hardrock mining rules to reduce the damage and public costs imposed by mining.

**Specific Regulatory Revisions**

In order to successfully meet these challenges and implement the required reforms, this petition proposes revisions to the following provisions, with current and proposed language identified:

> **43 C.F.R. § 3800.6 (fees);**
>
> **43 C.F.R. § 3830.12 (locatable vs. common variety minerals), with attached legal and policy analysis;**
>
> **43 C.F.R. § 3832.32 (millsites), with attached legal and policy analysis;**
>
> **43 C.F.R. §§ 3809.00 *et seq.* (Surface Management Regulations for locatable minerals).**

In support of these proposed changes, this petition includes detailed legal and policy analysis, embedded with the proposed language revisions and/or as separate documents.

Attachment 1: Executive summary
Attachment 2: 43 C.F.R. Part 3809 line-by-line and analysis
Attachment 3: The definition and standards to "Prevent Unnecessary or Undue Degradation" under FLPMA must be strengthened to adequately protect public lands and important environmental, tribal, cultural, scientific, historical, and other valuable public resources (unnecessary or undue degradation line-by-line and analysis)
Attachment 4: Millsite proposed changes and supporting analysis
Attachment 5: The proper scope of BLM regulation of mineral operations is dependent on the extent of rights under the Mining Laws (BLM

discretion, ancillary uses, fees, and related issues line-by-line and analysis)

Attachment 6: Elimination of notice level operations to ensure that public lands and important environmental, tribal, cultural, scientific, historical, and other valuable public resources are protected

Attachment 7: A Plan of Operations must not remain valid in perpetuity; unanticipated events or conditions must require a Plan of Operations to be modified in a transparent and public process with government-to-government consultation

Attachment 8: 43 C.F.R. 3800 fees analysis

Attachment 9: 43 C.F.R. 3830 minerals used for common variety purposes/uses are not locatable minerals

This petition also requests that Department Opinions, Memoranda, Handbooks, and Manuals be revised accordingly to support and implement the revised regulations.

**Conclusion**

We can work together to help meet the twin challenges of climate and equity posed by sourcing the materials we need for the clean energy transition. Yet, DOI must first update the regulatory regime for public lands mining that remains outdated, inadequate, and structurally inequitable. The solutions begin with reform to the hardrock mining rules. We respectfully submit this Petition for your prompt consideration and response.

Sincerely,

**<u>Tribes and Indigenous Organization Petitioners</u>**

Chilkat Indian Village
- Kimberley Strong, Tribal Council President
  HC60-2207
  Haines, AK 99827
  Physical Address: 32 Chilkat Ave. Klukwan, AK

Fort Belknap Indian Community
- Andy Werk Jr., President
  656 Agency Main St
  Fort Belknap Agency
  Harlem, MT 59526

Hualapai Tribe
- Martina Dawley, Interim Director/THPO/Senior Archaeologist
  Hualapai Department of Cultural Resources

P.O. Box 310
Peach Springs, AZ 86434

Havasupai Tribe
- Evangeline Kissoon, Chairwoman
  P.O. Box 10
  Supai, AZ 85435

Inter Tribal Association of Arizona
- Maria Dadgar, Executive Director
  2214 North Central Ave.
  Phoenix, AZ 85004

The Cultural Resources Protection Committee for the Lone Pine Paiute-Shoshone Tribe
- Kathy Bancroft, Tribal Historic Preservation Officer
  Lone Pine Paiute-Shoshone Tribe
  P.O. Box 747
  975 Teya Rd
  Lone Pine, CA 93545

Norton Bay Inter-Tribal Watershed Council
- Doug Katchatag, President
  P.O. Box 15332
  Fritz Creek, AK 99603

Tohono O'odham Nation
- Howard M. Shanker, Attorney General
  P.O. Box 830
  Sells, AZ 85634

Western Shoshone Defense Project
- Larson Bill, Director
  401 Railroad Street
  Elko, NV 89801

**Conservation Group Petitioners**

Amigos Bravos
- Rachel Conn, Deputy Director
  114 Des Georges Pl.
  Taos, NM 87571

Arizona Mining Reform Coalition
- Roger Featherstone, Director
  P.O. Box 43565
  Tucson AZ 85733-3565

Basin and Range Watch
- Kevin Emmerich, Co-Founder
  P.O. Box 70
  Beatty, NV 89003

Black Hills Clean Water Alliance
- Lilias Jarding, President
  P.O. Box 591
  Rapid City, SD 57709

Center for Biological Diversity
- Allison N. Melton, Senior Attorney
  P.O. Box 3024
  Crested Butte, CO 81224

Clark Fork Coalition
- Karen Knudsen, Executive Director
  P.O. Box 7593
  Missoula, MT 59807

Dakota Rural Action
- Rebecca M Terk, Senior Organizer
  2650 Jackson Blvd #14
  Rapid City, SD 57702

Earthjustice
- Blaine Miller-McFeeley, Senior Legislative Representative
  1001 G Street NW, Suite 1000
  Washington, DC 20001

Earthworks
- Lauren Pagel, Policy Director
  1612 K Street NW, Suite 904
  Washington, DC 20006

Gila Resources Information Project
- Allyson Siwik, Director
  305A North Cooper St.
  Silver City, NM 88061

Glenwood Springs Citizens Alliance
- Jeff Peterson, Director
  P.O. Box 2471
  Glenwood Springs, CO 81602

Grand Canyon Trust
- Aaron M. Paul, Staff Attorney
  4404 Alcott St.
  Denver, CO 80211

Great Basin Resource Watch
- John Hadder, Director
  P.O. Box 207
  Reno, NV 89504

Greater Yellowstone Coalition
- Joe Josephson, Senior Montana Conservation Associate
  215 South Wallace Avenue
  Bozeman, MT 59715

High Country Conservation Advocates
- Matt Reed, Public Lands Director
  P.O. Box 1066
  Crested Butte, CO 81224

Idaho Conservation League
- John Robison, Public Lands Director
  PO Box 844
  Boise, ID 83701

Information Network for Responsible Mining
- Jennifer Thurston, Director
  P.O. Box 332
  Paradox, CO 81429

League of Conservation Voters
- Madeleine Foote, Deputy Legislative Director
  740 15th Street NW, 7th Floor
  Washington, DC 20005

