1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

LEILANI DOKTOR
Trial Attorney (HI Bar)
Natural Resources Section.
150 M Street NE
Washington, D.C. 20002
Tel.: (202) 305-0447
Fax: (202) 305-0506
Email: leilani.doktor@usdoj.gov

*Attorneys for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| GREAT BASIN RESOURCE WATCH, et al.,<br><br>            Plaintiffs,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>            Federal Defendants,<br><br>and<br><br>EUREKA MOLY, LLC.,<br><br>            Intervenor Defendant. | No. 3:19-cv-00661-LRH-WGC<br><br><br>**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

ARGUMENT ......................................................................................................... 1

I.  BLM Did Not Violate PWR 107 or the Mining Law in Approving the
Project's Plan of Operations ......................................................................... 1

    a.  The Lands Surrounding the PWR 107 Springs Were Never
Withdrawn with Respect to Metalliferous Minerals, Thus BLM's
Decision Required No "Evidence" of Mining Claim Validity ................. 2

    b.  Evidence of "Valid Rights" Is Not Required Before Approving
Operations on Open Lands, Including Lands Used for Metalliferous
Mining Operations on Lands Surrounding PWR 107 Sites ...................... 4

        i.  The Broad Authorization in Section 22 of the Mining Law Is
Not Dependent on the Existence of a Valid Mining Claim. ........... 5

        ii.  BLM Is Not Required to Make a Validity Determination
Prior to Approving the Project's Plan of Operations ..................... 6

    c.  BLM's Approval Does Not Constitute a Permanent Authorization
for EML. ................................................................................................ 9

    d.  BLM's Approval Conforms With the Agency's Longstanding Legal
Interpretation and Practice ...................................................................... 11

II.  BLM Complied with FLPMA ...................................................................... 12

    a.  BLM Correctly Applied its Part 3809 Surface Management
Regulations When Reviewing the Plan of Operations ............................ 12

    b.  BLM Appropriately Exercised its Discretion on Bonding
Requirements ......................................................................................... 14

III.  BLM Adequately Analyzed the Impacts of the Project According to NEPA
and Performed the Corrective Analysis Mandated by the Ninth Circuit ...... 15

    a.  BLM Took a "Hard Look" at the Impacts to Air Quality........................ 15

    b.  BLM Reasonably Determined the Baseline Air Quality ......................... 17

    c.  BLM Took a "Hard Look" at the Impacts to Water Resources ............... 18

    d.  BLM Adequately Analyzed Mitigation and Monitoring ........................ 18

CONCLUSION.................................................................................................... 19

**TABLE OF AUTHORITIES**

**Cases**

*Amoco Production Co. v. S. Ute Indian Tribe*,
   526 U.S. 865 (1999).................................................................................................. 6

*Badaracco v. Comm'r*,
   464 U.S. 386 (1984)................................................................................................ 11

*Belk v. Meagher*,
   104 U.S. 279 (1881).................................................................................................. 7

*Best v. Humboldt Placer Mining Co.*,
   371 U.S. 334 (1963).................................................................................................. 7

*Cameron v. United States*,
   252 U.S. 450 (1920).................................................................................................. 8

*Chem. Mfrs. Ass'n. v. EPA*,
   28 F.3d 1259 (D.C. Cir. 1994)................................................................................ 17

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
   409 F. Supp. 3d 738 (D. Ariz. 2019) ...................................................................... 7

*Ctr. for Biological Diversity vs. Salazar*,
   706 F.3d 1085 (9th Cir. 2013) ............................................................................... 10

*Davis v. Nelson*,
   329 F.2d 840 (9th Cir. 1964) ................................................................................... 8

*Great Basin Mine Watch v. Hankins*,
   456 F.3d 955 (9th Cir. 2006) ................................................................................. 16

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
   844 F.3d 1095 (9th Cir. 2016) ................................................................... 2, 15, 18

*Great Basin Res. Watch v. U.S. Dep't of the Interior*,
   3:13-cv-00078, 2014 WL 3696661 (D. Nev., July 23, 2014)................................ 2

*Lands Council v. Powell*,
   395 F.3d 1019 (9th Cir. 2005) ............................................................................... 16

*Loughrin v. United States*,
   573 U.S. 351 (2014)................................................................................................. 4

*McGirt v. Oklahoma*,
   140 S. Ct. 2452 (2020)........................................................................................... 11

*McMaster v. United States*,
   731 F.3d 881 (9th Cir. 2013) ............................................................... 4, 6, 11, 14

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   422 F.3d 782 (9th Cir. 2005) ................................................................................. 16

*Payne v. United States*,
    31 Fed. Cl. 709 (1994) ................................................................................................ 8

*Robertson v Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .................................................................................................. 18

*S. Fork Band Council v. U.S. Dep't of the Interior*,
    588 F.3d 718 (9th Cir. 2009) .................................................................................... 18

*Schweiker v. Hansen*,
    450 U.S. 785 (1981) .................................................................................................. 14

*Union Oil Co. v. Smith*,
    249 U.S. 337 (1919) ................................................................................................ 5, 8

*United States v. Bush*,
    157 I.B.L.A. 359 (Oct. 31, 2002) ............................................................................... 2

*United States v. Coleman*,
    390 U.S. 599 (1968) .................................................................................................... 8

*United States v. Union Oil Co.*,
    549 F.2d 1271 (9th Cir. 1977) .................................................................................... 5

*Watt v. Western Nuclear, Inc.*,
    462 U.S. 36 (1983) ...................................................................................................... 5

*Wisconsin Central Limited v. United States*,
    138 S. Ct. 2067 (2018) ............................................................................................... 7

**Statutes**

16 U.S.C. § 410aaa-47 .................................................................................................... 3

16 U.S.C. § 551 .............................................................................................................. 7

30 U.S.C. § 181 ............................................................................................................ 12

30 U.S.C. § 2 .................................................................................................................. 6

30 U.S.C. § 22 ............................................................................................................. 4, 5

30 U.S.C. § 23 ................................................................................................................ 4

30 U.S.C. § 26 ............................................................................................................. 4, 6

30 U.S.C. § 29 ........................................................................................................... 4, 12

30 U.S.C. § 35 ................................................................................................................ 6

30 U.S.C. § 37 ................................................................................................................ 6

30 U.S.C. § 42 ................................................................................................................ 6

