1
2
3
4

UNITED STATES DISTRICT COURT

5

DISTRICT OF NEVADA

6

* * *

7

GREAT BASIN RESOURCE WATCH; et al.,

Case No. 3:19-cv-00661-LRH-CSD

8

Plaintiffs,

ORDER

9

v.

10

UNITED STATES DEPARTMENT OF THE
INTERIOR; et al.,

11

Defendants,

12

EUREKA MOLY, LLC,

13

Defendant-Intervenor.

14

15        The present litigation follows a 2013 lawsuit in this district before U.S. District Court Judge

16   Robert C. Jones and an appeal to the Ninth Circuit Court of Appeals in which Great Basin Resource

17   Watch ("GBRW") and Western Shoshone Defense Project ("WSDP") challenged the Bureau of

18   Land Management's ("BLM") approval of the Mt. Hope Project.[1]  As a result of that litigation,

19   Judge Jones vacated BLM's record of decision regarding the Project and remanded to BLM.  On

20   remand, BLM approved the Project a second time.  Now joined by Progressive Leadership

21   Alliance of Nevada ("PLAN"), GBRW and WSDP challenge BLM's second approval of the

22   Project.  Before the Court are the plaintiffs', defendants', and defendant-intervenor's motions for

23   summary judgment.[2]  For the reasons explained below, the Court grants Plaintiffs' motion in part

24   and denies it in part.  Accordingly, the Court also grants in part and denies in part the Defendants'

25   motions.

26

---

[1] *Great Basin Res. Watch v. U.S. Dep't of Interior*, No. 3:13-cv-00078-RCJ-VPC, 2014 WL 3696661 (D. Nev. 2014);

27   *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095 (9th Cir. 2016).

[2] ECF Nos. 57, 68, 69.  In addition to the parties' briefing, American Exploration & Mining Association, submitted

28   an amicus brief.  ECF No. 73.  And the parties filed supplemental briefing regarding relevant authorities.  ECF Nos.
78, 85, 86, 89, 90.  The Court has fully considered all briefing and addresses it as needed within this order.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.     BACKGROUND

### A.  Factual Background

The Project is an eighty-year mining operation located near Eureka, Nevada.  AR06673–74.  Eureka Moly, LLC ("EML") intends to mine for molybdenite ore, which will produce recoverable molybdenum.  AR066773.  The Project will consist of "an 18- to 24- month construction phase, 44 years of mining and ore processing, 30 years of reclamation, and five years of post-closure monitoring."  AR066774.  And it will span across 21,523 acres of both private and public land, causing surface disruption to 8,355 acres.  *Id.*  EML holds 14 patented claims on the private land and approximately 1,550 lode mining claims and mill site mining claims on the public land.  *Id.*  The Project will consist of an open pit mine and ancillary facilities.  *Id.*

Throughout the Project, EML will use an open pit mining method and a flotation and roasting process to process the mined ore.  AR066773.  The estimated 966 million tons of molybdenite ore mined will produce approximately 1.1 billion pounds of recoverable molybdenum and approximately 1.7 billion tons of waste rock and 1 billion tons of tailings.  AR066774.  In addition, the Project will utilize dewatering in the open pit and will require ground water pumping in other areas.  AR066364.  These two actions will lower the water table in the vicinity of those facilities and will impact springs and streams.  *Id.*; AR066365.  BLM concluded that four of the springs within the Project area are considered PWR 107 springs.  AR066364.

### B.  Procedural Background

In 2013, GBRW and WSDP sued BLM, challenging BLM's approval of the Project.[3]  They alleged that BLM failed to protect lands withdrawn under Public Water Reserve 107 ("PWR 107"), violated the National Environmental Policy Act ("NEPA"), and violated the Federal Land Policy Management Act ("FLPMA").  *Great Basin Res. Watch*, 2014 WL 369661 at *2.  In a summary judgment order, the district court found in favor of the defendants on all issues.  *Id.* at 7–18.

On appeal, the Ninth Circuit held that BLM violated NEPA but declined to reach the PWR 107 claim and the FLPMA claim, reasoning that BLM should be given an opportunity to correct the NEPA violations "before challenges to the approval of the Project itself are entertained." *Great*

---

[3] PLAN was not a party in the first case.

1  *Basin*, 844 F.3d at 1101–11, 1111 n.10.  Although the court did not reach the PWR 107 claim, it

2  indicated that BLM should confirm whether four springs within the Project area are PWR 107

3  springs.  *Id.* at 1111.