Montana Environmental Information Center
- Derf Johnson, Clean Water Program Director & Staff Attorney
  P.O. Box 1184
  Helena, MT 59624

Natural Resource Defense Council
- Joshua Axelrod, Senior Advocate, Nature Program
  1152 15th Street NW, Suite 300
  Washington, DC 20005

National Wildlife Federation

- Jim Lyon, Vice President, Conservation Policy
  P.O. Box 1583
  Merrifield, VA 22116

Powder River Basin Resource Council
- Shannon Anderson, Staff Attorney
  934 N. Main St.
  Sheridan, WY 82801

Rock Creek Alliance
- Mary Costello, Executive Director
  P.O. Box 2636
  Sandpoint, ID 83864

Save the Scenic Santa Ritas
- Gayle Hartman, President
  8987 E. Tanque Verde #309-157
  Tucson, AZ 85749

Save the South Fork Salmon
- Fred Coriell, Board Member
  P.O. Box 1808
  McCall, ID 83638

Sierra Club
- John Dunmore, Associate, Lands Protection Program
  50 F Street NW
  Washington, DC 20001

Southern Utah Wilderness Alliance
- Stephen Bloch, Legal Director
  425 East 100 South
  Salt Lake City, UT 84111

Trustees for Alaska
- Victoria Clark, Director
  1026 W. 4th Ave., Suite 201
  Anchorage, AK 99501

Western Organization of Resource Councils
- Sara Kendall, Program Director
  110 Maryland Ave, NE, Suite 306
  Washington, DC 20002

Western Watersheds Project
- Eric Molvar, Executive Director

          319 South 6th Street
          Laramie, WY 82070

Wild Earth Guardians
- John Horning, Director
          301 N. Guadalupe, Suite 201
          Santa Fe, NM 87501

**NOTICE OF PETITION AND PETITION FOR RULEMAKING**
**BRINGING HARDROCK MINING REGULATIONS AND POLICY INTO THE 21ST CENTURY TO PROTECT INDIGENOUS AND PUBLIC LANDS AND RESOURCES IN THE WEST**

# Appendix of Printed Materials

# List of Cited Documents

a. "2019 TRI Factsheet: Industry sector: Metal Mining, 2122," Environmental Protection Agency (2020).

b. *Adapting to Climate Change: A Guide for the Mining Industry* by Ryan Schuchard and Julia Nelson, BSR (2011).

c. *Alaska Metal Mines: The track record of impacts to land and water from the failure to capture and treat mine pollution* by Bonnie Gestring, Earthworks (2020).

d. *Americans Pay for Dirty Water*, Environmental Protection Agency (2000).

e. "As Arctic warming accelerates, permafrost thaw hits Red Dog mine with $20 million bill" by Nathaniel Herz, Alaska Public Radio (2020).

f. "Brumadinho Dam Collapse: A Tidal Wave of Mud" by Shasta Darlington, James Glanz, Manuela Andreoni, Matthew Bloch, Sergio Peçanha, Anjali Singhvi and Troy Griggs, The New York Times (2019).

g. "Climate Change–Extreme Conditions: Do Plans of Operations Need to Include an Ark?" by R. David Williams, Mine Design, Operations & Closure Conference (2012).

h. "Global Resources Outlook 2019 Fact Sheet: Natural Resources for the Future We Want," United Nations Environmental Program (2019).

i. "How the 20 tons of mine waste per gold ring figure was calculated," Earthworks (2004).

j. "July Wildfire: Zortman Landusky Mine" by Bill Maehl, Mine Design Operations and Closure Conference (2018).

k. "Letter to Interior Secretary Haaland and Agriculture Secretary Vilsack from Chair Grijalva et al.," by Chair Grijalva et al. (2021).

l. "Letter to the Chairs of the House of Representatives Committees on Energy and Commerce and Oversight and Reform" by the Center for Biological Diversity et al., Center for Biological Diversity (2021).

m. *Polluting the Future: How mining companies are polluting our nation's waters in perpetuity* by Bonnie Gestring and Lisa Sumi, Earthworks (2013).

n. *Predicted Versus Actual Water Quality at Hardrock Mine Sites: Effect of Inherent Geochemical and Hydrologic Characteristics* by Ann Maest, James Kuipers, Kim MacHardy, and Gregory Lawson, American Society of Mining and Reclamation (2006).

o. *Report on Mount Polley Tailings Storage Facility Breach* by the Independent Expert Engineering Investigation and Review Panel, Province of British Columbia (2015).

p. *Safety First: Guidelines for Responsible Mine Tailings Management* by Jamie Kneen, Ugo LaPointe, Jan Morrill, Payal Sampat, Earthworks (2020).

q. *The Increasing Number of Tailings Facility Failures: Navigating the Decade 2020-2029* by Dr. Dave M. Chambers, Canadian Dam Association Annual Conference (2019).

r. *The Risk, Public Liability, and Economics of Tailings Storage Facility Failures* by Lindsay Newland Bowker and David M. Chambers, Earthworks (2015).

s.   *Track Record: Montana Modern Hardrock Mining Water Quality Impacts and Reclamation Bonding*  by Laura Zanolli, Montana Trout Unlimited and Earthworks (2018).

t.   "Tribes and Hardrock Mining," National Wildlife Federation.

u.   *U.S. Copper Porphyry Mines: The track record of water quality impacts resulting from pipeline spills, tailings failures and water collection and treatment failures* by Bonnie Gestring, Earthworks (2012, revised 2012).

v.   *U.S. Gold Mines Spills & Failure Report: The Track Record of Environmental Impacts Resulting from Pipeline Spills, Accidental Releases and Failure to Capture and Treat Mine Impacted Water* by Bonnie Gestring and John Hadder, Earthworks (2017).

w.   "U.S. Operating Copper Mines: Failure to capture & treat wastewater" by Bonnie Gestring, Earthworks (2019).