30 U.S.C. § 611 ............................................................................................................ 12

iii

42 U.S.C. § 4332(C)(ii) .................................................................................. 18

43 U.S.C. § 1732(b) ...................................................................................... 11

Pub. L. No. 94-579, 90 Stat. 2743 .................................................................. 5

Pub. L. No. 94-579, 90 Stat. 2786 .................................................................. 5

**Regulations**

36 C.F.R. Part 228 ......................................................................................... 7

40 C.F.R. § 1508.7 ................................................................................. 16, 17

43 C.F.R. § 2920.1-1 .................................................................................... 13

43 C.F.R. § 3809.100 ................................................................................. 7, 8

43 C.F.R. § 3809.2(a) ................................................................................... 12

43 C.F.R. § 3809.2(e) ................................................................................... 13

43 C.F.R. § 3809.401(b)(2)(ii) ........................................................................ 9

43 C.F.R. § 3809.401(b)(3) ...................................................................... 9, 12

43 C.F.R. § 3809.411(d)(2) ........................................................................... 11

43 C.F.R. § 3809.412 ................................................................................... 14

43 C.F.R. § 3809.423 .............................................................................. 9, 12

43 C.F.R. § 3809.5 ................................................................................. 9, 13

43 C.F.R. § 3809.552(a) ............................................................................... 14

43 C.F.R. § 3809.590(c) ................................................................................. 9

43 C.F.R. § 3809.591(c) ................................................................................. 9

43 C.F.R. §3809.552(c) ................................................................................ 14

43 C.F.R. Part 3809 ............................................................. 4, 6, 8, 9, 11, 12

**Other Authorities**

45 Fed. Reg. 31,284 (May 12, 1980) ............................................................ 13

46 Fed. Reg. 5772-01 (Jan. 19, 1981) .......................................................... 13

65 Fed. Reg. 69,998 (Nov. 21, 2000) .......................................................... 8, 9

*Authorization of Reasonably Incident Mining Uses on Lands Open to the Operation of the Mining Law of 1872*, M-37057 (Aug. 17, 2020) ....................................... 11

*Legal Requirements for Determining Mining Claim Validity Before Approving a Mining Plan of Operations*, M-37012, (Nov. 14, 2005) ................................................... 10

**INTRODUCTION**

The U.S. Bureau of Land Management's ("BLM") decision to approve the mining plan of operations for the Mount Hope Mine Project ("Project") complied with the Mining Law of 1872, the National Environmental Policy Act ("NEPA), and the Federal Land Policy and Management Act ("FLPMA"). In challenging this decision, Plaintiffs assert three overarching arguments. First, that BLM violated the Mining Law and Public Water Reserve ("PWR") 107 by not investigating the validity of Intervenor-Defendant's, Eureka Moly, LLC ("EML"), mining claims prior to approving the Project's plan of operations. Second, that BLM did not comply with FLPMA's bonding requirement or take the required steps to avoid unnecessary or undue degradation. And third, that BLM did not adequately analyze the impacts of the plan of operations for the Project in the 2019 Final Environmental Impact Statement ("FEIS"). Each of these arguments fail. The first because it is not supported by the plain language and long standing interpretation of the applicable statutes. The second because BLM reasonably determined that the proposed operations would not cause "unnecessary or undue degradation" and exercised appropriate discretion over bonding requirements in accordance with Federal and state regulations. And the third because the administrative record ("Record") supports BLM's position that it adequately analyzed the impacts of the Project pursuant to NEPA and FLPMA. Therefore, the Court should deny Plaintiffs' Motion for Summary Judgment in its entirety.

**ARGUMENT**

**I.      BLM Did Not Violate PWR 107 or the Mining Law in Approving the Project's Plan of Operations**

Federal Defendants agree that BLM's obligations to verify mining claim validity before approving the Project's plan of operations are dependent on the facts on the ground. The facts on the ground of this case are that the Project is for exploration and development of metalliferous minerals, and the lands within the Project area were not withdrawn under PWR 107. Therefore, BLM's authorization of EML's plan of operations without first conducting a validity

1

examination did not violate PWR 107, the Mining Law, or BLM's surface management regulations, and Plaintiffs' arguments fail to provide bases for this Court to conclude otherwise.

**a. The Lands Surrounding the PWR 107 Springs Were Never Withdrawn with respect to Metalliferous Minerals, thus BLM's Decision Required No "Evidence" of Mining Claim Validity**

Plaintiffs' continued assertion that the lands around the PWR 107 sites[1] have been withdrawn from operation of the Mining Law since the issuance of the 1926 Executive Order, and that BLM's decision was arbitrary and capricious because it failed to establish "evidence" that the approved mine plan qualified for the Pickett Act's withdrawal exception, remains unsupported. Rehashing contentions from their opening brief cannot overcome the fact that PWR 107 and the Pickett Act clearly provide that the Project area lands remain open for exploration and occupation for metalliferous minerals, such as molybdenum. *See Great Basin Res. Watch v. U.S. Dep't. of the Interior* ("*GBRW I*")*, No. 3:13-cv-00078, 2014 WL 3696661 at *7-8 (D. Nev., July 23, 2014), aff'd in part, rev'd in part and remanded,*; *see also United States v. Bush*, 157 I.B.L.A. 359, 360 & n.1 (Oct. 31, 2002) (confirming that lands remained open for entry for metalliferous minerals).

Rather than acknowledge this carved-out exception in the President's withdrawal authority under the Pickett Act, *see GBRW I, 2014 WL 3696661 at *7-8*, Plaintiffs again ask this Court to read the Pickett Act language as imposing an obligation on BLM to establish "evidence of sufficient mineralization" in order to "override" the alleged withdrawal. Pls.' Reply., ECF No. 71, at 29-33. Plaintiffs also assert that the "evidence" must be sufficient to demonstrate that the Project lands contain "valid claims for metalliferous minerals" and "valuable deposits of metalliferous minerals." ECF No. 71 at 29; *see also id.* at 28. BLM's opening brief amply

---

[1] The PWR sites at issue are springs 597, 604, 619 and 742. *See* AR066366. In accordance with the Ninth Circuit's directive, BLM identified all applicable PWR 107 sites and confirmed that the sites at issue are covered by PWR 107. *See Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1111 (9th Cir. 2016).