4       On remand, the district court vacated the 2012 Record of Decision and remanded to the

5  BLM.  Subsequently, BLM issued a supplemental environmental impact statement, followed by a

6  new record of decision in 2019.  *See* AR066344; AR066770.  The 2019 Record of Decision

7  approved the Project.  AR066772.  Plaintiffs now challenge the 2019 Record of Decision, alleging

8  BLM violated PWR 107 and related laws, NEPA, and the FLPMA.

9  **II.**    **LEGAL STANDARD**

10       The Administrative Procedure Act governs judicial review of alleged violations of NEPA

11  and the FLPMA, *Or. Nat'l Res. Council Fund v. Brong*, 492 F.3d 1120, 1124–25 (9th Cir. 2007),

12  and requires a court to "hold unlawful and set aside agency action" if it is found to be "arbitrary,

13  capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

14  An agency's action is considered "arbitrary and capricious" when

15      the agency has relied on factors which Congress has not intended it to consider,
16  entirely failed to consider an important aspect of the problem, offered an
   explanation for its decision that runs counter to the evidence before the agency, or
   is so implausible that it could not be ascribed to a difference in view or the product
17  of agency expertise.

18  *350 Mont. v. Haaland*, 29 F.4th 1158, 1168 (9th Cir. 2022) (quoting *Motor Vehicle Mfrs. Ass'n of*

19  *U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  When reviewing agency

20  action under this standard, a court "may not substitute [its] judgment for that of the agency," and

21  must limit its review to "the grounds that the agency invoked when it took the action."  *Ctr. for*

22  *Biological Diversity v. U.S. Fish and Wildlife Serv.*, 33 F.4th 1202, 1216 (9th Cir. 2022) (internal

23  quotations omitted).  "This standard is highly deferential, presuming the agency action to be valid

24  and affirming the agency action if a reasonable basis exists for its decision."  *Indep. Acceptance*

25  *Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotation marks omitted).

26  **III.**    **DISCUSSION**

27       Plaintiffs seek summary judgment on their PWR 107, NEPA, and FLPMA claims.

28  Specifically, they argue that (1) BLM failed to protect water rights and withdrawn lands under

PWR 107; (2) BLM violated NEPA by failing to adequately analyze direct, indirect, and cumulative impacts, baseline conditions, and mitigation and related project impacts; and (3) BLM violated the FLPMA by failing to adequately prevent unnecessary or undue degradation of public resources and by failing to include the reclamation costs and financial assurances in the Record of Decision.  The Court addresses each argument in turn.

**A.  PWR 107**

Plaintiffs first assert that BLM failed to adequately protect federal water reserves that are located within the project area and thereby violated PWR 107 and related laws.

President Calvin Coolidge created PWR 107 by executive order in 1926 pursuant to his authority under the Pickett Act.  *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 966 (9th Cir. 2006); *United States v. Idaho*, 959 P.2d 449, 451 (Idaho 1998).  The executive order provided:

> It is hereby ordered that every smallest legal subdivision of the public land surveys which is vacant unappropriated unreserved public land and contains a spring or water hole, and all land within one quarter of a mile of every spring or water hole located on unsurveyed public land be, and the same is hereby, withdrawn from settlement, location, sale, or entry, and reserved for public use in accordance with the provisions of Sec. 10 of the [Stock Raising Homestead Act of 1916 ("SRHA")] and in aid of pending legislation.

*Hankins*, 456 F.3d at 966.  This withdrawn land remained subject to the Pickett Act, which provided that "all lands withdrawn under the provisions of this Act shall at all times be open to exploration, discovery, occupation, and purchase, under the mining laws of the United States, so far as the same apply to metalliferous minerals."  Act of June 25, 1910, Pub. L. No. 3030, *as amended* by Act of August 24, 1912, Pub. L. No. 316, ch. 369.[4]  Thus, PWR 107 withdrew qualifying springs and land but held them open to exploration, discovery, occupation, and purchase for metalliferous minerals as permitted by the mining laws.

In the previous litigation, Plaintiffs raised a PWR 107 claim before the district court and the Ninth Circuit.  The Ninth Circuit declined to address this claim, in part, because "the proper analysis of the PWR 107 claim turns in large part on whether" certain springs within the Project area are covered by PWR 107, but BLM's position on that issue was unclear.  *Great Basin*, 844

---

[4] The Pickett Act was later withdrawn in the FLPMA.  Pub. L. 94–579, 905 Stat. 2744 (1976) (codified at 43 U.S.C. §§ 1701 *et seq.* (1986)).  All withdrawals in force on the date of enactment remain in force until modified in accordance with the FLPMA or other applicable law.  *Id.*

F.3d at 1111.  On remand, the BLM examined several springs within the Project area and determined that four springs and their surrounding land are covered by PWR 107.[5]  AR066362.