# List of Petition Attachments

1. Executive Summary
2. 43 C.F.R. Part 3809 line-by-line and analysis
3. The definition and standards to "Prevent Unnecessary or Undue Degradation" under FLPMA must be strengthened to adequately protect public lands and important environmental, tribal, cultural, scientific, historical, and other valuable public resources
4. Millsite proposed changes and supporting analysis
5. The proper scope of BLM regulation of mineral operations is dependent on the extent of rights under the Mining Laws
6. Elimination of notice level operations to ensure that public lands and important environmental, tribal, cultural, scientific, historical, and other valuable public resources are protected
7. A Plan of Operations must not remain valid in perpetuity; unanticipated events or conditions must require a Plan of Operations to be modified in a transparent and public process with government-to-government consultation
8. 43 C.F.R. 3800 fees analysis
9. 43 C.F.R. 3830 minerals used for common variety purposes/uses are not locatable minerals

**NOTICE OF PETITION AND PETITION FOR RULEMAKING**
**BRINGING HARDROCK MINING REGULATIONS AND POLICY**
**INTO THE 21ST CENTURY**
**TO PROTECT INDIGENOUS AND PUBLIC LANDS AND RESOURCES IN THE WEST**

# Attachment 4
# Millsite proposed changes and supporting analysis

**Millsite Proposed Changes and Supporting Analysis**[1]

**43 CFR § 3832.32 How much land may I include in my millsite?**

The maximum size of an individual millsite is 5 acres. You may locate more than one millsite, so long as you do not locate more than an aggregate of 5 acres of millsite land for each 20-acre parcel of patented or unpatented placer or lode mining claims associated with that millsite land, regardless of the number of lode or placer claims located in the 20-acre parcel. ~~per mining claim if y~~You must use each site for at least one of the purposes described in § 3832.34 of this part. You may locate only that amount of millsite acreage that is reasonably necessary to be used or occupied for efficient and reasonably compact mining or milling operations.

In addition, the Bureau should not approve plans of operation which rely on a greater number of millsites than allowed under this section unless the use of additional lands is obtained through other means.

Source: Final Rule entitled "Locating, Recording, and Maintaining Mining Claims or Sites," 68 Fed. Reg. 61,046-01 (Oct. 24 2003) and M-37010 Mill Site Location and Patenting under the 1872 Mining Law, Oct. 7, 2003.

**Supporting rationale:**

The Mining Law's millsite provision states:

(a) Vein or lode and mill site owners eligible

Where nonmineral land not contiguous to the vein or lode is used or occupied by the proprietor of such vein or lode for mining or milling purposes, such nonadjacent surface ground may be embraced and included in an application for a patent for such vein or lode, and the same may be patented therewith,…; **but no location made on and after May 10, 1872, of such nonadjacent land shall exceed five acres**….

30 U.S.C. § 42 (emphasis added). A similar provision applies to millsite use associated with placer mining claims. § 42(b). The proposed millsite language corrects the errors in the current millsite provision, which does not accurately reflect the language of, and congressional intent for, § 42 of the Mining Law, 30 U.S.C. § 42. Instead, the current language improperly grants mine operators rights to use non-mineral public lands whenever the operator deems occupation of those lands beneficial to the mining operations located on mineral lands elsewhere. The 1872 Mining Law, however, does not authorize such rights on non-mineral lands, which have led to widespread harm of public resources and lands.

The Department of the Interior ("DOI") is the primary federal agency charged with interpreting the provisions of 1872 Mining Law. Beginning in 1993, DOI began a comprehensive

[1] This Attachment provides the existing 3832.32 regulation, with proposed additional language in red and underlined and language to be excised in red and stricken-through. Petitioners' supporting rationale for these changes is found within this Attachment.

review of patent applications under the Mining Law. As a result of this review, the Department's Solicitor, with concurrence by Interior Secretary Babbitt, issued DOI's interpretation of the millsite provision of the Mining Law, 30 U.S.C. § 42. Memorandum M-36988, "Limitations on Patenting Millsites Under the Mining Law of 1872," November 12, 1997 ("1997 Millsite Opinion"). The 1997 Opinion stated in relevant part:

> The Mining Law of 1872 provides that only one millsite of no more than five acres may be patented in association with each mining claim. … In addition, the Bureau [BLM] should not approve plans of operation which rely on a greater number of millsites than the number of associated [mining] claims being developed unless the use of additional lands is obtained through other means.

1997 Opinion, at 2.

DOI's interpretation of § 42 has important ramifications across the West because facilities such as large waste rock and tailings dumps, and toxic reagent chemical processing "heaps," often cover thousands of acres beyond the open pit mine itself, especially at larger mine sites typical of those developed in more recent history. Under the proposed interpretation, millsite claims in excess of 5 acres per mining claim would be deemed invalid and in excess of the strict acreage limits in § 42. The proposed interpretation removes the confusion inherent in the existing language and confirms that federal land management agencies must exercise the full scope of their authority to manage mine-related activity and protect non-mineral public land resources such as Native American cultural and religious uses, wildlife, hunting and fishing uses, water quality, historic and cultural sites, and recreation. As shown in this Petition, the current interpretation of § 42 results in significant, irreparable, and permanent damage to these invaluable public resources and unnecessarily hamstrings federal agencies from exercising their full management authority as expressed in their organic statutes.

In 1999, DOI proposed a set of regulations streamlining and affirming DOI policy on numerous issues related to mining and millsite claims.[2] "Location, Recording, and Maintenance of Mining Claims or Sites," 64 Fed. Reg. 47023-47046 (Aug. 27, 1999) (the "1999 Proposed Rule"). Regarding the number of millsites that may be associated with proposed mining operations, DOI stated:

> In accordance with the Mining Law, this rule proposes to make clear that you may not locate more than an aggregate of 5 acres of mill site land for each associated placer or lode mining claim. The provision allowing a maximum of 5 acres of mill site land for each lode or placer mining claim held is contained in 30 U.S.C. 42, and derives from the Lode Law of 1866 (14 Stat. 251). This requirement was recently reviewed and Solicitor's opinion M-36988 reaffirmed it on November 7, 1997.

64 Fed. Reg. 47028. The 1999 Proposed Rule proposed to codify these millsite requirements at 43

---

[2] Between 1997 and 1999, The 1997 Opinion attracted the attention of Congress, which addressed its application in legislation. Specifically, for fiscal years 2000 and 2001, Congress prohibited application of the 1997 Opinion to existing patent applications and to mining plans submitted before November 7, 1997, or that BLM approved before November 29, 1999. Pub. L. No. 106-113, § 337. **Congress did not, however, prohibit application of the 1997 Opinion to operations approved after November 1999.** Overall, it neither ratified nor overturned the 1997 Opinion.