demonstrated that the Pickett Act's withdrawal authority was inapplicable in this instance. Defs.' Cross Mot. for Summ. J, ECF No. 68 at 9-13. In continuing to insist that BLM was required to provide "evidence" before approving the Project in their reply,  Plaintiffs once again attempt to broaden the withdrawal authority in the Pickett Act by inferring additional requirements. But such inferences are improper because the Pickett Act's withdrawal language is different than the "subject to valid existing rights" provision found in other withdrawal statutes. For that reason, the Court should resolve this case consistent with the BLM's position that mining for metalliferous minerals was exempted from withdrawal under the Pickett Act.[2]

BLM has no quarrel with the principle that where lands are withdrawn "subject to valid existing rights," evidence must be provided and verified whenever a third party wishes to have such rights recognized on the withdrawn lands. *see, e.g.*, 16 U.S.C. § 410aaa-47 ("Subject to valid existing rights, all Federal lands within the [Mojave National P]reserve are hereby withdrawn from all forms of entry, appropriation, or disposal under the public land laws; from location, entry, and patent under the United States mining laws; and from disposition under all laws pertaining to mineral and geothermal leasing, and mineral materials, and all amendments thereto.") But neither the plain language of the Pickett Act's withdrawal authority nor PWR 107 itself frame the provision related to metalliferous minerals as allowing for a full withdrawal of the lands "subject to valid existing rights related to metalliferous minerals." Because Congress expressly reserved the withdrawal authority for lands containing metalliferous minerals under the Pickett Act, this Court should decline Plaintiffs invitation to infer a "subject to valid existing rights" provision into the statute's language.[3]

---

[2] Plaintiffs repeatedly mischaracterizations BLM's position by stating that BLM uses mining claim language when discussing the inapplicability of the PWR 107 withdrawal, ECF no. 71 at 27 and 39, when in fact BLM tied the inapplicability of the withdrawal to the <u>mining</u> for metalliferous minerals.

[3] Plaintiffs' continued assertion that a valid mining claim for metalliferous minerals is necessary to "override" the PWR 107 withdrawal fails for the additional reason that two of the activities

### b. Evidence of "Valid Rights" Is Not Required Before Approving Operations on Open Lands, Including Lands Used for Metalliferous Mining Operations that Surround PWR 107 Sites

Plaintiffs renew their argument that, even if the lands were not withdrawn under PWR 107, BLM's approval of the plan of operations was nevertheless improper because the Mining Law's authorization to explore, develop, and remove minerals from open public lands found in 30 U.S.C. § 22 ("Section 22") applies only where the miner has located a mining claim <u>and</u> BLM has determined that the mining claim contains a discovery of a valuable mineral deposit. *See* Pls' Reply, ECF No. 71 at 7-8, 29-30. Plaintiffs' reply adds no additional persuasive support for their novel interpretation, which conflates two distinct concepts: the right to freely access and remove minerals subject to disposal on open federal lands, 30 U.S.C. § 22, and the separate option to secure property rights to those lands as against the United States by locating mining claims or obtaining fee title through "patents." *Id.* §§ 26, 29. Because the lands at issue are open, and because no law, regulation, or policy requires an operator to demonstrate a property interest to obtain surface use authorization under 43 C.F.R Part 3809 on open lands, BLM was not required to evaluate whether EML possessed a property right in the form of *valid* mining claims[4] prior to approving the mining plan.

---

enumerated in the Pickett Act--"exploration" and "discovery"—occur *before* a mining claim can be determined to be valid. If Plaintiffs' interpretation were correct that metalliferous mining could only happen where there are valid existing mining claims, then this "exploration" and "discovery" language in the Pickett Act would be rendered surplusage, which Plaintiffs themselves admit is inconsistent with canons of statutory construction. *See* ECF No. 71, at 9 (citations omitted).

[4] "Valid mining claim" is a term of art for a mining claim where there has been a discovery of a valuable mineral deposit that could grant the claimant a property right to the claim. BLM may verify this discovery through a validity determination which is subject to extensive requirements such as annual reporting, a mineral examination by a Certified Mineral Examiner, or contest proceedings as detailed in 43 C.F.R Part 3809.

1

2

### i.   The Broad Authorization in Section 22 of the Mining Law Is Not Dependent on the Existence of a Valid Mining Claim.

Plaintiffs continue to argue that by declaring "valuable mineral deposits and the lands in which they are found" to be "free and open," 30 U.S.C. § 22, Congress actually meant for the Mining Law's mineral disposal authority to apply only where there were valid "mining claims" located "upon veins or lodes," *id.* §§ 23, 26. ECF No. 71 at 9.  But Section 22 says nothing about mining claims, the discovery of veins or lodes, or mining claim validity.  Where "Congress includes particular language in one section of a statute but omits it in another," courts "presume that Congress intended a difference in meaning." *Loughrin v. United States,* 573 U.S. 351, 357 (2014); *cf. McMaster v. United States,* 731 F.3d 881, 893 (9th Cir. 2013) (holding that the terms "valid existing rights" and "valid claims" in the Wilderness Act meant different things). Plaintiffs attempt to rewrite Section 22's broad language so that only the lands and minerals within valid mining claims are free and open.  But their argument cannot be reconciled with the text and structure of the Act, which only imposes such limitations in later provisions that specifically address the establishment of property rights to mining claims or patents.

Plaintiffs also cannot read a "valid mining claims" restriction into the phrase "the lands in which [valuable mineral deposits] are found."  30 U.S.C. § 22.  Plaintiffs assert that this language limits Section 22's broad authorization to lands containing actual, validated valuable mineral deposits. Pls' Reply, ECF No. 71 at 9-10.  But, Section 22 cannot be interpreted so narrowly.  Instead, the "lands in which [valuable mineral deposits] are found" references all lands mineral in character.[5]  When Congress enacted the Mining Law, "public lands were

---

[5] As a practical matter, Plaintiffs' strained interpretation of "lands in which [valuable mineral deposits] are found" is unworkable.  If a discovery of a valuable mineral deposit were necessary to occupy open lands, then a miner would need to discover minerals before exploring for them. But the Supreme Court has rejected that interpretation of the Mining Law.  *Union Oil Co. v. Smith*, 249 U.S. 337, 346 (1919).  Recognizing that authority, Plaintiffs argue that the meaning of Section 22 varies depending on the stage of development.  For example, Plaintiffs maintain that Section 22 broadly allows citizens to occupy all lands mineral in character during