Plaintiffs now allege that BLM failed to adequately protect the PWR 107 springs and surrounding land because it approved EML's proposal to permanently dump its waste rock on the land even though EML does not have a valid mining claim for those lands and the lands do not contain metalliferous minerals.  In turn, Defendants argue that the Pickett Act's exception that withdrawn lands remain open for exploration and occupation for metalliferous minerals as permitted by the Mining Law applies, and that EML has a statutory right under the Mining Law to occupy and use open lands for its waste rock and tailings facilities.  Notably, the parties agree that the four springs and the surrounding land qualify for PWR 107 protection, that molybdenite ore qualifies as a metalliferous mineral, and that no mining will occur on the land.  The parties' main disagreement focuses on whether BLM can occupy the land that qualifies for PWR 107 protection by dumping waste rock on it.  The Court agrees with Plaintiffs that BLM cannot do so.[6]

PWR 107 withdrew qualifying springs and their surrounding land "to prevent monopolization of water needed for domestic and stock watering purposes." *Hankins*, 456 F.3d at 966.  They, however, remained open to occupation relating to metalliferous minerals as the mining laws permitted.  Plaintiffs claim that to qualify for this exception to the PWR 107 withdrawal, there must be valuable deposits of metalliferous minerals on the lands.

Although this exception, found in the Pickett Act, does not specifically mention the necessity of a valuable mineral deposit on the withdrawn land, Plaintiffs' claim is correct.  The Pickett Act explicitly references the mining laws as what governs whether the lands remain open for occupation pertaining to metalliferous minerals, requiring the Court to look to the Mining Law of 1872.  Section 22 of the Mining Law of 1872 states:

---

[5] BLM determined that the Garden Spring (Spring 597), an unnamed spring (Spring 604), the Mount Hope Spring (Spring 619), and the Lone Mountain Spring (Spring 742) are all PWR 107 springs.  AR066362–63.

[6] The Court finds that the PWR 107 claim and all related arguments regarding the Mining Law and other relevant laws are properly before the Court.  Although the district court in the first round of litigation found when addressing the PWR 107 claim that determining mining claim validity was unnecessary, Plaintiffs raised the PWR 107 claim on appeal.  In addition, as explained below, the Ninth Circuit has issued a new binding opinion that addresses the prerequisites for occupying land under the Mining Law.

Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States … under regulations prescribed by law ….

30 U.S.C. § 22.

In *Center for Biological Diversity v. United States Fish and Wildlife Service*, the Ninth Circuit recently explained that Section 22 has two clauses. 33 F.4th 1202, 1219 (2022) [hereinafter *Rosemont*]. The first clause requires that government lands "shall be 'free and open to *exploration* and purchase' of 'valuable mineral deposits.'" *Id.* at 1219 (emphasis in original). The second clause "provides that government lands 'in which they [*i.e.*, valuable mineral deposits] are found' shall be free and open to '*occupation* and purchase.'" *Id.* (alteration and emphasis in original). "That is, the right of 'occupation' depends on valuable minerals having been 'found' on the land in question. If no valuable minerals have been found on the land, Section 22 gives no right of occupation beyond the temporary occupation inherent in exploration," *id.* (citing 30 U.S.C. § 23, 26), because "validity of a mining claim is a necessary prerequisite to post-exploration occupancy of a claim. A claim is valid only if valuable minerals have been found on the claim," *id.* at 1217–18.

The Defendants attempt to distinguish this case from *Rosemont*, primarily arguing that *Rosemont* involved a different federal agency that has a different organic statute and regulations.[7] As both parties acknowledge, *Rosemont* involved the Forest Service rather than the BLM. *Id.* at 1207. But this difference has no bearing here. When discussing Section 22, the court made no reference to Forest Service's regulations but rather focused exclusively on the text of the statute. *Id.* at 1218–21. BLM offers, and the Court finds, no reason to depart from *Rosemont*'s interpretation of Section 22. Another court in this district recently reached the same conclusion. *Bartell Ranch LLC v. McCullough*, 3:21-cv-00080-MMD-CLB, 2023 WL 2226849, at *6–11 (D. Nev. Feb. 6, 2023) (applying *Rosemont*'s holding to a mining project authorized by BLM). Thus,

---

[7] Defendants attempt to distinguish this case from *Rosemont* also on the ground that the plaintiffs in *Rosemont* brought a claim challenging the agency's compliance with the Mining Law itself. It is true that the Plaintiffs in this case do not raise a claim under the Mining Law, but the Court finds that PWR 107 and the Pickett Act require it to look to the Mining Law to determine to what extent EML may occupy the PWR 107 lands and what the prerequisites of that occupation are.

the Court finds that *Rosemont*'s interpretation of Section 22 is binding on this Court. *Rosemont* therefore requires a valid mining claim, which depends upon the discovery of a valuable mineral deposit of metalliferous minerals on the PWR 107 lands, for the Pickett Act exception to apply.