C.F.R. § 3832.32, which would state:

> A mill site must not exceed 5 acres in size. You may locate more than one mill site, so long as you do not locate more than an aggregate of 5 acres of mill site land for each 20-acre parcel of patented or unpatented place or lode mining claims associated with that mill site land, regardless of the number of lode or placer claims located in the 20-acre parcel.

64 Fed. Reg. 47037. The 1999 Proposed Rule "reaffirmed" and "made clear" existing DOI/BLM legal interpretation and policy regarding the Mining Law's millsite provision, 30 U.S.C. § 42, as contained in the 1997 Opinion. 64 Fed. Reg. 47028. "[T]his rule does not substantially change BLM's overall management objectives or environmental compliance requirements." Id. 47030.

As stated in § 42, millsite claims cover the "nonmineral land" at a mine site (i.e., away from the lode or placer deposits/claims that contain the valuable minerals to be excavated) that are used for ancillary activities such as milling/processing, waste dumps, leaching facilities, etc. The Department's 2001 Ancillary Use Memo summarized the use of millsites as intended in 1872, and contrasted that use with the way that mine operators have more recently claimed rights beyond that intended in 1872 to include vast acreages of public lands to handle the ancillary facilities:

> In the long-ago era when the Mining Law was enacted, individual mining operations were usually extracting minerals from high-grade underground deposits that did not require extensive surface areas for ancillary operations. The mill site limitation in the Mining Law thus reflected contemporary mining practices. For many years thereafter, the five-acres-per-mining-claim limit on mill sites continued to be viewed as more than adequate.
>
> As rich deposits have been depleted, mining techniques and practices have evolved to require larger and larger amounts of land. Large modern mines may be open-pit operations encompassing a large, low-grade ore body that can produce enormous quantities of waste rock and tailings which must be put somewhere.

M-37004, Use of Mining Claims for Purposes Ancillary to Mineral Extraction, at 5-6 (Jan. 18, 2001) (citations omitted).[3] The Memo, at 6 n. 10, quoted the American Mining Congress's (the forerunner to the National Mining Association), The Mining Law and Public Lands 29 (1968), which stated that: "A mine having 500 acres of mining claims may, for example, require 5000 acres for surface plant facilities and waste disposal areas. **It is obvious that such activities may not be acquired through five-acre millsites**." (Emphasis added).

After the change in administrations in 2001, and without any prior public notice, the new Deputy Solicitor of the Interior Department, Roderick Walston, issued a Memorandum which purported to reverse the legal findings contained in the 1997 Opinion and the 1999 Proposed Rule. *See* M-37010, "Mill Site Location and Patenting Under the 1872 Mining Law (co-signed by Interior Secretary Gale Norton on October 8, 2003) (the "2003 Millsite Opinion").

The 2003 Opinion disregarded the strict limits in § 42 and found that a claimant may locate as many millsite claims and acres as needed to use in support of a proposed mining operation,

---

[3] The Department's improper rescission of the 2001 Ancillary Use Memo/Opinion is covered elsewhere in this Petition.

such as for the dumping of mine waste and for chemical processing/leaching facilities.

Roughly two weeks later, again without prior public notice, DOI issued a new regulation, the 2003 Millsite Rule, which codified the 2003 Opinion's new interpretation of the Mining Law. 68 Fed. Reg. 61046-61081 (Oct. 24, 2003). The 2003 Millsite Rule stated that as long as a proposed millsite was used for mining purposes, "[y]ou may locate more than one mill site per mining claim." Codified at 43 C.F.R. § 3832.32. The rule effectively gave mining companies a right to use as much land as they needed for waste dumping, etc., pursuant to a purported statutory right—severely curtailing the federal agencies' discretion over these permanent uses of public lands.

Three separate federal district courts have addressed § 42 in decisions handed down since these events within the executive branch between 1997 and 2003. In the first, the court held that a millsite claimant has "the right to locate up to five acres of nonmineral land for mill site use in association with **each** valid mining claim. 30 U.S.C. § 42." Mineral Policy Center v. Norton, 292 F. Supp. 2d 30, 47 (D.D.C. 2003) (emphasis added).

In 2019, the District of Arizona reached the same result after a comprehensive review of the Mining Law and the purported "rights" asserted by the claimant and federal agency. It held that any rights to millsite claims under § 42 are strictly limited and are directly tied to the number/acreage of mining claims proposed for use at a mining operation. "In the Mining Law of 1872, Congress anticipated that claimants would need more than the land directly above a deposit to extract minerals. *See* §§ 23, 42. Where Congress anticipated such use, it provided for such use. *See id.*" Center for Biological Diversity v. U.S. Fish and Wildlife Service, 409 F.Supp.3d 738, 763 (D. Ariz. 2019).

The court then detailed the limitations under § 42, where the claimant only "has the ability to patent up to 5 acres of non-contiguous, non-mineral land in conjunction with ***each*** valid mineral claim which can be up to 20 acres." Center for Biological Diversity, at 763, n. 13 (emphasis added). As an example, the court explained that under § 42, the claimant "has fee title to use 25 acres of separate non-mineral land to support extraction of [valuable minerals] from his 100 acres of mineral land (*see* § 42, 23, 29)." Id. After discussing this strict statutory limitation in § 42, the court stated that "[S]ome present-day mining operations may exceed the rights granted, and limitations imposed, by the Mining Law of 1872." Id.

In the third decision, another federal district judge, in the District of Columbia, hearing a challenge to the 2003 Millsite Rule, found that § 42 was "ambiguous." It upheld the 2003 rule's language based on principles of administrative law—not because it necessarily agreed with the 2003 rule, but because it was a "permissible" interpretation of § 42. Earthworks v. U.S. Dept. of the Interior, 2020 WL 6270751, *14 (D.D.C. 2020).

> Faced with a statute that leaves open the question of whether the number of mill sites should be limited, it is not the Court's place to second-guess how the BLM should strike a balance between the competing policy concerns underlying the Mining Law. *See Chevron*, 467 U.S. at 864, 104 S.Ct. 2778 ("[P]olicy arguments are more properly addressed to legislators or administrators, not to judges."). Even if the BLM's interpretation may not be the only plausible one (**or, for that matter, the most natural one**), this Court must defer to it because it is a permissible one.