5

disposed of as either wholly mineral or wholly nonmineral in character." *United States v. Union Oil Co.*, 549 F.2d 1271, 1274 (9th Cir. 1977). If lands were "mineral" in character, "the mining laws provided incentives for the discovery and exploitation of minerals, but the land could not be disposed of under the major land-grant statutes." *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 47 (1983). And if lands were agricultural — that is, non-mineral in character — then "the land-grant statutes," like the homestead laws, "provided incentives for parties who wished to use the land for the purposes specified in those statutes." *Id.* at 48; *see id.* at 47 n.8 (providing examples). Although Congress repealed the agricultural disposal laws in 1976 under FLPMA, Pub. L. No. 94-579,§§ 701–06, 90 Stat. 2743, 2786–94 (1976) , the Mining Law has endured. With that historical context, the text of Section 22 is plain: all mineral lands are free and open to exploration and development, while agricultural lands are subject to disposal under other statutes. *Cf. Amoco Production Co. v. Southern Ute Indian Tribe*, 526 U.S. 865, 873 (1999) (when enacting a mineral reservation, "Congress was dealing with a practical subject in a practical way" and intended the terms "to be understood in their ordinary and popular sense").

### ii. BLM is Not Required to Make a Validity Determination Prior to Approving the Project's Plan of Operations

BLM was not required to investigate the validity of EML's mining claims before approving its mining plan. 43 C.F.R. § 3809. Plaintiffs' argument otherwise cannot be reconciled with the separate provisions of the Mining Law. Contrary to the Plaintiffs' assertions in their reply, their theory that only mining on lands where there has been a discovery of a valuable mineral deposit is authorized under Section 22, is unsupported by 30 U.S.C. § 26's statement that "locators of all mining locations made on any mineral vein, lode, or ledge . . . shall have the

---

exploration. But once "development" has begun, Plaintiffs assert that Section 22 allows a miner to occupy only those lands containing a verified discovery of a valuable mineral deposit. ECF No. 71 at 12. That distinction has no basis in the statute. Nor is there a clear factual distinction between these labels— exploration, like mineral development, may produce large volumes of rock that must be placed somewhere

6

exclusive right of possession and enjoyment of all the surface included within the lines of their locations." ECF No. 71 at 12. That provision shows only that Congress gave miners who located valid mining claims additional property rights, such as the ability to obtain § 26's grant of "exclusive right of possession and enjoyment." *McMaster v. U.S.*, 731 F.3d 881, 885 (9th Cir. 2013). The text of Section 22 does not require the "discovery of a vein or lode" for its authorization to be operative; Plaintiffs cannot infer that language into the statutory text.[6] *Cf. Belk v. Meagher*, 104 U.S. 279, 284–85 (1881) (distinguishing between "taking possession alone" versus the "exclusive right to the possession and enjoyment" of a claim).

The federal government has consistently distinguished the statutory right to use and occupy land for mining purposes from the additional property rights obtained through locating mining claims and mill sites under other provisions of the Mining Law. *Center for Biological Diversity v. U.S. Fish and Wildlife Service*, 409 F. Supp. 3d 738 (D. Ariz. 2019) (hereby "*Rosemont*" in reference to the Rosemont Mine at issue in the case). Contrary to Plaintiffs assertions, Pls' Reply, ECF No. 71 at 14, *Rosemont's* holding is not directly applicable here because that case concerned the Forest Service's obligations under the Organic Administration Act of 1897, 16 U.S.C. § 551, and that agency's regulations at 36 C.F.R. Part 228 subpart A, not FLPMA or BLM's implementing regulations. In *Rosemont* the district court found "[a]ny

---

[6] By contrast, BLM's interpretation that it could authorize the Project without requiring EML to demonstrate a valid mining claim gives each provision of the Mining Law independent effect. Section 22 authorizes miners to explore and develop for valuable mineral deposits and occupy federal land for mining purposes, with later sections providing miners the additional option to secure property interests as against the United States and ultimately obtain legal title to those lands. It makes sense that Congress placed more restrictions on a miner's ability to obtain property interests (including title) in federal lands, than it did on a miner's non-exclusive right to simply use those lands. Interpreting Section 22's mineral disposal authority to also authorize the use of federal land for mining and occupation in the course of obtaining federal minerals does not nullify the separate property interests granted by 30 U.S.C. §§ 26, 29, 35, 36, 37, and 42. To the contrary, it is the only interpretation that gives each provision independent meaning. Plaintiffs' interpretation, which would read the statutory authorization contained in Section 22 as coextensive with the property rights granted in the later sections, "promises a graver surplusage problem." *Wisconsin Central Limited v. United States*, 138 S. Ct. 2067, 2073 (2018).

determination of a claimant's surface rights *upon Forest Service land* must begin with a discussion of the validity of their claims." *Ctr. for Biological Diversity*, 409 F. Supp. at 757 (citing *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 337 (1963)) (emphasis added).  But that finding was premised on the district court's determination that the Forest Service Organic Act's required that the Service protect forest resources against "depredations."  16 U.S.C. § 551. The district court stated that, in order to protect Forest Service lands against "depredations" in accordance with the Organic Act, the agency must "first determin[e] who may, *as a right*, use the surface." *Rosemont*, 409 F. Supp. at 757.

This bar against "depredations" is specific to the Organic Act and is not paralleled in FLPMA or BLM's regulations.  Moreover, under FLPMA, BLM's corresponding regulations only require the agency to first determine who has a property right, i.e., a valid mining claim, to use the surface of BLM-managed public lands for mining purposes only when the lands have been withdrawn, subject to valid existing rights.  *See* 43 C.F.R. § 3809.100.  Absent a withdrawal, neither FLPMA nor BLM's regulations purport to require a determination of who "may, as a right, use the surface."  *See* 65 Fed. Reg. 69,998, 70,007-08 (2000) (preamble to 43 C.F.R. subpart 3809 noting that "approvals of plans of operations on unclaimed lands are not based on *property* rights under the mining laws, and that approval of a plan of operations under subpart 3809 does not create property rights where none previously existed").

The other cases cited by Plaintiffs are inapposite because they address separate property rights under the Mining Law.  ECF No. 71 at 12-14.  For example, in *Davis v. Nelson*, 329 F.2d 840 (9th Cir. 1964), the Ninth Circuit rejected an attempt by 64 mining claimants to enjoin Interior from determining the scope of their property rights.  *Id.* at 842.  In so deciding, the Court explained that the claimants did not automatically "acquire[] a vested property right enforceable and defendable against the United States as well as third persons."  *Id.* at 845.  Instead, "valid ownership of the property" hinges on "a discovery of valuable mineral" and "compliance with the legal requirements for locating a claim."  *Id.*  Plaintiffs cite this portion of the Court's

holding without mentioning that later in the decision, the Court confirmed that miners "also have and enjoy a statutory right to prospect and explore the public domain." *Id.* at 846.