Like the defendant in *Rosemont*, BLM and EML argue that Section 22 permits EML to occupy the PWR 107 land with waste rock during that period because the occupancy will not be permanent. In *Rosemont*, the Forest Agency—in a near identical argument to BLM's—argued that occupation would not be permanent because Rosemont would not have authorization to occupy the lands after mining ends and reclamation is completed. "Certainly," the Forest Agency acknowledged, "the lands will be changed, but that does not preclude other meaningful uses after mining reclamation." *Id.* The Ninth Circuit found that the Forest Agency's argument "does violence to the English language." *Id.* at 1221. Rosemont proposed to bury thousands of acres of National Forest land beneath a 700-foot-deep layer of waste rock. *Id.* "Under any ordinary definition, the layer of waste rock will 'occupy' the land on which it sits, and will do so permanently. No person or structure will ever again touch the surface of that land." *Id.*

The Court finds no meaningful difference between the Forest Agency's argument in *Rosemont* and BLM's argument here. EML seeks to dump its waste rock on the PWR 107 lands and leave it there permanently. Although EML's authorization to use the land will expire when the Project is complete, the waste rock will remain. Thus, EML's occupation of the PWR 107 lands will be permanent. *Rosemont* requires that to permanently occupy the land as EML proposes, valuable deposits of minerals must exist. Moreover, "discovery of valuable minerals is essential to the right to *any* occupancy—temporary or permanent—beyond the occupancy necessary for exploration." *Id.* at 1220.

Here, however, the record contains no evidence that the PWR 107 springs or surrounding lands contain molybdenite ore or any other metalliferous mineral. BLM admits that it made no attempt to determine whether EML's mining claims are valid. ECF No. 25 at 22 ¶143. And, as Plaintiffs point out, the fact that EML plans to use this land to dump its waste rock suggests that the land does not contain the requisite valuable mineral deposits. *Cf.* AR068712 (explaining that this land was chosen as the location for the waste rock in part because of an "absence of suitable

mining reserves underneath the waste rock disposal facilities").  On this record, the Court cannot conclude that the PWR 107 springs and lands within the Project area meet the prerequisite to occupation under the mining laws.  And accordingly, the Court cannot conclude that the Pickett Act exception applies.

The defendants also attempt to rely on 30 U.S.C. § 612 to support the proposition that EML can use the PWR 107 lands for uses that are "reasonably incident" to mining the minerals in the pit.  This argument is also foreclosed by *Rosemont*.  *See Rosemont*, 33 F.4th at 1218 ("[N]either Section 612 nor the Mining Law provides Rosemont with the right to dump its waste rock on thousands of National Forest land on which it has no valid mining claims.").  "Section 612 of the Multiple Use Act does not authorize uses of mining claims beyond those authorized by the Mining Law. … Section 612 'did not change the lands to which the Mining Law applied or specify where mining operations may or may not occur.'"  *Id.*  BLM cannot skirt the Mining Law requirement that valuable mineral deposits must be found in order to occupy the land by relying on Section 612's authorization of using the lands for uses reasonably incident to mining.

As explained above, the Court finds that the record does support the conclusion that the Pickett Act's exception to the withdrawal of land under PWR 107 applies.  Because BLM has not prepared any analysis regarding whether valuable mineral deposits exist on the PWR 107 lands, the Court finds that it is appropriate to remand to the agency so that it can conduct the proper analysis in the first instance.  Because that analysis may affect BLM's decision regarding the approval of the Project, the Court declines to reach Plaintiffs' FLPMA claim as it relates to the PWR 107 lands and Plaintiffs' arguments regarding the Stock Raising Homestead Act of 1916.

**B.  NEPA**

Plaintiffs also challenge BLM's approval of the Project under NEPA, alleging that (1) BLM failed to fully consider all direct, indirect, and cumulative impacts of the proposed action; (2) BLM failed to fully analyze the Mt. Hope Project's baseline air quality conditions; and (3) BLM failed to adequately analyze mitigation and related project impacts.

NEPA, a procedural statute, requires "federal agencies to consider the environmental impact of any major federal action."  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462

U.S. 87, 89 (1983). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Its aim is to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and "that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 924 (9th Cir. 2015) (quotations omitted).