Earthworks, *14 (emphasis added).

The court noted that DOI was free to change its position on § 42: "As long as an agency explains itself, it can change its view of an ambiguous statute's meaning without forfeiting *Chevron* deference." Earthworks, *15.

This Petition, coupled with the 1997 Opinion and 1999 Proposed Rule, provides that explanation and is consistent with the statute, congressional intent, and the interpretation of other courts. As the Arizona district court noted, the Interior Department's "application of its regulations to mining operations cannot grant rights outside the bounds of the Mining Law of 1872." Center for Biological Diversity, at * 18 (discussing the limitations under § 42 noted above). For the reasons that follow, the Interior Department's current regulations, based on the legally erroneous 2003 Millsite Rule, gives claimants rights to federal public land that exceed those actually provided by the Mining Law.

Importantly, the Department's interpretation of the scope of the General Mining Law's grant must focus on the statute and on congressional intent in the context of mining practices at the time the statue was enacted in 1872. See Andrus v. Charlestone Stone Prods. Co., 436 U.S. 604, 611 (1978) (determination of what constituted a "valuable mineral" based on intent of the "1872 Congress"). "[P]ublic land statutes should be interpreted in light of the condition of the country when the acts were passed." Amoco Prod. Co. v. Southern Ute Indian Tribe, 526 U.S. 865, 875 (1999).

In interpreting the Mining Law, the Supreme Court has held that grants of public lands from the United States to private parties, such as § 42's millsite provision, must be construed in favor of the public: "It has long been established that, when grants to federal land are at issue, any doubts 'are resolved for the Government, not against it.'" Id. at 617, *quoting* U.S. v. Union Pacific R. Co., 353 U.S. 112, 116 (1957).

Thus, the question is whether the 1872 Congress intended to limit grants of "nonmineral" land associated with a 20-acre mining claim to the 5 acres stated in § 42. The 1997 Opinion (and Proposed Rule in 1999) recognized that, while a claimant could file as many mining claims as needed to cover the valuable minerals in the ore body, the amount of nonmineral land allocated for milling was not unlimited. This was because, based on the prevailing situation in the mining regions in the West when the law was enacted, more than 5 acres per mining claim was not needed to support extraction of minerals from such mining claims.

In contrast, the current language, based on the 2003 Opinion and Rule, asserts that because a claimant could file as many mining claims on lands containing "valuable minerals" as needed, the same must hold true for millsites covering "nonmineral" land. The 2003 Rule erroneously states that this interpretation is "[c]onsistent with Congress's goal in the Mining Law to promote mineral development on the public lands," and that "Interior consistently followed this practice and interpretation for at least 50 years immediately preceding the 1997 Opinion." 68 Fed. Reg. 61054. As noted above, however, what Interior allowed in 2003, 1997, or 50 years prior to that is not determinative. Only what Congress intended in 1872 matters. As the Supreme Court recently noted, government practices, no matter how prevalent or longstanding, cannot be upheld if they do not comport with the statutory language. "Nor may a court favor contemporaneous or later practices *instead* of the laws Congress passed." McGirt v. Okla., 140 S.Ct. 2452, 2468 (2020) (emphasis in original). Whatever "practical advantages" government policy or practice may offer cannot control if it "ignore[es] the written law." Id. at 2474.

The 2003 Opinion is based on the idea that Congress must have intended to allow unlimited lands for millsite activities on non-mineral land in 1872 (limited primarily only by the requirement that the uses of millsite claims be reasonably related to mining/processing) because the general aim of the law was to "promote mining." Yet this ignores what was happening in the West at the time. While it is true that the Mining Law promoted mining, it was not the only law promoting development and settlement of the West at the time, particularly uses of lands that did not contain valuable minerals (i.e., "non-mineral" land for millsites).

Unlike mineral land, public land that was not mineral in character had many other equally important, and congressionally-encouraged, uses. Therefore, limiting a claimant to five acres of non-mineral land is consistent with Congressional intent at the time for efficiently and fairly allocating uses and rights to non-mineral land. Although a congressional purpose of the Mining Law was to encourage mining, Congress sought to achieve this goal by granting broad rights to *mineral* land. 30 U.S.C. § 21 ("In all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law." Act of July 4, 1866, ch. 166, § 5, 14 Stat. 86). *See also* 30 U.S.C. § 22 (only lands containing "valuable mineral deposits" were "free and open to exploration and purchase, and the lands in which they are found to occupation and purchase.").

Congress clearly recognized the importance of other uses for *non-mineral* land as evidenced by other land disposal legislation at the time:

> For example, mineral land was exempted from the homestead laws, Act of June 21, 1866, 14 Stat. 66, ch. 127, § 1, 43 U.S.C. § 201, from statutes granting lands to railroads, Act of July 1, 1862, 12 Stat. 489, ch. 120, § 3; Act of July 2, 1864, ch. 217, § 3, 13 Stat. 365, and from a statute granting land to states for agricultural colleges, Act of July 2, 1862, ch. 130, § 1, 12 Stat. 503. If land was classified as mineral land, it could not be conveyed under these statutes.

Watt v. Western Nuclear, Inc., 462 U.S. 36, 47, n. 8 (1983) (other citations omitted).

Although mining activities were given precedence over other uses of land, this hierarchy only applied to **mineral** land. *See* Watt, 462 U.S. at 47-48. Land that was not mineral in character was open for other equally important uses. Id.

> Under the old system of land classification, the disposition of land owned by the United States depended upon whether it was classified as mineral land or non-mineral land, and title to the entire land was disposed of on the basis of the classification. This system of land classification encouraged particular uses of entire tracts of land depending upon their classification as mineral or non-mineral. With respect to land deemed mineral in character, the mining laws provided incentives for the discovery and exploitation of minerals, but the land could not be disposed of under the major land-grant statutes. **With respect to land deemed non-mineral in character, the land-grant statutes provided incentives for parties who wished to use the land for the purposes specified in those statutes.**

Id. (emphasis added). See also U.S. v. Sweet, 245 U.S. 563, 567 (1918) (noting distinction between purposes of uses for mineral lands and non-mineral lands). In other words, Congress at the time recognized that other equally-important users of public land, such as farmers, ranchers, timber companies, etc., had rights to use non-mineral land, and that allowing mining companies to claim and acquire essentially unlimited lands for millsite use (as asserted by the 2003

Opinion/Rule and current language) does not square with the prevailing intent of Congress in the 1870s.  Indeed, unlimited use of public lands for millsite purposes would create uncertainty and risk for claimants under the other land grant statutes and undermine Congress's overarching scheme to allocate public lands based on their mineral character and the uses to which they would be put.