BLM does not dispute that the "discovery of mineral is essential" to "create valid rights or initiate a title against the United States." *Union Oil Co. v. Smith*, 249 U.S. 337, 347 (1919). But EML has not asserted a property right against the United States here. Defs.' Cross Mot. for Summ. J., ECF No. 68 at 27–28 and n. 8 at 28.[7] Because BLM's approval of EML's proposed operations on the open lands at issue neither recognized nor created a property interest, BLM was not required to assess whether EML had a valid mining claim before approving the mining plan on open lands. *See* 43 C.F.R. § 3809.100.

### c. BLM's Approval Does Not Constitute a Permanent Authorization for EML.

As in their opening brief, Plaintiffs' reply continues to repeatedly mischaracterize BLM's action as "permanently" authorizing EML's use of the lands. ECF No. 71, at 7, 10, 13, 20, 28, 37, 46, and 47. Indeed, Plaintiffs even go so far as to characterize BLM's approval as violating the Congressional moratorium on processing patent applications under the Mining Law, arguing that BLM's approval of a mining plan of operations under 43 C.F.R. Part 3809 is tantamount to a transfer of fee title to EML. ECF No. 71, at 11. In making these assertions that BLM's decision has consequences equivalent to actions requiring a demonstration of a valid mining claim, Plaintiffs hope to justify a similar demonstration is required here. This Court should reject Plaintiffs' contentions.

Plaintiffs' "permanence" argument focused in particular on EML's waste rock and tailing facilities. ECF No. 71, at 7. Waste rock and tailing facilities fall squarely within BLM's regulatory definition of mining operations. 43 C.F.R. § 3809.5 (defining "operations"); *see* 65 Fed. Reg. 69,998, 70,013 (2000) (stating that the "definition is intended to be broad in scope to

---

[7] EML has not filed a patent application or a takings claim. *Cf. United States v. Coleman,* 390 U.S. 599, 600 (1968); *Payne v. United States*, 31 Fed. Cl. 709, 710–11 (1994) (Tucker Act claim for compensation). Nor does EML propose to conduct mining operations on withdrawn lands. *Cf. Cameron v. United States*, 252 U.S. 450, 456 (1920).

address 'cradle to grave' activities" and includes everything from prospecting through reclamation and closure); *see also* 43 C.F.R. § 3809.401(b)(2)(ii) (requiring proposed plans to contain a description of the proposed operations, including "[p]reliminary or conceptual . . . operating plans for mining areas, processing facilities, and waste rock and tailing disposal facilities"). These mining operations, like all mining operations authorized under BLM's regulations, must be reclaimed before the operator's authorization concludes.

Contrary to Plaintiffs' repeated assertions, the challenged BLM authorization for EML's use of these lands is limited. After mining ends and reclamation is completed, EML will no longer have BLM's permission to occupy the surface of those lands. *See* 43 C.F.R. § 3809.423; *see also id.* §§ 3809.401(b)(3)  (requiring mine plans to include a reclamation plan), 3809.590 (describing conditions for release of bonds after completion of reclamation). Plaintiffs wrongly claim that BLM's decision effectively grants EML permanent possession of the land, ECF No. 71 at 20; in fact, following completion of reclamation and release of its financial guarantee, *see* 43 C.F.R. §§ 3809.590(c), 3809.591(c) , EML will have no superior rights to the land via-a-vis other public lands users, and will have no ability to preclude others from those lands.  And while the landscape will be changed, the lands will be available for other uses following reclamation, such as recreation, grazing, and wildlife habitat. *see also* 43 C.F.R. § 3809.591(c) (stating that the remainder of the reclamation bond will be released when "BLM determines that you have successfully completed reclamation, including revegetating the area disturbed by operations" and certain water quality benchmarks are met). Thus, EML's authorization to use the land is temporary, and only for the "life of the project," *see Center for Biological Diversity vs. Salazar*, 706 F.3d 1085 (9th Cir. 2013), in contrast to the type of permanent property right entailed by other provisions of the Mining Law for which a valid mining claim *is* required. No party is arguing here that under the Mining Law EML is entitled to exclusive permanent possession of the lands underlying the proposed waste rock and tailings facilities.  To the contrary, BLM has maintained that EML has only the non-exclusive right to *use* the lands for mining operations, for only the period authorized by BLM.  ECF No. 68 at 29.

1

2

### d.  BLM's Approval of the Plan of Operations Conforms With the Agency's Longstanding Legal Interpretation and Practice

3

Plaintiffs admit that BLM's decision to approve the Project without first "inquiring into"

4

mining claim validity because the lands surrounding the PWR 107 sites are open to operation of

5

the Mining Law with respect to metalliferous minerals adheres to the agency's longstanding

6

practice.  ECF No. 71 at 19.  Indeed the Interior Department's Solicitor, shortly after BLM

7

promulgated the surface management regulations implemented here, reviewed the Mining Law,

8

the Surface Resources Act, FLPMA, and administrative decisions of both the Interior and

9

Agriculture Departments and confirmed that no statute or regulation requires BLM to verify

10

mining claim validity before approving a mining plan on lands open to operation of the Mining

11

Law. *Legal Requirements for Determining Mining Claim Validity Before Approving a Mining*

12

*Plan of Operations*, M-37012, at 3-4 (Nov. 14, 2005) (noting that not only does the Interior

13

Department not know whether most mining claims are valid, but it "*need not know*[] whether

14

these mining claims and mill sites are valid before approving a proposed plan for exploration or

15

mining on open lands" (emphasis in original)).[8]  Interior recently reaffirmed that position.

16

*Authorization of Reasonably Incident Mining Uses on Lands Open to the Operation of the*

17

*Mining Law of 1872*, M-37057 at 1–3 (Aug. 17, 2020).  This Circuit has held that thorough,

18

formal, signed opinions stating Interior's legal position are entitled to deference.[9]  *McMaster*,

19

20

21

[8] While outside parties had interpreted an earlier Solicitor's Opinion to have identified

22

circumstances where validity must be determined on open lands, the opinion never expressed

that conclusion.  *See* M-37012, at 2 ("[T]he 2001 Opinion did not conclude that the Department

23

was under such an obligation."). For clarity, the 2005 Solicitor's Opinion expressly rejected the

earlier opinion's "suggest[ion] that validity examinations might be required under certain

24

circumstances" on open lands).  *Id.* The agency's policy and practice of not requiring operators

25

to demonstrate a valid mining claim before beginning mining operations on open lands have thus

remained consistent throughout the history of the Mining Law, both before and after the agency

26

became involve in approving mining operations in 1981.