Included in NEPA is the requirement to prepare an environmental impact statement ("EIS") "[f]or major federal actions significantly affecting the quality of the human environment." *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004). To satisfy NEPA, the EIS must include "a thorough analysis of the potential environmental impacts that provides full and fair discussion of significant environmental impacts and informs decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.*

In the Ninth Circuit, a reviewing court employs a "rule of reason" standard when reviewing an EIS. *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997) (per curiam). This standard requires that "an EIS contain[] a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Id.* In other words, the agency must take a "hard look" at the impacts of its action. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008).

1. Baseline Values for Air Pollutants

Plaintiffs argue that BLM failed to adequately assess the baseline air quality conditions within the Project area. Specifically, Plaintiffs fault BLM for not obtaining site specific data and for its decision to set the baseline values for CO, $NO_2$, and $SO_2$ as zero.

This portion of BLM's analysis was also challenged in the previous litigation. The Ninth Circuit affirmed BLM's decision to rely on baseline values from other rural areas because no actual baseline values were available for the project area. *Great Basin*, 844 F.3d at 1102. But the court criticized BLM's analysis regarding several pollutants because BLM insufficiently supported its

decision to use zero as a baseline value for those pollutants. *Id.* at 1103–04. BLM had relied on an email from a Nevada Department of Environmental Protection's ("NDEP") official that did not explain how or why NDEP arrived at its recommendation of using zero as the pollutants' baseline value. *Id.* at 1103. Instead, with no further explanation or independent scrutinization of the estimate, BLM adopted the recommendation and used zero as the pollutants' baseline value. *Id.* Finding that that the air impacts analysis was essentially immune from public scrutiny, the court concluded that BLM's air impacts analysis was inadequate. *Id.* at 1104.

On remand, BLM did not obtain any site-specific data for the baseline values. BLM did, however, obtain additional explanation from the NDEP official for his recommendation that zero should be used for the baseline values for CO, $NO_2$, and $SO_2$. The NDEP official explained:

> The determination of appropriate background concentrations is a complex issue especially in the remote areas of Nevada. First, ambient monitoring is sparse and seldom representative on large spatial scales. The [Bureau of Air Quality Planning] BAQP maintains a monitoring network for the State of Nevada; however, there are no monitors for these pollutants in remote areas. Second, human activities in the remote areas of Nevada are considered to be an insignificant influence to ambient air quality. To the extent that these pollutants are generated by anthropogenic activities, their background concentrations are not significantly different from zero when used for modeling purposes.

AR066415. Alternatively, he explained, background concentrations from representative sites can be obtained, taking into account terrain and microclimatic conditions. *Id.* Sites far away, such as those in adjacent states, can be used as representative states but caution should be exercised when looking at those because they may not be representative. *Id.* The NDEP official concluded by explaining that the BAQP has successfully used a zero-background concentration level (baseline value) for CO, $NO_2$, and $SO_2$ for air dispersion modeling in remote areas of Nevada for many years. *Id.*

In addition, Air Sciences, Inc. conducted supplemental analyses regarding the concentration levels and the cumulative air impacts, *see* AR070556–71, which was largely adopted by the BLM in the 2019 Final Supplemental Environmental Impact Statement ("FSEIS"), *see* AR066373–84. These analyses reached the same conclusion as the NDEP official: the baseline value for the pollutants should be zero.

///

10

The Court finds that BLM has provided a sufficient explanation for its use of zero as the baseline value for the pollutants.  As BLM explained, the Project is located in a rural area that has no development or major roads and does not have a monitoring station.  AR066375.  Because of the lack of site-specific data, the Bureau of Air Pollution Control was contacted, who suggested zero as the background concentrations for the pollutants.  *Id.*  In addition, BLM and Air Sciences looked at representative sites to obtain baseline values.  AR066375–84.  Given the rural nature of the Project, BLM identified monitoring stations that could be considered "rural."  Only four monitoring stations in Nevada are located relatively far away from major population centers and could be considered rural.  AR066380.  But those stations, unlike the Project area, are influenced by urban activities, traffic, and power plant emissions, making them unrepresentative of rural settings.  *Id.*

The lack of helpful Nevada specific data led BLM to assess monitoring stations in nearby states, AR066381, resulting in BLM looking at Yosemite and White Mountain specifically, AR066383.  Based on its review of the data from those monitoring stations, along with the guidance from NDEP, the BLM concluded that it is reasonably justified to use a zero-baseline concentration for $CO$, $NO_2$, and $SO_2$ in the Project area.  Moreover, the EPA trends data showed that concentrations of $CO$ and $NO_2$ decreased significantly in the California/Nevada area.  AR066384.