Allowing mineral claimants to assert a right to as many millsites as they need for waste dumping and other ancillary uses (to the significant detriment to the environment and other users of public land), as allowed by the 2003 Rule, cannot override the language of the statute and congressional intent.  As the D.C. Circuit explained in upholding the statutory limitations on right-of-way grants to companies on public lands:

> Congress, by enacting Section 28, allowed pipeline companies to use a certain amount of land to construct their pipelines. **These companies have now come into court, accompanied by the executive agency authorized to administer the statute, and have said, "This is not enough land; give us more."** We have no more power to grant their request, of course, than we have the power to increase congressional appropriations to needy recipients.

Wilderness Society v. Morton, 479 F.2d 842, 891 (D.C. Cir. 1973) (en banc) (emphasis added).

The 1997 Opinion included a detailed analysis of § 42, both in the 1870s and through the ensuing decades, and correctly concluded that the number and size of millsite claims corresponds to the number and size of the mining claims associated with the millsites.  The 1997 Opinion found that: "Nothing in the statutory language suggests that the five-acre restriction on millsites may be avoided by locating multiple millsites in connection with a single mining claim." Opinion at 5.

The 1997 Opinion is based on initial Interior Department rulings handed down in the early years of the Mining Law that interpreted the millsite provision as limited to five acres per mineral claim. Opinion at 8-11 (discussing cases). For example, J.B. Hoggin, 2 L.D. 755 (1884), concluded that, "The Secretary made it clear, therefore, that a single mining claim could support multiple millsites only where the combined area of the millsites was five acres or less." 1997 Opinion at 9.  These nineteenth century rulings carry much greater weight than the agency's more recent interpretations of the same provision.  "Particularly is this respect due when the administrative practice at stake involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new." Udall v. Tallman, 380 U.S. 1, 16 (1965).

The 2003 Opinion attempted to refute these cases, asserting that prior to 1997, it was the Department of the Interior's "settled administrative practice and interpretation" that the Mining Law allows miners to claim multiple 5-acre mill sites in connection with a single mining claim. The 2003 Opinion reaches this conclusion only by ignoring clear authority and powerful evidence to the contrary, and by misrepresenting the primary authorities upon which it does rely—the BLM regulations and internal guidance.  Yet as correctly noted by the 1997 Opinion: "BLM's apparently recent ad hoc changes in practice to permit patenting of multiple millsites" violated the Mining Law, BLM regulations, and were never subject to Solicitor or Secretarial review. 1997 Opinion at 15 (emphasis in original).

Notably, the 2003 Opinion largely ignores the position *the mining industry itself* had consistently taken for decades—that the millsite provision constrained the amount of land that could be acquired for surface facilities. Industry lawyers explained that § 42 was "inadequate" or "insufficient" to allow for the large acreages needed by mining operators for non-mineral millsite land for waste dumping and other ancillary facilities. Mining lawyers had noted this limitation since at least 1914. Curtis H. Lindley, one of the leading authorities on the Mining Law in the early twentieth century, wrote in the third edition of his treatise that a "lode proprietor may select more than one tract [for a millsite] if the aggregate does not exceed five acres." *Lindley on Mines* § 520 (3d ed. 1914). In 1960, the first edition of *American Law of Mining* (which is written by attorneys for the mining industry) stated: "A mill site may, if necessary for the claimant's mining or milling purposes, consist of more than one tract of land, provided that it does not exceed five acres in the aggregate." 1 *Am. L. Mining* § 5.35 (1960). The Second Edition concluded that: "The acquisition of federal lands or interests therein by means other than the locating of mining claims or mill sites is sometimes necessary to provide the additional ground needed for a planned mining operation. **The restraints on the number and size of mill site claims can limit their usefulness as a land acquisition method."** 4 *Am. L. Mining*, § 111.01 (2d ed. rev. 1987) (emphasis added). The current Department language ignores this.

The last time Congress reviewed the millsite acreage limitations, in 1960, it amended § 42 to extend the ability to utilize and patent millsites in association with placer as well as lode claims. Pub. L. No. 86-390, 74 Stat. 7 (1960), codified at 30 U.S.C. §42 (b). Congress specifically rejected the original bill's proposal to allow a millsite location of "ten acres for each individual claimant" in connection with a placer claim. The Senate Committee's Report stated:

> [T]he word "ten" was stricken and the word "five" inserted in lieu thereof. The purpose of this amendment is to restrict the area of ***a*** millsite in conjunction with ***a*** placer claim to 5 acres of land to make it conform with the allowable millsite acreage for lode claims which has been the statutory requirement since 1872….
>
> [T]he words "for each individual claimant" were stricken ***so as to impose a limit of one 5-acre millsite in any individual case preventing the location of a series of 5-acre millsites in cases where a single claim*** is jointly owned by several persons….
>
> In essence, S. 2033 merely grants to holders of placer claims the same rights to locate ***a*** 5-acre millsite as has been the case since 1872 in respect to holders of lode claims, and the committee unanimously urges enactment.

S.Rep.No. 904, 86th Cong., 1st Sess., at 2 (emphasis added) quoted in 1997 Opinion.

Importantly, the Senate specifically "restrict[ed] the area of a [(i.e., one)] millsite in conjunction with a [i.e., one] placer claim." Id. This comports with the provision for lode claims where "such" millsite land may be included in a patent application for "such [lode] claim." 30 U.S.C. § 42(a).

> This [1960] legislative history demonstrates that Congress understood both the amendment in 1959 and the existing Mining Law to permit location of only one five-acre millsite per mining claim. The Senate Interior Committee removed the phrase 'for each individual claimant' from the bill for the express purpose of preventing the aggregation of multiple five-acre millsites by a mining claimant,

and made it clear that the Committee understood this to be consistent with the existing law applicable to millsites associated with lode claims.