27

[9] Plaintiffs reliance on *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), is misplaced because the

question in that case was subject to the legal precept that only Congress can diminish a

28

congressionally established Native American reservation and because the agency's practice of

11

731 F.3d at 891 & n.3.  Plaintiffs' attempt to upend Interior's longstanding interpretation and practice, based on only a far-fetched and novel construction of the Mining Law, *see supra* Argument I.b, fails to demonstrate that BLM's action was arbitrary or capricious. To the extent Plaintiffs seek to change the Mining Law, they should take their complaints to Congress, not the courts.  *Cf. Badaracco v. Comm'r,* 464 U.S. 386, 398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement.").

## II.      BLM Complied with FLPMA

BLM approved the Project in a manner consistent with FLPMA's requirement to prevent unnecessary or undue degradation of the lands.  *See* 43 U.S.C. § 1732(b); 43 C.F.R. § 3809.411(d)(2).  As discussed above, the approval of the Project's plan of operations was authorized by the Mining Law. *See supra* Argument I.  Therefore, by their express terms, BLM's surface management regulations at 43 C.F.R. Part 3809 governing actions authorized by the Mining Law apply to the Project.  In spite of this, Plaintiffs contend that BLM: (1) failed to apply the correct regulations to its decision and thus, violated FLPMA's "unnecessary or undue degradation" standard; and (2) did not comply with the bonding requirements under its surface management regulations. Because Plaintiffs misinterpret BLM's regulations, both their arguments under FLPMA should be denied.

### a.      BLM Correctly Applied its Part 3809 Surface Management Regulations When Reviewing the Plan of Operations.

Plaintiffs admit that their allegation that BLM violated FLPMA by processing EML's plan of operations under its surface management regulations at 43 C.F.R. Part 3809 (instead of the agency's regulations governing leases, permits, and easements at Part 2920) fails if this Court determines that the proposed operations fall within the scope of BLM's surface management

---

treating the Creek Tribe's reservation as disestablished contradicted the express statutory text.. *See id.* at 2462–74.  By contrast, no comparable precept applies here, and BLM's practice aligns with the text and structure of both the Mining Law and FLPMA.  *See supra* Argument I.d.

regulations. *See* ECF No. 71, at 47.[10] It is undisputed that the operations are proposed on BLM-managed public lands where the mineral interest is reserved to the United States.  The record is also clear that the mineral that the Project will develop is molybdenum, a mineral that has not been made subject to lease under the Mineral Leasing Act of 1920, 30 U.S.C. § 181, or sale under the Materials Act of 1947, *see* 30 U.S.C. § 611, and thus the disposal of which remains authorized solely by the Mining Law. Consequently, BLM's authorization of EML's mining plan falls squarely within the regulatory scope of Part 3809 *See* 43 C.F.R. § 3809.2(a) (stating that Part 3809 "applies [in part] to all operations authorized by the mining laws on public lands where the mineral interest is reserved to the United States")[11]. It is also worth noting the dual misleading aspects of Plaintiffs' repeated references to the Part 2920 regulations as the "regulations that apply to operations not authorized by the Mining Law." *See, e.g.*, ECF No. 71, at 47. In promulgating the Part 2920 regulations, BLM never contemplated that they could govern mining operations on BLM-managed public lands related to the removal of federal minerals. *See* 46 Fed. Reg. 5772-01 (Jan. 19, 1981); 45 Fed. Reg. 31,284 (May 12, 1980) (proposed rulemaking listing categories of major types of uses).  Moreover, Plaintiffs do not cite anything to support that the Part 2920 regulations, which are contained in Subchapter B-Land

---

[10] In addition to misstating the basis for BLM's decision, Plaintiffs also misrepresent the extent of BLM's decision, suggesting that BLM's approval of EML's plan of operations gave the operator the "Right to Permanently Occupy Public Lands."  ECF No. 57 at 25.  While BLM mine plans do not have a specific expiration date, the regulations make clear that the challenged BLM surface use authorization is not, in fact, "permanent," but rather remains effective only as long as EML is conducting mining operations, unless revoked earlier for failure to comply with the regulations.  *See* 43 C.F.R. § 3809.423; *see also id.* §§ 3809.401(b)(3)  (requiring mine plans to include a reclamation plan), 3809.590 (describing conditions for release of bonds after completion of reclamation).  While some mine features will certainly remain after closure, EML may "permanently occupy" these lands for mining purposes only by obtaining fee title to the lands.  *See* 30 U.S.C. § 29.

[11] Operations, as defined under subpart 3809 include "all functions, work, facilities, and activities on public lands in connection with prospecting, exploration, discovery and assessment work, development, extraction, and processing of mineral deposits locatable under the mining laws; reclamation of disturbed areas; and all other reasonably incident uses, *whether on a mining claim or not*[.]" 43 C.F.R. § 3809.5 (emphasis added).

13

1  Resource Management rather than Subchapter C-Minerals Management, would govern in

2  circumstances following a determination by BLM that mining operations are "not authorized by

3  the Mining Law."  Indeed, Plaintiffs' contention that in such circumstances BLM could have

4  authorized mining operations under the Part 2920 regulations stands in direct conflict with both

5  FLPMA and the regulations themselves. Part 2920 expressly applies as a catch-all provision,

6  only applicable if a proposed use "not specifically authorized under other laws or regulations"

7  and is "not specifically forbidden by law[,]" 43 C.F.R. § 2920.1-1. Based on the plain language

8  in Section 2920, BLM reasonably rejected Plaintiffs' assertion in its post-FEIS comment letter

9  that Part 2920 was applicable and appropriately authorized EML's mining plan under Part 3809.