Based on this record, the Court is satisfied that BLM took a "hard look" at the baseline values for $CO$, $NO_2$, and $SO_2$, and adequately explained its reasoning for using zero as the baseline level.  BLM was not required to obtain site-specific data to satisfy NEPA.  And its review presented a thorough discussion explaining how it reached its decision to use zero as the baseline value and why that was consistent with the rural nature of the Project.  Thus, BLM did not violate NEPA when reviewing the baseline values for pollutants.

2. <u>Cumulative Impacts</u>

Plaintiffs next argue that BLM failed to consider the cumulative impacts of oil and gas development to the air and water.  NEPA requires BLM to consider all cumulative impacts, i.e.,

1
2
3

the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

4    40 C.F.R. § 1508.7.  "Reasonably foreseeable future actions" are "those Federal or non-Federal

5    activities not yet undertaken, for which there are existing decisions, funding, or identified

6    proposals."  36 C.F.R. § 220.3.  "Although 'projects need not be finalized before they are

7    reasonably foreseeable,' *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078–

8    79 (9th Cir. 2011), they must be more than merely 'contemplated.'  *Kleppe v. Sierra Club*, 427

9    U.S. 390, 410 n.20 (1976)."  *League of Wilderness Defs./Blue Mountains Biodiversity Project v.*

10   *Connaughton*, 752 F.3d 755, 762 (9th Cir. 2014).  This standard requires BLM to provide "a

11   sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis

12   about how these projects, and differences between the projects, are thought to have impacted the

13   environment."  *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603

14   (9th Cir. 2010).

15        In the previous litigation, the Ninth Circuit found BLM's cumulative air impacts analysis

16   deficient.  The court explained that "BLM made no attempt to quantify the cumulative air impacts

17   of the Project together with the Ruby Hill Mine and vehicle emissions.  Nor did the BLM attempt

18   to quantify or discuss in any detail the effects of other activities, such as oil and gas development,

19   that are identified elsewhere in the Final Environmental Impact Statement ("FEIS") as potentially

20   affecting air resources."  *Great Basin*, 844 F.3d at 1105.

21        On remand, BLM included the Ruby Hill Project, the Gold Bar Project, and the reasonably

22   foreseeable future action of the Prospect Mountain Mine Project in its cumulative impacts analysis

23   for air resources.  AR066150–51.  BLM also confirmed that there are no gas developments within

24   the cumulative effects study area ("CESA") and explained that "vehicular emissions are generally

25   included in background concentrations and are not specifically included in air models for NEPA

26   analysis."  AR066150.

27   ///

28   ///

12

Plaintiffs now primarily take issue with BLM's analysis regarding cumulative impacts of oil and gas development on air and water.[8]  Specifically, Plaintiffs argue that BLM should have considered the cumulative impacts on air quality identified within BLM's Environmental Assessment for its July 2019 Oil and Gas Lease Sale ("2019 Lease Sale EA).[9]  This EA "ma[d]e some general assumptions about what type of activities could occur on oil and gas leases, and provide[d] general analysis of potential impacts associated with those types of activities."  ECF No. 50-12 at 4–5.  And it estimated that twenty-five wells would be drilled and 65–100 acres of surface disturbance associated with potential oil and gas exploration and production activities could be expected to occur in the [Battle Mountain] District" within the next ten years.  *Id.* at 5.

This Court's review of BLM's analysis regarding reasonably foreseeable future actions is governed by a rule of reason standard, which is highly deferential to BLM to determine what the proper scope of the EIS is, *Or. Nat. Res. Council*, 109 F.3d at 526, and the Court must uphold BLM's decision if it is supported by a reasonable explanation, *Indep. Acceptance Co.*, 204 F.3d at 1251.  Under this standard, the Court agrees with the Defendants that BLM did not act arbitrarily and capriciously by not considering the 2019 Lease Sale EA and potential oil and gas developments.

Here, BLM made a reasonable decision to not include potential oil and gas developments in its cumulative impacts analysis considering that there are currently no oil and gas developments in the CESA and no applications for permits to drill.  As BLM explained in its response to public comments,

> [t]he BLM confirmed, through the lack of any Applications for Permit to Drill since 2012, that there were no oil and gas developments within the Air Quality CESA. The lack of Applications for Permit to Drill leads the agency to conclude that it is unlikely that oil and gas development will occur within the Air Quality CESA in the future.  Although the 2012 Final EIS stated there was a moderate to high potential for oil and gas development, the BLM has now revised its opinion to

---

[8] Plaintiffs briefly argue that the only reasonably foreseeable future action BLM considered was the Prospect Mountain Mine.  Plaintiffs are correct that the Prospect Mountain Mine is the only reasonably foreseeable mining project that BLM considered.  However, Plaintiffs fail to identify any other project that BLM should have considered and focus instead on potential oil and gas development.