1997 Opinion at 8.

   The 2003 Opinion relies heavily on caselaw acknowledging that multiple *mining* claims can be filed by a single claimant, despite the lack of any specific limitation on the number of mining claims on mineral land.  From this, it argues that this automatically means that Congress intended to similarly allow an unlimited number of *millsite* claims for non-mineral land. It relies on one alleged instance, from 1863, cited in the 2003 Opinion, where someone filed a 272 acre claim for milling.  Yet because it predated by several years Congress's first legislation regarding millsites (in 1872), it is of little value.  Indeed, according to the 2003 Opinion, the need for large acreages of land for waste dumping and other ancillary uses to support the mining of low-grade deposits first arose decades after 1872: "Miners have been developing low-grade copper, lead, gold, and iron ore deposits since the use of froth flotation began in the early 20th Century." 2003 Opinion at 20, n. 15.

   The assertion that Congress in 1872 understood that the mining industry needed essentially unlimited large tracts of land for milling, and that § 42 amply provided for that (i.e., no acreage/number restrictions), flies is the face of the statutory language and decades of analysis by Congress and the mining industry itself, all of which indicated that § 42 was insufficient to meet the needs of modern mining as it developed in the 20th Century.

   Rather, the situation in those years refutes the argument that an unlimited number of mining claims automatically translates into an unlimited number of millsite acreages/claims (so long as they support mining).  As noted above, Congress distinguished between mineral and non-mineral land because Congress promoted the use of the latter for farms, ranches, railroads and townsites.  Limiting a claimant's ability to assert absolute rights to essentially unlimited amounts of non-mineral land is thus entirely consistent with Congress' overall approach to public land policy at the time.

   Moreover, the 2003 Opinion, ignores the conclusion of the 1970 Public Land Law Review Commission Report ("PLLRC Report"). That Report, entitled *One Third of the Nation's Land:  A Report to the President and to the Congress by the Public Land Law Review Commission* (June 1970), was commissioned by Congress in 1964 because "it is necessary to have a comprehensive review of those laws and the rules and regulations promulgated thereunder and to determine whether and to what extent revisions thereof are necessary." Pub. L. 88-606, §2, 78 Stat. 982.  The Commission was comprised of the leading Senators and Members of Congress from the Western states, as well as Presidential appointees.

   The PLLRC Report analyzed the millsite provision and confirmed that it did **not** allow for the expansive interpretation asserted by the 2003 Rule and current language.  Specifically, the Report expressed serious concern about how the Mining Law presented **"weaknesses from the standpoint of the using [mining] industry in that there is … (3) inadequate provision for the acquisition of land for related purposes such as locating a mill."** Report at 124 (emphasis added).  This is the exact opposite of what the current language and 2003 Opinion/Rule assert (i.e., that § 42 affords a mining company as much land as it reasonably needs for processing, dumping, etc. and that the law needed no change).

   In order to remedy this problem, the PLLRC Report recommended that the current millsite

provision, § 42, be abolished or substantively revised. In its place, the Report recommended the following language:

> Development and production rights . . . should embrace use of enough land to meet all reasonable requirements for a mineral operation, such as settling ponds, mills, tailings deposits, etc. **Present law allows only 5 acres for each millsite in addition to the actual claim acreages, and this clearly has been inadequate in many cases.**

Report at 128 (emphasis added). This conclusion, and recommendation, mirrored the findings of the industry lawyers that prepared the minerals Study that was essentially adopted by the PLLR Commission:

> One subject extremely important to the mining industry ... is suggested amendments to the public land laws ... to assure the operator of a mining property that he may acquire adequate surface rights for mine, mill and related facilities, for dumps and tailings . . . . **Existing laws, such as 30 U.S.C. § 42 providing for mill sites, are inadequate.**

Twitty, "Amendments to the Mining Laws," 8 *Ariz. L. Rev.* 63, 73 n.15 (1966) (emphasis added).

Further highlighting the current law and its problems for the modern mining industry, the PLLRC Report included a full-page diagram explaining how "Present" law only allowed one 5-acre millsite for each lode claim—the same interpretation as the 1997 Opinion. Report at 131 (shown below). The diagram depicted how large-scale modern mining, covering multiple mining claims to profitably extract low grade deposits, was expressly limited by the millsite provision, stating that: **"Separate millsites are limited to 5 acres for each mining claim."** Id. (emphasis added). The same diagram then offered the recommended solution: expand the number and acreage of allowable millsite lands so the operator could obtain the "right to use sufficient surface for mining, including millsite and tailings area." Id. Despite the PLLRC's recommendations, Congress did not amend the millsite provisions of the Mining Law, and mining industry lawyers and Congressional analysts continued to note the problem. *See above*.



The Supreme Court and the D.C. Circuit have recognized the PLLRC Report as a definitive source of authority on the interpretation of public land and mining laws—especially those that have not changed since their enactment (such as the Mining Law). *See* Lujan v. NWF, 497 U.S. 871, 876-77 (1990); Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745, 754, n. 10

(D.C. Cir. 2007); Wilderness Society v. Morton, 479 F.2d 842, 881 (D.C. Cir. 1973).

Chapter Seven of the PLLRC Report was devoted to "Mineral Resources," detailing the current state of the law, as well as making recommendations to Congress to modernize mining laws to fit modern mining methods. This chapter is attached to this Petition, and the full Report can be found at https://ir.library.oregonstate.edu/xmlui/handle/1957/11183 (viewed 4-19-21). The Minerals Chapter was based on a report directed by the Commission and prepared by experts and lawyers from the mining industry. *See* Twitty, Sievwright & Mills, "Nonfuel Mineral Resources of the Public Lands: A Study Prepared for the Public Land Law Review Commission."

The 2003 Opinion dismisses these legal commentaries as "viewpoints expressed by lawyers in privately-published treatises and articles" that were inconsistent with "the Department's prevalent practice and interpretation of the mill site provision." 2003 Opinion at n. 26. Notably, the 2003 Opinion completely ignored the *PLLRC Report*, which remains one of the fundamental source documents in American public land law.