   ### b.  BLM Appropriately Exercised its Discretion on Bonding Requirements

11  Plaintiffs also allege that BLM violated FLPMA by failing to estimate the project's

12  reclamation costs in the 2019 ROD. *See* Pls. Reply, ECF No. 71 at 48. BLM regulations do not

13  require a financial guarantee to be accepted and obligated by BLM until surface disturbing

14  activities will occur.  43 C.F.R. § 3809.412 (stating that operations may not commence until

15  BLM approves the plan of operations and the operator provides the financial guarantee required

16  under 43 C.F.R. § 3809.551). Contrary to Plaintiffs contentions, BLM's decision to omit

17  reclamation cost estimate ("RCE") is not without a "reasoned explanation".  Pls. Reply, ECF No.

18  71 at 49.  Circumstances had changed by the time BLM undertook its analysis for the 2019 FEIS.

19  As acknowledged by Plaintiffs, EML "stopped construction in mid-2013 due to unforeseen loss

20  of Project funding." Pls. Reply, ECF No. 71 at 50.  There are no planned imminent surface

21  disturbing activities, so BLM is well within its discretion to withhold an assessment of bonding

22  requirements until an accurate RCE can be determined. Indeed, any RCE would be premature at

23  this point due to the uncertain timeline of the project and the quickly shifting estimated costs for

24  reclamation in line with BLM regulations. 43 C.F.R. § 3809.552(a). Nothing in BLM's

25  regulations requires an RCE determination to be included in or even made before the issuance of

26  a ROD, and BLM is not bound by its internal policies. *McMaster v. United States*, 731 F.3d 881,

27  888-89 (9th Cir. 2013) ("BLM manuals are not legally binding." (citing *Schweiker v. Hansen*,

14

1    450 U.S. 785, 789-90 (1981)). Thus, BLM did not violate its regulations or FLPMA in deferring

2    an RCE determination.

3         Plaintiffs' assertions related to the Long-Term Funding Mechanism ("LTFM") similarly

4    fail. *See* Pls. Reply, ECF No. 71 at 49.  BLM's regulations do not require the establishment of a

5    trust fund or other LTFM, let alone require that it must be established at the time the ROD is

6    issued. *See* 43 C.F.R. §3809.552(c). Even though "BLM has determined that a LTFM *will be*

7    *required* for post-reclamation obligations (including long-term monitoring and mitigation),"

8    2012 ROD at 31, AR070349 (emphasis added), "BLM may identify the need for a trust fund or

9    other funding mechanism during plan review *or later*." *See* 43 C.F.R. §3809.552(c) (emphasis

10   added). BLM is entitled to discretion for *when* it determines bonding requirements for a project

11   based on the nature of enforcement and compliance actions between BLM and the party

12   providing the financial guarantee. *See* BLM 3809 Manual at 2-6 (Rel. 3-335) (Sept. 17, 2012).

13   Plaintiffs have failed to support their argument otherwise under BLM's regulations or FLPMA

14   and thus, the Court should reject Plaintiffs' claims.

15   **III.    BLM Adequately Analyzed the Impacts of the Project According to NEPA and**
         **Performed the Corrective Analysis Mandated by the Ninth Circuit**

16

17        Contrary to Plaintiffs' contentions, BLM's air and water quality impacts analysis

18   complied with NEPA and the Ninth Circuit's decision in the previous litigation.

19        **a.   BLM Took a "Hard Look" at the Impacts to Air Quality**

20        The Record reflects that, following the mandate of the Ninth Circuit, *See GBRW I*, 844

21   F.3d 1095, 1105 (9th Cir. 2016), BLM (1) quantified the cumulative air impacts of the Project

22   together with the Gold Bar, Ruby Hill, and Prospect Mountain mines and vehicle emissions; (2)

23   discussed the effects of other activities, such as oil and gas development, and those activities'

24   interactions with the Project; and (3) justified the use of a zero baseline for air pollutants. As

25   summarized in Federal Defendants Response Brief, the 2019 FSEIS explained more fully the

26   cumulative impacts of emission sources within the Cumulative Effects Study Area (CESA). *See*

27   AR066385; Defs. Brief at 16-17. Plaintiffs contend BLM should have expanded the CESA to

28

include every BLM decision within 1000 miles of the Project, without regard for the degree of impact those other decisions would have. This argument proposes an untenable standard with no basis in NEPA's "hard look" standard, and should be denied.

In the 2019 SEIS, BLM identified individual projects within the CESA, including existing and proposed mining operations that constitute major sources of criteria pollutants. *See* AR066385.  BLM then conducted a modeling analysis to determine the cumulative impacts of the combined emissions from the challenged action, present actions of the Gold Bar Project and the Ruby Hill Mine Project, and the reasonably foreseeable Prospect Mountain Mine Project. *Id*. Using the updated modeling tool, AERMOD version 1621r, BLM showed that the total ambient concentrations of pollutants for the Project, the reasonably foreseeable mines within the CESA, and background concentrations like vehicle emissions are below the National Ambient Air Quality Standards ("NAAQS") for each pollutant and averaging period.  *See* AR066385-86; *see also* AR066385-86 (explaining BLM's methodology).  BLM's analysis, in Table 4.1-1, also shows that the impacts from sources within CESA are cumulatively negligible due to the relative distance to the other projects and the localized nature of the emissions. This study and discussion adequately analyze the cumulative and reasonably foreseeable future impacts of mining in the CESA under NEPA and should be upheld.

Plaintiffs assert that BLM did not analyze the cumulative effects of all "nearby" oil and gas leasing decisions. But the Record discredits Plaintiffs' contention. As BLM explained, the supplemental air quality analysis tiers from and updates the 2012 FEIS, *see* AR066354, which discussed the reasonably foreseeable future actions from activities including oil and gas leasing and development, *see* AR069536-38. Plaintiffs' citation to oil and gas leasing cases are inapposite because they pertain to the discussion of cumulative impacts required for oil and gas leasing, not mining plans. BLM provided an "objective quantification of the impacts" from the existing and reasonably foreseeable mining activities in the region. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971-974 (9th Cir. 2006); *see Lands Council v. Powell,* 395 F.3d 1019, 1027 (9th Cir. 2005); 40 C.F.R. § 1508.7.  Moreover, the Battle Mountain Environmental

Assessment's reasonably foreseeable development scenario, 2019 Lease Sale EA 22 (Table 3), ARSUPP000165, is consistent with the 2019 FEIS determination that the overall potential for oil and gas exploration is "moderate to high" but within acceptable limits for the CESA. AR069538. BLM considered the impacts of other activities in the CESA on air quality and explained its position, in compliance with NEPA, so Plaintiffs claims should be denied.