[9] The Environmental Protection Agency identified this EA in its September 23, 2019, letter addressing concerns about the FSEIS for the Project.  AR066756.  This EA was completed by the same office that approved the Mount Hope Project.

1    conclude that there is a low probability and thus the BLM did not include such in
     the revised air quality modeling for the Final SEIS.

2    AR066206.  Moreover, no oil and gas projects have been proposed, and as BLM explained it

3    appears unlikely that any will be considering the lack of applications within the last ten years.  At

4    this point, BLM's consideration of oil and gas development would be speculative and premature.

5    NEPA does not require BLM to conduct such analysis.

6         Thus, the Court finds that BLM's consideration of the cumulative impacts of oil and gas

7    development on air quality satisfies NEPA.  For the same reasons, the Court finds that BLM

8    satisfied the NEPA requirements for analysis regarding the cumulative impacts of oil and gas

9    development on water.

10        3.   Mitigation Measures

11        Plaintiffs' last NEPA allegation is that BLM failed to adequately analyze mitigation and

12   related impacts to surface and ground water quantity.

13        NEPA requires an EIS to "include appropriate mitigation measures not already included in

14   the proposed action or alternatives," 40 C.F.R. § 1502.14(f), and to "include discussions

15   of … [m]eans to mitigate adverse environmental impacts (if not fully covered under

16   § 1502.14(f))," 40 C.F.R. § 1502.16(h).  The EIS must contain "a reasonably complete discussion

17   of possible mitigation measures" to avoid "undermin[ing] the 'action-forcing' function of NEPA."

18   *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).  But a complete

19   mitigation plan does not have to be actually formulated and adopted.  *Id.*; *South Fork Band Council*

20   *of W. Shoshone of Nev. v. U.S. Dep't. of Interior*, 588 F.3d 718, 727 (9th Cir. 2009).  It is essential

21   that the mitigation plan contain "at least *some* evaluation of effectiveness."  *Id.*

22        The mitigation measures addressed in the 2012 FEIS, from which the 2019 FSEIS is tiered,

23   include site-specific mitigation strategies for surface water and ground water resources that

24   addressed how much each spring or stream's flow would be reduced and how the water would be

25   replaced.   AR068927–40; AR068941–51; AR068962.   As the 2012 FEIS explained, the

26   replacement water needed "would at least initially come from EML's existing water rights if

27   additional water rights have not yet been secured."  AR068924.  The 2012 FEIS also discussed

28

1    what monitoring measures and mitigation triggers were associated with each spring and stream, as

2    well as the effectiveness of each site-specific mitigation plan.  *Id.*; AR068923–25.

3         During the first round of litigation, the Ninth Circuit noted that "the analysis of ground

4    water pumping in the FEIS does *not* take into account the roughly 200 gallons per minute needed

5    to replace depleted spring and stream water—that error appears to be quite small, raising questions

6    about whether it might be harmless."  *Great Basin*, 844 F.3d at 1110.  The court determined that

7    it was roughly a three percent error.  *Id.* n.9.  Because none of the parties briefed harmlessness,

8    and the disposition of the appeal did not depend on the resolution of this issue, the Court declined

9    to reach it.  *Id.* at 1111.

10        Now, Defendants assert that the failure to account for the replacement water is harmless

11   error.  When an agency fails to comply with NEPA, the harmless error analysis requires the Court

12   to analyze "whether the error caused the agency not to be fully aware of the environmental

13   consequences of the proposed action, thereby precluding informed decisionmaking and public

14   participation, or otherwise materially affected the substance of the agency's decision."  *Idaho Wool*

15   *Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016).  "In the context of agency review,

16   the role of harmless error is constrained.  The doctrine may be employed only when a mistake of

17   the administrative body is one that clearly had no bearing on the procedure used or the substance

18   of the decision reached."  *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1090–91

19   (9th Cir. 2011) (quotation omitted).

20        Plaintiffs allege that BLM's failure to include the replacement water had a bearing on the

21   substance of the decision reached by BLM.  But the amount of water that the error amounts to is

22   relatively minor to the overall mitigation plan.  Moreover, Plaintiffs have not advanced any

23   arguments supporting that BLM's failure to consider that replacement water precluded informed

24   decisionmaking and public participation.  Overall, the mitigation plan is substantially complete,

25   analyzing site-specific mitigation plans, the water quality of the replacement waters, and the

26   effectiveness of the plan.  Thus, the Court concludes that BLM did not violate NEPA.[10]

27

28   [10] Relying on their earlier arguments, Plaintiffs also cursorily claim that BLM failed to prepare or consider mitigation measures for the Project's air pollution.  But as explained above, the Court finds that BLM's consideration of air quality and baseline conditions satisfied NEPA.