If DOI's "prevalent practice" were to allow location of multiple millsites per mining claim, the congressional and industry authors would have had no reason to describe the millsite provision of the Mining Law as an impediment to modern large-scale mining operations. Moreover, if DOI was already allowing miners to claim as many millsites as they needed, mining industry attorneys would have had no reason to write articles arguing that the millsite provision of the Mining Law should be amended to provide for more lands for surface facilities.

The 2003 Opinion's assertions to the contrary rest on misrepresentations of BLM's regulations, internal guidance, and supposed practice. The 2003 Opinion asserts that BLM's regulations "are broadly written" to allow the purported "prevalent practice" of locating more than one 5-acre millsite per mining claim. In fact, nothing in BLM's regulations gives any indication that this is permissible. To the contrary, as the 1997 Opinion noted, the regulation speaks of millsites exclusively in the singular: a party holding the right to "a" mining claim and "a piece of nonmineral land" may apply for a patent, and shall describe "such . . . millsite" in the application. The 2003 Opinion simply ignores this fact.

Despite the PLLRC's recommendations, Congress did not amend the millsite provision, and mining industry lawyers and Congressional analysts continued to note the problem:

> Theoretically, **one five-acre millsite can be acquired for each valid mining claim**. . . .[I]f some 2,000 to 2,500 acres are needed for tailings ponds, dumps, and other mine-related uses, the five acres permitted for each valid lode mining claim would be insufficient.

Parr & Kimball, "Acquisition of Non-Mineral Land for Mine Related Purposes," 23 *Rocky Mtn. Min. L. Inst.* 595, 641-42 (1977) (emphasis added).[4]

In 1979, the Congressional Office of Technology Assessment (OTA), a non-partisan research arm of Congress, confirmed that § 42 only allows that "a separate millsite may be located for each lode or placer claim" (i.e., same as the 1997 Opinion). OTA further noted that:

[4] Congress did, however, allow companies to use lands above the strict millsite limits, albeit pursuant to the discretionary permits, easements, and special use authorities under FLPMA Title V, 43 U.S.C. §§1761-1771. *See* MPC at 47-48; 2001 Ancillary Use Memo.

> These limitations were probably not too restrictive in 1872 when mining operations were small, involved high-grade deposits, and were not faced with substantial
> competition for the use of nonmineral land. Today, however, the typical mine encompasses a large, low-grade ore body that is often mined in an environment of intense competition for the surface use of land. Such a mine produces enormous quantities of waste rock and tailings that must be disposed of. If it is an open pit mine, it will have deep slanting pit walls. There will be crushing and processing plants and other customary facilities.
> …
>
> [I]t is highly doubtful that [millsites] could satisfy all the demands for surface space. **There could be at most as many millsites as there are mining claims**, and each millsite would be at most one-fourth the size of the typical 20-acre claim, so that the millsites, in the aggregate, would be one-fourth the size of the ore body encompassed by the claims. Yet the ore body is itself likely to be smaller than the area required either for pit slopes or disposal of waste rock or tailings.
>
> **Because the Mining Law does not adequately provide for land needed for surface facilities and uses**, the miner must seek to obtain such land independently through purchases and exchanges.

Office of Technology Assessment, *Management of Fuel and Nonfuel Minerals in Federal Land*, at 127 (April 1979) (emphasis added) (attached to this Petition).

The 1997 Opinion correctly recognized this. Yet instead of seeking congressional action to change § 42 as recommended by the PLLRC and other analysis to fit the needs of modern mining operations, DOI in 2003 simply reversed its 1997 interpretation—not to match the plain language of the law, but to unilaterally eliminate discretion under FLPMA in deciding whether to allow thousands of acres of public lands to be permanently used for waste dumps, tailings impoundments, and other large ancillary facilities. Thus, by erroneously interpreting § 42, the current language violates (by eliminating) its duties under FLPMA's public resource protection mandates.

The Petitioning parties accordingly request that the Department revise its regulations as requested and issue supporting opinions and policy instructions to correctly implement federal mining and public land laws.

**NOTICE OF PETITION AND PETITION FOR RULEMAKING**
**BRINGING HARDROCK MINING REGULATIONS AND POLICY**
**INTO THE 21ST CENTURY**
**TO PROTECT INDIGENOUS AND PUBLIC LANDS AND RESOURCES IN THE WEST**

# Attachment 8
# 43 C.F.R. 3800 fees analysis

**Subpart 3800—General[1]**

**§ 3800.5 Fees.**

(a) An applicant for a plan of operations under this part must pay a processing fee on a case-by-case basis as described in §3000.11 of this chapter whenever BLM determines that consideration of the plan of operations requires the preparation of an Environmental Impact Statement.

(b) An applicant for any action for which a mineral examination, including a validity examination or a common variety determination, and their associated reports, is performed under §3809.100 or §3809.101 of this part must pay a processing fee on a case-by-case basis as described in section 3000.11 of this chapter for such examination and report.

(c) An applicant for a mineral patent under part 3860 of this chapter must pay a processing fee on a case-by-case basis as described in §3000.11 of this chapter for any validity examination and report prepared in connection with the application.

(d) An applicant for a mineral patent also is required to pay a processing fee under §3860.1 of this chapter.

[70 FR 58878, Oct. 7, 2005]

**§3800.6 Am I required to pay any fees to use the surface of public lands for mining purposes?**

You must pay all processing fees, location fees, and maintenance fees specified in 43 CFR parts 3800 and 3830. Other than the processing, location and maintenance fees, you are not required to pay any other fees to the BLM to use the surface of public lands for mining purposes. <u>For operations on public lands not authorized by valid rights under the mining laws, including but not limited to, those operations obtaining a special use permit or right-of-way under Sections 2900 and 2920 of this title, you must pay fair market value for the use of public lands pursuant to the Federal Land Policy and Management Act, (FLPMA), 43 U.S.C. 1701 et seq.</u>

~~[73 FR 73794, Dec. 4, 2008]~~

**Supporting Rationale: this revision makes clear that operations not authorized by valid rights under the mining laws are subject to all FLPMA provisions. *See also* attached analysis related to BLM discretion, ancillary uses, and "operations authorized by the mining laws."**

[1] Proposed new language is in red and underlined and language proposed to be removed is in red and crossed through.