**b. BLM Reasonably Determined the Baseline Air Quality**

The Record shows that BLM provided a thorough explanation for its use of a zero baseline value that does not contradict BLM's analyses for other mines in the CESA. After considering the Nevada Department of Environmental Protection Bureau of Air Quality Planning ("NDEP") recommendation, a contractor Air Sciences' analysis, and the EPA's comments, BLM concluded that the background concentrations of pollutants should be zero for modeling purposes. AR066376. This determination is entitled to deference—particularly because the decision required a high level of expertise. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005); *see also, Chem. Mfrs. Ass'n. v. EPA*, 28 F.3d 1259, 1265-66 (D.C. Cir. 1994) (noting that deference is owed to an agency's chosen methodology so long as it bears a "rational relationship between the [method] and [that] . . . to which it is applied") (citation omitted).

As explained in Defendant's Opening Brief, BLM provided a thorough discussion of how it reached its air quality baseline concentrations. *See* AR066373-84; *see also* AR066415-16 (NDEP analysis); AR060676-88 (Air Sciences' analysis).  Yet, Plaintiffs attack BLM's determination on the basis that other mines in the area have different baseline concentrations. This does not contradict and has no bearing on the Mt. Hope Project's baseline concentrations. Air pollution control regions in Nevada are based on geographical boundaries and hydrographic basins which can lead to different conditions even from valley to valley. 40 C.F.R 1508.7 (requiring BLM to include reasonably foreseeable future actions within the *geographic scope* and the timeframe of the analysis). For that reason, BLM rationally came to different conclusions for other mine projects. Moreover, data collected from neighboring states monitoring stations in

17

rural areas confirmed that a zero baseline concentration for $NO_2$, $SO_2$, and CO for rural Nevada was "reasonably justified." AR060687. In contrast, Plaintiffs have failed to cite to any authority that BLM's chosen methodology was unreasonable. Because BLM's methodologies were rationally connected to its conclusion, this Court should defer to its expertise and find that BLM compiled with NEPA's requirements.

### c. BLM Took a "Hard Look" at the Impacts to Water Resources

Plaintiffs further argue that BLM failed to consider impacts on (1) water resources due to the potential development of oil and gas leases; and (2) the PWR 107 springs due to mining activities.  Pls' Reply, ECF No. 71 at 35 and 42. Plaintiffs' argument is without merit. BLM provided analysis of cumulative impacts, including from the mining itself, oil and gas development, and other reasonably foreseeable future actions.  *See* AR069536-43. This analysis covered surface and ground water quality and quantity. *Id.*  Plaintiffs have failed to provide any citation to the record that significant quantities of water will be required for any purported future uses such as drilling for oil and gas.  Further, if a future lease did require "significant water removals" the onus would be on decision-makers for *that* decision to perform the additional NEPA analysis in light of the Mt. Hope Project's water usage, not the other way around.

The 2019 SEIS's discussion of the impacts to surface waters adequately analyzes the impacts to the waters of confirmed PWR 107 sites.  BLM explained that the impacts to surface waters would be the same as articulated in the 2012 FEIS (to which the 2019 FSEIS is tiered). *See* AR066364-72.  The 2012 FEIS discusses BLM's methodology for assessing impacts, including water flow modeling, and explained that impacts could include diminished surface water flow or, for springs located nearest to the open pit, a "reduc[tion] or elimination of water flow in perpetuity." AR068923.  Accordingly, BLM adequately considered the impacts to water resources and the Court should reject Plaintiffs' arguments to the contrary.

### d. BLM Adequately Analyzed Mitigation and Monitoring

The 2019 SEIS contains a "reasonably complete discussion of possible mitigation measures" in accordance with NEPA. *Robertson v Methow Valley Citizens Council,* 490 U.S.

332, 352 (1989); *see also* AR068923-53, AR066483-85; 42 U.S.C. § 4332(C)(ii). Notwithstanding these mitigation measures, Plaintiffs contend that the plan to mitigate impacts from the loss of surface and ground water is insufficient. PLs' Reply, ECF No. 71 at 45. The Court should refuse their argument because BLM met NEPA's "hard look" requirement.

NEPA does not impose "a substantive requirement that a complete mitigation plan be actually formulated and adopted," *Methow Valley* 490 at 352, or that "harms actually be mitigated," *S. Fork Band Council v. U.S. DOI,* 588 F.3d 718, 727 (9th Cir. 2009). The 2019 FSEIS satisfied NEPA's requirement to include "at least *some* evaluation of effectiveness." *Id.* The FEIS discusses several mitigation measures aimed at addressing the impacts to springs and streams—including a monitoring scheme to keep track of the status of spring and stream segments, water hauling, and piping in water from other locations to replace lost surface water— and it evaluates their effectiveness. *See* AR049893 (explaining surface water mitigation); AR049913 (discussing groundwater mitigation); AR066247 (describing the mitigation measures themselves for each of the springs and streams that might be impacted). Contrary to Plaintiffs statements, the Ninth Circuit did not determine that those measures were inadequate, *GBRW I,* 844 F.3d 1111, and BLM has since explained its analysis. BLM's discussion and evaluation of the effectiveness of these mitigation measures, *see* AR068904-39, thus suffices under NEPA.

## CONCLUSION

For the foregoing reasons, BLM's approval of the Mt. Hope Mine Project plan of operations adhered to the requirements of the Mining Law, FLPMA, and NEPA and should be upheld. Therefore, Federal Defendants respectfully request the Court deny Plaintiffs' Motion for Summary Judgment and grant Federal Defendants' Cross-Motion for Summary Judgment.

Respectfully submitted this 19th day of April, 2022.

TODD KIM,
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

1

2           */s/ Leilani Doktor*
          LEILANI DOKTOR, admitted to HI Bar

3           United States Department of Justice
          150 M Street NE

4           Washington, D.C. 20002
          Tel.: (202) 305-0447

5           Fax: (202) 305-0506

6           leilani.doktor@usdoj.gov

7           *Attorney for Federal Defendant*

8

9                     **CERTIFICATE OF SERVICE**

10

11       I hereby certify that on April 19, 2022, a true and correct copy of the above document

was electronically filed with the Clerk of Court using CM/ECF. Copies of the document will be

12 served upon interested counsel via the Notices of Electronic Filing that are generated by

CM/ECF.

13           */s/ Leilani Doktor*
          Leilani Doktor

14

15           *Attorney for Federal Defendant*

16

17

18

19

20

21

22

23

24

25

26

27

28