1    **C. FLPMA**

2        Plaintiffs allege that BLM violated FLPMA because it violated PWR 107 and NEPA,

3 causing it to fail to prevent unnecessary or undue degradation of public resources.  FLPMA

4 requires BLM to "take any action necessary to prevent unnecessary or undue degradation of the

5 lands" before approving a project.  43 U.S.C. § 1732(b); 43 C.F.R. § 3809.411(d)(3)(iii).   As

6 explained above, the Court declines to reach Plaintiffs' FLPMA claim as it relates to the PWR 107

7 lands.  And the Court has found that BLM did not violate NEPA.  Because Plaintiffs' FLPMA

8 claim depends upon their success on the NEPA claim, their FLPMA claim necessarily fails.

9    **D. Reclamation Costs and Financial Assurances**

10        Lastly, Plaintiffs allege that BLM's authorization of the Project was improper because

11 BLM did not require a reclamation cost estimate or reclamation bond for approved right of ways

12 prior to approving the Project, and BLM did not require a long-term funding mechanism ("LTFM")

13 as a condition of approval.

14        BLM's regulations require that all activities in the mining plan be covered by a financial

15 guarantee that "must cover the estimated cost as if BLM were to contract with the third party to

16 reclaim your operations according to the reclamation plan, including construction and maintenance

17 costs for any treatment facilities necessary to meet Federal and State environmental standards."

18 43 C.F.R. § 3809.552(a).  The reclamation cost of determination is the amount of money that must

19 be covered by the financial guarantee.  43 C.F.R. § 3809.554.  "[S]urface disturbing activity cannot

20 begin until the financial guarantee has been accepted and obligated by BLM."   43 C.F.R.

21 § 3809.412.

22        Here, BLM stated in the 2019 Record of Decision that "EML will be required to provide a

23 financial guarantee consistent with the Plans of Operations," AR066835, and "EML will be

24 required to provide a bond" in accordance with 43 C.F.R. § 2805.20(a) and (3).  Plaintiffs primarily

25 take issue with these statements because BLM, unlike in 2012, did not provide the reclamation

26 cost estimate or determine the reclamation costs for the approved right of ways in the Record of

27 Decision.

28 ///

The Court agrees with BLM that the governing regulations do not specify when such a determination must be made.  Although it must be made before operations begin, nothing within the regulations require a reclamation cost estimate or a reclamation bond for approved right of ways prior to approval of a project.  Seeming to recognize this, Plaintiffs attempt to rely on a BLM internal policy that requires the decision to state the estimated reclamation cost determination and the financial guarantee amount.  BLM Surface Management Handbook H-3809-1, at 4-45.  Although this policy does support Plaintiffs' position, BLM's internal policies are not legally binding.  *McMaster v. United States*, 731 F.3d 881, 888–89 (9th Cir. 2013).  Thus, it was not improper for BLM to issue the Record of Decision without including the reclamation cost estimate or a reclamation bond for the right of ways.

Similarly, Plaintiffs' argument about the necessity of a LTFM fail.  BLM did determine that "a LTFM will be required for post-reclamation obligations (including long-term monitoring and mitigation) associated with the closure process of the Mount Hope Project."  AR066835.  But BLM's regulations give BLM the discretion to require a trust fund or other long term funding mechanism, and do not specific when it must be established.  43 C.F.R. § 3809.552(c).

///
///
///
///
///
///
///
///
///
///
///
///
///

1   **IV.     CONCLUSION**

2           IT IS THEREFORE ORDERED that Plaintiffs' motion for summary judgment (ECF No.

3   57) is granted in part and denied in part.

4           IT IS FURTHER ORDERED that the Defendants' cross-motions for summary judgment

5   (ECF Nos. 68 and 69) are granted in part and denied in part.

6           IT IS FURTHER ORDERED that the Federal Defendants' motion for leave to file a

7   response to ECF No. 89 (ECF No. 90) is granted.

8           IT IS FURTHER ORDERED that the BLM's 2019 Record of Decision is vacated and

9   remanded to the BLM.

10          IT IS FURTHER ORDERED that the Clerk of the Court shall accordingly enter judgment

11  and close this case.

12          IT IS SO ORDERED.

13          DATED this 31st day of March, 2023.

14

15                                                   _____

16                                                   LARRY R. HICKS
                                                     UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28